Nos. 24-5374, 24-5375

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
—————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JOHN BRUNST AND SCOTT SPEAR,

*Defendant-Appellants.*

—————————

On Appeal from the United States District Court for the District of
Arizona, The Honorable Diane J. Humetewa, Presiding.
CR No. 2:18-cr-00422-DJH

—————————

**APPELLANTS JOHN BRUNST AND SCOTT SPEAR'S JOINT MOTION
FOR BAIL PENDING APPEAL UNDER FEDERAL RULE OF
APPELLATE PROCEDURE 9 AND CIRCUIT RULE 9-1.2**

—————————

Gary S. Lincenberg
Gopi K. Panchapakesan
Michael C. Landman
BIRD, MARELLA, RHOW,
LINCENBERG, DROOKS &
NESSIM, LLP
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067-2561
Telephone:  (310) 201-2100
glincenberg@birdmarella.com
gpanchapakesan@birdmarella.com
mlandman@birdmarella.com

*Attorneys for Defendant-Appellant
John ("Jed") Brunst*

Alyssa D. Bell
COHEN WILLIAMS LLP
724 South Spring Street, 9th Floor
Los Angeles, CA 90014
Telephone:  (213) 232-5160
abell@cohen-williams.com

*Attorneys for Defendant-Appellant
Scott Spear*

1

Pursuant to 18 U.S.C. § 3143(b), Federal Rule of Appellate Procedure 9(a), and Circuit Rule 9-1.2(a), Defendant-Appellants Scott Spear and John Brunst (hereinafter, "Appellants") hereby move for bail pending appeal. Appellants are currently serving the 120-month sentences imposed in this case. They moved for bail pending appeal before the district court, and the district court denied their motions on August 28, 2024. (*See* Declaration of Alyssa D. Bell ¶ 18; Ex. O at 242-45.)

This motion is based upon the attached memorandum of law, declaration of counsel, exhibits, and any further briefing that the Court may receive or request. Pursuant to Federal Rule of Appellate Procedure 28(i), Appellants hereby join in the arguments set forth in Codefendant and Appellant Michael Lacey's forthcoming motion for bail pending appeal. (*See* Case No. 24-5376.) The government opposes relief.

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................1

FACTUAL BACKGROUND AND PROCEDURAL HISTORY ..........................5

STANDARD OF REVIEW ....................................................................11

LEGAL STANDARD............................................................................11

ARGUMENT .....................................................................................12

I.     APPELLANTS ARE NOT A FLIGHT RISK OR A DANGER.........12

II.    APPELLANTS' APPEALS ARE NOT FOR THE PURPOSES OF DELAY. ...........................................................................13

III.    APPELLANTS' APPEALS WILL RAISE SUBSTANTIAL QUESTIONS THAT, IF RESOLVED IN THEIR FAVOR, WOULD RESULT IN AN ACQUITTAL OR A NEW TRIAL. .......13

      A.    It is "fairly debatable" whether the First Amendment bars Appellants' convictions. ............................................14

      B.    It is "fairly debatable" whether the government failed to prove specific intent.................................................20

      C.    It is "fairly debatable" whether the district court's First Amendment jury instructions were erroneous. ..........24

      D.    It is fairly debatable whether the district court erred in sustaining Appellants' convictions of an impermissible boundless conspiracy. .............................................26

      E.    It is fairly debatable whether the district court violated Appellants' due process rights by precluding evidence of their good faith. ..........................................................29

          1.    Backpage's responses to state attorneys general letters................................................................31

          2.    Good faith reliance on federal court decisions..............33

               i.    *Dart* litigation ......................................33

         ii.     Federal opinions recognizing First
Amendment rights ................................................36

     3.     Transparency with financial institutions ........................38

F.    It is fairly debatable whether the district court erred in
denying Appellants' motion to dismiss for outrageous
government misconduct regarding the government's
privilege invasion and violation of Judge Logan's order. ........40

G.    It is fairly debatable whether the district court violated
Appellants' Sixth Amendment Right to confront Ferrer. .........43

H.    It is fairly debatable whether the district court erred in
finding that the money laundering counts traced to the
Travel Act conspiracy. .............................................46

CONCLUSION ....................................................................46

CERTIFICATE OF COMPLIANCE .......................................................49

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ashcroft v. Free Speech Coalition*,
    535 U.S. 234 (2002) ........................................................................14

*Backpage.com v. Dart*,
    807 F.3d 229 (7th Cir. 2015), *cert. denied*, 137 S. Ct. 46 (2016) ................ *passim*

*Backpage.com, LLC v. Cooper*,
    939 F. Supp. 2d 805 (M.D. Tenn. 2013) .............................................17

*Backpage.com, LLC v. Hoffman*,
    No. 13-CV-03952 DMC JAD, 2013 WL 4502097 (D.N.J. Aug. 20, 2013) .......18

*Backpage.com, LLC v. McKenna*,
    881 F. Supp. 2d 1262 (W.D. Wash. 2012)................................... *passim*

*Banks v. Dretke*,
    540 U.S. 668 (2004) ........................................................................43

*Beech Aircraft Corp. v. Rainey*,
    488 U.S. 153 (1988) ........................................................................32

*Burr v. Sullivan*,
    618 F.2d 583 (9th Cir. 1980) ............................................................43

*Bursey v. United States*,
    466 F.2d 1059 (9th Cir. 1972) ..................................................... 14, 46

*California v. Ferrer*,
    2016 WL 7237305 (Cal. Super. Ct. 2016)...................................... 18, 19

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
    128 F. Supp. 3d 597 (E.D.N.Y. 2015) ..................................................24

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
    868 F.3d 104 (2d Cir. 2017)...................................................... 16, 24

*Doe v. Backpage.com, LLC*,
    104 F. Supp. 3d 149 (D. Mass. 2015), *aff'd*, 817 F.3d 12 (1st Cir. 2016),
    *cert. denied*, 137 S. Ct. 622 (2017) ....................................................19

*Dunagin v. City of Oxford*,
    718 F.2d 738 (5th Cir. 1983) ................................................................17

*Eimann v. Soldier of Fortune Mag., Inc.*,
    880 F.2d 830 (5th Cir. 1989) ...............................................................16

*Greater Philadelphia Chamber of Com. v. City of Philadelphia*,
    949 F.3d 116 (3d Cir. 2020)................................................ 16, 24

*IMDb.com Inc. v. Becerra*,
    962 F.3d 1111 (9th Cir. 2020) ........................................... 15, 16, 24

In *Woodhull Freedom Found. v. United States*,
    72 F.4th 1286 (D.C. Cir. 2023) ...........................................................21

*Rosemond v. United States*,
    572 U.S. 65 (2014)................................................................................23

*Skilling v. United States*,
    561 U.S. 358 (2010)..............................................................................25

*Thunder Studios, Inc. v. Kazal*,
    13 F.4th 736 (9th Cir. 2021) ...............................................................11

*United States v. Bernhardt*,
    840 F.2d 1441 (9th Cir. 1988) .............................................................26

*United States v. Biaggi*,
    909 F.2d 662 (2d Cir. 1990)................................................................30

*United States v. Garcia*,
    340 F.3d 1013 (9th Cir. 2003) ......................................... 11, 12

*United States v. Gibson Specialty Co.*,
    507 F.2d 446 (9th Cir. 1974) ............................................... 3, 20

*United States v. Haischer*,
    780 F.3d 1277(9th Cir. 2015) .............................................................30

*United States v. Handy*,
    761 F.2d 1279(9th Cir. 1985) .................................................. *passim*

*United States v. Hansen*,
   599 U.S. 762 (2023)..................................................................22

*United States v. Joelson*,
   7 F.3d 174 (9th Cir. 1993) ........................................................30

*United States v. Polizzi*,
   500 F.2d 856 (9th Cir. 1974) ....................................................20

*Valle Del Sol Inc. v. Whiting*,
   709 F.3d 808 (9th Cir. 2013) ........................................... 3, 15, 24

*Williams v. Woodford*,
   384 F.3d 567 (9th Cir. 2004) ....................................................40

*Woodhull Freedom Found. v. United States*,
   No. 22-5105 (D.C. Cir. Nov. 2, 2022) ......................................22

## Federal Statutes

18 U.S.C. § 1952(a)(3)(A) ...........................................................26

18 U.S.C. § 2421A .......................................................................21

18 U.S.C. § 3143(b)(1)..................................................................12

47 U.S.C. § 230 ...........................................................................18

Fed. R. Evid. 106 .........................................................................32

## **INTRODUCTION**

This case arises from the unprecedented prosecution of media company executives for publishing third-party speech that allegedly facilitated the criminal activities of their customers.  Appellants are the former owners and operators of Village Voice Media Holdings, LLC ("VVMH"), an award-winning newspaper conglomerate dedicated to independent journalism.  To fund its free journalism, VVMH sold advertising space, including classified ads found on its papers' back pages.  In 2004, the conglomerate founded backpage.com ("Backpage"), a Craigslist-style website that published third-party classified ads online that had existed in print for decades.  Just like Craigslist, Backpage hosted an adult services section that included ads for dating, massages, escorts, and strippers.

In 2018, the government indicted Backpage's former owners, charging them with conspiracy to violate the Travel Act, fifty substantive Travel Act counts for publishing fifty adult-oriented ads, and various money laundering offenses based on transactions involving publishing proceeds.  (Ex. A[1].)  The government did not allege, nor offer proof at trial, that Appellants had ever seen any of the predicate ads or associated themselves in any way with the advertisers.  Moreover, all but

---

[1] All exhibits cited herein are attached to the concurrently filed Declaration of Alyssa D. Bell.

1

one of the ads contained facially-lawful speech.[2]  To circumvent these obstacles to prosecution, the indictment was predicated upon a novel liability-by-notice theory: It alleged that public calls to shutter the website based on the generalized perception that the website was being misused in certain instances put Appellants "on notice" that the site was being misused by the specific advertisers who posted the fifty predicate ads.

This liability-by-notice theory violated several basic tenets of the First Amendment and effectively lowered the government's burden to prove scienter. Nonetheless, the government claimed that the First Amendment was irrelevant to this prosecution because the ads were associated with illegal transactions.  In support, the government relied on the ads' inclusion of "coded terms" associated with prostitution, Backpage's marketing practices, and Backpage's moderation policies.  Further, the government relied upon third-party allegations from state Attorneys General, CNN, non-profit organizations, and others, which it claimed put Appellants "on notice" that pimps and prostitutes had posted ads on Backpage. Such "notice" evidence, the government asserted, demonstrated that Appellants knew the website's publication of adult-oriented content would result in ads

---

[2] One of the alleged Travel Act violations related to an ad that, on its face, proposed an illegal transaction.  There was no evidence Appellants had notice of that ad, and they were acquitted of that count.

associated with prostitution, and made them liable for facilitating the activities of business enterprises that posted ads to the site, even though they had never met anyone who posted an ad to the website or associated themselves with any advertiser.

Fundamental principles of First Amendment law foreclose the government's novel liability-by-notice theory. Only speech that *itself* "proposes an illegal transaction," not speech merely "associated with unlawful activity," is excluded from the protections of the First Amendment. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 821 (9th Cir. 2013). And, publishers of third-party speech cannot be held liable for facilitating unlawful business enterprises absent sufficient proof of specific intent—*i.e.*, proof the publisher knows the speech at issue proposes unlawful activity, and publishes it with the intent to facilitate the speaker's misconduct. *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974). The government's liability-by-notice theory violates these fundamental principles. Under its overbroad theory, the publication of facially-lawful speech loses First Amendment protection if the publisher is on "notice" that, in the past, his website has hosted other instances of speech associated with criminal activity.

That unprecedented notion chills broad swaths of protected activity and vastly expands the government's power to censor media outlets nationwide. Should Amazon be criminally liable for facilitating the sale of stolen property if its

3

operators are on notice that some customers misuse its marketplace to sell fenced goods?[3]  Should Twitter be criminally liable for facilitating gang-related criminal activity if its operators are on notice that some gang members use the website to transmit coded messages that further their misconduct?[4]  This prosecution puts those publishers, and others like them, in the crosshairs.

Appellants' appeals will thus present substantial questions on matters of first impression in this Circuit, and their resolution will have wide-ranging consequences for publishers of third-party content across the Internet.  Those questions include: (1) whether the First Amendment bars the criminal prosecution of website operators that host facially-lawful third-party speech on the theory that they are on "notice" that some of the speech posted to the website furthers the criminal endeavors of third parties; (2) whether the First Amendment bars the prosecution of publishers for speech they have never seen concerning criminal activities they know nothing about; and (3) whether the jury instructions given at trial misstated First Amendment law, depriving Appellants of their Sixth Amendment right to present their theories of defense to the jury.

---

[3] https://sfist.com/2024/03/13/california-retail-theft-rings-making-millions-just-selling-stolen-loot-on-amazon/ (last visited Oct. 1, 2024).

[4] https://www.usatoday.com/story/news/nation/2013/09/29/twitter-crime-dark-side/2875745/ (last visited Oct. 1, 2024).

In addition to these matters of first impression, Appellants will raise substantial issues that include: (1) whether they were convicted of a "boundless conspiracy" untethered to the fifty predicate counts; (2) whether they were denied their due process right to present and testify to "counter-notice" evidence supporting their good faith belief that their conduct was lawful; (3) whether the district court erred in denying their motion to dismiss based on the government's flagrant attempts to solicit attorney-client privileged information; (4) whether they were denied their Sixth Amendment right to confront the government's star witness with verbatim prior statements inconsistent with his trial testimony; and (5) whether the district court erred in denying their motion for a judgment of acquittal for failing to trace the money laundering counts to the Travel Act violations of which they were convicted.

Because Appellants' appeals present at least eight issues that are "fairly debatable," *United States v. Handy*, 761 F.2d 1279, 1281 (9th Cir. 1985), they respectfully request that the Court grant them bail pending appeal.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In 1970, Appellant Michael Lacey and his partner James Larkin founded the Phoenix New Times, an alternative weekly newspaper, which published hard-hitting, often-controversial articles and editorials concerning people and issues of interest. (Ex. B at 2-5.) They ultimately expanded their journalism nationwide,

acquiring sixteen other newspapers, including the iconic Village Voice.  With

Appellants John Brunst and Scott Spear, they operated the newspaper

conglomerate under the VVMH umbrella.  (*Id.*)  During their operation of VVMH,

the newspapers won over 3,800 journalism awards, including a Pulitzer Prize.  (*Id.*)

VVMH circulated its newspapers for free, earning revenue through the sale of

classified advertising space located in the back pages of the newspapers.  (*Id.*)

With the advent of the Internet, and the creation of classified advertising

websites like www.craigslist.com, classified ad revenue for print media

plummeted.  (*Id.*)  In response, VVMH created Backpage, a website similar to

Craigslist, that allowed the public to post classified advertisements in a wide range

of categories, such as household items, real estate, auto sales, and jobs, as well as

in adult-oriented categories such as dating, strippers, massage services, and escort

services—just as newspapers, yellow pages, and other media had published for

decades.  (*Id.*)  Over its fourteen-year history, Backpage published hundreds of

millions of classified ads, including millions of adult-oriented ads.  (*Id.*)

For nearly two decades, adult-oriented classified advertising on the Internet

has been a political lightning rod, resulting in significant political and social

pressure on website operators to refuse to carry such content.  (*Id.* at 5-8.)

Craigslist.com capitulated to that pressure in 2010 and shut down its adult services

section.  Backpage, owned by a media conglomerate controlled by First

Amendment stalwarts, refused to do the same. (*Id.* at 5-8.) Rather than censoring lawful adult content like ads for dating, stripping, and escorts, Backpage prohibited ads proposing illegal transactions and invested heavily in software and manpower to detect, review, and remove such content. Public criticism nonetheless continued to mount. (*Id.* at 5-8.)

The government indicted Appellants in March of 2018 for facilitating prostitution in violation of the Travel Act and money laundering offenses involving publishing proceeds, and returned a Superseding Indictment ("SI") soon after. Specifically, the SI alleged one count of Conspiracy to violate the Travel Act; fifty counts of violating the Travel Act; one count of Conspiracy to commit Money Laundering; ten counts of Concealment Money Laundering; six counts of International Promotional Money Laundering; and, ten counts of Transactional Money Laundering. (Ex. A.)

The fifty substantive Travel Act counts were premised upon fifty ads, created by advertisers, and published on Backpage. The SI alleged money laundering predicated on the Travel Act counts. (*See* Ex. A ¶¶ 205, 207, 209, 211.) The SI set forth the government's novel liability-by-notice theory, and did not allege that Appellants knew *anything* about the fifty ads, the persons who posted those ads, or the activities in which those persons were engaged. (Ex. A ¶ 201 (counts 2-51).)

7

Appellants moved to dismiss the charges against them on various First Amendment grounds.  (Ex. B.)  Well-respected organizations from across the political spectrum—the ACLU, Cato Institute, DKT Liberty Project, and Reason Foundation—filed Amicus briefs that joined in opposing the government's unprecedented attack on the First Amendment.  (Exs. C, D.)  Appellants' motion was denied.  (Ex. E.)  Their subsequent efforts to have the jury instructions reflect fundamental principles of First Amendment law were likewise rejected.  (Exs. G, I.)

The case proceeded to trial.  The first trial ended in a mistrial due to government misconduct after prosecutors elicited inflammatory, irrelevant, and highly prejudicial testimony from multiple witnesses, despite the district court's repeated warnings.  (Ex. F.)  After adjourning the trial, the presiding judge, Judge Brnovich, recused herself.  The case was reassigned to Judge Humetewa.  (Ex. V.)

At the second trial, the government's evidence tracked the SI's flawed and overbroad theory.  Though the government adduced what it claimed was evidence that Appellants were "on notice" that some portion of the facially-lawful ads posted on Backpage were associated with prostitution, the government failed to prove that Appellants ever saw any of the ads at issue or knew anything about the activities of the advertisers.  (Ex. J at 2.)  The evidence also showed that various techniques that Backpage employed in its early days to compete with Craigslist—

8

techniques the government claimed were responsible for attracting ads associated with prostitution to Backpage—were no longer in play by the time the ads at issue were posted.  (*Id.*)  The fifty charged ads therefore did not involve those assailed practices, which included moderation (the removal of unlawful speech from ads prior to publication), aggregation (copying adult-oriented ads from Craigslist), and affiliate links (to websites the government also alleged were associated with prostitution).  None of the evidence adduced at trial, in other words, brought Appellants' conduct outside the protection of the First Amendment.

To prove its liability-by-notice case, the government presented voluminous evidence regarding the claims of state Attorneys General, nonprofits, and media outlets that third parties were using Backpage to advertise prostitution.  (Ex. K at 21:17-19.)  But Appellants were precluded from testifying to their good faith reliance on "counter-notice" evidence, including contemporaneous federal court decisions affirming the legality of Backpage's operations.  (Ex. X at 3, 8-12; Ex. AF at 13:16-22.)

Further, the district court allowed the government to use the privilege as a sword and a shield, sustaining objections to the defense's attempts to impeach the government's main cooperating witness with attorney-client communications, while ignoring the government's repeated invasions of that same privilege during

its interviews of that witness, in violation of the prior district court's order. (Ex. AG at 56:22-58:2; Ex. Y at 68:17-19; Ex. U at 4; Ex. AO at 4-6.)

Following three months of testimony and deliberations, and after twice informing the court it was unable to reach a unanimous decision and receiving an *Allen* charge, the jury returned a split verdict. Spear stands convicted of one count of conspiracy to violate the Travel Act, seventeen counts of Travel Act violations, one count of conspiracy to launder Travel Act money, and ten counts of concealment money laundering. (Ex. H.) Brunst stands convicted of one count of conspiracy to violate the Travel Act, one count of conspiracy to launder the Travel Act money, and fifteen money laundering counts. Brunst was acquitted of all fifty Travel Act counts. (Exs. H, AS.)

Appellants moved for acquittal of the Travel Act conspiracy on the ground that there was no proof that Appellants (or anyone from Backpage) conspired with the people who created and posted the fifty charged ads (as Judge Brnovich had required, and Judge Humetewa had charged the jury). Instead, the government had effectively swept every adult ad posted on the website over a fourteen-year period into the conspiracy's ambit. Judge Humetewa denied that motion. (Ex. K at 20-21; *compare* Ex. AB at 13, 18.) Appellants' motion for a judgment of acquittal on a certain of the money laundering offenses was granted. (Ex. K.)

Prior to sentencing, Appellants moved for bail pending appeal, arguing that they were not a flight risk or a danger, and that their appeals would raise substantial issues. (Ex. L; Ex. Z at 3-8.) The district court denied Appellants' motions, finding that, although their appeals were not "for purposes of delay," they had failed to identify "a fairly debatable question as to [the jury's] verdicts." (Ex. O at 242:20-243:24.) Misapplying the *Handy* standard, the district court reasoned that the appeals would not raise substantial questions because "these were jury verdicts" and "the circuit has an applicable review process in which a jury conviction is viewed with deference." (*Id*. at 243:19-22)

## STANDARD OF REVIEW

Review of the district court's legal determinations is *de novo*. *United States v. Garcia*, 340 F.3d 1013, 1015 (9th Cir. 2003). Review of the district court's findings of constitutional fact—including whether speech proposes an illegal transaction and "is therefore unprotected by the First Amendment"—is also *de novo*. *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 742 (9th Cir. 2021). Review of all other factual findings is for clear error. *Garcia*, 340 F.3d at 1015.

## LEGAL STANDARD

This Court must grant Appellants bail pending appeal if it finds that they: (1) do not pose a flight risk and do not pose a danger to public safety; (2) the appeal is not for purpose of delay; and (3) the appeal will raise a substantial

question of law or fact that, if resolved in their favor, is likely to result in a new trial or reversal.  18 U.S.C. § 3143(b)(1); *Handy*, 761 F.2d at 1283.  Substantial questions are those that are "fairly debatable" or "fairly doubtful."  *Handy*, 761 F.2d at 1281-82.  The issue must, in other words, be "one of more substance than would be necessary to a finding that it was not frivolous."  *Id.* at 1283.

Congress "did not intend to limit bail pending appeal to cases in which the defendant can demonstrate at the outset of appellate proceedings that the appeal will probably result in reversal or an order for a new trial."  *Id.* at 1280.  Instead, the defendant must present "only a non-frivolous issue that, if decided in the defendant's favor, would likely result in reversal …."  *Garcia*, 340 F.3d at 1020 n.5 (the analysis "does not involve assessing the likelihood that a reversal will occur in the particular case"); *Handy*, 761 F.2d at 1281 ("[R]equiring the defendant to demonstrate to the district court that its ruling is likely to result in reversal is tantamount to requiring the district court to certify that it believes its ruling to be erroneous.  Such an interpretation of the Act would make a mockery of" the requirement that the application first be made in the district court).

## ARGUMENT

## I.     APPELLANTS ARE NOT A FLIGHT RISK OR A DANGER.

Spear and Brunst are both in their seventies and have close ties to their local community.  They have no prior criminal record.  Brunst's oldest son is the

12

Command Master Chief at Naval Special Warfare Development Group (Seal Team Six). Their respective PSRs concluded that they were neither a flight risk, nor a danger, and the district court agreed. (Ex. P at 67; Ex. AA at 54; Ex. O at 241-42, 244.) The district court's conclusion is not clearly erroneous.

## II.   APPELLANTS' APPEALS ARE NOT FOR THE PURPOSES OF DELAY.

The district court found Appellants' appeals would not "be for purposes of delay." (Ex. O at 242:20-22.) That finding is not clearly erroneous.

## III.   APPELLANTS' APPEALS WILL RAISE SUBSTANTIAL QUESTIONS THAT, IF RESOLVED IN THEIR FAVOR, WOULD RESULT IN AN ACQUITTAL OR A NEW TRIAL.

Appellants' appeals will raise multiple issues that are "substantial" and "not frivolous." *Handy*, 761 F.2d at 1281-83. The district court already determined as such. (Ex. N at 9:16-22 (finding, "there are substantial issues that have to be considered by the Ninth Circuit" that "may change the complexity [of the case] or … what the government may or may not be able to pursue with regard to a retrial"); *see also* Ex. S at 15:6-20 (noting, "it may be that on appeal several of [Appellants'] convictions are set aside or remanded back"); *id.* at 16:13-17 (opining that Appellants' case might "come[] back in total" for a retrial on all counts).) This Court should make the same finding.

13

A.    **It is "fairly debatable" whether the First Amendment bars Appellants' convictions.**

"The [g]overnment may not suppress lawful speech as the means to suppress unlawful speech.  Protected speech does not become unprotected merely because it resembles the latter."  *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002).  The First Amendment therefore prohibits the government from declaring that facially-lawful classified ads for adult services are unprotected because they "look like" ads for prostitution.  Yet that is the overbroad and unconstitutional premise of the government's prosecution.  From indictment to summation, the government characterized *all* Backpage adult-oriented ads as "obviously" for prostitution, and told the jury that "common sense" dictated that the ads proposed unlawful sex.  (*E.g.*, Ex. T at 150:9-11 ("every ad is obviously about prostitution").)  That theory permitted the government to criminalize the publication of facially-lawful speech based purely on its presumed association with a crime, in violation of basic constitutional precepts.

The First Amendment requires the government "to establish that the *particular expressions*" at issue "are outside its reach."  *Bursey v. United States*, 466 F.2d 1059, 1082 (9th Cir. 1972) (emphasis added).  The government assumed that burden away, well-knowing that a great many activities involving sex and money are legal.  *E.g.*, *Backpage.com v. Dart*, 807 F.3d 229, 234 (7th Cir. 2015), cert. denied, 137 S. Ct. 46 (2016) ("Fetishism? Phone sex? Performances by

14

striptease artists?…  It's not obvious that such conduct … violates any laws, including laws against prostitution.").  At trial, the government presented *no* evidence that the predicate ads for the *majority* of the Travel Act counts were even associated with prostitution—the government simply told the jury to rely upon "coded terms" in the ads that it claimed were indicative of prostitution, and to trust its witnesses, who claimed to know that *all* of Backpage's millions of adult-oriented ads were associated with prostitution.  (*E.g.*, Ex. M at 14:20, 15:6-7, 16:22, 19:7-18.)

Under this Court's precedents, however, only "speech that *itself* proposes an illegal transaction" may be censored.  *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1123 (9th Cir. 2020) (emphasis added); *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 821 (9th Cir. 2013) (speech that "proposes an illegal transaction," not speech merely "associated with unlawful activity," is excluded from the protections of the First Amendment).  *IMDb* involved a facial challenge to a state statute that prohibited certain websites from publishing the ages and dates of birth of entertainment industry professionals.  *IMDb.com*, 962 F.3d at 1116.  That information, the statute's proponents argued, could be censored because it facilitated third-party illegal conduct (namely, age discrimination).  *Id.* at 1117, 1123.  The court disagreed, categorically rejecting the notion that the government may ban "facially inoffensive speech that a third-party might use to facilitate its

15

own illegal conduct." *Id.* at 1123. "'[I]t would be quite remarkable,'" this Court opined, "'to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party.'" *Id.* (quoting *Bartnicki v. Vopper*, 532 U.S. 514, 529-30 (2001)).

But that "remarkable" hypothetical became the reality of this case. The fifty predicate ads were "facially inoffensive speech that a third-party might use to facilitate its own illegal conduct." *Id.* Just as in *IMDb*, Backpage's publication of those ads should have enjoyed the protection of the First Amendment.

*IMDb* is hardly an outlier. Rather, it forms part of a broad consensus that, if "there are plausible ways to complete a proposed transaction lawfully, speech proposing that transaction 'concerns *lawful* activity' and is therefore protected commercial speech." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 114 (2d Cir. 2017) (emphasis added); *accord Greater Philadelphia Chamber of Com. v. City of Philadelphia*, 949 F.3d 116, 141 (3d Cir. 2020) (rejecting city's argument that speech "concern[ed] unlawful activity" where it might relate to both lawful and unlawful acts); *Eimann v. Soldier of Fortune Mag., Inc*., 880 F.2d 830, 837-38 (5th Cir. 1989) (publishers are not required to reject "any suspicious, ambiguous ad that might cause serious harm," because "in the constitutional arena we have noted that the possibility of illegal results does not necessarily strip an ad of its commercial speech protection"); *Dunagin v. City of*

16

*Oxford*, 718 F.2d 738, 743 (5th Cir. 1983) (en banc) ("The commercial speech doctrine would disappear if its protection ceased whenever the advertised product might be used illegally.").

Here, given the wide array of lawful activities the predicate ads proposed, the First Amendment should have barred Appellants' liability for their publication. As one district court put it, in the course of invalidating a statute targeting Backpage, "where an online service provider publishes advertisements that employ coded language, a reasonable person could believe that facts exist that do not in fact exist: an advertisement for escort services may be just that." *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1279 (W.D. Wash. 2012).

Consistent with this authority, *every* court to address whether the First Amendment protects the publication of third-party ads that are suggestive of prostitution—including three federal courts addressing adult ads posted on Backpage—has held it does, even if a reasonable person would conclude that such ads *would* lead to prostitution. *See, e.g.*, *McKenna*, 881 F. Supp. 2d at 1268, 1281-82 (holding that publication of third-party ads—even if associated with illegal transactions—"does not fall within [the] 'well-defined and narrowly limited classes of speech' that fall outside of First Amendment protection"); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 833-34 (M.D. Tenn. 2013) (holding that the publication of third-party ads on Backpage was protected by the First Amendment,

17

and rejecting state's argument that the statute did "not implicate First Amendment scrutiny because it criminalize[d] only offers to engage in illegal transactions"); *Backpage.com, LLC v. Hoffman*, No. 13-CV-03952 DMC JAD, 2013 WL 4502097, at *9-11 (D.N.J. Aug. 20, 2013) (striking down statute targeting Backpage and rejecting arguments that Backpage's publication of adult-oriented ads was unprotected by the First Amendment).

The government has wrongly sought to distinguish these cases as focused on Section 230 of the Communications Decency Act (the "CDA"), but each independently addressed *both* the First Amendment's protection of the facially-lawful speech Backpage published and Section 230. Moreover, Section 230 embodies fundamental principles of First Amendment law. *See, e.g.*, *California v. Ferrer*, 2016 WL 7237305, at *3 (Cal. Super. Ct. 2016) (dismissing state criminal charges filed against Backpage executives and discussing "whether, and to what extent, Defendants' activities entitle them to protection of their *First Amendment rights* through the immunity provision of the CDA.") (emphasis added).

The government has also attempted to distinguish these cases because they did not address Backpage's content moderation and ad aggregation practices—*i.e.*, its removal of facially-unlawful content from ads ultimately posted on the website, and its copying of adult-oriented ads from Craigslist to Backpage. That argument is both irrelevant and incorrect. None of the predicate ads were the product of

moderation (beyond deleting photos that violated Backpage's terms of service) or aggregation. And, in both civil and criminal cases, courts rejected liability based on Backpage's moderation practices, finding they "amount[ed] to neither affirmative participation in an illegal venture nor active web content creation."[5] *Doe v. Backpage.com*, LLC, 104 F. Supp. 3d 149, 157, 162 (D. Mass. 2015), *aff'd*, 817 F.3d 12 (1st Cir. 2016), *cert. denied*, 137 S. Ct. 622 (2017); *see also Ferrer*, 2016 WL 7237305 at *5 (finding that Backpage's use of moderation "generally [fell] within the scope of protected editorial functions.").

As the foregoing reveals, the First Amendment's exception for speech that proposes an illegal transaction has *never* been extended to encompass a website operator's publication of facially-neutral speech, no matter how suggestive of unlawful activity the government might believe it to be. Appellants' prosecution stands alone. It is therefore fairly debatable whether this case "present[s] unique facts not plainly covered by controlling precedents," and whether, given the government's "novel" prosecution theory, the First Amendment should have

---

[5] The government has repeatedly sought to distinguish the Seventh Circuit's opinion in *Dart* because that decision predated their investigation in the instant case. The evidentiary record in *Dart*, however, was effectively identical to that before the district court—*Dart* considered evidence of moderation, aggregation, super-posters, etc., yet held that Backpage's publication of adult-oriented ads was protected by the First Amendment, even if some people misused the website to engage in prostitution or sex-trafficking. (Exs. AQ, AR.)

barred Appellants' convictions, if not their prosecution altogether. *Handy*, 761 F.2d at 1281-82 (citations omitted).

### B. It is "fairly debatable" whether the government failed to prove specific intent.

To sustain Appellants' convictions for publishing third-party speech, the government was required to prove they acted with specific intent—*i.e.*, that they knew each predicate ad proposed prostitution and that publishing the ad would facilitate the advertiser's unlawful business enterprise. The government failed to do so.

It is beyond dispute that the Travel Act is a specific intent crime. *United States v. Polizzi*, 500 F.2d 856, 876 n.29 (9th Cir. 1974) ("[T]he specific intent which the Government must show is the intent to facilitate the carrying on of a business enterprise involving [unlawful activity] in violation of [state] law."). To sustain a Travel Act conviction, the government therefore was required to prove that each Appellant "in some significant manner associated himself with the [predicate] criminal venture for the purpose of its advancement," such as by having a "financial interest in or control over" that venture. *United States v. Gibson Specialty Co.*, 507 F.2d 446, 448-50 (9th Cir. 1974) (dismissing indictment against manufacturers of gambling implements who shipped their implements to distributors, even though most forms of gambling were illegal nationwide, and the

20

manufacturers knew the purchasers of their gambling implements would violate state law merely by possessing those implements).

Yet Appellants' prosecution is premised upon liability by notice—their generalized knowledge of facts putting them on "notice" that, among the millions of ads posted on Backpage, some were associated with prostitution. The government expressly disclaimed any burden to prove Appellants were even aware of the predicate ads, let alone that they sought to advance the unlawful activities of the advertisers. (Ex. R at 50:11-14 ("[W]hat I'm not going to show you is a jury instruction says we must prove that any defendant had specific knowledge of these particular ads because it isn't in there. We don't have to do that.").)

Recently, however, the government took the opposite position before the D.C. Circuit, in the course of defending the constitutionality of the Fight Online Sex Trafficking Act (FOSTA), a newly-enacted statute that, like the Travel Act, prohibits the "promotion" or "facilitation" of prostitution. 18 U.S.C. § 2421A. In *Woodhull Freedom Found. v. United States*, 72 F.4th 1286 (D.C. Cir. 2023), the plaintiffs argued that FOSTA violated the First Amendment because it was unconstitutionally overbroad and vague, lacked a clear scienter requirement, and was not limited to speech that was integrally related to criminal activity. The government disagreed, arguing that the court should construe FOSTA's "promote" or "facilitate" language in the same manner as the Travel Act, saying: "[T]he

phrase 'promote or facilitate,' as used in the Travel Act, is equivalent to 'aid or abet' … [W]hatever meaning 'promote' or 'facilitate' might have in everyday speech, their meaning as terms of art in criminal statutes, invoking traditional principles of accomplice liability, is established."  Brief for the United States at 28-29, *Woodhull Freedom Found. v. United States*, No. 22-5105 (D.C. Cir. Nov. 2, 2022) (Doc. #1971878).  The D.C. Circuit agreed, explaining that both FOSTA and the Travel Act are "accomplice liability" statutes, and that FOSTA, thus construed, was "not unconstitutionally overbroad under the First Amendment."  *Woodhull*, 72 F.4th at 1299.

The government cannot have its cake and eat it too.  It cannot credibly argue before the D.C. Circuit that the Travel Act is an aiding and abetting offense, while arguing here that the Travel Act is a liability-by-notice statute that prescribes Appellants' publication of ads they never saw, involving business enterprises they knew nothing about.[6]  *See also United States v. Hansen*, 599 U.S. 762, 771 (2023) ("Facilitation—also called aiding and abetting—is the provision of assistance to a wrongdoer with the intent to further an offense's commission … [and] require[s]

---

[6] The district court erroneously upheld Appellants' conspiracy convictions under a *Pinkerton* theory, even though the government presented no evidence that any alleged coconspirator, including its star cooperator, ever saw the charged ads or knew of the activities of those posting the ads, at the time they were posted or while live on the website.  (Ex. K at 30-31.)

an intent to bring about *a particular unlawful act*.") (emphasis added); *Rosemond v. United States*, 572 U.S. 65, 76 (2014) ("To aid and abet a crime, a defendant must not just 'in some sort associate himself with the venture,' but also 'participate in it as in something that he wishes to bring about' and 'seek by his action to make it succeed' … '*with full knowledge of the circumstances constituting the charged offense*.'") (emphasis added, citation omitted).

Not a single case supports the government's expansive claim that criminal liability may be premised upon the defendant's "notice" that some of the speech he publishes is (allegedly) associated with criminal activity, absent actual knowledge of the speech in question and intent to facilitate the criminal venture of the speaker. No court, in other words, has ever held a defendant liable for publishing third-party speech that he has never seen and facilitating criminal ventures he knows nothing about. *See McKenna*, 881 F. Supp. 2d at 1281-82 (striking down statute on First Amendment grounds where "criminal liability is triggered only by notification or knowledge that 'illegal' content is available on any actor's website").

In light of the government's contradictory positions, and the D.C. Circuit's endorsement of a *mens rea* standard that the government disclaimed any need to prove in this case, it is at least fairly debatable whether the government's liability-by-notice theory was overbroad and legally invalid.

23

**C.     It is "fairly debatable" whether the district court's First Amendment jury instructions were erroneous.**

Appellants proposed a jury instruction that would have foreclosed a guilty verdict based on their publication of lawful commercial speech, even if the government could prove that speech was ultimately associated with a crime: "[s]peech that proposes a commercial transaction that necessarily would constitute an illegal act if concluded is unprotected, but, if there are plausible ways to complete a proposed transaction lawfully, the speech proposing that transaction concerns lawful activity and is, therefore, protected commercial speech." (Ex. G at 67.)  The district court refused to give the instruction, though it reflected bedrock principles of First Amendment law.  *IMDb*, 962 F.3d at 1123 (only "speech that *itself* proposes an illegal transaction" may be censored); *Valle Del Sol*, 709 F.3d at 821 (same); *Centro de la Comunidad Hispana*, 868 F.3d at 114 ("if … there are plausible ways to complete a proposed transaction lawfully," it is "protected commercial speech"); *Greater Philadelphia Chamber of Com.*, 949 F.3d at 141 (speech does not "concern unlawful activity" where it might relate to both lawful and unlawful acts); *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 128 F. Supp. 3d 597, 615 (E.D.N.Y. 2015) ("When the legality of a proposed commercial transaction depends on circumstances outside the content of the speech, the activity is lawful and the speech is entitled to protection"), *aff'd*, 868 F.3d 104 (2d Cir. 2017).

24

The district court instead instructed the jury that "the First Amendment does not protect speech that proposes an illegal transaction." (Ex. I at 48.) That instruction was incomplete—it said nothing about speech that is open to interpretation, or speech that is facially-lawful but later leads to unlawful third-party conduct, and left the door open for the jury to convict if the ads in question plausibly proposed *either* a lawful *or* unlawful act.

The district court's flawed instructions thus permitted the government to present its overbroad theory to the jury. In its summation, the government asked jurors to convict Appellants for publishing facially-lawful ads if they found that the circumstances surrounding those ads indicated they were "really for prostitution" because "context matters." (Exs. M at 10:21-11:2; R at 42:1-14.) That argument, though permitted by the court's instructions, violated the many First Amendment principles discussed above.

"Constitutional error occurs" when a jury "returns a general verdict that may rest on a legally invalid theory," and the jury instructions do nothing to cure the error. *Skilling v. United States*, 561 U.S. 358, 414 (2010). Here, it is fairly

debatable whether the jury instructions misstated the tenets of the First Amendment and permitted Appellants' convictions for protected conduct.[7]

### D. **It is fairly debatable whether the district court erred in sustaining Appellants' convictions of an impermissible boundless conspiracy.**

Notwithstanding multiple rulings and two jury instructions limiting the scope of the conspiracy to the facilitation of the fifty charged ads, the district court's Rule 29 ruling makes it clear that the defendants were prosecuted and convicted of a "boundless" conspiracy to facilitate prostitution in general.

An indictment must "enable [the defendant] to plead double jeopardy." *United States v. Bernhardt*, 840 F.2d 1441, 1445 (9th Cir. 1988). The SI alleged that, "[b]eginning in or around 2004, and continuing through April 2018" defendants conspired "to commit the following offenses against the United States: 18 U.S.C. § 1952(a)(3)(A) (Travel Act-Facilitate Prostitution)." (Ex. A at 49.) Appellants filed a motion to dismiss the indictment, arguing that it "improperly indicts a 'boundless conspiracy to facilitate prostitution in general[,]'" which posed double jeopardy concerns. (Ex. AB at 13.) In denying Appellants' motion, Judge Brnovich held:

---

[7] The First Amendment errors discussed herein taint not only the Travel Act and conspiracy counts, but Appellants' money laundering convictions as well. This issue will be extensively briefed in Codefendant and Appellant Michael Lacey's forthcoming motion for bail pending appeal, and Appellants hereby join in those arguments and incorporate them by reference.

> [Appellants] were not indicted for facilitating the amorphous notion of "prostitution." They were indicted for facilitating (via publishing ads) on *fifty distinct occasions* where prostitutes, prostitution-related businesses, or other groups were involved in the business of prostitution.

(*Id.* at 13 (emphasis added).) As to the double jeopardy concerns, the judge

explained: "These *targeted instances* enable each Defendant to plead an acquittal

or conviction in future similar prosecutions and prepare to defend themselves at

trial." (*Id.* at 18 (emphasis added).)

At trial, Appellants showed they had no connection with the fifty "targeted

instances" that predicated the conspiracy and Travel Act counts. The government,

in other words, presented fatally deficient proof of the very thing Judge Brnovich

said the government was required to prove. At the close of evidence, Judge

Humetewa (who was then presiding) instructed the jury that, to convict the

Appellants of the conspiracy charge, jurors were required to find Appellants

intended to join a conspiracy "to commit at least one Travel Act offense *as

charged in Counts 2-51 of the indictment…*" (Ex. I at 24:5-7 (emphasis added);

*see also* Ex. T at 131:11-14.)

Incredibly, the jury acquitted Brunst of *all* fifty substantive Travel Act

counts, yet convicted him of the alleged conspiracy to commit *those same* fifty

Travel Act violations. Post-verdict, Brunst argued he was entitled to a judgment of

acquittal on the Travel Act conspiracy count because the government had not

adduced *any* evidence that he had any involvement in or knowledge of the substantive Travel Act counts of which he was acquitted, as the district court's prior orders and jury instructions had required.  Spear joined Brunst's argument that he could not be guilty of conspiracy in the absence of proof, of any kind, that he facilitated the fifty specific instances of prostitution alleged in the SI.

In denying Appellants' Rule 29 motion, Judge Humetewa ignored both the law of the case and her own jury instructions limiting the scope of the conspiracy to facilitation of the fifty charged ads.  Judge Humetewa held that "[u]nlike the substantive Travel Act counts, *the conspiracy allegations were not specifically tied to the 50 ads*."  (Ex. K at 20 (emphasis added).)  In addition to changing course, and expanding the scope of the conspiracy from the facilitation of the fifty charged ads to a "boundless" conspiracy to facilitate prostitution in general, Judge Humetewa thus tacitly conceding that there was *no* proof of a conspiracy tied to the fifty charged ads.

Permitting Appellants' convictions of a boundless conspiracy—particularly when Appellants tried the case in accordance with Judge Brnovich's contrary ruling, and Judge Humetewa instructed the jury that the conspiracy was limited to the charged ads—was clear error.  That error was especially prejudicial to Brunst, given his acquittal of all substantive Travel Act counts, which came after the jury twice reported being unable to reach a unanimous verdict and after the district

28

court gave the jury an *Allen* charge over the defense's objection.  (Exs. W; AC at 28:11-29:11.)  Therefore, either (1) the Travel Act Conspiracy count should be dismissed because the government's charges failed to enable Appellants to prepare a defense and plead double jeopardy, or, (2) Appellants should be acquitted of the Travel Act Conspiracy count, given the lack of evidence supporting a conspiracy as to the fifty charged ads.  It is fairly debatable whether the district court erred in doing neither one.

### E. It is fairly debatable whether the district court violated Appellants' due process rights by precluding evidence of their good faith.

Appellants' due process rights were violated when the district court precluded them from testifying to their good faith belief that their conduct was lawful.

The government's case was predicated on evidence that third parties—including state Attorneys General, nonprofits, and media outlets—called for Backpage to cease publishing all adult advertising.  (*See, e.g.*, Ex. M at 32:1-4.)  The government used this evidence to argue that Appellants were on "notice" that many ads on Backpage were associated with criminal activity, which the government argued help establish the Appellants' knowledge of and intent to facilitate prostitution in violation of the Travel Act.  But the district court categorically precluded Appellants from testifying to the reasons that, despite the

29

"notice" evidence, they held a good faith belief that their conduct was lawful. Specifically, the district court precluded Appellants from testifying that legal opinions disclosed to third parties and prior court decisions affirming Backpage's First Amendment right to publish facially lawful third-party content informed their mental state and subsequent conduct.  (Exs. K AT 3, 8-12; Q at 11; R at 18; AF at 13:16-22; AH at 15:17-24.)

"An evidentiary error violates a defendant's due process rights when it excludes: (1) the main piece of evidence, (2) for the defendant's main defense, to (3) a critical element of the government's case." *United States v. Haischer*, 780 F.3d 1277, 1284 (9th Cir. 2015) (internal citations omitted); *United States v. Biaggi*, 909 F.2d 662, 692 (2d Cir. 1990) ("Where evidence of a defendant's innocent state of mind, critical to a fair adjudication of criminal charges, is excluded, we have not hesitated to order a new trial.").  Further, "[a]n accused's right to testify is a constitutional right of fundamental dimension." *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993).

As set forth below, the district court erroneously precluded Appellants from putting on the "main" pieces of evidence for their "main defense," all of which would have responded to and seriously undermined the government's theory of liability against them. *Haischer*, 780 F.3d at 1284.

30

### 1.    Backpage's responses to state attorneys general letters

The district court admitted three letters from the National Association of Attorneys General (NAAG) calling for Backpage to discontinue publishing all adult advertising without giving the opportunity for the defense to introduce "counter-notice" evidence supporting their good faith belief that their conduct was protected by the First Amendment.  (*See, e.g.*, Exs. AD at 76:9-78:11, 81:8-82:4; AT at 53:5-59:5; AU at 81:15-85:6; AV; AW; AX.)  The government had Mr. Ferrer read paragraphs of the NAAG letters into the record—inflammatory hearsay evidence often about sex trafficking—cloaked under the guise of not-for-the-truth "notice" evidence.  Backpage attorneys, including noted First Amendment experts, wrote responses to the NAAG letters, tackling NAAG's allegations head-on and asserting Backpage's First Amendment right to publish third-party content even if some users misused the site.  The government elicited testimony from Ferrer that Backpage's responses were "deceptive" and "highly misleading" (Ex. AD at 84:15-19), but precluded the defense from introducing the responses themselves. The jury thus received the inculpatory half of the "notice" evidence, but not the exculpatory half of the same evidence.  (*See* Ex. AE at 16:2-18:13); *See also Beech*

*Aircraft Corp. v. Rainey*, 488 U.S. 153, 172 (1988) (finding reversible error where cross-examination of a complete writing was precluded).[8]

The district court went on to preclude Brunst, the former CFO of VVMH, from testifying that "none [of the State AGs] ever succeeded in their legal threats or actions, which gave him further comfort that the company's compliance efforts and legal advice were sound[.]"  (Exs. X at 3; AF at 13:16-22; AH at 15:17-24.)  The district court held that Brunst's proffered testimony would be "irrelevant because those legal threats or actions are not relevant to the allegations here, the indicted Travel Act violation."  (Ex. AF at 10:10-15.)  The district court's ruling is logically impossible to square with its admission *ad nauseum* of such "irrelevant … legal threats" during the government's case-in-chief—none of which related to the Travel Act or the indicted Travel Act violations.

The district court doubled down on the error in denying Appellants' Rule 29 Motion as to the Travel Act conspiracy charge on the basis that they were "on notice by law enforcement, State Attorneys General, non-profits, and the media

---

[8] The responsive letters also should have been admitted under the rule of completeness and the government's hearsay objections overruled.  *See* Fed. R. Evid. 106 ("If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement— that in fairness ought to be considered at the same time.  *The adverse party may do so over a hearsay objection*.") (emphasis added).

that a portion of Backpage's escort ads were in fact leading to prostitution," while precluding them from testifying about their state of mind in response to such "notice" evidence.  (Ex. K at 21.)  It is fairly debatable whether the district court thus erred.

### 2.      Good faith reliance on federal court decisions

The district court precluded defendants from presenting their defense of good faith reliance on federal court decisions.  First, the defense was precluded from presenting any evidence about the *Dart* case, concerning credit card processing—information central to the government's money laundering theory.  Second, the defense was precluded from presenting any evidence of Backpage's victories in federal courts, in which court after court recognized Backpage's First Amendment right to publish third-party content, even when some advertisers misused the site.  These rulings—which gutted the ability to present evidence of lack of criminal intent—present substantial issues on appeal.

### i.      *Dart* litigation

In its opening statement, in referring to Visa and Mastercard terminating their relationships with Backpage in 2015, the government said Brunst "was a key cog, key player in this response to credit card Armageddon and the creative methods that Backpage and these defendants engaged in to attempt to keep the money flowing in."  (Ex. T at 157:2-9.)  The district court freely permitted the

government to elicit evidence (1) suggesting that Visa and Mastercard terminated Backpage's credit card processing because they believed the content on Backpage was illegal, and (2) about Backpage's purported responses to the terminations. Conversely, the district court precluded Appellants from introducing evidence of— and testifying to—why Visa and Mastercard actually terminated those relationships and what happened next.

Had the court not muzzled the defense, the jury would have learned that these credit card companies had terminated their relationship with Backpage after being repeatedly threatened by Cook County Sheriff Dart, and that Sheriff Dart's threats not only were baseless but violated Backpage's First Amendment rights. Critically, in ruling in Backpage's favor on an action Backpage brought against Dart, the Seventh Circuit excoriated Dart for his unlawful tactics and criticized Visa and Mastercard for bowing to them:

> [Dart] is using the power of his office to threaten legal sanctions against the credit-card companies for facilitating future speech, and by doing so *he is violating the First Amendment* unless there is *no* constitutionally protected speech in the ads on Backpage's website— and no one is claiming that. The First Amendment forbids a public official to attempt to suppress the protected speech of private persons by threatening that legal sanctions will at his urging be imposed unless there is compliance with his demands.

*Dart*, 807 F.3d at 231 (initial emphasis added).

Judge Posner's opinion makes it clear that Visa and Mastercard terminated their relationships with Backpage *not* because they believed the content on the site

34

was illegal, but because of Dart's unlawful threats. Backpage's resounding legal victory over Dart gave Appellants substantial comfort that the credit card terminations were not a reflection of the propriety of Backpage's publication of adult content and that Backpage could continue to lawfully seek other payment processing options.

The district court precluded the jury from learning these facts, though they were plainly relevant to Appellants' *mens rea—i.e.*, their good faith. Specifically, the district court precluded evidence that: (1) Backpage's lawyer sent a letter to the credit card companies asserting that Dart was violating the First Amendment; (2) Backpage sued Dart; (3) the Seventh Circuit held that Dart had violated the First Amendment; and (4) the Seventh Circuit found that Dart's illegal and unconstitutional threats lead to the terminations. (*E.g.*, Exs. Q at 11; X at 3, 8-12; AF at 13:16-22; AG at 90:12-100:25; AH at 15-22, 15:17-24; AF at 13:16-22.) For example, Ferrer—the government's star witness—submitted a sworn declaration in *Dart* in which he attacked Dart's actions as having "harmed Backpage.com's efforts to police and preclude improper ads." (Ex. AZ ¶¶ 6, 24, 29.) At trial, not only was the defense precluded from asking Ferrer about this inconsistent statement, the defense was precluded from doing anything more than merely mentioning Dart's name during the cross-examination of Ferrer. (Ex. AG at 90:12-91:20; 95:12-23; 96:4-97:5.)

Later in the trial, when Appellants sought to testify in their own defense regarding their reliance on the *Dart* opinion, the district court precluded that testimony as well.  (Exs. X at 3, 8-12; AF at 13:16-22.)  In short, the district court prevented Appellants' counsel from questioning Ferrer—and Appellants from testifying in their own defense—regarding a key issue in the case; namely, the basis for the credit card terminations, the company's reaction to those terminations, and Appellants' state of mind regarding those terminations.

The importance of the misleading "credit card Armageddon" evidence to the government's case is evident from both its open and closing statements, where its discussions of money laundering commenced with references to the termination of credit card processing.  (Exs. M at 21:3-5; T at 155:11-19.)  The government also well-knew the importance of the *Dart* opinion to the defense.  The government's pre-trial interviews with Ferrer discussed Sheriff Dart's actions and the ensuing litigation no fewer than forty times.  (Ex. AY.)

It is therefore debatable whether the district court's one-sided preclusion of *Dart*-related evidence violated Appellants' right to due process.

### ii.    Federal opinions recognizing First Amendment rights

The district court also improperly precluded Appellants from eliciting testimony about—and Appellants from testifying about their reliance on—prior federal court decisions involving Backpage, including *McKenna*, 881 F. Supp. 2d

at 1268.  In *McKenna*, Backpage successfully challenged the constitutionality of a proposed law in Washington that would have criminalized Backpage's knowing publication of ads that a "reasonable person" would conclude were "explicit or implicit" offers for commercial sex with a minor—or, in other words, ads that *looked like* they might be associated with the prostitution of a minor.  *Id.*  Here, the district court allowed the government to prosecute Appellants under the Travel Act for Backpage's publication of adult ads that the government claimed *looked like* prostitution ads, *i.e.*, on a theory analogous to the statute the federal court in Washington held violated the First Amendment, saying: "[A] publisher who receives notice that content *might* be illegal would have no incentive to ensure that such content is *in fact* illegal.  Rather, the rational choice in such a scenario is to remove the content as quickly as possible, whether or not it constitutes protected speech."  *Id.* at 1278; (Ex. X at 3, 12-13.)

The district court ruled that *McKenna* and other "prior court decisions" were irrelevant "unless those prior cases were adjudications of" Travel Act offenses. (Ex. Q at 11.)  That reasoning was reiterated throughout trial, (*see, e.g.*, Ex. AH at 15:17-24), though applied only to Appellants.  For example, the censorship demands in the NAAG letters were the centerpiece of the government's case, but were *not* predicated on violations of the Travel Act or the adjudication of Travel Act offenses, much less related to the fifty ads charged in the indictment.

37

Not only did the district court apply its ruling only to Appellants, the court effectively foreclosed Appellants' good faith defense.  Indeed, far from being "on notice" that Backpage's publication of adult ads was unprotected speech, multiple federal courts had upheld the same advertising as protected speech.  Appellants were precluded from testifying about their good faith reliance upon those decisions, and the jury therefore never heard critical evidence of Appellants' sincerely-held beliefs that they were following the law.  (Exs. X at 3, 8-12; AF at 13:16-22; AH at 15:17-24.)  To fairly assess whether Appellants acted in good faith, the district court should have permitted counter-notice evidence to refute the government's liability-by-notice theory.  It is fairly debatable whether precluding that evidence violated Appellants' right to due process.

### 3.    Transparency with financial institutions

The government focused its money laundering case on Backpage's purported deception of financial institutions.  For example, Ferrer testified that Backpage made purportedly misleading statements to BMO.  (*See* Ex. AI at 11:20-19:18.)  Brunst's defense rested on the fact that he had been forthcoming with those financial institutions.  Brunst sought to introduce a legal memo prepared by Mark Sableman, a noted First Amendment lawyer, which he emailed to a BMO bank representative in 2010.  (*See* Exs. AJ, AK; X at 2.)  The memo discussed,

among other things, Backpage's risks of civil and criminal liability, and analyzed each risk under both the CDA and the First Amendment. (Ex. AJ.)

The defense repeatedly advised the district court that the letter was not being offered for an advice of counsel defense, but instead, to show that Brunst openly shared information about the legal issues facing Backpage with its banking institutions. Nonetheless, the district court precluded the exhibits and Brunst's anticipated testimony about his communications with BMO on the basis that Brunst had not met the prerequisites for an advice of counsel defense. Moreover, even though the government repeatedly introduced "notice" evidence untethered to the fifty charged ads, the district court precluded the exhibits because they were not tethered to the fifty charged ads. (Ex. AF at 6:7-7:8, 16:24-17:10.) Among other things, this counter-evidence, demonstrative of Appellants' good faith belief that Backpage's operations were lawful, was erroneously precluded.[9]

For all of these reasons, it is fairly debatable whether the district court violated Appellants' due process rights by precluding evidence—including Appellants' testimony—of their good faith reliance upon counter-notice evidence.

---

[9] The letter was also crucial impeachment evidence as to Ferrer as it contradicted his testimony that Backpage withheld information from financial institutions.

39

**F.** **It is fairly debatable whether the district court erred in denying Appellants' motion to dismiss for outrageous government misconduct regarding the government's privilege invasion and violation of Judge Logan's order.**

The district court should have dismissed the SI due to the government's flagrant misconduct and violation of the district court's own order attempting to preserve the Appellants' joint defense privilege. Deliberate interference to "the confidential relationship between a criminal defendant and defense counsel" violates the Sixth Amendment right to counsel "if it substantially prejudices the criminal defendant." *Williams v. Woodford*, 384 F.3d 567, 584-85 (9th Cir. 2004). "Substantial prejudice results from the introduction of evidence gained through the interference against the defendant at trial, from the prosecution's use of confidential information pertaining to defense plans and strategy, and from other actions designed to give the prosecution an unfair advantage at trial." *Id.* at 585.

Toward the outset of this case, the government invaded the attorney-client privileges of Appellants and/or their entities and then concealed from the district court that it was actively invading the privilege in violation of the court's orders. The three different district judges who presided over this case each issued inconsistent rulings regarding the privileges and the government's misconduct.

This case initially was assigned to Judge Steven Logan. On June 14, 2018, the government sought permission from Judge Logan to review privileged communications it had seized. The government *did not tell* Judge Logan that it had

40

*already* been questioning Ferrer about these very communications. (*See* Ex. BB at 12-13 (enumerating various examples contained in Ferrer's Memoranda of Interview).) On October 18, 2018, Judge Logan denied the government's request, holding that "the Government cannot use Ferrer's written waiver of attorney-client privilege to circumvent the terms of the [Joint Representation Agreement among the defendants]." (Ex. U at 4.)

Despite Judge Logan's order, and even though Appellants already had expressed concern to the district court that the government had been invading the attorney-client privilege (*Id.* at 7:27-8:1), the government *continued to invade* the privilege in interviews with Ferrer. (Ex. BB at 13.) For example, on December 14, 2018, prosecutors continued to ask Ferrer about Attorney Don Moon's legal advice. (*See*, *e.g.*, Ex. AY ¶¶ 111-112.)

Based on these clear violations of Judge Logan's orders, Appellants moved to dismiss for outrageous government conduct.[10] (Ex. BA.) Given the cryptic nature of the Government's memoranda documenting the privilege invasions, Appellants requested an evidentiary hearing at which they could question Ferrer, to

---

[10] Judge Logan recused himself, without explanation, on March 1, 2019. (Ex. BC.) Judge Susan Brnovich succeeded Judge Logan and addressed the motion to dismiss. Judge Brnovich also subsequently recused herself, without explanation, on October 29, 2021. (Ex. V.) Judge Diane Humetewa succeeded Judge Brnovich.

explore exactly what was said during these interviews, to establish the privileged nature of the communications, and to establish the scope of the Government's privilege invasions. (*Id*. at 27-28, 33, 37.) Judge Brnovich denied the motion to dismiss, finding that Ferrer's communications with counsel were not privileged, either because Appellants had failed to establish the privilege or because the privilege had been waived. (Ex. AO at 9-12 (under seal).) Judge Brnovich also denied Appellant's request for an evidentiary hearing, at which Appellants would have examined Ferrer and might have satisfied the court's concerns.

At trial, Judge Humetewa reverted back to Judge Logan's view that Ferrer's communications with counsel were privileged and precluded the defense from using them to cross-examine Ferrer. (Ex. Y at 68:17-19.)

Communications with counsel are either privileged or not, but plainly cannot be both *non-privileged* when the government seeks to defeat a defense motion for sanctions based on its improper invasion of the privilege and later *privileged* when the government subsequently seeks to block the defense from using the same communications to cross-examine its key cooperator. The government either (1) invaded the attorney-client privilege (ultimately in direct violation of Judge Logan's orders), in which case a hearing and severe sanctions were warranted, or (2) the defense should have been permitted to use those communications in its defense at trial.

42

It is thus fairly debatable whether the district court erred in permitting the government to use the privilege as a shield and a sword.

### G. It is fairly debatable whether the district court violated Appellants' Sixth Amendment Right to confront Ferrer.

The district court repeatedly precluded defense counsel from using prior inconsistent statements to impeach the Government's principal cooperator, Carl Ferrer, in violation of Appellants' Sixth Amendment right to confrontation.

Given the "serious questions of credibility" that cooperating witnesses pose, defendants must be provided "broad latitude to probe [informants'] credibility by cross-examination." *Banks v. Dretke*, 540 U.S. 668, 701-02 (2004); *Burr v. Sullivan*, 618 F.2d 583, 587 (9th Cir. 1980) (holding "wide latitude in cross-examination is especially appropriate when the key witness is an accomplice of the accused"). But the district court repeatedly precluded defense counsel from using prior inconsistent statements to impeach the government's principal cooperator, Carl Ferrer. This violated Appellants' Sixth Amendment right to confront witnesses against them.

The government does not refute that Ferrer was the *only* witness to inculpate Brunst and the *only* witness to slant emails involving Brunst to favor the government. Ferrer was on the witness stand for eight days on direct exam. Ferrer testified that he and his purported co-conspirators provided false information in applications and communications to financial institutions. In response to

43

questioning about whether he did anything to "try to conceal the fact that Backpage was the ultimate recipient of the … revenue," Ferrer testified, "Yes. We created holding companies."  (Ex. AL at 71:15-20.)

On cross-examination, Appellants sought to impeach Ferrer by contrasting his trial testimony about "misdirect[ing]" banks (Ex. AG at 53:8-9) with his prior statements that there was "no evidence of fraudulent merchant bank applications," "you are not disguising your transaction when you fill out a contract, spend months getting contracts vetted by the acquiring bank/processor and attorneys," and "[a money laundering charge here] is really an attempt to 'legislate by prosecution' via payment service providers which is the weak link the government pressures to cut off unpopular speech[.]"  (Exs. AM, AN.)  The government does not refute that these statements directly contradicted Ferrer's trial testimony.  Knowing that this impeachment would have been the most damning cross-examination of Ferrer, the government vigorously objected to the impeachment on the conflicting grounds that Ferrer's prior statements were privileged and that Ferrer might not have made the statements.  (Ex. AG at 59:21-60:23.)  The district court ultimately precluded the impeachment, questioning the authenticity of the document *and* finding that it appeared to constitute work product.  (*Id.* at 63:22-25 (questioning authenticity)); (Ex. Y at 68:17-71:22.)  That decision was erroneous.

Ex. AM is an email from Ferrer and Ex. AN is the attachment to that email, which contains highlighted portions titled, "CARL COMMENT."  On its face, there is no question these were Ferrer's words.  And the district court refused to permit questions of Ferrer (even outside the presence of the jury) where Ferrer no doubt would have admitted this.  There was no basis for the district court to preclude direct impeachment evidence for lack of authenticity without affording Appellants the right to question Ferrer on any issues related to authenticity.  The government had also argued that the exhibits were privileged, but that argument is in direct contrast to Judge Brnovich's prior ruling that the privilege had been waived.  (Ex. AO at 9-12 (denying defendants' motion to dismiss for invasion of privilege); *see also* Ex. AP at 54:2-21 (allowing defense counsel to reference Ferrer's communications with lawyers).)

The denial of Appellants' right to impeach the government's key witness—and the only witness against Brunst—with Ferrer's contradictory prior statements on the key issue of openness to financial institutions was a blatant violation of the Sixth Amendment's Confrontation Clause.  It is at least fairly debatable whether the district court erred.

**H.    It is fairly debatable whether the district court erred in finding that the money laundering counts traced to the Travel Act conspiracy.**

Finally, the district court erred in denying Appellants' motion for judgment of acquittal on the money laundering counts.  (Ex. K at 41-58.)  The government had the burden to establish that the funds at issue were derived from specific instances of third-party speech that constituted Travel Act violations.  *See Bursey v. United States*, 466 F.2d 1059, 1081–82 (9th Cir. 1972).  Brunst was acquitted of all fifty Travel Act counts and Spear was acquitted of thirty-three of the fifty Travel Act counts.  The Travel Act conspiracy ended in mid-2015, well before any of the money laundering counts that were charged, and the government did no tracing of any funds to Travel Act violations.  Thus, Appellants were entitled to a judgment of acquittal on the money laundering counts, and it is fairly debatable whether the district court erred in reaching a contrary conclusion.  As noted, this issue will be extensively briefed in Appellants Michael Lacey's forthcoming motion for bail pending appeal and Appellants join in his arguments.

## CONCLUSION

For these reasons, Appellants request that the Court grant their motions for bail pending appeal.

Dated:  October 2, 2024                **COHEN WILLIAMS LLP**

By:  _____/s/ Alyssa D. Bell_____
           Alyssa D. Bell


*Attorneys for Scott Spear*


Dated:  October 2, 2024                **BIRD, MARELLA, RHOW,**
                                            **LINCENBERG, DROOKS & NESSIM, LLP**

By:  _____/s/ Gary Lincenburg_____
           Gary S. Lincenberg
           Gopi K. Panchapakesan
           Michael C. Landman


*Attorneys for John ("Jed") Brunst*

47

## <u>**ATTESTATION**</u>

Appellants join and concur in the contents of this filing.


Dated:  October 2, 2024          **COHEN WILLIAMS LLP**



By: _____*Alyssa D. Bell*_____
        Alyssa D. Bell
        Attorneys for Scott Spear

48

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 27(d)(2)(A) and Ninth Circuit Rule 27-1(1)(d), I

certify that this motion brief is proportionally spaced, has a typeface of 14 points,

contains approximately 10,312 words.

Dated:  October 2, 2024                **COHEN WILLIAMS LLP**


By:  *Alyssa D. Bell*
     Alyssa D. Bell
     Attorneys for Scott Spear

49