**Nos. 24-5374, 24-5375, 24-5376**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JOHN "JED" BRUNST; SCOTT SPEAR; &
MICHAEL LACEY,

Defendants-Appellants.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF ARIZONA, NO. 2:18-CR-422-DJH
(THE HONORABLE DIANE J. HUMETEWA, UNITED STATES DISTRICT JUDGE)

_____

**CONSOLIDATED ANSWERING BRIEF
FOR THE UNITED STATES**

_____

TIMOTHY COURCHAINE
United States Attorney

WILLIAM G. VOIT
KEVIN RAPP
Assistant United States Attorneys
District of Arizona

AUSTIN M. BERRY
Trial Attorney
Child Exploitation & Obscenity Section
Criminal Division

A. TYSEN DUVA
Assistant Attorney General

JOSH A. GOLDFOOT
Deputy Assistant Attorney General

PAUL T. CRANE
Attorney, Appellate Section
Criminal Division
United States Department of Justice
950 Pennsylvania Ave. NW, Rm. 1264
Washington, DC 20530
Telephone: (202) 616-9316
Paul.Crane@usdoj.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................... vi

INTRODUCTION ................................................................1

JURISDICTION AND CUSTODY STATUS....................................3

STATEMENT OF THE ISSUES..................................................4

STATEMENT OF THE CASE ....................................................5

    I.    Statement of Facts .................................................5

        A.    The Defendants' Leadership Roles in Backpage ......................6

        B.    The Defendants Utilize Various Strategies to Cultivate Backpage's Online Prostitution Advertisement Business .........7

                1.    Backpage's "Content Aggregation" Strategy..................8

                2.    Backpage's VIP Treatment Program For Prostitution "Super Posters" ...............................9

                3.    Backpage's "Secret Sauce": Its Reciprocal Relationship with The Erotic Review.............................9

        C.    The Defendants Employ Various Strategies To Preserve Backpage's Position as The Internet's Most Profitable Sex-for-Money Platform While Also Maintaining "Plausible Deniability" About Their Actual Objectives..........11

                1.    Backpage Continues Operating Its Non-Adult Categories to Maintain "Plausible Deniability" Regarding its Prostitution Advertisements....................13

                2.    Backpage Implements Moderation Policies Geared Towards "Growing Revenue and Not Removing Illegal Content"................................................14

                3.    Backpage's "Slow Dance Strategy" with State Attorneys General and Law Enforcement .....................16

D.  The Defendants Utilize A Variety of Financial Structures To Keep Backpage's Revenues Flowing Into Their Personal Bank Accounts ...........................................................18

  1.  The Defendants Start Funneling Backpage's Transactions Through Innocuously Named Shell Companies, Foreign Payment Processors, and European Banks ..............................................................19

  2.  The Defendants Enter Into A Seller-Financed Sale of Backpage to Ferrer in April 2015 to Distance Themselves from Backpage But Not Its Profits .............22

E.  Backpage Is Shut Down By The Federal Government in April 2018 ...........................................................................24

II.  Procedural History...........................................................................25

  A.  The Parties Engage In Extensive Pretrial Litigation.................25

  B.  After A Three-Month Trial, The Jury Returns A Mixed Verdict.............................................................................................27

  C.  The District Court Grants in Part and Denies in Part The Defendants' Motions for Judgment of Acquittal ......................29

  D.  Sentencing ..................................................................................30

III.  Rulings Under Review .......................................................................31

SUMMARY OF ARGUMENT ...............................................................................31

ARGUMENT .............................................................................................................34

I.  Spear's Travel Act Convictions Do Not Rest On An Invalid Legal Theory ........................................................................................34

  A.  Background ..................................................................................35

  B.  Standard of Review.....................................................................39

  C.  The Travel Act Is Not An Accomplice Liability Statute..........39

D.    The District Court Did Not Reversibly Err When Instructing the Jury About The Travel Act's Specific Intent Requirements ................................................................51

II.    Spear's Travel Act Convictions Do Not Violate The First Amendment ...........................................................................52

A.    Background ............................................................................52

B.    Standard of Review..............................................................56

C.    Spear's Travel Act Convictions Are Not Based On Protected Speech ....................................................................57

D.    The District Court Did Not Reversibly Err When Instructing the Jury About The First Amendment....................67

III.    The District Court Did Not Reversibly Err When Limiting Brunst's Proposed Testimony In Manners Consistent With Its Evidentiary Rulings ...............................................................69

A.    Background ............................................................................70

B.    Standard of Review..............................................................78

C.    The District Court's Evidentiary Rulings Were Not Arbitrary Or Disproportionate To The Purposes The Federal Rules Of Evidence Are Designed To Serve ................79

IV.    The District Court Did Not Abuse Its Discretion When Limiting Brunst's Cross-Examination Of Ferrer In Manners Consistent With its Evidentiary Rulings ............................................84

A.    Background ............................................................................85

B.    Standard of Review..............................................................91

C.    The District Court Did Not Err Or Otherwise Abuse Its Discretion When Limiting Cross-Examination Based On The Federal Rules Of Evidence .................................................92

V.    The District Court Did Not Reversibly Err When Denying Brunst's Motion For A Judgment of Acquittal On Count 1 ..............96

iii

A.     Background ............................................................96

B.     Standard of Review...............................................101

C.     Sufficient Evidence Supports Brunst's Conviction For Conspiracy To Violate The Travel Act (Count 1).................101

D.     There Was No Constructive Amendment To Count 1 Of The Superseding Indictment ...................................104

VI.    Sufficient Evidence Supports Brunst's Concealment Money Laundering Convictions (Counts 53-62)............................106

A.     Background ...........................................................107

B.     Standard of Review...............................................110

C.     Viewing The Evidence In The Light Most Favorable To The Prosecution, A Rational Jury Could Have Found Brunst Guilty Of Concealment Money Laundering ...............111

VII.   Sufficient Evidence Supports Brunst's International Promotional Money Laundering Convictions (Counts 64-68) .........117

A.     Background ...........................................................118

B.     Standard of Review...............................................120

C.     There Was Sufficient Evidence That Brunst Acted With An Intent To Promote Violations Of The Travel Act.............120

VIII.   The District Court Correctly Denied The Defendants' Motion To Dismiss The Indictment Based On Alleged Government Misconduct ....................................................122

A.     Background ...........................................................122

B.     Standard of Review...............................................126

C.     Brunst Fails To Demonstrate Any Reversible Error In the District Court's Ruling...........................................126

IX.    The District Court Did Not Err When Calculating Brunst's Offense Level Under the Sentencing Guidelines .............................129

iv

A. Background ............................................................129

B. Standard of Review ................................................132

C. The District Court Did Not Abuse Its Discretion Or Clearly Err In Calculating Brunst's Offense Level ...............132

X. Sufficient Evidence Supports Lacey's Conviction For International Concealment Money Laundering (Count 100)............135

A. Background ............................................................135

B. Standard of Review ................................................141

C. A Rational Jury Could Conclude That Lacey Knew The Transferred Funds Were Proceeds From Violations Of The Travel Act .............................................................141

D. A Rational Jury Could Conclude That Lacey Knew The Transfer Was Designed, At Least In Part, To Conceal The Nature Or Source Of The Illicit Funds ....................................145

XI. Lacey's Evidentiary Challenges Are Meritless................................149

A. Standard of Review................................................149

B. The District Court Did Not Reversibly Err............................150

CONCLUSION .................................................................156

# TABLE OF AUTHORITIES

## Cases

*Backpage.com, LLC v. Cooper*,
  939 F. Supp. 2d 805 (M.D. Tenn. 2013) ..................................................... 64, 65

*Backpage.com, LLC v. Hoffman*,
  No. 13-cv-3952, 2013 WL 4502097 (D.N.J. Aug. 20, 2013).............................64

*Backpage.com, LLC v. McKenna*,
  881 F. Supp. 2d 1262 (W.D. Wash. 2012) ................................................. 64, 65

*Bailey v. Iles*,
  87 F.4th 275 (5th Cir. 2023) ..............................................................................60

*Chambers v. Mississippi*,
  410 U.S. 284 (1973)............................................................................................79

*Counterman v. Colorado*,
  600 U.S. 66 (2023)....................................................................................... 60, 66

*Coyote Pub., Inc. v. Miller*,
  598 F.3d 592 (9th Cir. 2010) ..............................................................................59

*Crane v. Kentucky*,
  476 U.S. 683 (1986)............................................................................................80

*Delaware v. Fensterer*,
  474 U.S. 15 (1985)..............................................................................................95

*Delaware v. Van Arsdall*,
  475 U.S. 673 (1986)..................................................................................... 93, 95

*Elonis v. United States*,
  575 U.S. 723 (2015)............................................................................................49

*Erlenbaugh v. United States*,
  409 U.S. 239 (1972)................................................................................ 41, 44, 46

*Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*,
  880 F.3d 450 (9th Cir.), amended, 881 F.3d 792 (9th Cir. 2018) .....................59

*Giboney v. Empire Storage & Ice Co.*,
  336 U.S. 490 (1949).................................................................58

*Holmes v. South Carolina*,
  547 U.S. 319 (2006).................................................................80

*IMDb.com Inc. v. Becerra*,
  962 F.3d 1111 (9th Cir. 2020) ..............................................63

*In re Grand Jury Investigation*,
  974 F.2d 1068 (9th Cir. 1992) ............................................127

*In re Pac. Pictures Corp.*,
  679 F.3d 1121 (9th Cir. 2012) ............................................126

*Jackson v. Virginia*,
  443 U.S. 307 (1979).............................................................102

*Marietta Mem'l Hosp. Emp. Health Benefit Plan v. DaVita Inc.*,
  596 U.S. 880 (2022).................................................................48

*Moses v. Payne*,
  555 F.3d 742 (9th Cir. 2009) ................................................80

*Musacchio v. United States*,
  577 U.S. 237 (2016).............................................................111

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*,
  413 U.S. 376 (1973)....................................................... 59, 143

*Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*,
  290 F.3d 1058 (9th Cir. 2002), as amended (July 10, 2002) (en banc).............60

*Puckett v. United States*,
  556 U.S. 129 (2009).................................................................92

*Regalado Cuellar v. United States*,
  553 U.S. 550 (2008).............................................................146

*Rock v. Arkansas*,
  483 U.S. 44 (1987)......................................................... 79, 80

vii

*Rosemond v. United States,*
    572 U.S. 65 (2014)................................................................48

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos,*
    605 U.S. 280 (2025)..............................................................49

*Snyder v. Phelps,*
    562 U.S. 443 (2011)..............................................................60

*Sturgeon v. Frost,*
    577 U.S. 424 (2016)..............................................................50

*Thunder Studios, Inc. v. Kazal,*
    13 F.4th 736 (9th Cir. 2021) ................................................56

*United States v. Abel,*
    469 U.S. 45 (1984)................................................................78

*United States v. Adamson,*
    291 F.3d 606 (9th Cir. 2002) ....................................... 101, 104

*United States v. Adefehinti,*
    510 F.3d 319 (D.C. Cir. 2007)............................................116

*United States v. Alarcon-Simi,*
    300 F.3d 1172 (9th Cir. 2002) ............................................111

*United States v. Awada,*
    425 F.3d 522 (8th Cir. 2005) ..............................................113

*United States v. Baker,*
    63 F.3d 1478 (9th Cir. 1995) ..............................................121

*United States v. Barragan,*
    263 F.3d 919 (9th Cir. 2001) ..............................................120

*United States v. Bellot,*
    113 F.4th 1151 (9th Cir. 2024) ............................................45

*United States v. Books,*
    914 F.3d 574 (7th Cir. 2019) ................................................84

viii

*United States v. Brown,*
  770 F.2d 768 (9th Cir. 1985) ...............................................................40

*United States v. Chadwell,*
  798 F.3d 910 (9th Cir. 2015) .............................................................132

*United States v. Cherry,*
  330 F.3d 658 (4th Cir. 2003) .............................................................113

*United States v. Childress,*
  58 F.3d 693 (D.C. Cir. 1995) ..............................................................40

*United States v. Collazo,*
  984 F.3d 1308 (9th Cir. 2021) (en banc) ..........................................103

*United States v. Cook,*
  808 F.3d 1195 (9th Cir. 2015) ...........................................................129

*United States v. Davis,*
  854 F.3d 601 (9th Cir. 2017) .............................................................106

*United States v. Daychild,*
  357 F.3d 1082 (9th Cir. 2004) ...........................................................132

*United States v. Dennis,*
  132 F.4th 214 (2d Cir. 2025) ...............................................................60

*United States v. Depue,*
  912 F.3d 1227 (9th Cir. 2019) (en banc) ............................................92

*United States v. Dominguez Benitez,*
  542 U.S. 74 (2004) ...............................................................................92

*United States v. Douglass,*
  780 F.2d 1472 (9th Cir. 1986) .............................................................47

*United States v. Ellis,*
  No. 24-3575, 2025 WL 2028309 (9th Cir. July 21, 2025) .................92

*United States v. Espinoza-Baza,*
  647 F.3d 1182 (9th Cir. 2011) ..................................................... 78, 79

*United States v. Feola,*
420 U.S. 671 (1975).................................................................103

*United States v. Finazzo,*
704 F.2d 300 (6th Cir. 1983) ................................................44

*United States v. Gallagher,*
99 F.3d 329 (9th Cir. 1996) ..................................... 32, 79, 80, 81

*United States v. Garcia,*
37 F.3d 1359 (9th Cir. 1994) ...............................................109

*United States v. Garcia,*
400 F.3d 816 (9th Cir. 2005) ...............................................45

*United States v. Gibson Specialty Co.,*
507 F.2d 446 (9th Cir. 1974) ..................................... 40, 41, 51

*United States v. Golb,*
69 F.3d 1417 (9th Cir. 1995) ................................... 109, 113

*United States v. Gordon,*
641 F.2d 1281 (9th Cir. 1981) ..............................................43

*United States v. Grasso,*
724 F.3d 1077 (9th Cir. 2013) ............................................103

*United States v. Haines,*
918 F.3d 694 (9th Cir. 2019) .............................................155

*United States v. Hanley,*
190 F.3d 1017 (9th Cir. 1999) ...........................................114

*United States v. Hanna,*
293 F.3d 1080 (9th Cir. 2002) .............................................56

*United States v. Hansen,*
599 U.S. 762 (2023)......................................................... 36, 42

*United States v. Harkonen,*
510 Fed. Appx. 633 (9th Cir. 2013)......................................56

x

*United States v. Hayat*,
710 F.3d 875 (9th Cir. 2013) ............................................................150

*United States v. Haynes*,
216 F.3d 789 (9th Cir. 2000) ............................................................125

*United States v. Hinkson*,
585 F.3d 1247 (9th Cir. 2009) (en banc) .................................... 78, 79

*United States v. Jabara*,
644 F.2d 574 (6th Cir. 1981) ..............................................................47

*United States v. Jaimez*,
45 F.4th 1118 (9th Cir. 2022) ...........................................................103

*United States v. Jenkins*,
943 F.2d 167 (2d Cir. 1991) ...............................................................44

*United States v. Kaplan*,
836 F.3d 1199 (9th Cir. 2016) ..........................................................101

*United States v. Kellum*,
119 Fed. Appx. 32 (9th Cir. 2004)............................................ 115, 117

*United States v. Keyser*,
704 F.3d 631 (9th Cir. 2012) ..............................................................56

*United States v. Lacey et al.*,
No. 22-10000, 2022 WL 4363818 (9th Cir. Sept. 21, 2022)..............27

*United States v. Larson*,
495 F.3d 1094 (9th Cir. 2007) (en banc) ........................ 91, 92, 93, 96

*United States v. Liera*,
585 F.3d 1237 (9th Cir. 2009) ..........................................................156

*United States v. Macias*,
789 F.3d 1011 (9th Cir. 2015) ............................................................92

*United States v. Manarite*,
44 F.3d 1407 (9th Cir. 1995) ............................................................120

*United States v. Mankarious*,
151 F.3d 694 (7th Cir. 1998) ..............................................................113

*United States v. Martinelli*,
454 F.3d 1300 (11th Cir. 2006) .........................................................113

*United States v. McLennan*,
563 F.2d 943 (9th Cir. 1977) .............................................. 73, 74, 89

*United States v. Medina*,
711 Fed. Appx. 420 (9th Cir. 2018)...................................................151

*United States v. Mickey*,
897 F.3d 1173 (9th Cir. 2018) ...........................................................101

*United States v. Mikhel*,
889 F.3d 1003 (9th Cir. 2018) ............................................... 93, 94

*United States v. Montague*,
29 F.3d 317 (7th Cir. 1994) ..................................................................44

*United States v. Montgomery*,
384 F.3d 1050 (9th Cir. 2004) ...........................................................103

*United States v. Montoya*,
945 F.2d 1068 (9th Cir. 1991), *rev'd on other grounds*,
*McCormick v. United States*, 500 U.S. 257 (1991) .........................120

*United States v. Moreno*,
102 F.3d 994 (9th Cir. 1996) .............................................. 78, 79, 81

*United States v. Muskovsky*,
863 F.2d 1319 (7th Cir. 1988) ..............................................................40

*United States v. Naranjo*,
634 F.3d 1198 (11th Cir. 2011) .........................................................147

*United States v. Nevils*,
598 F.3d 1158 (9th Cir. 2010) (en banc) ..........................................111

*United States v. Norwood,*
  603 F.3d 1063 (9th Cir. 2010) ............................................................63

*United States v. Pang,*
  362 F.3d 1187 (9th Cir. 2004) ..........................................................104

*United States v. Perez,*
  962 F.3d 420 (9th Cir. 2020) ....................................................... 57, 69

*United States v. Polizzi,*
  500 F.2d 856 (9th Cir. 1974) ....................................................... 40, 47

*United States v. Raineri,*
  670 F.2d 702 (7th Cir. 1982) .............................................................47

*United States v. Richard,*
  234 F.3d 763 (1st Cir. 2000)............................................................113

*United States v. Rockelman,*
  49 F.3d 418 (8th Cir. 1995) ............................................................148

*United States v. Rodriguez,*
  971 F.3d 1005 (9th Cir. 2020) ..................................................... 39, 57

*United States v. Rogers,*
  321 F.3d 1226 (9th Cir. 2003) .........................................................153

*United States v. Rubio-Villareal,*
  967 F.2d 294 (9th Cir. 1992) (en banc) ..........................................111

*United States v. Ruehle,*
  583 F.3d 600 (9th Cir. 2009) ........................................ 124, 126, 127

*United States v. Sanmina Corp.,*
  968 F.3d 1107 (9th Cir. 2020) .........................................................133

*United States v. Sarkisian,*
  197 F.3d 966 (9th Cir. 1999) ............................................................39

*United States v. Shetler,*
  665 F.3d 1150 (9th Cir. 2011) .........................................................111

xiii

*United States v. Singh*,
  995 F.3d 1069 (9th Cir. 2021) .............. 93, 94, 95, 104, 107, 115, 117, 145, 147

*United States v. Stafford*,
  831 F.2d 1479 (9th Cir. 1987) ............................................ 40, 43, 44, 46, 47, 48

*United States v. Staggs*,
  136 Fed. Appx. 63 (9th Cir. 2005) ................................................................154

*United States v. Stevens*,
  559 U.S. 460 (2010) ........................................................................................58

*United States v. Stinson*,
  647 F.3d 1196 (9th Cir. 2011) ......................................................................126

*United States v. Sullivan*,
  522 F.3d 967 (9th Cir. 2008) ........................................................................102

*United States v. Sun*,
  673 Fed. Appx. 729 (9th Cir. 2016) ..................................................... 115, 117

*United States v. Sutcliffe*,
  505 F.3d 944 (9th Cir. 2007) ...................................................................... 45, 56

*United States v. Tavelman*,
  650 F.2d 1133 (9th Cir. 1981) ........................................................................40

*United States v. Tekle*,
  329 F.3d 1108 (9th Cir. 2003) .............................................. 115, 116, 146, 148

*United States v. Teplin*,
  775 F.2d 1261 (4th Cir. 1985) ........................................................................44

*United States v. Tisor*,
  96 F.3d 370 (9th Cir. 1996) ............................................................................56

*United States v. Tucker*,
  641 F.3d 1110 (9th Cir. 2011) ........................................................................68

*United States v. Ubaldo*,
  859 F.3d 690 (9th Cir. 2017) ....................................................... 110, 120, 141

xiv

*United States v. Waters*,
627 F.3d 345 (9th Cir. 2010) ............................................................150

*United States v. Welch*,
327 F.3d 1081 (10th Cir. 2003), *abrogated on other grounds*,
*Ciminelli v. United States*, 598 U.S. 306 (2023) ........................ 40, 43

*United States v. White*,
610 F.3d 956 (7th Cir. 2010) ...............................................................61

*United States v. Whittemore*,
776 F.3d 1074 (9th Cir. 2015) ...........................................................151

*United States v. Wilkes*,
662 F.3d 524 (9th Cir. 2011) .......................... 107, 109, 116, 117, 144, 146, 147

*United States v. Williams*,
553 U.S. 285 (2008)........................................ 31, 53, 55, 58, 63, 143

*United States v. Wilson*,
39 Fed. Appx. 495 (9th Cir. 2002)....................................................120

*Valle Del Sol Inc. v. Whiting*,
709 F.3d 808 (9th Cir. 2013) ...............................................................64

*Woodhull Freedom Foundation v. United States*,
72 F.4th 1286 (D.C. Cir. 2023)..................................................... 36, 49

*Yellen v. Confederated Tribes of Chehalis Rsrv.*,
594 U.S. 338 (2021)............................................................................50

*Young v. United States*,
22 F.4th 1115 (9th Cir. 2022) .............................................................45

**Statutes and Rules**

8 U.S.C. § 1324 ......................................................................... 42, 48

18 U.S.C. § 2 .....................................................................................41

18 U.S.C. § 371 ........................................................................ 25, 96

18 U.S.C. § 1952 .................................. 26, 34, 35, 37, 42, 43, 46, 67, 71, 88, 96, 130

18 U.S.C. § 1956 .................................. 25, 26, 107, 112, 117, 118, 135, 141, 145

18 U.S.C. § 1957 ................................................................................. 26, 30

18 U.S.C. § 2421 ......................................................................................154

18 U.S.C. § 3231 ..........................................................................................3

28 U.S.C. § 1291 ..........................................................................................3

47 U.S.C. § 230 .................................................................................. 65, 72

Fed. R. Crim. P. 52 ....................................................................................91

Fed. R. Evid. 401 .......................................................................................71

Fed. R. Evid. 402 .......................................................................................71

Fed. R. Evid. 403 ................................................................................. 72, 80

Fed. R. Evid. 602 ......................................................................................150

Fed. R. Evid. 701 ......................................................................................151

U.S.S.G. § 1B1.3 ................................................................................ 133, 134

U.S.S.G. § 1B1.10 .....................................................................................134

U.S.S.G. § 2E1.2 .......................................................................... 130, 131, 133

U.S.S.G. § 2G1.1 ............................................................................... 130, 133

U.S.S.G. § 2G1.3 .......................................................................... 130, 131, 133

U.S.S.G. § 2S1.1 ............................................................................... 130, 133

U.S.S.G. § 2X1.1 .......................................................................................132

**Other Authorities**

Ninth Circuit Model Criminal Jury Instructions....................... 37, 45, 108, 118, 139

## INTRODUCTION

For most of its 14-year existence, Backpage.com ("Backpage") was the country's leading platform for online prostitution advertisements. At its peak, Backpage's "Adult" section received more than one billion page views per month and generated more than $100 million in advertising revenue per year. Backpage's empire of prostitution advertising was not built in a day, nor was it built by accident. Rather, it was the purposeful and deliberate result of various business strategies developed, implemented, and refined by Backpage's leadership. That leadership included the three defendants here, all of whom owned and operated Backpage.

As Backpage established a near monopoly over online prostitution advertising, banks and credit card companies in the United States increasingly refused to process the company's financial transactions. In response, Backpage's leadership adopted numerous financial strategies designed to keep Backpage's booming revenues flowing into their personal accounts, including the pervasive use of shell companies and substantial reliance on foreign payment processors. Eventually, the defendants determined that the most effective way to insulate their massive personal profits from public scrutiny was to transfer ownership of Backpage to co-defendant Carl Ferrer in a seller-financed deal. Following that transfer, Backpage's advertising revenues were delivered to the defendants in the form of loan payments made through multiple holding companies.

In 2018, defendants-appellants Scott Spear, John "Jed" Brunst, Michael Lacey, and several others were charged by a federal grand jury in a 100-count superseding indictment with conspiracy to violate the Travel Act, violating the Travel Act, conspiracy to commit money laundering, and money laundering. Five years later, the defendants sat for a three-month trial. After carefully considering all the evidence, the jury returned a nuanced verdict—returning convictions on some counts, acquittals on some counts, and failing to reach a verdict on some counts. Following substantial post-trial briefing and argument, the district court granted in part and denied in part the defendants' motions for a judgment of acquittal in a scrupulous 73-page opinion. As detailed more below, few cases have received more scrutiny from jurists and jurors than this criminal prosecution.

On appeal, the defendants primarily rehash arguments the district court carefully and, oftentimes, repeatedly rejected. In particular, the defendants challenge the jury's verdict on the grounds of insufficient evidence; advance novel interpretations of the Travel Act, First Amendment, and money laundering statute that have not been adopted by any federal court; and claim the district court abused its discretion with respect to various evidentiary rulings made over the course of this three-month trial. For the reasons explained below, each of those claims is meritless. This Court should affirm the district court's judgment and the jury's carefully considered verdict.

2

## JURISDICTION AND CUSTODY STATUS

In these consolidated appeals, defendants John "Jed" Brunst, Scott Spear, and Michael Lacey appeal from the judgments of conviction in their criminal cases. *See* 1-ER-3-7 (Brunst Amended Judgment); 1-ER-8-12 (Spear Judgment); 1-ER-13-17 (Lacey Judgment).[1] The district court (Humetewa, J.) had jurisdiction under 18 U.S.C. § 3231.

On September 3, 2024, each of the defendants filed timely notices of appeal. *See* 28-ER-8015 (Lacey); 28-ER-8018 (Brunst); 28-ER-8021 (Spear). On October 9, 2024, this Court consolidated the defendants' appeals. C.A. Doc. 32.1. This Court has jurisdiction under 28 U.S.C. § 1291.

On November 21, 2024, this Court denied Brunst's and Spear's motions for bail pending appeal, and it granted Lacey's motion. C.A. Doc. 50.1; *see also* C.A. Doc. 120.1 (denying Brunst's and Spear's renewed motions for bail pending appeal). Brunst is currently in custody and has a projected release date of September 1, 2032 (BOP Register No. 91635-408). Spear is currently in custody and has a projected release date of November 15, 2032 (BOP Register No. 91634-408). Lacey is currently not in custody.

---

[1] "ER" refers to the defendant's joint Excerpts of Record; "BrunstER" refers to Brunst's Excerpts of Record; and "SER" refers to the government's Supplemental Excerpts of Record.

## STATEMENT OF THE ISSUES

1.      Whether Spear's convictions under the Travel Act (Counts 2-18) rest on a legally invalid theory of prosecution. (Spear Issues 1 & 3)

2.      Whether Spear's convictions under the Travel Act (Counts 2-18) violate the First Amendment. (Spear Issues 2 & 3)

3.      Whether the district court reversibly erred when limiting Brunst's proposed testimony in manners consistent with its evidentiary rulings. (Brunst Issue 1)

4.      Whether the district court abused its discretion when it limited the defendants' cross-examination of a government witness in manners consistent with its evidentiary rulings. (Brunst Issue 1)

5.      Whether the district court reversibly erred when denying Brunst's motion for a judgment of acquittal on Count 1 (conspiracy to violate the Travel Act). (Brunst Issues 2 & 3)

6.      Whether sufficient evidence supported Brunst's convictions for concealment money laundering. (Brunst Issues 4 & 5)

7.      Whether sufficient evidence supported Brunst's convictions for international promotional money laundering. (Brunst Issues 4 & 5)

8. Whether the district court erred when it denied the defendants' motion to dismiss the indictment based on the defendants' claims of government misconduct. (Brunst Issue 6)

9. Whether the district court erred when calculating Brunst's offense level under the Sentencing Guidelines. (Brunst Issue 7)

10. Whether sufficient evidence supported Lacey's conviction for international concealment money laundering. (Lacey Issues 1-4)

11. Whether the district court reversibly erred with respect to the evidentiary rulings challenged by Lacey on appeal. (Lacey Issue 5)

## STATEMENT OF THE CASE

### I. STATEMENT OF FACTS

Defendants-Appellants Scott Spear, Jed Brunst, Michael Lacey, and their co-conspirators deliberately and methodically built Backpage.com ("Backpage") into the country's leading source for online prostitution advertisements. Because of their dedicated efforts, Backpage generated more than $500 million in revenue over its 14-year existence—with most of its revenue coming from prostitution advertising. *See, e.g.*, 2-ER-299-302 (district court explaining that "the sale of ad space leading to prostitution offenses was the primary focus of Backpage's business," and those sales "became the dominant portion of Backpage's business"). Because of their

5

respective roles in owning and operating Backpage, Spear, Brunst, and Lacey each reaped substantial financial rewards.

As explained in more detail below, the defendants deployed several marketing strategies to establish Backpage as the country's top website for shopping for prostitutes. They developed, approved, funded, defended, or otherwise perpetuated strategies that fueled Backpage's growth into a prostitution advertising powerhouse. The defendants then worked for years to keep Backpage's profits flowing, concealing Backpage's intended business model and utilizing complex financial mechanisms to hide the true nature and source of their personal profits.

## A. The Defendants' Leadership Roles in Backpage

Backpage was launched by the defendants and others in 2004 and began as "an online website offering classified ads for a variety of goods of services," seeking to serve as a competitor to Craigslist. 1-ER-279. From its inception through April 2015, Backpage was owned by Lacey, Brunst, Spear, and James Larkin. 1-ER-279.

Each of the Backpage owners had leadership roles in Backpage's parent company, Village Voice Media, which for a time also operated several alternative newspapers. 1-ER-279. Larkin was the Chief Executive Officer; Lacey was the Chief Editorial Officer; Brunst was the Chief Financial Officer; and Spear was an Executive Vice President. 1-ER-279.

Among other responsibilities at Backpage, Spear directly managed and supervised Carl Ferrer, who ran Backpage's daily operations. While Spear was Ferrer's immediate supervisor, Ferrer also described Brunst and Larkin as his superiors. 1-ER-279.

**B.     The Defendants Utilize Various Strategies to Cultivate Backpage's Online Prostitution Advertisement Business**

From the beginning, Backpage charged for advertisements placed in its "Adult" section, which included the following categories: "Female Escorts"; "Male Escorts"; "Transsexual Escorts"; "Body Rubs"; "Adult Jobs"; and "Phone and Web." 1-ER-279. The defendants quickly recognized that the "Adult" section generally, and the "Female Escort" section specifically, was the most profitable category on Backpage. 1-ER-279-280. Unlike a job advertisement, where the need to advertise ends after a position is filled, escorts "'needed repeat business'" and wanted to advertise "every day." 1-ER-279-280; 47-ER-13426. The defendants accordingly decided that "Female Escorts," which they knew to be "hooker ads," was the best vehicle to "grow money on Backpage." 1-ER-279-282; 34-ER-9633-9634; 47-ER-13427.

To achieve that end, the defendants engaged in a multi-prong strategy to dramatically grow Backpage's Female Escorts section, ultimately building Backpage into the leading online sex-for-money platform in the United States.

7

### 1. Backpage's "Content Aggregation" Strategy

One early key strategy was referred to internally at Backpage as "content aggregation." To expand the number of female escort advertisements appearing on Backpage, Spear directed Ferrer and others to (a) systematically identify escort ads placed on Craigslist's "'Erotic Services'" section; (b) copy and publish the same ads (including the poster's contact information) on Backpage; and (c) separately contact the poster and offer to publish her escort advertisements for free for a limited time on Backpage. 1-ER-280; 34-ER-9569-9573; 47-ER-13429-13435. This was all done "in hopes that the original posters and any responding users would [over time] start paying to post ads on Backpage instead of Craigslist." 1-ER-280.

Spear and Ferrer presented the content aggregation marketing strategy to Brunst, as his approval was necessary "to fund the staffing needed to execute this strategy." 1-ER-280. After Brunst "approved the budget plan," Spear directed "Ferrer to use the strategy 'in every major metro market in the U.S.'" 1-ER-280. As Ferrer later explained, the goal was "to 'seed the site'"—that is, Backpage's Female Escorts section—with posts from at least "200 independent escorts" in "every market" in the United States. 1-ER-280; 34-ER-9631-9633; *see also* 34-ER-9633 (Ferrer explaining that it was important to have many female escort advertisements with "different phone numbers and different pictures so that it looks like it's a lot of content that the consumer of those ads would enjoy going through").

8

After Craigslist shut down its own Adult (formerly Erotic Services) section in 2010, "this type of content aggregation strategy was no longer necessary because" Backpage now had a "monopoly" on online prostitution advertisements. 1-ER-281.

### 2. Backpage's VIP Treatment Program For Prostitution "Super Posters"

In addition to pursuing its aggregation strategy, Backpage also reached out to and eventually developed affiliate programs with bulk prostitution advertisers—called "super posters." 1-ER-282; 34-ER-9584-9589; 47-ER-13504-13505. These "super posters" would post "thousands of prostitution ads" on Backpage, and in exchange they would receive "VIP treatment," such as discounted advertisement rates, referral fees, and personal access to Backpage managers. 1-ER-282. Indeed, Spear and Larkin specifically directed Ferrer to meet with several different super posters in person in New York City, which he did. 1-ER-282; 34-ER-9584-9585.

### 3. Backpage's "Secret Sauce": Its Reciprocal Relationship with The Erotic Review

While "content aggregation" and working with "super posters" helped populate Backpage's Female Escorts section with advertisements, "[t]he 'secret sauce' to increasing Backpage's adult ad revenue" was its "hyperlink exchange agreement" with The Erotic Review ("TER"). 1-ER-281.

TER was a "prostitution review website described as 'Yelp for prostitution.'" 1-ER-281. On TER, "[j]ohns" (purchasers of sex from prostitutes) provided detailed

information about the sexual encounter and the prostitute, including the "price of the services and a description of the sexual services along with a description of the escort or, as they called it on The Erotic Review, the provider." 34-ER-9574-9575; *see, e.g.*, 35-ER-9688-9707 (detailing content on the TER website and representative TER reviews, including Trial Exs. 1835, 1835a, 1835b, 1835c).

By 2007, "when a person posted a review of their experience on TER, TER would include a link to the ad on Backpage, and vice versa." 1-ER-281. TER and Backpage also had a "'banner ad exchange program' where each website featured banner-like ads for the other on their respective websites." 1-ER-281. For many years, Backpage paid TER $4,000 per month for this reciprocal relationship. 1-ER-281-282. Ferrer submitted the TER invoices to Spear and Brunst for approval, and Spear personally signed the payment checks. 1-ER-281-282.

Backpage's reciprocal relationship with TER was instrumental to its exponential growth because the TER connection ensured that prospective prostitution "customers" from across the country would be directed to Backpage and its prostitution advertisements. *See, e.g.*, 34-ER-9574 (Ferrer explaining that, "if no one responds to [Backpage's] ads, you're not going to turn them into paying customers. So by having a relationship with The Erotic Review…we could make their phone numbers ring."). In other words, if content aggregation and super posters

10

provided Backpage with the prostitution *supply*, reciprocal links with TER provided Backpage with the prostitution *demand*.

The owners and operators of Backpage, including Spear, Brunst, Larkin, and Ferrer, all understood the "importance of Backpage's relationship with TER." 1-ER-281; *see, e.g.*, 1-ER-282 ("Spear understood that 'the traffic from The Erotic Review was very, very important for Backpage's success'"). For example, in a 2008 budget plan presented to Brunst and Larkin, Spear specifically emphasized Backpage's partnership with TER, explaining that Backpage's deal with TER and its use of "'reciprocal links [had] created huge brand awareness in this niche industry and increased page views from TER by 120,000 per day.'" 1-ER-281 (quoting 24-ER-6721-6744). For many years thereafter, "Spear, Brunst, and Larkin regularly received Google Analytics reports showing TER as the number one source of non-search engine referrals to Backpage." 1-ER-282.

**C.    The Defendants Employ Various Strategies To Preserve Backpage's Position as The Internet's Most Profitable Sex-for-Money Platform While Also Maintaining "Plausible Deniability" About Their Actual Objectives**

Due to the efforts of the defendants and their co-conspirators, Backpage established itself as the country's leading online platform for prostitution by 2010—a fact the defendants trumpeted to potential buyers around the same time. *See, e.g.*, 2-ER-290-291; 24-ER-6770-6811; 24-ER-6783 (PowerPoint presentation created by Brunst in 2011 describing Backpage as "the market leader in adult online

11

classifieds" and declaring that "Backpage's strong position ensures significant barriers exist for market entrants to generate critical mass"); *see also, e.g.*, 26-ER-7184-7186 (industry news article published in October 2010 with the headline, "Backpage replaces Craigslist as prostitution-ad leader") (Trial Ex. 1610); 35-ER-9886-9888 (Ferrer explaining that he and Spear discussed the October 2010 news article).

Before long, Backpage was reliably making more than $100 million per year, with nearly all of that revenue attributable to its Adult category—and, in particular, its Female Escort section. *See, e.g.*, 25-ER-7172-7173; 24-ER-6781-6783; 2-ER-290 ("nearly 80% of Backpage's revenue derived from the Female Escorts section and over 94% of the revenue was generated from the Adult category").

Backpage's meteoric rise presented the defendants and their co-conspirators with a dilemma: how to maintain their dominant market position (and therefore continue making hundreds of millions of dollars per year) while avoiding the same fate as Craigslist's Adult Section (and being forced, one way or another, to shutter its booming prostitution advertising business)? *See, e.g.*, 1-ER-284. Their answer was a multi-prong strategy centered on maintaining "plausible deniability" about the true nature and objective of Backpage's prostitution advertising empire. 24-ER-6785.

1. *Backpage Continues Operating Its Non-Adult Categories to Maintain "Plausible Deniability" Regarding its Prostitution Advertisements*

As noted, the vast majority of Backpage's revenue derived from its prostitution advertising business, with more than 94% being attributable to its Adult category. *See, e.g.*, 2-ER-290; 25-ER-7172-7173; 24-ER-6781-6783. The Adult category's proportion of Backpage's total revenue was also commensurate with its respective percentage of the *paid* advertisements on Backpage. *See, e.g.*, 24-ER-6781 (Brunst's 2011 PowerPoint reporting that the Adult Category had 93.4% of Backpage's paid advertisements and generated 94.2% of Backpage's total revenue). In terms of total (paid *and free*) advertisements posted on Backpage, however, the Adult Category accounted for less than one-third of all ads appearing on Backpage. *See, e.g.*, 24-ER-6781.

In his 2011 PowerPoint presentation for potential buyers, Brunst highlighted the various ways in which robust amounts of free-to-post advertisements in the non-Adult categories "strengthens Backpage's defensible market position in the Adult category." 24-ER-6785. Among other things, Brunst explained, the presence of such ads "allows 'plausible deniability' for exposure" regarding the Adult category; "drives search engine ranking and traffic, benefitting [the] Adult category"; makes "[c]orporate firewalls less likely to block versus a pure adult content site"; and "aids in the collaborative posture to regulatory and law enforcement." 24-ER-6785.

13

In other words, as Ferrer would later explain, the main purpose of Backpage's non-Adult categories was "to create the veneer of a general classified site," thereby disguising the degree to which Backpage was, in reality, a site principally for prostitution advertisements. 35-ER-9818-9819; *see, e.g.*, 35-ER-9798-9799 (Ferrer explaining that Spear and others did not "want the site to be so obvious that we're just marketing prostitution only" and instead "keep that veneer of credibility of being like a Craigslist even though we were…almost entirely prostitution"); 35-ER-9817 (similar).

### 2. *Backpage Implements Moderation Policies Geared Towards "Growing Revenue and Not Removing Illegal Content"*

Backpage's moderation policies were similarly designed to maintain a facade of plausible deniability. Spear launched and directed Backpage's program of "moderat[ing]" advertisements that contained explicit "sexual content or express offers for prostitution." 1-ER-282-283; *see* 1-ER-283 (Spear was responsible for Backpage's "moderation guidelines" and "Backpage's terms of use, which he continually modified"). As its prostitution advertisement business boomed, Backpage ultimately needed to hire more staff to assist with reviewing and moderating Adult advertisements. Spear, Brunst, and Larkin approved the necessary budget increases for this moderation, 1-ER-284, and Lacey repeatedly defended Backpage's moderation practices against public criticism, 6-ER-1500-1503.

14

While Backpage's precise moderation guidelines varied over time, the basic strategy remained the same: moderators were directed to "scrub ads to edit and remove sex act images and sex act language" that would otherwise make an advertisement appear as "'obvious prostitution.'" 1-ER-282-284. Critically, however, the removal of explicit sexual images or express offers of prostitution "did not mean the whole ad was removed or that the user was blocked from posting on Backpage." 1-ER-282. Rather, the now-edited advertisement was still published on Backpage, even though the purpose of the submitted advertisement (*i.e.*, solicitation of prostitution) was evident from the start. 1-ER-282-284. For example, "obvious prostitution" advertisements were still published on Backpage, but now with certain words changed—such as "Greek" changed to "G-R-3-3-K," "hooker" changed to "Female Escort," and "cash" changed to "roses." 1-ER-283.

As Ferrer later explained, this was entirely by design: "the moderation department's main priority was to not ban prostitution advertisers but to provide tools and mechanisms to coach them. It was about growing revenue and not [about] removing illegal content." 39-ER-10908; 1-ER-282-283 (district court quoting same).

One particularly illustrative example of Backpage's moderation priorities involved its relationship with TER. In late 2010, the defendants "learned CNN was planning an exposé on Backpage," in which one of its reporters would—among other

15

things—use "text from an old Backpage ad offering a 12-year-old girl for sex," post that advertisement with the reporter's phone number, and then show how the reporter's "phone immediately 'start[ed] ringing off the hook.'" 1-ER-285. After Spear, Brunst, and Lacey unsuccessfully "tried to stop" CNN from broadcasting the story, 1-ER-285, Backpage faced mounting criticism, including "pressure to remove any references to TER," 1-ER-285.

In early 2011, "Spear and Ferrer agreed that moderators should remove TER links in [Backpage] ads," but they also decided that Backpage should still permit "users to put [in] TER IDs (just no live links)." 1-ER-285 (internal quotation marks omitted). As Ferrer would later explain, "removing the links [to TER] would not hurt revenue because the johns responding to Backpage prostitution ads knew 'that when it says "highly reviewed" and then an ID number that [TER] is the place to go' to look for the advertiser's review." 1-ER-285. In fact, "TER ID numbers remained on Backpage ads through 2017." 1-ER-281.

### 3. Backpage's "Slow Dance Strategy" with State Attorneys General and Law Enforcement

Around the same time, and especially after Craigslist closed its Adult section in 2010, several State Attorneys General began contacting Backpage about its "'rampant' prostitution advertising." 1-ER-284. Relatedly, "Backpage started receiving thousands of prostitution investigation subpoenas." 1-ER-284. In fact, "[t]he number of subpoenas became so plentiful that…Spear and Brunst approved

16

hiring staff to respond to them." 1-ER-284; *see* 1-ER-284-285 (noting that "Lacey became aware that Backage was receiving such subpoenas" no later than April 2010).

As Ferrer later recounted, the defendants had "'watched Craigslist be attacked by the Attorneys General and were very concerned that they were next.'" 1-ER-284 (brackets omitted). Accordingly, Spear, Larkin, and Ferrer decided to implement a "slow dance strategy with the Attorney Generals." 35-ER-9831; 1-ER-285. As Ferrer later explained, the "slow dance" strategy involved giving the Attorneys General "very, very little but creat[ing] the impression that we're doing something." 35-ER-9831-9832; 1-ER-285.

For example, Spear and Larkin directed Ferrer to implement any modifications to Backpage's moderation policies "gradually," to ensure that Backpage would not inadvertently "lose revenue." 36-ER-9997-9998; 36-ER-10175-10176 ("We're not going to lose revenue over moderation changes."); 1-ER-285. Moreover, as Ferrer later emphasized, Spear and Larkin made clear that any changes Backpage made in response to outreach by the Attorneys General were supposed to be "cosmetic and superficial." 36-ER-10042. The goal, Ferrer explained, was adopting "cosmetic changes…in order to get the AGs to stop sending us letters to take down…the escort site." 36-ER-10093; 1-ER-285 ("Larkin and Spear directed Mr. Ferrer to 'not throw the baby out with the bathwater'"); *see also*

1-ER-285 (Ferrer "continued to meet with" Larkin and Spear "about these changes, communicated the results to staff, and solicited further changes 'to get approved by'" Spear).

Consistent with its slow dance strategy, Backpage hired internet safety experts, but then refused to implement many of their top recommendations. For example, the safety experts "recommended screening ads bought with prepaid cards because this was an 'indicator [of] a potential trafficking ad.'" 1-ER-285-286. "Spear, Larkin, and Ferrer rejected that change, because 'up to 70 percent of [Backpage]'s transactions came from prepaid cards.'" 1-ER-286. Similarly, Spear, Larkin, and Ferrer "ignored recommendations to completely remove ads visited from TER." 1-ER-286.

Perhaps most tellingly, when it came to responding to the Attorneys General inquiries and requests, the defendants did not discuss the most straightforward solution of all: "just shutting down the Adult section." 36-ER-10094. As Ferrer later explained, if "we eliminate the Adult section, there's just not enough revenue for Backpage to operate profitably or certainly to support the rest of the company." 36-ER-10270.

### D. The Defendants Utilize A Variety of Financial Structures To Keep Backpage's Revenues Flowing Into Their Personal Bank Accounts

Near the end of 2012, Larkin, Brunst, and Spear asked Ferrer to provide a comparison of monthly revenue growth by category from October 2010 to

November 2012. That comparison showed huge growth in the Adult category (from $1.1 million in October 2010 to nearly $8 million in November 2012)—growth that was not remotely shared by any of the other categories on Backpage. *See* 37-ER-10494-10495 (discussing Trial Exs. 355 & 355b); 1-ER-280 ("From 2010 through 2012, Backpage's Adult section yielded $138,850,097.36 compared to $208,658.90 from its non-Adult sections.").

Around the same time, Backpage began to face the first of many "existential" banking and credit card processing crises. 37-ER-10519. As discussed in more detail below, time and again, the defendants developed creative financial solutions to keep Backpage's prostitution advertising revenue flowing into their respective coffers.

> 1. *The Defendants Start Funneling Backpage's Transactions Through Innocuously Named Shell Companies, Foreign Payment Processors, and European Banks*

By 2012, various U.S. financial institutions "were dropping Backpage as a customer due to its reputation for hosting ads that were resulting in prostitution and human trafficking." 1-ER-286. For example, in 2013, "Backpage was dropped by its U.S.-based credit card processor, Litle." 1-ER-286. Similarly, that same year, "Chase Bank informed Backpage that it 'was no longer accepting transactions from Backpage.com, due to their involvement in human trafficking.'" 1-ER-286.

At this point, as Ferrer would later put it, "the barn [was] on fire." 37-ER-10558. From 2013 forward, the "entire focus of the [Backpage] company…[was]

19

banking, [was] trying to get payments, ways for users to be able to pay for ads and then find treasury banking solutions." 37-ER-10539; 1-ER-286 ("The banks' refusal to do business with Backpage meant Backpage had to expend tremendous efforts in finding ways for users to pay for ads.").

Brunst, Spear, Larkin, and Ferrer ultimately developed and implemented various financial strategies aimed at staying one step ahead of the banks and credit card companies. For example, after Litle dropped Backpage, the defendants and Ferrer worked "'to secure credit card processing from Europe.'" 1-ER-286 (quoting 37-ER-10525). Similarly, "after Chase Bank stopped accepting Backpage transactions, Backpage directed Chase credit card purchasers to e-Merchant Pay ('EMP'), a European processor that would 'use a different billing descriptor that won't say Backpage.com on it.'" 1-ER-286; *see also* 1-ER-286 (summarizing other European credit card processing options explored by Brunst, Spear, and Ferrer).

The defendants also started "using [company] names, internet addresses, and billing descriptors that would not include the name 'Backpage.'" 2-ER-289. For example, Backpage's executives, including Brunst, started "open[ing] up [holding] companies" with innocuous names "like Classified Solutions, Payment Solutions, just general-sounding companies that…don't say Backpage." 37-ER-10525; 2-ER-289.

One such "shell company" was Website Technologies. 2-ER-289; 37-ER-10538. Website Technologies was created by Brunst "for the purpose of opening bank accounts under a name that was not Backpage." 2-ER-289; *see* 2-ER-289-290 ("'[Brunst] set up Website Technologies to handle payroll, 401(k) and to do leases [because] he want[ed] to ensure that its reputation is protected, not affiliated with Backpage.'"). "The money that flowed through Website Technologies, which Mr. Ferrer described as 'the same company' as Backpage, derived 'from postings in the Female Escorts section primarily.'" 2-ER-290.

In addition, the defendants and their co-conspirators were careful to engage in "'load balancing across many banks with different billing descriptors,'" so as "to stay below thresholds that would otherwise trigger reviews" by major credit card companies like Mastercard and Visa. 2-ER-289. As a result, Backpage would—for example—use Classified Solutions (in England) for credit card processing with EMP (in Bulgaria), and then spread the payments from EMP across multiple foreign banks, including Borgun (in Iceland) and Bank Frick (in Liechtenstein). 37-ER-10553-10554; 38-ER-10794; 38-ER-10823. Those funds would then be sent to BMO Bank in the United States, where Backpage had an account under the name of Website Technologies. 37-ER-10537-10538.

In April 2014, after US Bank gave notice that it was dropping Backpage, Brunst informed Spear, Ferrer, and others that "Backpage would be moving 'all

banking under Website Technologies at BMO.'" 2-ER-290; 38-ER-10585-10586 (discussing Trial Ex. 178). Relatedly, because of the now-intolerable "reputational risk" of being associated with Backpage, Brunst and Spear began avoiding use of a "backpage.com" email address altogether. 37-ER-10523-15024; 2-ER-289. Brunst was especially cognizant about ensuring that the name Website Technologies did not become affiliated with Backpage. 2-ER-289.

> 2. *The Defendants Enter Into A Seller-Financed Sale of Backpage to Ferrer in April 2015 to Distance Themselves from Backpage But Not Its Profits*

For a few years, at least, the defendants' financial shell games worked well enough. From 2013 to 2015, Backpage continued to make more than $100 million per year. *See, e.g.*, 25-ER-7173. And during that same time span, Lacey personally profited nearly $115 million from Backpage; Larkin, over $110 million; Brunst, over $20 million; and Spear, over $10 million. 25-ER-7173; 45-ER-12850-12856.

Seeking to further distance themselves from Backpage (but not from its revenue stream), Lacey, Larkin, Brunst, and Spear sold Backpage to Ferrer for approximately $600 million in April 2015. 2-ER-291; *see, e.g.*, 2-ER-291 ("[T]he sale of Backpage was intended to distance the Defendants from Backpage's business of selling illegal ads for prostitution."). The sale was financed by two loan agreements between the sellers and Ferrer. 2-ER-291. Cereus Properties, a company owned by "Lacey, Larkin, Brunst, and Spear, collected the interest and debt

22

payments for the $600 million loan." 2-ER-291. By that time, "revenue from Backpage was only sent to and divided between Website Technologies and Ad Tech BV," a company registered in the Netherlands. 2-ER-292. Cereus Properties accordingly collected the interest and debt payments for the sale of Backpage from Website Technologies and Ad Tech B.V. 2-ER-292-293.[2]

As Ferrer later explained, "the source of the money that went to Cereus Properties 'was the prostitution ads posted on Backpage.'" 2-ER-291; *see, e.g.*, 34-ER-9621 (Ferrer testifying that the $600 million sale price would be paid as an "earn out"—that is, the defendants would take "the funds that would go to the Backpage accounts…as payments for principal and interest so whatever money came in [to Backpage], they would find a way to get swept to their accounts"); 1-ER-275 (district court finding that "Backpage operated in the same way before and after the sale," and the post-sale "loan repayments derived from" the operation of Backpage).

---

[2] As discussed in more detail below, ten separate wire transfers from a Website Technologies bank account to a bank account held by Cereus Properties—made from May 2016 to August 2016 and totaling nearly $17 million—serve as the basis for the concealment money laundering counts set forth in Counts 53-62 of the superseding indictment. 2-ER-292-293.

Similarly, five separate wire transfers from a Netherlands bank account of Ad Tech B.V. to a bank account held by Cereus Properties in Arizona—made from August 2016 to November 2016 and totaling approximately $11.3 million—serve as the basis for the international promotional money laundering counts set forth in Counts 64-68 of the superseding indictment. 2-ER-293.

Consistent with this arrangement, the sellers also remained significantly involved in the operations of Backpage after the sale. 2-ER-291. For example, shortly after the sale, Spear, Brunst, and Larkin received a copy of Backpage's five-year business plan, as they were continuing to "monito[r] the business very closely." 38-ER-10710. In addition, "after Visa, Mastercard, and American Express dropped Backpage" in mid-2015, "Brunst assisted Backpage in trying to obtain credit card processing." 2-ER-291. As Ferrer later explained, Brunst remained "involved in the financial problems the company was having and wanted to understand the revenue that was coming in and what our options were for banking and when we might, you know, get the reserves coming from these other credit card processors." 34-ER-9624-9625. In fact, Ferrer or Backpage's new CFO communicated with Brunst "'[a] minimum of a few times a week.'" 2-ER-291.

### E.      Backpage Is Shut Down By The Federal Government in April 2018

Backpage continued to receive extensive public scrutiny and criticism. Among other things, in January 2017, the United States Senate Permanent Subcommittee on Investigations held a hearing and issued a staff report, both entitled

24

"Backpage.com's Knowing Facilitation of Online Sex Trafficking."[3] *See, e.g.*, 38-ER-10845-10853; 39-ER-10909-10910.

In April 2018, the federal government seized the Backpage website and shut down its operations. 45-ER-12854. At the same time, Ferrer pleaded guilty to one count of conspiracy to violate the Travel Act and commit money laundering, in violation of 18 U.S.C. § 371. *See United States v. Ferrer*, No. 2:18-cr-464 (D. Ariz.), Doc. 180 (Judgment) & Doc. 179 (Plea Agreement). And Backpage.com LLC, Website Technologies LLC, Posting Solutions LLC, Amstel River Holdings LLC, Ad Tech B.V., and UGC Tech Group CV each pleaded guilty to one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). *See United States v. Backpage.com LLC et al.*, No. 2:18-cr-465 (D. Ariz.), Docs. 187-192 (Judgments) & Docs. 180-185 (Plea Agreements).

## II.  PROCEDURAL HISTORY

### A.  The Parties Engage In Extensive Pretrial Litigation

In July 2018, a federal grand jury sitting in the District of Arizona returned a 100-count superseding indictment against Lacey, Larkin, Brunst, Spear, and three other co-defendants. The superseding indictment charged one count of conspiracy to violate the Travel Act, in violation of 18 U.S.C. § 371 (Count 1); 50 counts of

---

[3] The printed hearing record, including the staff report, is available at https://www.govinfo.gov/content/pkg/CHRG-115shrg24401/pdf/CHRG-115shrg24401.pdf.

violating the Travel Act, in violation of 18 U.S.C. § 1952(a)(3)(A) (Counts 2-51); one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count 52); ten counts of concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Counts 53-62); six counts of international promotional money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A) (Counts 63-68); 31 counts of transactional money laundering, in violation of 18 U.S.C. § 1957(a) (Counts 69-99); and one count of international concealment money laundering, in violation of 18 U.S.C. § 1956(a)(2)(B)(i) (Count 100). 20-ER-5506-5597.

Over the next five years, the parties engaged in extensive pretrial litigation. Among other things, the defendants filed at least eight different sets of motions to dismiss the indictment—all of which were denied by the district court in detailed written orders. *See* SER-216-226 (11-page order denying motion to dismiss for alleged government interference with right to counsel) (May 2019); 18-ER-5033-5055 (23-page order denying motion to dismiss that alleged the defendants were being prosecuted pursuant to invalid Travel Act theory and in violation of the First Amendment) (October 2019); SER-203-215 (13-page order denying motion to dismiss based on Section 230 of the Communications Decency Act or void for vagueness) (January 2020); SER-192-202 (11-page order denying motion to dismiss for alleged grand jury abuse) (January 2020); 2-ER-562-579 (18-page order denying motion to dismiss that alleged the indictment failed to charge the necessary Travel

Act elements) (May 2020); 2-ER-538-556 (19-page order denying motion to dismiss alleging outrageous government misconduct by invading the attorney-client privilege) (June 2021); 12-ER-3177-3193 (17-page order denying motion to dismiss on Double Jeopardy grounds) (December 2021)[4]; SER-110-127 (18-page order denying motion to dismiss that challenged the sufficiency of the Travel Act charges) (June 2023); SER-103-109 (7-page order denying a motion to reconsider the court's prior denial of a motion to dismiss challenging the sufficiency of the Travel Act charges) (July 2023).

### B.    After A Three-Month Trial, The Jury Returns A Mixed Verdict

A jury trial commenced in August 2023.[5] Over the course of a three-month trial, the government presented the jury with 21 witnesses and hundreds of exhibits. As summarized above, the evidence showed that the defendants deliberately built Backpage into a massive prostitution advertising website, generated hundreds of millions of dollars from selling ads for illegal prostitution, and then laundered the proceeds through a complex web of domestic and foreign accounts.

After careful deliberation, the jury returned the following verdicts:

---

[4] After the defendants filed an interlocutory appeal, this Court affirmed the district court's denial of the motion to dismiss on Double Jeopardy grounds. *See United States v. Lacey et al.,* No. 22-10000, 2022 WL 4363818, at *1 (9th Cir. Sept. 21, 2022).

[5] Larkin committed suicide in late July 2023, about one month before the trial began. 1-ER-279; 11-ER-2847.

The jury convicted Spear on Count 1 (conspiracy to violate the Travel Act); Counts 2-18 (violating the Travel Act); Count 52 (conspiracy to commit money laundering); Counts 53-62 (concealment money laundering); and Counts 71-78, 85, 93 (transactional money laundering). The jury acquitted Spear on Counts 19-51 (violating the Travel Act) and Counts 63-68 (international promotional money laundering). 2-ER-411-454.

The jury convicted Brunst on Count 1 (conspiracy to violate the Travel Act); Count 52 (conspiracy to commit money laundering); Counts 53-62 (concealment money laundering); Counts 64-68 (international promotional money laundering); and Counts 69-70, 78-84, 86-93 (transactional money laundering). The jury acquitted Brunst on Counts 2-51 (violating the Travel Act) and Count 63 (international promotional money laundering). 2-ER-411-454.

The jury convicted Lacey on Count 100 (international concealment money laundering). The jury acquitted Lacey on Count 63 (international promotional money laundering). The jury did not reach a verdict on the remaining counts against Lacey (Counts 1, 2-51, 52, 53-62, 64-68, 69-70, 81, 83-84, 86, 88-92, 94-99). 2-ER-411-454.[6]

---

[6] As noted above, the superseding indictment charged three other codefendants. 20-ER-5506-5597. Two of those codefendants, Andrew Padilla and Joye Vaught, were tried by the same jury as Brunst, Spear, and Lacey. The jury

### C.     The District Court Grants in Part and Denies in Part The Defendants' Motions for Judgment of Acquittal

After the trial and following substantial briefing by the parties, the district court issued a thorough, 73-page order granting in part and denying in part the defendants' motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. *See* 1-ER-277-286; 2-ER-289-351.

The district court held that the government presented sufficient evidence against Spear and Brunst (and Lacey) on Count 1 (conspiracy to violate the Travel Act), 2-ER-297-303; against Spear (and Lacey) on Counts 2-18 (violating the Travel Act), 2-ER-303-319; against Spear and Brunst on Count 52 (conspiracy to commit money laundering), 2-ER-335-336; against Spear and Brunst (and Lacey) on Counts 53-62 (concealment money laundering), 2-ER-319-325; against Brunst (and Lacey) on Counts 64-68 (international promotional money laundering), 2-ER-325-326; and against Lacey on Count 100 (international concealment money laundering), 2-ER-327-333.

---

acquitted Padilla and Joye on all counts charged against them (Counts 1-51). 2-ER-411-454.

The third codefendant, Daniel Hyer, pleaded guilty to Count 1 (conspiracy to violate the Travel Act) in August 2018. SER-3-4 (Hyer Judgment); SER-5-17 (Hyer Plea Agreement). Hyer testified on behalf of the government at the defendants' jury trial.

The district court entered a judgment of acquittal for each defendant with respect to the transactional money laundering counts under 18 U.S.C. § 1957 (Counts 69-99), 2-ER-333-335, and for Lacey on Counts 19-51 (violating the Travel Act), 2-ER-318-319.

The district court also denied the defendants' motions for a new trial. 2-ER-336-351.

### D.    Sentencing

In August 2024, following extensive briefing and a two-day sentencing hearing, the court sentenced Spear to 120 months of imprisonment, to be followed by three years of supervised release; Brunst to 120 months of imprisonment, to be followed by three years of supervised release; and Lacey to 60 months of imprisonment, to be followed by three years of supervised release. The court further ordered Brunst to pay a $50,000 fine and Lacey to pay a $3,000,000 fine. 1-ER-3-7 (Brunst Amended Judgment); 1-ER-8-12 (Spear Judgment); 1-ER-13-17 (Lacey Judgment).[7]

---

[7] The district court held separate restitution proceedings for Brunst and Spear several months later. On July 3, 2025, the court ordered that Brunst and Spear were jointly and severally liable for approximately $3.4 million in total restitution to eight different victims. *See* SER-18-49 (Restitution Order). Brunst and Spear have each appealed from that restitution order. *See* 9th Cir. Nos. 25-4487 (Spear) & 25-4570 (Brunst). Those restitution appeals, which have been consolidated with one another, have been stayed by this Court until resolution of the present merits appeals. *See* C.A. Doc. 17.1, 9th Cir. No. 25-4487 (Jan. 20, 2026).

## III. RULINGS UNDER REVIEW

The rulings presented for review and the applicable standards of review are set forth in the relevant argument sections below.

## SUMMARY OF ARGUMENT

1.      Spear mistakenly contends that the Travel Act is an accomplice liability statute. That claim, which was repeatedly rejected by the district court, is contrary to the Travel Act's text, its evident statutory purpose, and long-standing circuit precedent. This Court should decline Spear's invitation to be the first federal court to interpret the Travel Act in such a manner.

2.      Spear incorrectly asserts that prostitution advertisements should be afforded First Amendment protection so long as they are not unambiguously criminal on their face. That novel contention, which has never been adopted by any court, is contrary to precedent from the Supreme Court and this Court that make clear that "[o]ffers to engage in illegal transactions are categorically excluded from First Amendment protection." *United States v. Williams*, 553 U.S. 285, 297 (2008). Spear's claim is also contrary to the jury's determination that the government satisfied its burden to "establish that each of the ads alleged in this case is an ad for prostitution and not for another purpose." 2-ER-410.

3.      Contrary to Brunst's contention, the district court did not improperly infringe on his constitutional right to testify. Rather, the district court merely ruled

that Brunst's proposed testimony must comply with its otherwise sound evidentiary rulings under the Federal Rules of Evidence. Because Brunst cannot show the court's evidentiary rulings were "arbitrary or disproportionate to the purposes they are designed to serve," his claim must fail. *See, e.g., United States v. Gallagher*, 99 F.3d 329, 332 (9th Cir. 1996).

4.      The government's main witness, Ferrer, was extensively cross-examined by five different defense attorneys for five days and nearly 900 transcript pages. Brunst nonetheless claims that a few of the district court's evidentiary rulings during the defendants' cross-examination amounted to a violation of his constitutional right to confrontation. That contention, which is raised for the first time on appeal, is meritless. The district court's evidentiary rulings were sound, and certainly not an abuse of discretion (plainly or otherwise). And given the defendants' wide-ranging cross-examination of Ferrer, the jury was surely left with sufficient information to assess Ferrer's credibility.

5.      Contrary to Brunst's assertion, the district court correctly determined that sufficient evidence supported his conviction for conspiracy to violate the Travel Act. Similarly, Brunst's claim that the district court constructively amended the superseding indictment—an argument he raises for the first time on appeal—is unsupported by the record.

6.     The government presented more than sufficient evidence that Brunst committed concealment money laundering. The district court correctly held that a rational jury, viewing the evidence in the light most favorable to the prosecution, could conclude that (a) the funds transferred from Website Technologies to Cereus Properties involved proceeds from violations of the Travel Act, and (b) those transactions were designed, at least in part, to conceal the true nature or source of the illicit funds.

7.     The government presented more than sufficient evidence that Brunst committed international promotional money laundering. The district court correctly held that a rational jury, viewing the evidence in the light most favorable to the prosecution, could conclude that (a) the funds transferred from Ad Tech B.V. to Cereus Properties involved proceeds from violation of the Travel Act, and (b) Brunst acted with the intent to promote the carrying on of Travel Act violations.

8.     Brunst's claim that the prosecution team invaded the defendants' attorney-client privilege is meritless. As the district court correctly found, none of the communications purportedly invaded by the government were privileged. In addition, as the court also concluded, even if communications were privileged, the defendants waived that privilege. Finally, as the court also correctly held, the defendants failed to show any prejudice.

9.     The district court did not abuse its discretion or clearly err when calculating Brunst's base offense level under the Sentencing Guidelines.

10.     The government presented more than sufficient evidence that Lacey committed international concealment money laundering. The district court correctly held that a rational jury, viewing the evidence in the light most favorable to the prosecution, could conclude that (a) Lacey knowingly transferred funds that involved proceeds from violations of the Travel Act to a bank account in Hungary, and (b) the transfer was designed, at least in part, to conceal the true nature or source of the illicit funds.

11.     Lacey's challenges to various evidentiary rulings by the district court are meritless. Whether reviewed for plain error or abuse of discretion, Lacey fails to identify any reversible error in the district court's rulings.

## ARGUMENT

## I.     SPEAR'S TRAVEL ACT CONVICTIONS DO NOT REST ON AN INVALID LEGAL THEORY

Spear principally claims (Spear.Br.32-50) that his convictions on Counts 2 through 18 must be reversed because they are based on an erroneous interpretation of the Travel Act, 18 U.S.C. § 1952(a). The district court repeatedly and correctly rejected that contention, and this Court should do the same.

## A.    Background

1.    Counts 2 through 18 of the superseding indictment charged the defendants with violating the Travel Act, specifically 18 U.S.C. § 1952(a)(3)(A), for using a facility of interstate commerce with the intent to promote or facilitate the promotion of prostitution. Section 1952(a)(3)(A) provides as follows: "Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to…promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform" such an act "shall be shall be fined under this title, imprisoned not more than 5 years, or both." As relevant here, the statute specifically defines "unlawful activity" to include "any business enterprise involving…prostitution offenses in violation of the laws of the State in which they are committed or of the United States." 18 U.S.C. § 1952(b)(i)(1).

2.    Raising arguments similar to those now advanced by Spear on appeal, the defendants repeatedly moved to dismiss the superseding indictment on the grounds the government was pursuing an invalid theory of prosecution under the Travel Act. *See, e.g.*, 18-ER-5091-5093; 19-ER-5214-5225; SER-137-147.

The district court consistently denied those motions. *See, e.g.*, 18-ER-5047-5052 ("The Government's proposed *mens rea* standard…is consistent with *Gibson*, *Tavelman*, and *Polizzi*—the Ninth Circuit cases discussing intent requirements of

the Travel Act."); 2-ER-567-577 (holding that the superseding indictment "adequately alleges the necessary Travel Act elements"); SER-114-122 ("The Court rejects Defendants' premise that the Travel Act offenses require the Government to allege the elements of aiding and abetting."); SER-105-109 (denying defendants' motion for reconsideration and rejecting their arguments based on *United States v. Hansen*, 599 U.S. 762 (2023), and *Woodhull Freedom Foundation v. United States*, 72 F.4th 1286 (D.C. Cir. 2023)).

3.   Consistent with this Court's pattern jury instruction for Section 1952(a)(3)(A), the district court instructed the jury that it needed to find the following elements beyond a reasonable doubt to convict a defendant on a substantive Travel Act count:

> First, the defendant used any facility in interstate commerce with the specific intent to promote or facilitate the promotion of any business enterprise involving prostitution offenses in violation of the laws of the State in which they are committed (as specified below), and

> Second, after doing so the defendant performed an act that did promote or facilitate the promotion of any business enterprise involving prostitution offenses, specifically, by publishing on Backpage.com the ads listed in Counts 2-51 of the indictment.

> To prove specific intent, the government must establish that each defendant in some significant manner associated himself or herself with the purpose of promoting or facilitating the promotion of any business enterprise involving prostitution offenses that the defendant knew to be unlawful under state law.

> In the context of this Travel Act case, the terms to "promote" or "facilitate the promotion of" means helping someone else commit a prostitution offense in violation of state law.

36

> The phrase "Business enterprise," means a continuous course of criminal conduct, that is, engaging or planning to engage in two or more violations of law, rather than a sporadic, casual, individual, or isolated violation.
>
> The phrase "uses any facility in interstate commerce" as used in the Travel Act, 18 U.S.C. § 1952(a), means employing or utilizing any method of communication or transportation between one state and another, and includes, for example, the use of telephones, mails, and the Internet.

2-ER-392; *see also* Ninth Circuit Model Criminal Jury Instruction 18.1.

The court further instructed the jury about the respective state laws governing prostitution as relevant to the Travel Act offenses charged in Counts 2 through 51. 2-ER-393-400. In addition, the court instructed the jury that the government "does not have to prove that the referenced states' laws were actually violated, only that each defendant had intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any business enterprise involving prostitution offenses in violation of state law, and committed a subsequent overt act in furtherance of the unlawful activity." 2-ER-401.

As relevant here, the jury ultimately convicted Spear on 17 counts of violating the Travel Act (Counts 2-18), acquitted Brunst on those same counts, and failed to reach a verdict with respect to Lacey on those counts. 2-ER-412-420.[8]

---

[8] The jury acquitted Spear and Brunst of the Travel Act offenses charged in Counts 19-51, and it failed to reach a verdict with respect to Lacey on those counts. 2-ER-420-436.

4.      As relevant here, the district court denied Spear's post-trial motion for a judgment of acquittal with respect to Counts 2 through 18. 2-ER-303-318.

Among other things, the district court found that "Spear's role in making Backpage a platform from which prostitution could be advertised is sufficient to establish his specific intent to facilitate the promotion of the prostitution businesses posting the ads in Counts 2-18." 2-ER-308; *see* 2-ER-308 ("Evidence sufficiently shows that Mr. Spear, in the interest of making money, directly helped develop moderation and editing policies that facilitated the promotion of prostitution and allowed Backpage to continue to accept payment from pimps, traffickers, and prostitutes for posting the illegal ads.").

The court also found that "there was sufficient evidence adduced that Mr. Ferrer, a co-conspirator, also significantly associated himself with and helped promote the poster's enterprises such that his acts in relation to the ads in Counts 2-

---

The prostitution advertisements underlying Counts 2-18 were published between September 2013 and February 2015. 2-ER-412-420; 20-ER-5555-5556. The prostitution advertisements underlying Counts 19-51 were published between May 2015 and February 2018. 2-ER-420-436; 20-ER-5557-5560. As the district court later observed, the prostitution advertisements charged in Counts 19-51 (unlike those charged in Counts 2-18) all "post-dat[e] the sale of Backpage from its owners to Mr. Ferrer," which occurred in April 2015. 2-ER-319; 2-ER-308 n.15. The district court surmised that "the Jury's likely conclusion" was "that the sale of Backpage to Mr. Ferrer was a break in the conspiracy's agreement to violate the Travel Act." 2-ER-319; *see also* 2-ER-319 ("For that reason, the Court finds that there is insufficient evidence to convict Mr. Lacey of Counts 19-51, even under a *Pinkerton* theory of liability.").

18 were fairly attributed to Mr. Spear under a *Pinkerton* theory of liability." 2-ER-308-309; 2-ER-318; *see also* 2-ER-389 (instructing the jury about *Pinkerton* liability for substantive Travel Act counts).

### B. Standard of Review

"The district court's interpretation of a criminal statute and the scope of the conduct covered by the statute is a question of law reviewed de novo. This court must review the evidence presented against the defendant in the light most favorable to the government to determine whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Sarkisian*, 197 F.3d 966, 984 (9th Cir. 1999) (citation omitted).

This Court also "review[s] de novo whether a jury instruction misstates the law." *United States v. Rodriguez*, 971 F.3d 1005, 1012 (9th Cir. 2020). "A preserved instructional error warrants reversal unless it is harmless beyond a reasonable doubt." *Id.*

### C. The Travel Act Is Not An Accomplice Liability Statute

The major premise of Spear's challenge to his convictions on Counts 2 through 18 is that "the Travel Act is an accomplice liability statute." Spear.Br.2; *see, e.g.*, *id.* at 35 (asserting "that the Travel Act is an accomplice liability statute"). That contention, which has never been adopted by any federal court addressing a Travel Act prosecution, is meritless.

39

1.     As the district court correctly recognized, 18-ER-5047; 2-ER-568-569; SER-114-115, this Court has consistently held that the government must establish the following elements when pursuing a Travel Act prosecution: "(1) interstate commerce or use of an interstate facility (2) with intent to promote an unlawful activity and (3) a subsequent overt act in furtherance of that unlawful activity." *United States v. Tavelman*, 650 F.2d 1133, 1138 (9th Cir. 1981); *see, e.g.*, *United States v. Stafford*, 831 F.2d 1479, 1481 (9th Cir. 1987) (same) (quoting *Tavelman*); *United States v. Brown*, 770 F.2d 768, 772 (9th Cir. 1985) (same) (quoting *Tavelman*); *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974) (similar).[9]

With respect to the Travel Act's specific intent requirement, this Court has also held that the government must prove that the defendant "in some significant manner associated himself with the…criminal venture for the purpose of its advancement." *Gibson Specialty Co.*, 507 F.2d at 449; *see also United States v. Polizzi*, 500 F.2d 856, 877 (9th Cir. 1974) (explaining that the Travel Act requires proof of a defendant's "specific intent to facilitate an activity which the accused knew to be unlawful under state law"). Absent such a requirement, this Court has

---

[9] Other circuits are in accord. *See, e.g.*, *United States v. Welch*, 327 F.3d 1081, 1090 (10th Cir. 2003), *abrogated on other grounds*, *Ciminelli v. United States*, 598 U.S. 306 (2023); *United States v. Childress*, 58 F.3d 693, 719 (D.C. Cir. 1995) (per curiam); *United States v. Muskovsky*, 863 F.2d 1319, 1326 (7th Cir. 1988).

cautioned, the Travel Act "would be plagued by the very overexpansiveness which Congress sought to rule out by inclusion of an express *mens rea* requirement." *Gibson Specialty Co.*, 507 F.2d at 449; *see Erlenbaugh v. United States*, 409 U.S. 239, 248 (1972) (explaining that the Travel Act "obviously poses no threat to innocent citizens" because "[i]ts application is limited to those who act with an intent to further unlawful activity").

The district court instructed the jury in accordance with this Court's precedents. After careful deliberation, the jury found Spear guilty on Counts 2-18 (and acquitted him on Counts 19-51).

2.    Contrary to Spear's contention, the Travel Act is not—and never has been—an accomplice liability statute. Indeed, neither this Court nor any other federal court has ever held that, to be convicted under the Travel Act, a defendant must also have been an accomplice to a separate criminal offense. And for good reason: Spear's assertion is contrary to the Travel Act's text, its evident statutory purpose, and longstanding circuit precedent interpreting the Travel Act.

To begin, the text of Section 1952(a) does not support Spear's proffered interpretation. The U.S. Code's accomplice liability statute, 18 U.S.C. § 2(a), provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." Critically, Section 1952(a) contains none of those verbs. *See* 18 U.S.C.

41

§ 1952(a); *see also* SER-115 ("The Travel Act does not contain the words 'aid or abet.'").

That fact also immediately distinguishes Section 1952(a) from 8 U.S.C. § 1324(a)(1)(A)(iv), the statute at issue in *Hansen*, 599 U.S. 762. *Cf.* Spear.Br.33-34 (relying primarily on *Hansen*). Section 1324(a)(1)(A)(iv) penalizes a person who, as relevant here, "induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law." The Supreme Court interpreted "induces" in Section 1324(a)(1)(A)(iv) according to its "specialized, criminal-law sense"—namely, aiding and abetting (or accomplice) liability. *See* 599 U.S. at 770-775; *see id.* at 774 (explaining that "'induce' ha[s] [a] well-established legal meanin[g]"). Unlike the statute in *Hansen* and unlike 18 U.S.C. § 2(a), Section 1952(a) does not include the word "induces."

Undeterred by that decisive textual distinction, Spear (Spear.Br.33-34) seeks to make much of the fact that the Supreme Court in *Hansen* referred to aiding-and-abetting liability as "criminal facilitation." *See, e.g.*, 599 U.S. at 771 ("Facilitation—also called aiding and abetting—is the provision of assistance to a wrongdoer with the intent to further an offense's commission."); *id.* at 773 ("In sum, the use of…'induce' to describe…facilitation is both longstanding and pervasive."). To be clear, the Supreme Court's decision in *Hansen* turned on the statutory term

42

"induces," as Section 1324(a)(1)(A)(iv) does not include the term "facilitate." *Contra* Spear.Br.33.

In any event, and contrary to Spear's suggestion, Section 1952(a)(3)(A)'s use of the word "facilitate" does not mean that a defendant must have aided and abetted an unlawful activity. Rather, the Travel Act prohibits a defendant's travel in or use of interstate commerce with the specific intent to "promote, manage, establish, carry on, or facilitate *the promotion, management, establishment, or carrying on*, of any unlawful activity." 18 U.S.C. § 1952(a)(3) (emphasis added). In other words, not only is the Travel Act's use of "facilitate" primarily tied to a defendant's specific intent (as opposed to his conduct), but that intent requirement is satisfied if the defendant intended to "facilitate the *promotion*" of an unlawful activity (as opposed to *facilitating* the unlawful activity itself).

Moreover, as this Court and others have repeatedly made clear, "[t]he Travel Act does not require the commission of the predicate offense." *Stafford*, 831 F.2d at 1482. This is because, as the text makes plain, "the gravamen of a charge under 18 U.S.C. § 1952 is the violation of federal law (use of an interstate facility with intent to violate state or federal law)," and "'reference to state law is only necessary to identify the type of illegal activity.'" *United States v. Gordon*, 641 F.2d 1281, 1284 n.6 (9th Cir. 1981); *see, e.g.*, *United States v. Welch*, 327 F.3d 1081, 1092 (10th Cir. 2003) ("The Travel Act proscribes not the unlawful activity per se, but the use of

43

interstate facilities with the requisite intent to promote such unlawful activity. An actual violation of [state law] is not an element…and need not have occurred.") (citation omitted), *abrogated on other grounds*, *Ciminelli v. United States*, 598 U.S. 306 (2023); *United States v. Montague*, 29 F.3d 317, 322 (7th Cir. 1994) ("Section 1952 does not require that the state crime ever be completed.") (internal quotation marks omitted); *United States v. Jenkins*, 943 F.2d 167, 173 (2d Cir. 1991) ("The Travel Act is a substantive offense that in-and-of-itself punishes individuals for using facilities of interstate or foreign commerce to further certain unlawful activities."); *see also Erlenbaugh*, 409 U.S. at 246 (explaining that the Travel Act focuses "upon the use of the facilities of interstate commerce with the intent of furthering an unlawful 'business enterprise'")

As a result, this Court has explained that "the Travel Act and its predicate offense will ordinarily constitute separate offenses." *Stafford*, 831 F.2d at 1482; *see, e.g.*, *United States v. Teplin*, 775 F.2d 1261, 1264-1265 (4th Cir. 1985) (same); *United States v. Finazzo*, 704 F.2d 300, 307-308 (6th Cir. 1983) (same). This is because "proof of a Travel Act violation will not ordinarily prove a violation of the underlying offense," since the Travel Act only requires that the defendant intended "'to promote [the] unlawful activity'" and performed "'a subsequent overt act in furtherance of that unlawful activity'"—not that the unlawful activity was successfully accomplished. *Stafford*, 831 F.2d at 1481-1482.

That all stands in stark contrast to accomplice liability, which requires that the criminal offense being aided and abetted actually be committed. *See, e.g.*, *United States v. Sutcliffe*, 505 F.3d 944, 959 (9th Cir. 2007) ("There is no question that a conviction for aiding and abetting a crime requires proof that the underlying crime was committed."); *United States v. Garcia*, 400 F.3d 816, 818 n.2 (9th Cir. 2005) (explaining that, to convict a defendant pursuant to accomplice liability, the jury must find—among other things—"that someone committed the underlying substantive offense"); *see also* Ninth Circuit Model Criminal Jury Instruction 4.1. This is because "'[a]iding and abetting is not a separate and distinct offense from the underlying substantive crime, but is a different theory of liability for the same offense.'" *United States v. Bellot*, 113 F.4th 1151, 1155 (9th Cir. 2024); *Young v. United States*, 22 F.4th 1115, 1122 (9th Cir. 2022) ("[T]here is no distinction between aiding-and-abetting liability and liability as a principal under federal law.").

In other words, for a defendant to be found guilty pursuant to a theory of accomplice liability, the underlying substantive crime must have been committed by someone. Not so for the Travel Act. That is yet another reason why Spear's accomplice liability interpretation is incompatible with the text of Section 1952(a)(3)(A), as it does not require proof that a separate offense was successfully committed.

3.     Spear's attempt to apply an accomplice-liability gloss to Section 1952(a) not only is atextual but also runs contrary to the Travel Act's manifest and recognized purposes.

Nearly 65 years ago, Congress adopted Section 1952 as part of its "comprehensive federal legislative effort to assist local authorities in dealing with organized criminal activity which, in many instances, had assumed interstate proportions and which in all cases was materially assisted in its operations by the availability of facilities of interstate commerce." *Erlenbaugh*, 409 U.S. at 244-245 (footnotes omitted); *see, e.g.*, *Stafford*, 831 F.2d at 1484 (discussing *Erlenbaugh* and "Congress' expressed concern with the inability of state law enforcement agencies to reach criminal activity spanning their borders").

As evidenced by its text, Section 1952(a) focuses "upon the use of the facilities of interstate commerce with the intent of furthering an unlawful 'business enterprise.' It is, in short, an effort to deny individuals who act for such a criminal purpose access to the channels of commerce." *Erlenbaugh*, 409 U.S. at 246; *see* 18 U.S.C. § 1952(a) (making it unlawful to "travel[] in interstate or foreign commerce or use[] the mail or any facility in interstate or foreign commerce" with the requisite specific intent). As this Court once put it, the Travel Act addresses "Congress' concern that the criminal's use of interstate facilities decreases the likelihood of

46

detection by law enforcement agencies and increases the likelihood of success of the criminal endeavor." *Stafford*, 831 F.2d at 1485.

Consistent with the Travel Act's focus on the "channels of commerce," this Court (like others) has also recognized "that each act of travel may be treated as a separate violation of [S]ection 1952." *Polizzi*, 500 F.2d at 897-899 (Browning, J., concurring); *see, e.g.*, *United States v. Douglass*, 780 F.2d 1472, 1478 (9th Cir. 1986) ("Each crossing of the border may, in the prosecutor's discretion, be charged as a separate offense under the Travel Act."); *United States v. Raineri*, 670 F.2d 702, 715 n.9 (7th Cir. 1982) (each act of interstate travel and each use of interstate facility may constitute separate offense under the Travel Act); *United States v. Jabara*, 644 F.2d 574, 577 (6th Cir. 1981) (same).

As this Court has emphasized, that is true even if each act of travel "related to the same underlying unlawful activity." *Stafford*, 831 F.2d at 1484. This is because "'Congress may well have concluded there was a separate social interest in deterring each act of travel in furtherance of an illegal enterprise: each successive trip may increase the success of the illegal activity, and a decision not to make a given trip for fear of additional penal consequences could therefore limit the harm to society § 1952 is intended to prevent.'" *Id.* at 1485 (quoting *Polizzi*, 500 F.2d at 898 n.7 (Browning, J., concurring)).

Spear's proffered interpretation of Section 1952(a) would upset each of those long-settled understandings. In fact, under Spear's view, it is far from clear what practical relevance the Travel Act would even retain, given that accomplice liability is already established by 18 U.S.C. § 2(a).

As this Court has previously explained, Congress's inclusion of "the interstate component of the Travel Act" was not "merely to obtain a jurisdictional 'peg.'" *Stafford*, 831 F.2d at 1484. If that were its only purpose, "it would have been unnecessary [for Congress] to define 'unlawful activity' to include various federal offenses because those offenses already provided federal jurisdiction." *Id.* Similarly, "[i]f Congress merely intended the Travel Act to criminalize the underlying activity, multiple prosecutions for each act of travel to promote the same unlawful activity would make no sense." *Id.* at 1484-1485.

When Congress wishes to employ concepts of accomplice liability, it surely knows how to do so. *See, e.g.*, 8 U.S.C. § 1324(a)(1)(A)(iv). Congress simply chose not to do so here. *See, e.g.*, *Marietta Mem'l Hosp. Emp. Health Benefit Plan v. DaVita Inc.*, 596 U.S. 880, 887 (2022) ("Congress knew how to write such a law. It did not do so in this statute.").

4. Because the Travel Act is not an accomplice liability statute, Spear's discussion about what accomplice liability requires is inapposite here. *See* Spear.Br.35-46 (relying on *Rosemond v. United States*, 572 U.S. 65 (2014); *Elonis*

48

*v. United States*, 575 U.S. 723 (2015); *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280 (2025)).

5.     Spear's reliance on *Woodhull*, 72 F.4th 1286, is similarly misplaced. *See* Spear.Br.34-35.

In *Woodhull*, the D.C. Circuit considered a pre-enforcement facial overbreadth challenge to the Allow States and Victims to Fight Online Sex Trafficking Act of 2017 (commonly referred to as "FOSTA"). 72 F.4th at 1292. As relevant here, 18 U.S.C. § 2421A(a) (a provision of FOSTA) "makes it a felony to 'own[], manage[], or operate[]' an interactive computer service—for example, a website, chat room, or search engine—'with the intent to promote or facilitate the prostitution of another person[.]'" 72 F.4th at 1292 (quoting Section 2421A(a)). In rejecting the plaintiff's facial overbreadth challenge, the D.C. Circuit—as relevant here—construed the phrase "promote or facilitate the prostitution of another person" to mean "aiding and abetting the prostitution of another." *See id.* at 1299-1303.

Most obviously, *Woodhull* did not involve the Travel Act but a different statute that has its own unique text, context, and structure. *See* SER-108 (district court rejecting defendants' argument based on *Woodhull* and noting that decision did not and could not "overtur[n] Ninth Circuit precedent that identifies the essential elements of a Travel Act violation"). Among other things, unlike Section 2421A(a), the Travel Act does not include the phrase "promote or facilitate." Rather, Section

1952(a)(3) includes the phrase "otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on" (of a specified unlawful activity).

Moreover, as the Supreme Court has repeatedly emphasized, "'[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338, 359 (2021) (quoting *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016)). For the reasons discussed above, the context and statutory scheme of the Travel Act are quite dissimilar from that of FOSTA.

Finally, Spear points to a few sentences from the government's appellate brief to the D.C. Circuit during the second round of *Woodhull* litigation. Those, too, must be viewed in their proper context. *See* SER-123 (district court explaining that "'previous statements made by the Government in other cases are not binding on the Court, not relevant to this prosecution, and, in any case, not inconsistent with the Government's current theory regarding the Travel Act'"). In any event, as the government has consistently maintained throughout the course of this prosecution, the Travel Act is not an accomplice liability statute. Any statements made by the government in the context of the *Woodhull* litigation suggesting otherwise were mistaken.

50

### D. The District Court Did Not Reversibly Err When Instructing the Jury About The Travel Act's Specific Intent Requirements

Spear's challenge to the district court's jury instructions about the specific intent required under the Travel Act is largely derivative of the arguments discussed above. Spear.Br.60-62; *see id.* at 60 ("As discussed above, the Travel Act is an accomplice liability statute. The district court should therefore have required the government to prove Spear acted with 'the traditional state of mind required for aiding and abetting.'") (citations omitted). For the same reasons already discussed, Spear's claims about the court's jury instructions are also meritless.

In addition, and contrary to Spear's suggestion (Spear.Br.60), the district court correctly instructed the jury that, for purposes of the Travel Act, "the terms to 'promote' or 'facilitate the promotion of' means intentionally helping someone else commit a prostitution offense in violation of state law." 2-ER-392; *see, e.g.*, *Gibson Specialty Co.*, 507 F.2d at 450 (explaining that, "[i]n the context of the [T]ravel [A]ct," the "term 'facilitate' has been held to have its ordinary meaning: 'to make easy or less difficult'"). Moreover, Spear overlooks that the jury was also instructed that, "[t]o prove specific intent, the government must establish that each defendant in some significant manner associated himself or herself with the purpose of promoting or facilitating the promotion of any business enterprise involving prostitution offenses that the defendant knew to be unlawful under state law." 2-ER-392; *see Gibson Specialty Co.*, 507 F.2d at 449.

51

Put simply, the district court's instructions to the jury regarding the specific intent required under the Travel Act were free from error.

\*          \*          \*

For the reasons detailed above, this Court should reject Spear's invitation to be the first federal court to interpret the Travel Act as an accomplice liability offense.

## II.   SPEAR'S TRAVEL ACT CONVICTIONS DO NOT VIOLATE THE FIRST AMENDMENT

Spear also claims (Spear.Br.50-59) that his Travel Act convictions should be reversed because they "are predicated upon First Amendment-protected activity." Spear.Br.50; *id.* at 31 ("Spear's Travel Act convictions also violate the First Amendment."). That contention is meritless.

### A.   Background

1.   As relevant here, Counts 2 through 18 of the superseding indictment corresponded to the publication of specific prostitution advertisements in the Escorts section on Backpage. 20-ER-5554-5556 (Superseding Indictment); *see* 24-ER-6855-6856 (advertisement underlying Count 2); 25-ER-7026 (advertisement underlying Count 3); 24-ER-6857-6860 (advertisement underlying Count 4); 24-ER-6869-6872 (advertisement underlying Count 5); 25-ER-7027 (advertisement underlying Count 6); 25-ER-7028 (advertisement underlying Count 7); 25-ER-7029 (advertisement underlying Count 8); 25-ER-7030 (advertisement underlying Count 9); 25-ER-7031 (advertisement underlying Count 10); 25-ER-7032 (advertisement underlying Count

11); 25-ER-6888-6897 (advertisement underlying Count 12); 25-ER-6930-6936 (advertisement underlying Count 13); 24-ER-6875-6881 (advertisement underlying Count 14); 25-ER-6919-6925 (advertisement underlying Count 15); 25-ER-6904-6910 (advertisement underlying Count 16); 25-ER-6911-6914 (advertisement underlying Count 17); 25-ER-7033 (advertisement underlying Count 18); *see also* 6-ER-1485 (summary of advertisements charged in Counts 2-18).

2. Prior to trial, the defendants moved to dismiss the superseding indictment on First Amendment grounds. *See, e.g.*, 19-ER-5204-5206; 19-ER-5227-5230. The district court denied those motions. *See, e.g.*, 18-ER-5046 (recognizing that "[t]he First Amendment does not protect 'offers to engage in illegal transactions,'" such as prostitution) (quoting *United States v. Williams*, 553 U.S. 285, 297 (2008)).

3. At trial, and as relevant here, the government introduced substantial evidence that each of the advertisements underlying Counts 2 through 18 were, in fact, ads for prostitution. *See, e.g.*, 2-ER-305-317 (district court summarizing that evidence); 6-ER-1474-1476 (government summarizing that evidence).

For example, in addition to being presented with the content of the advertisements themselves, the jury heard testimony from several of the victims being sold in those prostitution advertisements. Specifically, the persons depicted in the prostitution advertisements underlying Counts 4-5, 12-15, and 16-17 each

testified about how the advertisements published on Backpage were ads for prostitution. *See, e.g.*, 2-ER-312-317. In addition, a police officer that investigated the advertisement underlying Count 2 testified that his investigation revealed that it was a prostitution ad. *See, e.g.*, 2-ER-310. And Ferrer testified that the person depicted in the prostitution advertisements underlying Counts 3, 6-11, and 18 was known by him to be "engaged in prostitution," 36-ER-10052, and that her ads on Backpage were for prostitution, *see, e.g.*, 2-ER-311-312.

4.    As relevant here, the district court provided the jury with the following instructions regarding the First Amendment: "All speech is presumptively protected by the First Amendment to the United States Constitution. However, the First Amendment does not protect speech that proposes an illegal transaction. Prostitution is illegal in 49 states and most of Nevada. It is the government's burden to establish that each of the ads alleged in this case is an ad for prostitution and not for another purpose such as an ad for an escort, dating or massage service. If you find that an ad proposes an illegal transaction, it is not protected by the First Amendment." 2-ER-410.

As previously noted, with respect to the Travel Act charges, the jury convicted Spear on Counts 2 through 18.

5.    In his post-trial motion for a judgment of acquittal, Spear renewed his claim that the advertisements underlying Counts 2-18 "could not be the basis for a

criminal prosecution or conviction" because "Backpage's publication of those ads was protected by the First Amendment." 7-ER-1620-1626.

The district court rejected that contention. *See* 2-ER-303-306. The court reiterated "that the First Amendment does not protect 'offers to engage in illegal transactions.'" 2-ER-304 (quoting *Williams*, 553 U.S. at 297). The court then explained that, in light of the verdict and its First Amendment instruction, the jury "necessarily found that the ads in Counts 2-18 were unprotected speech"—that is, that each of the advertisements "were in fact ads for prostitution and not for some other purpose such as a lawful escort ad." 2-ER-305.

The court further found "sufficient evidence for the Jury to find that these were offers of sex for money ads." 2-ER-305. Among other things, the court emphasized (1) the victims' testimony that "their ads were what the Government purported them to be; (2) [that] all of the ads used at least some language the Government established was indicative of prostitution; (3) [that] ads 3, 6-11, and 18 were posted by a person known to be a prostitute by Mr. Ferrer; and (4) the photos in the ads initially submitted in Counts 4, 5, 12, 13, 15, 16, and 17 were removed or otherwise moderated by Backpage." 2-ER-305; *see* 2-ER-305 (noting that "Ferrer and several victims and witnesses who created or helped to create each ad in the Superseding Indictment testified that they were posting sex for money ads on Backpage").

55

## B.    Standard of Review

This Court reviews the denial of a motion for a judgment of acquittal "de novo, asking whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Sutcliffe*, 505 F.3d 944, 959 (9th Cir. 2007) (citing *United States v. Tisor*, 96 F.3d 370, 379 (9th Cir. 1996)).

This Court "review[s] First Amendment challenges to criminal convictions in two steps: (1) deferring to the jury's findings on historical facts, credibility determinations, and the elements of statutory liability, [the Court] ask[s] whether sufficient evidence supports the verdict; and (2) if it does, [the Court] determine[s] whether the facts, as found by the jury, establish the core constitutional facts." *United States v. Harkonen*, 510 Fed. Appx. 633, 635 (9th Cir. 2013) (footnote omitted) (citing *United States v. Keyser*, 704 F.3d 631, 638 n.1 (9th Cir. 2012)); *see also, e.g.*, *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 742 (9th Cir. 2021) (explaining that this Court reviews "constitutional facts *de novo*" but "'construe[s] the historical facts, the findings on the statutory elements, and all credibility determinations in favor of the prevailing party'"); *United States v. Hanna*, 293 F.3d 1080, 1088 (9th Cir. 2002) (observing that this Court "defers to the jury's findings on all but the constitutional facts," which are those facts "that determine the core issue of whether the challenged speech is protected by the First Amendment").

56

Finally, this Court "review[s] de novo whether a jury instruction misstates the law." *Rodriguez*, 971 F.3d at 1012. "'[A]n improper jury instruction does not require reversal if the error is harmless.'" *United States v. Perez*, 962 F.3d 420, 441 (9th Cir. 2020).

## C. Spear's Travel Act Convictions Are Not Based On Protected Speech

As both the jury and district court found, each of the advertisements underlying Counts 2 through 18 was an advertisement for prostitution, and not merely an "ad for an escort, dating or massage service." 2-ER-410 (jury instruction); 2-ER-306 (district court finding that the government presented "sufficient evidence for a reasonable juror to find that each [advertisement] was illegal and therefore not protected by the First Amendment").

Spear does not meaningfully contest those determinations—nor could he. As detailed above, the government presented substantial evidence that each of the advertisements underlying Counts 2-18 were in fact advertisements for prostitution.

Spear instead claims (Spear.Br.50-59) that, even if the published advertisements were *in fact* ads for prostitution (which they undoubtedly were), they should still qualify as protected speech under the First Amendment because "[n]one [of the advertisements] *explicitly* offered sex for money." Spear.Br.52 (emphasis added). According to Spear, the prostitution advertisements at issue here should be afforded First Amendment protection because, when read in isolation and devoid of

57

context, they theoretically could be interpreted as offering a legal transaction. *See, e.g.*, Spear.Br.66 (claiming that "speech that is open to interpretation is protected by the First Amendment"). In other words, in Spear's view, so long as an advertisement for prostitution maintains a veneer of plausible deniability, it is entitled to First Amendment protection.

That novel assertion is legally baseless.

1.      It is well-established that "[o]ffers to engage in illegal transactions are categorically excluded from First Amendment protection." *Williams*, 553 U.S. at 297; *see id.* at 298 (explaining "that offers to give or receive what it is unlawful to possess have no social value and thus, like obscenity, enjoy no First Amendment protection"); *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949) ("It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute."). For this reason, "[m]any long established criminal proscriptions—such as laws against conspiracy, incitement, and solicitation—criminalize speech (commercial or not) that is intended to induce or commence illegal activities." *Williams*, 553 U.S. at 298; *see United States v. Stevens*, 559 U.S. 460, 468 (2010) (recognizing that "speech integral to criminal conduct" is categorically excluded from First Amendment protection).

58

As the Supreme Court and this Court have repeatedly recognized, that categorical exclusion from First Amendment protection extends to advertisements and other offers to engage in prostitution. *See, e.g.*, *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 388 (1973) ("We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes."); *Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*, 880 F.3d 450, 460 (9th Cir.), amended, 881 F.3d 792 (9th Cir. 2018) (recognizing that "soliciting prostitution" is "not protected speech under the First Amendment" because it "involves unlawful activity"); *Coyote Pub., Inc. v. Miller*, 598 F.3d 592, 600-604 (9th Cir. 2010).

2.    Spear contends that this categorical exclusion from First Amendment protection applies only to a *subset* of offers to engage in illegal transactions—namely, only to those offers that, when viewed in a vacuum, explicitly and unequivocally propose an illegal transaction. That contention is unsupported by law or logic.

Neither the Supreme Court nor this Court has ever suggested that the categorical exclusion for offers to engage in illegal transactions extends only to proposals that are unambiguously criminal on their face. Indeed, contrary to Spear's contentions (*e.g.*, Spear.Br.3), the Supreme Court and this Court have repeatedly

emphasized the importance of a statement's context when considering whether it is entitled to First Amendment protection.

For example, when considering whether a person's statements qualify as categorically unprotected "true threats," courts consistently emphasize that "context is critical." *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1078 (9th Cir. 2002), as amended (July 10, 2002) (en banc); *see, e.g.*, *Counterman v. Colorado*, 600 U.S. 66, 74 (2023) (explaining that "[t]he 'true' in that term distinguishes" proscribable threats of violence "from jests, 'hyperbole,' or other statements that *when taken in context* do not convey a real possibility that violence will follow") (emphasis added); *United States v. Dennis*, 132 F.4th 214, 230 (2d Cir. 2025) (observing that a "defendant need not precisely or explicitly reference physical harm to communicate a true threat" because "a seemingly ambiguous communication is properly considered in context to determine whether it implicitly conveyed a true threat"); *Bailey v. Iles*, 87 F.4th 275, 285 (5th Cir. 2023) ("In deciding whether speech is an unprotected 'true threat,' context is critical.").

Similarly, when determining whether a person's speech was on a matter of "public concern," courts are required "to examine the 'content, form, and context' of that speech, 'as revealed by the whole record.'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011); *see, e.g.*, *id.* at 454 ("In considering content, form, and context, no factor

is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said.").

The same is true for proposals to engage in illegal transactions: context undoubtedly matters. *See, e.g.*, *United States v. White*, 610 F.3d 956, 960 (7th Cir. 2010) (per curiam) (recognizing that merely because "a request for criminal action is coded or implicit does not change its characterization as a solicitation"). Were it otherwise, the categorical exclusion for offers to engage in illegal transactions would be reduced to little more than an empty formalism, and one that could be easily exploited by enterprising criminals.

Take the advertisements at issue here, for example. *See supra* pp. 52-53 (listing record cites for advertisements underlying Counts 2 through 18). According to Spear, even though those were *in fact* advertisements for prostitution, they should nonetheless be afforded First Amendment protection merely because they, for example:

- use the word "roses" instead of "money," *see, e.g.*, 25-ER-7026 ("50 Red R*O*S*E*S S*P*E*C*I*A*L"); 25-ER-7027 (similar); 25-ER-7028 (same); 25-ER-7029 (same); 25-ER-7030 (same); 25-ER-7031 (same); 25-ER-7032 (same); 25-ER-7033 (same);

- use the word "donation" instead of "payment," *see, e.g.*, 25-ER-6919; 25-ER-6934; 25-ER-7026 ("My donation is very reasonable");

- use the word "companionship" instead of "sex," *see, e.g.*, 25-ER-6906; 25-ER-6919; 25-ER-6934; 25-ER-7026; 25-ER-7028; 25-ER-7030;

61

- use well-known terminology related to prostitution, without ever saying "sex-for-money," *see, e.g.*, 24-ER-6856 ("Doin incalls and outcalls"); 24-ER-6869 ("INCALLS, 30 min specials!!!); 24-ER-6875 ("NEW IN TOWN"); 25-ER-7027 ("100% Independent & Safe");

- use various euphemisms for prostitution but never use the word "prostitution," *see, e.g.*, 24-ER-6859 ("looking to satisfy your cravings"); 24-ER-6870 ("Doing 30 minute specials all night !"); 25-ER-6896 ("I love to please...[and] am ready to make Your fantasy come true"); 25-ER-6909 ("Pleasing you is my mission!"); 25-ER-6935 ("I love to make others happy and satisfied them with my unforgettable skills."); and/or

- expressly disavow being prostitution ads, *see, e.g.*, 24-ER-6859 ("you are not paying me for sexual services"); 24-ER-6871 (same); 25-ER-6913 ("This ad is not in any form a [sic] ad for solicitation/prostitution"); 25-ER-7026 ("This is not an offer for prostitution.").

In Spear's view, moreover, such advertisements are protected by the First Amendment, even if they include provocative photographs of naked or near-naked women; include links or references to TER; appeared in the Escorts section of Backpage; and/or had certain explicit images removed prior to publication by Backpage's moderators. *See supra* pp. 52-53 (record cites for advertisements underlying Counts 2 through 18).

By Spear's logic, even the most-thinly veiled solicitations to engage in illegal conduct would be entitled to First Amendment protection, so long as they utilized code words or euphemistic language. For example, according to Spear, a drug trafficker seeking to sell seven grams of cocaine for $500 would be entitled to First Amendment protection so long as his offer referred to two "eight balls" and did not

62

use the word "cocaine." *See United States v. Norwood*, 603 F.3d 1063, 1072 (9th Cir. 2010) (explaining that an "eight ball" of cocaine "is a commercial amount that could be sold on the street"). According to Spear, such an offer is constitutionally protected because, "on its face," the drug trafficker could theoretically be seeking to sell unusually valuable billiard equipment.

That absurd result simply is not—and cannot be—the law.

3.      Spear's reliance (Spear.Br.51-54) on *IMDb.com Inc. v. Becerra*, 962 F.3d 1111 (9th Cir. 2020), is misguided. That case involved a state statute that prohibited "a specified category of websites," such as IMDb, "from publishing the ages and dates of birth of entertainment industry professionals." *Id.* at 1116. As relevant here, this Court determined that the statute violated the First Amendment because it was an impermissible content-based regulation on otherwise protected speech. *See id.* at 1119-1127. In particular, this Court held that the statute did not implicate a recognized category of unprotected speech, such as "'[o]ffers to engage in illegal transactions.'" *Id.* at 1123 (quoting *Williams*, 553 U.S. at 297); *see id.* at 1122-1123 ("That rationale does not apply here. *Pittsburgh Press* implicates only those instances when the state restricts speech that itself proposes an illegal transaction."). As this Court explained, the "publication of an individual's age and birthdate" does not, without more, "propose[] an illegal activity." *Id.* at 1123. The statute accordingly could not be upheld as regulating speech integral to criminal

63

conduct or speech proposing an illegal transaction.[10] In other words, unlike the prostitution advertisements at issue here, the content at issue in *IMDb* did not involve offers to engage in illegal transactions.

4.    Spear's reliance (Spear.Br.54-56) on cases such as *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805 (M.D. Tenn. 2013); and *Backpage.com, LLC v. Hoffman*, No. 13-cv-3952, 2013 WL 4502097 (D.N.J. Aug. 20, 2013), is also unavailing.

To begin, none of those decisions addressed (let alone support) the First Amendment argument Spear now makes on appeal—namely, that offers to engage in illegal transactions are protected speech unless they are unambiguously criminal on their face. In fact, the district courts in those cases expressly recognized that offers to engage in illegal transactions were constitutionally unprotected—without regard to whether they were unambiguous on their face. Rather, part of why each of those courts enjoined the respective state statute at issue was because the state law prohibited speech *beyond* offers to engage in illegal transactions. *See, e.g.*,

---

[10] Spear's reliance (Spear.Br.51) on this Court's decision in *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808 (9th Cir. 2013), is similarly unavailing. Among other things, the speech at issue in that case—"the solicitation of labor—is perfectly legal." *Id.* at 822; *see id.* (emphasizing that the speech at issue in *Valle* did not involve proposals to engage in "an illegal transaction").

*McKenna*, 881 F. Supp. 2d at 1280 ("It is true that '[o]ffers to engage in illegal transactions are categorically excluded from First Amendment protection.'…SB 6251, however, encompasses more than offers to engage in illegal transactions."); *Cooper*, 939 F. Supp. 2d at 834 (explaining that "the statute as written does not 'criminalize only offers to engage in illegal transactions'").

In addition, the district courts in those civil litigation cases ruled for the plaintiffs primarily on federal preemption grounds, holding that the respective state statutes were preempted by Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230(e). *See, e.g.*, *McKenna*, 881 F. Supp. 2d at 1273 (holding that "[p]laintiffs are likely to succeed on their claim that SB 6251 is preempted both because it is likely expressly preempted and because it likely conflicts with federal law"); *Cooper*, 939 F. Supp. 2d at 823-826 (same). As the district court here correctly recognized, "[t]he CDA's grant of immunity 'protects certain internet-based actors from certain kinds of lawsuits,' but has 'no effect' on 'any other federal criminal statute.'" SER-214 (citation omitted); *see* 47 U.S.C. § 230(e)(1) ("Nothing in this section shall be construed to impair the enforcement of…any other Federal criminal statute.").[11]

---

[11] Moreover, since those decisions were issued (in 2012 and 2013), there has been a sea change in the availability of evidence concerning Backpage, including the evidence presented to the jury in this prosecution. Among other things, it has been revealed that Backpage was not merely a passive conduit for third-party content, but that it deliberately built itself into the nation's leading source for online

5.    Finally, Spear's reliance (Spear.Br.56-58) on *Counterman*, 600 U.S. 66, is similarly misplaced. In *Counterman*, the Supreme Court addressed what *mens rea* is required for a defendant's speech to be constitutionally proscribable as a "true threat" and, therefore, unprotected by the First Amendment. *See id.* at 69. The Court determined that, in order to prosecute a person for his threatening statements, "the State must prove…that the defendant had some understanding of his statements' threatening character." *Id.* at 73. At a minimum, the Court held, the "State must show that the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *Id.* at 69.

The Court's decision in *Counterman* has little relevance here. *Counterman* addressed a different category of unprotected speech (true threats) than the category at issue in this prosecution (offers to engage in illegal transactions). In addition, the Court in *Counterman* was focused solely on properly defining the category of "true threats"—not addressing First Amendment *mens rea* requirements more generally. *Contra* Spear.Br.57-58.

---

prostitution advertisements, while deceptively doing a "slow dance" with law enforcement. *See supra* pp. 7-18. Based on those more recent revelations, some district courts have sanctioned Backpage for its "fraudulent conduct" during the course of such civil litigation. *See, e.g.*, *Backpage.com, LLC v. Dart*, N.D. Ill. No. 1:15-cv-6340, Doc. 253, at 7 (March 25, 2019) (sanctioning Backpage for "knowingly and repeatedly ma[king] false representations of fact concerning relevant aspects of its operations" and finding that "[t]his fraudulent conduct has been pervasive throughout this law suit").

Moreover, contrary to his contention on appeal (Spear.Br.56-58), Spear was not convicted pursuant to a "negligence" theory. Rather, as detailed above, the Travel Act is not a negligence liability statute, but rather has a well-defined specific intent requirement. *See* 18 U.S.C. § 1952(a)(3) (requiring that the interstate travel or use be done "with intent to…promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity").

**D.     The District Court Did Not Reversibly Err When Instructing the Jury About The First Amendment**

Spear relatedly contends (Spear.Br.63-67) that the district court erred when instructing the jury about the First Amendment. That claim, which is largely derivative of the argument discussed above, is meritless.

1.     As relevant here, the defendants requested that the jury be given the following instructions with regards to the First Amendment: "Although the First Amendment permits the government to restrict speech that proposes an illegal activity, the government may not restrict facially inoffensive speech that a third-party might use to facilitate its own illegal conduct. Speech that proposes a commercial transaction that necessarily would constitute an illegal act if concluded is unprotected, but, if there are plausible ways to complete a proposed transaction lawfully, the speech proposing that transaction concerns lawful activity and is, therefore, protected commercial speech." 2-ER-521. The district court rejected the

defendants' proposed instruction, *see* 50-ER-14378-14395, and gave the instruction described earlier, 2-ER-410; *see supra* p. 54.

2.     Spear now claims (Spear.Br.63-64) that the instruction given by the district court "was incomplete" because "it said nothing about speech that is open to interpretation and thus left the door open for the jury to convict even if the predicate ads proposed transactions whose consummation would *not* necessarily be unlawful."

That assertion misreads the given instruction, which specifically informed the jury that "[i]t is the government's burden to establish that each of the ads alleged in this case is an ad for prostitution and not for another purpose such as an ad for an escort, dating or massage service. If you find that an ad proposes an illegal transaction, it is not protected by the First Amendment." 2-ER-410. That instruction did not, as Spear suggests, leave "the door open for the jury to convict" if it had reasonable doubts about whether the advertisements were for prostitution. Moreover, Spear ignores that the jury was instructed (correctly) that it was the *government's* burden to establish the illegality of the advertisements.

For many of the reasons detailed above, Spear's remaining challenges to the First Amendment jury instruction are legally mistaken. Because the defendants' proposed instruction misstated the law, the district court correctly declined to give it to the jury. *See, e.g.*, *United States v. Tucker*, 641 F.3d 1110, 1122 (9th Cir. 2011)

(observing that a district court does not err when it declines a defendant's request to instruct the jury in a manner than is not "'supported by law'").

In addition, even if the district court erred by failing to give the defendants' preferred First Amendment instruction, any such error was harmless. *Contra* Spear.Br.65-66. On this record, there is no plausible reason to believe the jury would have concluded that the prostitution advertisements at issue here were proposals to engage in lawful transactions, even if it had been instructed pursuant to the defendants' requested instruction. Accordingly, any alleged error was harmless. *See Perez*, 962 F.3d at 442-443.

*      *      *

Finally, Spear briefly challenges his conviction for conspiracy to violate the Travel Act (Count 1), effectively for the same reasons he challenges his substantive Travel Act convictions. *See* Spear.Br.67-68. Because the government's theory of prosecution under the Travel Act was valid, and because the prostitution advertisements posted on Backpage were not entitled to First Amendment protection, Spear's challenges to Count 1 likewise fail.

## III. THE DISTRICT COURT DID NOT REVERSIBLY ERR WHEN LIMITING BRUNST'S PROPOSED TESTIMONY IN MANNERS CONSISTENT WITH ITS EVIDENTIARY RULINGS

Brunst claims (Brunst.Br.51-54) the district court improperly infringed on his constitutional right to testify when it precluded certain aspects of his proposed

69

testimony. That contention is meritless. Each of the limitations about which Brunst now complains were based on sound evidentiary rulings by the district court. Brunst was not prohibited from testifying to his "good faith" if he so desired; rather, he was merely obliged to testify in a manner consistent with the Federal Rules of Evidence.

### A.    Background

1.    During trial, Brunst filed a motion seeking "approval to testify as to his state of mind" when the defense presented its case to the jury. 11-ER-2760-2774; *see also* 11-ER-2747-2751 (Spear joining the motion); 11-ER-2752-2759 (Lacey joining the motion). As Brunst explained at the time, he "file[d] this motion because the anticipated testimony would violate prior Court Orders" about what evidence would be admissible. 11-ER-2761; *see also* 11-ER-2761 (Brunst additionally informing the court that if it "intends to preclude such testimony, [he] likely would not testify at trial").

The crux of Brunst's motion sought permission to testify that he acted in "good faith reliance on statements from attorneys and court opinions." 11-ER-2766; *see, e.g.*, 11-ER-2767-2772 ("Brunst's Reliance on Court Opinions Played a Central Role in His State of Mind"); 11-ER-2772-2773 (Brunst claiming that he relied on Backpage's "hiring of counsel to address legal matters facing Backpage"). As Brunst recognized, "[b]ased on the Court's rulings to date, it appears that most, if not all, of this testimony would be precluded." 11-ER-2765.

70

2.      Three prior evidentiary rulings by the district court were particularly pertinent to Brunst's motion.

a.      Prior to trial, the government moved *in limine* to preclude the admission of "the decisions, rulings, or opinions issued in, or the outcomes of, any prior litigation in which Backpage.com, LLC (Backpage) or any of its then-owners or parent companies was a plaintiff or defendant," including the *Dart* and *McKenna* litigation. 12-ER-3085-3089; *see* 12-ER-3086 (explaining that the court "should preclude discussion of these decisions under Fed. R. Evid. 401-403 and 802").

The district court granted the motion. 2-ER-534-535. The court instructed the defendants that they should not "refer to prior court decisions, rulings, opinions or results filed by or against Backpage.Com, LLC, unless those prior cases were adjudications of 18 U.S.C. § 1952(a)(3)(A) offenses." 2-ER-535. The court explained that "those prior cases are distinguishable" from the present prosecution "because they were (1) civil adjudications; (2) brought by different parties; and (3) reviewed under differing legal standards." 2-ER-535. "Therefore," the court determined, "they are irrelevant because they bear no relation to this case or the criminal issues to be decided." 2-ER-535; *see* Fed. R. Evid. 401 & 402 ("Irrelevant evidence is not admissible.").

The court additionally found that "[t]o refer to any prior court case as legally controlling the issues here [are] misstatements of law, would confuse the jury, and

71

would prejudice the Government." 2-ER-535; *see* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."); *see also* 2-ER-535 (finding that "statements about prior unrelated civil cases and money judgments are irrelevant to the specific Travel Act violations and will only mislead and confuse the jury"); 2-BrunstER-345 (district court stating: "But what I'm saying is you cannot bring in anything related to the litigation. It's confusing and it doesn't relate to this particular case or the counts in the case.").

b.      The government also moved *in limine* to preclude the defendants from "introducing evidence or argument at trial about Section 230 of the Communications Decency Act," 47 U.S.C. § 230. *See* 12-ER-3102-3106. As the government explained in its motion, such evidence would be irrelevant under Rules 401 and 402 and impermissible under Rule 403. *See, e.g.*, 12-ER-3104 ("Section 230 is not relevant: It does not apply to this federal criminal prosecution."); 12-ER-3104-3105 ("Further, this Court should preclude references to Section 230 because any probative value it may have would be substantially outweighed by risks of misleading the jury, confusing the issues, and wasting time.").

The district court granted the motion in relevant part, holding that the defendants "may not argue that Section 230 of the CDA immunizes Defendants from

72

Counts 2-51 of the [superseding indictment] for violating the Travel Act." 2-ER-533-534; *see* 2-ER-533-534 ("Defendants' reliance on Section 230 of the CDA for their immunity argument is a misstatement of law.").

c. The government also moved *in limine* "to preclude Defendants from soliciting testimony or otherwise suggesting that they relied upon the advice of their attorneys as a defense to the charged offenses." 12-ER-3080-3084. Among other things, the government noted that the defendants had failed to satisfy this Court's prerequisites for asserting an advice-of-counsel defense. 12-ER-3082-3083 ("Defendants may not raise an advice of counsel defense without first showing that they disclosed all relevant and material facts to their attorneys.").

The district court once again agreed and granted the motion in pertinent part. 2-ER-536-537. The court explained that the defendants "may assert they relied upon the advice of counsel to negate the scienter requirement of the alleged charge, but only if they *first* meet the following factors: (1) they made a complete disclosure to counsel; (2) they requested counsel's advice as to the legality of the contemplated action; (3) they received advice that it was legal; and (4) they relied in good faith on the advice." 2-ER-536 (citing *United States v. McLennan*, 563 F.2d 943, 946 (9th Cir. 1977)). Because the defendants had failed to "proffer a showing of all four factors," the court held that they were precluded from asserting an advice-of-counsel defense until doing so. 2-ER-536-537. The court also explained that "[t]o permit

Defendants to tell the jury that they broadly sought advice on conduct unrelated to the [superseding indictment]'s allegations would present irrelevant evidence, could be factually misleading, would result in jury confusion, and would prejudice the Government." 2-ER-536-537.

The court also entered a similar order with respect to defendants' potential First Amendment arguments: "should Defendants intend to rely upon 'advice of counsel' to assert they were within their First Amendment rights to produce and post the alleged ads, they must set forth the requisite criteria as further discussed [above]. Notwithstanding this fine distinction, Defendants are not precluded from referring to their general business of publishing articles and information on Backpage.com, LLC to promote their First Amendment rights." 2-ER-532-533; *see* 12-ER-3135-3139 (government's motion *in limine*).

As the district court would later observe, "[w]hether Defendants could raise an advice of counsel defense was an issue that was litigated extensively and *ad nauseum* in pre-trial motions, on the eve of trial, and again at various points during trial. The Court told Defendants, in no uncertain terms, that the defense was theirs to raise if they could first meet the four preconditions laid out in *United States v. McLennan*, 563 F.2d 943, 946 (9th Cir. 1977). Defendants steadfastly refused to waive the attorney-client privilege with regar[d] to their communications. The

Defendants *never* attempted to clear the *McLennan* hurdles." 2-ER-346 (citations and footnote omitted).

3.    After holding a hearing, the district court denied Brunst's motion in relevant part. *See* 49-ER-13844-13875.

The court observed that, in many respects, the motion "basically take[s] issue again with the Court's prior ruling on the admissibility of advice-of-counsel testimony and the Court's preclusion of past litigation related to Backpage." 49-ER-13844. The court reiterated that testimony seeking to advance an advice-of-counsel defense would only be permitted if all the *McLennan* prerequisites had been satisfied. 49-ER-13844-13845. "[I]f that showing is not made," the court explained, "you cannot rely on the professional's advice to negate scienter." 49-ER-13845; *see* 49-ER-13846-13847 (explaining that the defendants may not rely on the "Sableman memo" or any "transfer of that memo to the defendants" or "any communications or advice given by [attorneys] Hemanshu Nigam, Liz McDougall, Don Moon, [or] Samuel Fifer").

Similarly, the court reiterated that the defendants may not introduce testimony about prior litigation involving Backpage or Section 230 of the CDA. 49-ER-13848-13849. Among other things, the court restated its concerns that such testimony would lead the parties to "go down this rabbit hole of irrelevant testimony that will lead to confusion." 49-ER-13849; *see also* 49-ER-13850 (finding that Brunst may not

testify that he was aware "'some state law enforcement attacked Backpage'" but never succeeded because that "is irrelevant because those legal threats or actions are not relevant to the allegations here, the indicted Travel Act allegations").

At the same time, the court made clear that "some of the proffered testimony would be admissible under the state of mind exception to show good faith." 49-ER-13849. For example, the court held that Brunst "certainly can testify that within the relevant time period that no auditor ever told him they believed Backpage was unlawfully facilitating prostitution or engaging in money laundering. He can also testify as to his understanding of why banks withdrew work from Backpage or did not withdraw their business from Backpage." 49-ER-13849-13850.

In addition, the court noted that Brunst "can testify that the auditors sought letters from counsel on litigation risks doing business with Backpage, and he can testify whether or not he referred those auditors to counsel, Backpage counsel or other counsel, but he cannot testify as to what the lawyers told the auditors because that would be inadmissible hearsay." 49-ER-13850. The court also explained that Brunst may testify that he "relied on statements from Mr. Ferrer, Mr. Larkin and Mr. Lacey that the sex-for-money ads were protected by the First Amendment or that they were not promoting or facilitating prostitution by placing the sex-for-money ads," but that "no defendant can testify that Mr. Lacey, Mr. Larkin or Mr. Ferrer told

them that that understanding came from legal counsel. Again, that would be inadmissible hearsay." 49-ER-13850-13851; *see* 49-ER-13859-13860 (similar).

Finally, the court made clear that Brunst "can certainly put forward evidence of [his] role and responsibility in Backpage." 48-ER-13851; *see* 49-ER-13852 (cautioning that, with respect to such testimony, "you have to be mindful that much of what you've proffered so far includes layers of hearsay [and] run afoul of advice of counsel and so, therefore, I'm restricting any testimony in that way").

Brunst ultimately declined to testify.

4. The jury was provided with a "good faith" instruction before deliberating. *See* 2-ER-409. Among other things, the court instructed the jury that the "government has the burden to prove beyond a reasonable doubt that a defendant acted with criminal intent and did not act in good faith. 'Good faith' encompasses a belief or opinion honestly held and an absence of malice or ill will. If a defendant carries out his or her actions in good faith, there is no criminal intent." 2-ER-409. The instruction concluded by informing the jury that, "[i]f the government fails to meet its burden to prove a defendant lacked good faith, you must return a not guilty verdict." 2-ER-409.

In their respective closing arguments, each of the defendants asserted— among other things—that they should not be convicted because they had acted in "good faith." *See, e.g.*, 52-ER-14760 (Brunst's counsel claiming that his client acted

"in good faith" reliance on others at Backpage); 51-ER-14558-14559 (Lacey's counsel claiming that Lacey "relied in good faith on Carl Ferrer and others that they operated Backpage lawfully"); 51-ER-14648 (Spear's counsel stating that Spear acted in "good faith every day to try to operate a legal site").

### B. Standard of Review

This Court reviews de novo whether evidentiary limitations placed on a defendant's testimony violates his constitutional right to testify. *United States v. Moreno*, 102 F.3d 994, 998 (9th Cir. 1996).

As relevant here, "[a] district court is accorded a wide discretion in determining the admissibility of evidence." *United States v. Abel*, 469 U.S. 45, 54 (1984). Evidentiary rulings are thus reviewed for abuse of discretion. *United States v. Hinkson*, 585 F.3d 1247, 1267 (9th Cir. 2009) (en banc). In particular, a district court's determinations under Federal Rule of Evidence 403 are "subject to great deference, because 'the considerations arising under Rule 403 are susceptible only to case-by-case determinations, requiring examination of the surrounding facts, circumstances, and issues.'" *Id.* (internal quotation marks omitted). Since "trial judges are better able to sense the dynamics of a trial than [courts of appeals] can ever be," "broad discretion must be accorded them in balancing probative value against prejudice." *United States v. Espinoza-Baza*, 647 F.3d 1182, 1189 (9th Cir. 2011) (brackets and internal quotation marks omitted). A court's conclusion that the

"risk [of admitting the evidence] substantially outweighed the reward" is subject to reversal only if "illogica[l] or implausible based on the record." *Hinkson*, 585 F.3d at 1267; *see, e.g.*, *Espinoza-Baza*, 647 F.3d at 1189 ("[W]e generally will not disturb such a ruling unless it lies beyond the pale of reasonable justification under the circumstances.") (internal quotation marks omitted).

### C.   The District Court's Evidentiary Rulings Were Not Arbitrary Or Disproportionate To The Purposes The Federal Rules Of Evidence Are Designed To Serve

1.     A criminal defendant, of course, has the constitutional right "to take the stand in his own defense and present relevant testimony." *United States v. Gallagher*, 99 F.3d 329, 332 (9th Cir. 1996) (citing *Rock v. Arkansas*, 483 U.S. 44, 52 (1987)). As this Court and the Supreme Court have repeatedly recognized, however, that right "is not absolute." *Moreno*, 102 F.3d at 998; *see Gallagher*, 99 F.3d at 332 ("This right is not, however, without limitation.") (citing *Rock*, 483 U.S. at 55).

"The right may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Rock*, 483 U.S. at 55 (internal quotation marks omitted). For example, "[w]hen exercising this right, the defendant must 'comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" *Gallagher*, 99 F.3d at 332 (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)). Critically, such

79

"[r]estrictions on a defendant's right to testify violate the Constitution *only* when they are arbitrary or disproportionate to the purposes they are designed to serve." *Id*. (citing *Rock*, 483 U.S. at 55-56) (emphasis added).

Under this "arbitrary or disproportionate" framework, the Supreme Court has invalidated state evidentiary "rules that excluded important defense evidence but that did not serve any legitimate interests." *Holmes v. South Carolina*, 547 U.S. 319, 325 (2006); *Moses v. Payne*, 555 F.3d 742, 758 (9th Cir. 2009) (observing that the Supreme Court has invalidated state evidentiary rules that, "by their terms, required the trial court to exclude crucial evidence that had a critical effect on the trial, with little or no rational justification").

At the same time, the Supreme Court has made clear that, "[w]hile the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes*, 547 U.S. at 326 (citing Fed. R. Evid. 403); *see, e.g.*, *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("[W]e have never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence

80

admitted."). Or, as this Court has put it when examining the scope of a defendant's constitutional right to testify: "Without question, the Government has a legitimate interest in excluding evidence which is not relevant or is confusing under Rule 402 and Rule 403 of the Federal Rules of Evidence." *Moreno*, 102 F.3d at 998 (footnotes omitted).

2.      Understandably, Brunst does not contend that Federal Rules of Evidence 401, 402, 403, or 802 are somehow impermissible by their own terms. Nor does Brunst seem to directly challenge the district court's evidentiary rulings under those provisions here. Rather, Brunst appears to contend (Brunst.Br.51-54) that the application of those well-established evidentiary rules to his proffered testimony was "arbitrary or disproportionate to the purposes" those evidentiary rules are designed to serve. *Gallagher*, 99 F.3d at 332. Brunst does not come close to satisfying that particularly demanding standard.

For example, Brunst erroneously contends (Brunst.Br.52-53) that the district court's ruling that he could not testify about his personal reliance on the *Dart* or *McKenna* litigation was an "arbitrary" and "disproportionate" application of Rules 401, 402, and 403. The district court's determination that prior civil litigation involving Backpage, which was resolved primarily under Section 230 of the CDA and did not involve any of the offenses charged here, was irrelevant was a sound determination—and certainly not one that was arbitrary. Similarly, the district

81

court's determination that discussion of such litigation would likely be confusing to the jury and would likely lead to a series of mini-trials about the contents of such prior litigation was also well-founded—and certainly not arbitrary under the particularly deferential standards of Rule 403.

Brunst's complaints about limitations on his putative testimony regarding the aftermath of the State Attorneys General letters (Brunst.Br.52) and an investigation by the U.S. Attorney's Office in the Western District of Washington (Brunst.Br.54) fail for the same reasons. As the district court explained when limiting the permissible testimony about the Western District of Washington investigation, "what I don't want to do...is to [get] into a position where the government is going to have to produce evidence of what the...Western Washington District investigation was about and whether or not it was related to a Travel Act violation charge or money laundering charge or whatever it might be, because then it ends up creating this mini trial within a trial, and that's – I don't want to waste the jury's time on that, and I don't want to confuse the jury, and that's the dilemma that we get into with that type of testimony." 49-ER-13871.

Likewise, the district court's ruling that Brunst could not testify about his reliance on Backpage's attorneys or attorney communications without first satisfying the prerequisites for an advice-of-counsel defense was not arbitrary or disproportionate to the purposes of that rule. *Contra* Brunst.Br.53-54. And the

district court's observation that such testimony by Brunst would necessarily run into a variety of hearsay problems was both correct and not meaningfully contested below. *See, e.g.*, 49-ER-13856 ("THE COURT: Well, the way that you characterize Mr. Brunst's testimony was, well, he was arms length away from any lawyer. He wasn't involved in any of those communications. So the problem here is how then does he get to that information but through what will amount to hearsay embedded in hearsay. [Brunst's Counsel]: Oh, it is hearsay."); 49-ER-13850-13851 (district court explaining that Brunst "cannot testify as to what the lawyers told the auditors because that would be inadmissible hearsay"); 49-ER-13859-13860 (similar).

Moreover, the district court did not preclude Brunst from testifying about other forms of reliance to show his good faith. For example, the court held that Brunst could testify that he "relied on statements from Mr. Ferrer, Mr. Larkin and Mr. Lacey that the sex-for-money ads were protected by the First Amendment or that they were not promoting or facilitating prostitution by placing the sex-for-money ads." 49-ER-13850. The primary limitation was that Brunst could not testify that such an "understanding came from legal counsel," because that would be "inadmissible hearsay"—in addition to circumventing the established requirements for pursuing an advice-of-counsel defense. 49-ER-13850-13851.

Put simply, the district court's evidentiary rulings were well supported by the record here, and certainly not tantamount to an arbitrary application of the Federal

Rules of Evidence, nor one that was disproportionate to the purposes those rules are designed to serve. Accordingly, Brunst's constitutional right to testify was not violated.

3.     Even if Brunst could establish a violation of his right to testify, given the strength of the evidence against him on his counts of conviction, any error would have been harmless beyond a reasonable doubt. *See, e.g.*, *United States v. Books*, 914 F.3d 574, 580 (7th Cir. 2019) ("In reviewing the trial record, our obligation is to determine whether any error was harmless beyond a reasonable doubt, and we do so in no small part by evaluating the overall strength of the prosecution's case.")

## IV.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN LIMITING BRUNST'S CROSS-EXAMINATION OF FERRER IN MANNERS CONSISTENT WITH ITS EVIDENTIARY RULINGS

Brunst additionally contends (Brunst.Br.45-51) his Sixth Amendment confrontation rights were violated when the district court limited certain aspects of his cross-examination of Ferrer. That constitutional claim, which is raised for the first time on appeal, is meritless. Each of the limitations about which Brunst complains were based on sound evidentiary rulings by the district court, and they certainly do not constitute an abuse of discretion. Accordingly, Brunst cannot show error, much less can he show reversible plain error.

### A.    Background

Five different defense attorneys cross-examined Ferrer over five trial days (and nearly 900 trial transcript pages), using nearly 150 exhibits and addressing scores of different topics. *See* 39-ER-11002-11011; 39-ER-11046-11148; 39-ER-11170-11172; 40-ER-11176-11272; 40-ER-11305-11400; 40-ER-11418-11471; 41-ER-11475-11543; 41-ER-11579-11682; 41-ER-11702-11770; 42-ER-11774-11826; 42-ER-11861-11969; 42-ER-11988-12030.

On appeal, Brunst claims (Brunst.Br.46-47) his confrontation rights were violated when the defendants were precluded from introducing five different sets of exhibits during Ferrer's otherwise lengthy cross-examination.

1.    The first are two letters written by Backpage attorney Samuel Fifer to the National Association of Attorneys General in 2011. *See* 1-BrunstER-45-54 (Trial Ex. 487); 1-BrunstER-61-65 (Trial Ex. 5019). When Spear's counsel attempted to introduce the exhibits as evidence during his cross-examination of Ferrer, the district court rejected that request on the grounds the letters were hearsay. *See* 40-ER-11182 (denying admission of Exhibit 487 on hearsay grounds); 40-ER-11182-11183 (denying admission of Exhibit 5019 on hearsay grounds). The defense did not offer a non-hearsay purpose (or hearsay exception) that would justify the exhibits' admission. Moreover, the defense was not generally precluded from cross-examining Ferrer about Backpage's responses to the State Attorneys General; it

simply was required to do so in a manner that was consistent with the Rules of Evidence. *See, e.g.*, 40-ER-11182-11183.

About a week after Ferrer's testimony was complete, the defendants filed a document styled "Defendants' Brief In Support Of Objections To Court Rulings During Ferrer Testimony." *See* SER-68-85. In that filing, the defendants argued that the two letters should have been admitted under the rule of completeness, Fed. R. Evid. 106, to establish the defendants' good faith. *See* SER-72; SER-76-77. The government responded, explaining why the letters were not admissible under Rule 106. *See* SER-56-57.

The district court agreed with the government and found that the letters were not admissible under Rule 106. *See* 44-ER-12443-12444 (explaining that Rule 106 allows "introduction of parts of a writing when necessary to avert misunderstanding or distortion created by another writing" and finding that the defendants had not "identified any specific statements in those AG letters that are misleading or distorting, nor do they explain fully how the responsive letters would correct that misunderstanding").

2.    The second set of exhibits concerns redactions made to two exhibits that otherwise discussed or invoked Section 230 of the CDA. *Compare* 25-ER-7111-7116 (Trial Ex. 1185) (with redactions) (admitted) *with* 1-BrunstER-55-60 (Trial Ex. 1185a) (unredacted) (not admitted); and *compare* 24-ER-6770-6811 (Trial Ex. 120

with PowerPoint slide 13 removed) (admitted) *with* 1-BrunstER-2-44 (Trial Ex. 120a) (PowerPoint slide 13 not removed) (not admitted).

As noted earlier, *see supra* pp. 72-73, the district court granted the government's motion *in limine* to preclude the defendants from introducing evidence or argument about Section 230 serving as a basis for legal immunity from the offenses charged here. *See* 2-ER-533-534 ("Defendants' reliance on Section 230 of the CDA for their immunity argument is a misstatement of the law…and will lead to jury confusion."); *see also, e.g.*, 2-BrunstER-319 (district court addressing redactions to Exhibit 1185 and explaining: "I'm not going to permit anybody to bring in any information related to the CDA. This is not a CDA case. And so if the response is self-serving, and if I find that the CDA permeates that response, then the government's entitled to have the redaction."); 35-ER-9966 ("the government can redact those portions that refer to the CDA and remove the redaction from those portions that do not specifically refer to or cases that involve the CDA or allegations related to that").[12]

3. The third set involved judicial opinions from prior civil litigation involving Backpage. As noted earlier, *see supra* pp. 71-72, the district court granted

---

[12] It is not clear from the record that the defendants ever actually sought to confront Ferrer with those redactions during cross-examination, as opposed to merely objecting to the redactions when the government's exhibits were admitted during Ferrer's direct testimony. *See, e.g.*, Brunst.Br.26-27.

the government's motion *in limine* to preclude the admission of "prior court decisions, rulings, opinions or results filed by or against Backpage.Com, LLC, unless those prior cases were adjudications of 18 U.S.C. § 1952(a)(3)(A) offenses." 2-ER-535. As the court repeatedly explained, such prior judicial decisions were not relevant under Rules 401 and 402 and, alternatively, were not admissible pursuant to Rule 403—as they would likely lead to juror confusion and risk a series of mini-trials about the merits of those prior cases. 2-ER-535; *see also, e.g.*, 2-BrunstER-341-356 (district court explaining that it would not permit admission of prior, irrelevant litigation involving Backpage, such as the *Dart* or *McKenna* cases); 2-BrunstER-356 (district court noting that it did not want the parties to "get into [the] *Dart* litigation because it leads down this path of what occurred in the litigation and has nothing to do with the allegations in the case").

As the district court also made clear, the defendants were not precluded from cross-examining Ferrer about Sheriff Dart; rather, they were precluded from introducing evidence or testimony discussing Backpage's prior *litigation* with Dart. *See, e.g.*, 41-ER-11507-11516 (district court explaining to Brunst's counsel: "[Y]ou can say, 'Did you meet with Sheriff Dart?' You know, 'What was your understanding of Sheriff Dart's concerns?' That's all legitimate, but you're getting at the line where you're going to start getting into this litigation and that's where we're drawing it."); 2-BrunstER-345 (district court informing Brunst's counsel:

88

"You can ask [Ferrer] to clarify what he meant by the 'credit card Armageddon.' If he says, well, Sheriff Dart, and I think his testimony was Sheriff Dart was writing these letters, and so it concerned the credit card companies. But what I'm saying is you cannot bring in anything related to the litigation. It's confusing and it doesn't relate to this particular case or the counts in the case.").

4. The fourth set of exhibits involve "[a]ttorney advice" (Brunst.Br.47) and communications from Backpage attorneys discussing the purported legality of Backpage's business. *See, e.g.*, 1-BrunstER-66-96 (Trial Ex. 5507) (Sableman memo) (not admitted); 1-BrunstER-97 (Trial Ex. 5508) (Brunst email forwarding Sableman memo) (not admitted).

As noted earlier, *see supra* pp. 73-75, the district court granted a motion *in limine* and ordered that the defendants may not rely upon an advice-of-counsel defense unless they satisfy the prerequisites set forth by *McLennan*, 563 F.2d at 946. 2-ER-536-537. The court further held that "[t]o permit Defendants to tell the jury that they broadly sought advice on conduct unrelated to the [superseding indictment]'s allegations would present irrelevant evidence, could be factually misleading, would result in jury confusion, and would prejudice the Government." 2-ER-536-537.

As with other forms of attorney advice, the district court informed the defendants that they could introduce the Sableman memo (or similar attorney

memoranda) only if they first established the requirements under *McLennan*. *See* 49-ER-13846-13847; *see* 49-ER-13866-13867 (inviting the defendants to call Sableman as a witness and/or "provide the Court or share with the government what it was specifically that he was asked to base his legal opinion on"). To permit otherwise, the court explained, would risk allowing the defendants to use "sort of a backdoor way to avoid the advice-of-counsel dilemma that you're faced with." 49-ER-13866-13867.

5. The final set of exhibits identified by Brunst involve a single email (and attachment) from May 2017, purportedly sent by Ferrer to his attorneys regarding a California state criminal prosecution against Ferrer. *See* 1-BrunstER-98-143 (Exhibits GL-CF-36 and GL-CF-37) (not admitted). The district court denied the defendants' request to admit the exhibits for use as impeachment, on the grounds that the document appeared to be privileged work product; "there's an authenticity issue here because there's strikeouts and there's really no description as to who created the document and whose statements are in there"; it "looks to me like a work in progress, not a statement under oath"; and it was not clear "where this came from." 41-ER-11634-11640; *see also* 41-ER-11476-11482 (similar).

The defendants renewed their request in the aforementioned "Brief in Support of Objections to Court Rulings During Ferrer Testimony." *See* SER-78-83; *see also* SER-58-64 (government's response, including asserting that the document was

90

privileged and, in any event, not a prior inconsistent statement). Addressing the renewed request, the court reiterated that it "remain[ed] troubled because I have not heard a clear explanation as to how the defense came into possession of this document, which, again, clearly looks like a draft, a working draft, redline strike-outs, modifications to language, back and forth between Mr. Ferrer and his counsel." 44-ER-12445; *see* 44-ER-12445 ("It does not appear that it came from Mr. Ferrer."). The court did not address "whether or not the exhibit contain[s] impeachment material," because its primary "concern is it appears to be attorney-client protected documentation." 44-ER-12446.

### B. Standard of Review

"If the defendant raises a Confrontation Clause challenge based on the exclusion of an area of inquiry," this Court reviews de novo. *United States v. Larson*, 495 F.3d 1094, 1101 (9th Cir. 2007) (en banc). If, however, the "challenge [is] to a trial court's restrictions on the manner or scope of cross-examination on nonconstitutional grounds," the review is for an abuse of discretion. *Id.* All of Brunst's challenges on appeal involve the latter; therefore, review is for—at most— abuse of discretion.

Brunst does not appear to have ever raised a Confrontation Clause challenge before the district court. Accordingly, this Court should review for plain error. *See* Fed. R. Crim. P. 52(b); *see, e.g.*, *United States v. Ellis*, No. 24-3575, 2025 WL

2028309, at \*1 (9th Cir. July 21, 2025) (unpublished) (applying plain error review to a Confrontation Clause challenge about limitations on cross-examination); *United States v. Macias*, 789 F.3d 1011, 1017 (9th Cir. 2015) ("Because Macias failed to preserve the argument by making a Confrontation Clause objection, this issue should be reviewed for plain error.").

"Plain error is (1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Depue*, 912 F.3d 1227, 1232 (9th Cir. 2019) (en banc) (internal quotation marks omitted). "If these conditions are met, the reviewing court has the discretion to grant relief so long as the error 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* The "burden of establishing entitlement to relief for plain error is on the defendant claiming it," *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004), and "[m]eeting all four prongs is difficult, 'as it should be,'" *Puckett v. United States*, 556 U.S. 129, 135 (2009).

C.     **The District Court Did Not Err Or Otherwise Abuse Its Discretion When Limiting Cross-Examination Based On The Federal Rules Of Evidence**

1.     "The Confrontation Clause of the Sixth Amendment, which 'guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him,"' includes 'the right of effective cross-examination.'" *Larson*, 495 F.3d at 1102 (citation omitted). The "right to cross-examine," however, "is subject to very

well-established limitations that permeate the Federal Rules of Evidence." *United States v. Singh*, 995 F.3d 1069, 1080 (9th Cir. 2021).

Among other things, "'trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Larson*, 495 F.3d at 1101 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

This Court has adopted a three-prong "test" for determining "when restrictions on cross-examination become sufficiently extensive to raise Confrontation Clause concerns that may undermine the fairness of a trial": "'(1) whether the excluded evidence was relevant; (2) whether there were other legitimate interests outweighing the defendant's interest in presenting the evidence; and (3) whether the exclusion of evidence left the jury with sufficient information to assess the witness's credibility.'" *Singh*, 995 F.3d at 1080 (quoting *United States v. Mikhel*, 889 F.3d 1003, 1048 (9th Cir. 2018)); *see, e.g.*, *Larson*, 495 F.3d at 1103.

2.     Under any standard of review, Brunst cannot pass this Court's three-prong test.

a.     First, as detailed above, the district court held that many of the now complained-of exhibits were not relevant to the charges at issue here. *See supra* pp.

93

86-90. For example, the district court found that the prior judicial decisions involving Backpage, discussions of Section 230 of the CDA, and substantial aspects of certain attorney communications were simply not relevant to this criminal trial. Those determinations were not plainly erroneous or an abuse of discretion. Moreover, in the context of cross-examining *Ferrer*, the relevance of establishing *Brunst*'s good faith (the purported reason for seeking to introduce the first four sets of exhibits) was minimal.

      b.    Second, several other legitimate interests "easily outweighed" the exhibits' limited probative value—"particularly, legitimate interests in avoiding undue delay and preventing a trial-within-a-trial on unrelated events." *Mikhel*, 889 F.3d at 1048-1049; *see, e.g.*, *Singh*, 995 F.3d at 1080 ("Under *Mikhel*'s second prong, it was well within the trial judge's discretion to limit cross-examination to prevent 'a trial-within-a-trial.'"). The district court's determination to restrict admission of exhibits involving prior judicial decisions, Section 230 of the CDA, and certain attorney communications all fit comfortably within the exclusionary confines of Rule 403. Similarly, the district court's refusal to admit exhibits on hearsay grounds, such as Backpage's response letters to the State Attorneys General and many of the attorney communications, was also well-founded.

      The same is true for the district court's restrictions on the use of exhibits containing attorney advice if the defendants did not satisfy the prerequisites for an

advice-of-counsel defense. Finally, the court's decision to disallow the use of an email communication between Ferrer and his attorneys because of its questionable authenticity and privileged nature was well supported by the record and Rules of Evidence.

c.     Third, "the exclusion[s] in question certainly left the jury with enough evidence to assess [Ferrer]'s credibility." *Singh*, 995 F.3d at 1081. As already mentioned, it is far from clear how exhibits purportedly directed at establishing the *defendants'* good faith could have impacted the jury's ability to assess *Ferrer*'s credibility. In any event, the defendants were able to thoroughly examine Ferrer, exploring a wide variety of topics and potential challenges to his credibility.

When viewed in proper context, Brunst's current complaints amount to a handful of meritless objections to garden-variety evidentiary rulings that occurred during cross-examinations that filled nearly 900 transcript pages. The district court did not violate the defendants' confrontation clause rights. *See Van Arsdall*, 475 U.S. at 679 ("'[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'") (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam)).

3.     Even if Brunst could demonstrate that the district court committed a clear or obvious error (or otherwise abused its discretion), he cannot discharge his

burden of establishing that any such error caused him prejudice. *See, e.g.*, *Larson*, 495 F.3d at 1107-1108 (finding a Confrontation Clause error to be harmless beyond a reasonable doubt).

## V. THE DISTRICT COURT DID NOT REVERSIBLY ERR WHEN DENYING BRUNST'S MOTION FOR A JUDGMENT OF ACQUITTAL ON COUNT 1

Brunst claims (Brunst.Br.54-57) his conviction for conspiracy to violate the Travel Act (Count 1) should be reversed for insufficient evidence and because there was a constructive amendment. Both contentions are meritless.

### A. Background

1.     The superseding indictment charged the defendants with conspiring to violate the Travel Act, in violation of 18 U.S.C. § 371 (and 18 U.S.C. § 1952(a)(3)(A)). Specifically, the indictment alleged as follows:

> Beginning in or around 2004, and continuing through April 2018, in the District of Arizona and elsewhere, [the defendants] and others known and unknown to the grand jury, knowingly and intentionally agreed, confederated, and conspired with each other, and with others known and unknown to the grand jury, to commit the following offenses against the United States:
>
> a.      18 U.S.C. § 1952(a)(3)(A) (Travel Act—Facilitate Prostitution).

20-ER-5554.

The indictment further alleged that the "object of the conspiracy was to obtain money," and that the "manner and means of the conspiracy are described in paragraphs 1-194 above." 20-ER-5554. Paragraphs 1-194 of the superseding

indictment detailed conduct that took place from 2004 through April 2018. 20-ER-5507-5554.

2. Prior to trial, the defendants moved *in limine* to preclude the government from introducing testimony or evidence unrelated to the prostitution advertisements charged in Counts 2-51 of the superseding indictment (charging the defendants with substantive violations of the Travel Act). *See* 12-ER-3140-3147; *see, e.g.*, 12-ER-3143 (proposing an order that stated "[e]vidence about a person engaging in prostitution or being trafficked is precluded" unless "the evidence relates to one or more of the fifty charged ads").

The district court denied the defendants' motion. 2-ER-527-529. As relevant here, the court rejected the defendants' argument "that the Government is prohibited from offering testimony or evidence about acts unrelated to a posted ad or witnesses who are not connected to a charged ad." 2-ER-528. The court reiterated that it "ha[d] already clarified that the Government may introduce proof of the entirety of the scope of the conspiracy." 2-ER-528. Among other things, the court explained, "the Government need not show that each defendant *knew* that the person who was the subject of a charged ad was engaged in prostitution or was being trafficked at the time the charged ad was posted." 2-ER-528-529 (internal quotation marks omitted). Rather, the "Government need only prove that Defendants were *aware* of the conspiracies [sic] objectives and participated in achieving those objectives." 2-ER-

529. In other words, "testimony about how the Backpage ads were created, paid for, and posted, as well as how those ads made it easier for individuals to engage in prostitution is relevant to the allegations charged." 2-ER-529.

3.     At trial, the government presented substantial evidence that the defendants conspired to violate the Travel Act. *See, e.g.*, 2-ER-297-303. As the district court later summarized, the "Government's theory for this count was that between 2004-2018, there was an agreement among the Defendants to facilitate the promotion of prostitution businesses by posting their sex for money ads on Backpage, as charged in the Travel Act Counts; that each Defendant became a member of the conspiracy knowing at least one of its objects—'to make money'— and intending to help accomplish it; and that one of the members of the conspiracy performed at least one overt act on or after March 28, 2013, for the purpose of carrying out the conspiracy." 2-ER-297.

With respect to Count 1, the jury was instructed that to find a defendant guilty, it had to find the following three elements: (1) "beginning in or around 2004, and ending on or about April 2018, there was an agreement between two or more persons to commit at least one Travel Act offense as charged in Counts 2-51 of the indictment by promoting, or facilitating the promotion of, a business enterprise or enterprises involving prostitution offenses in violation of the laws of the state in which they were committed, in violation of [the Travel Act]"; (2) "the defendant became a

member of the conspiracy knowing of at least one of its objects and intending to help accomplish it"; and (3) "one of the members of the conspiracy performed at least one overt act on or after March 28, 2013, for the purpose of carrying out the conspiracy." 2-ER-386.

Among other things, the jury was also instructed that, "[f]or a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. You must find that there was a plan to commit at least one of the crimes alleged in the indictment as an object of the conspiracy with all of you agreeing as to the particular crime, *i.e.*, the Travel Act violations, which the conspirators agreed to commit." 2-ER-386.

The jury ultimately convicted Brunst and Spear on Count 1, and it did not reach a verdict with respect to Lacey. 2-ER-411.

4.     As relevant here, the district court denied the defendants' motions for judgments of acquittal on Count 1. 2-ER-297-303.

In particular, the court rejected the defendants' argument "that the Government failed to show there was a specific agreement to commit the substantive crimes tied to the 50 Travel Act ads charged in Counts 2-51." 2-ER-298. The court explained that the "[d]efendants' proffered standard for a specific, detailed

99

agreement tied to the 50 ads is too stringent." 2-ER-298. "Unlike the substantive Travel Act counts," the court recognized, "the conspiracy allegations were not specifically tied to the 50 ads. To establish the conspiracy, the Government had to show there was an agreement to facilitate the promotion of prostitution businesses by posting sex for money ads on Backpage." 2-ER-298.

Viewing the evidence in the light most favorable to the verdict, the district court found "there is sufficient evidence that Messrs. Lacey, Brunst, Spear and Ferrer joined the conspiracy of making Backpage's Adult section profitable by developing and sustaining a platform where prostitutes and prostitution enterprises could advertise sex for money, including in states where prostitution is illegal." 2-ER-302; 2-ER-298 (finding "sufficient evidence supporting the existence of an agreement among the Defendants…to work together toward the goal of making money by helping prostitution posters make their ads look less obviously like prostitution ads"). In addition, "[e]vidence was also offered that suggested Defendant[s] structured Backpage in a way to ensure the majority of its revenues were derived from prostitution ads to their financial benefit." 2-ER-300. The court then detailed the sufficient evidence specifically supporting the Count 1 charges against Brunst, 2-ER-300; Spear, 2-ER-300-301; and Lacey, 2-ER-301-302.

**B.  Standard of Review**

This Court reviews the sufficiency of the evidence de novo. *United States v. Kaplan*, 836 F.3d 1199, 1211 (9th Cir. 2016).

If properly preserved, this Court reviews a claim that an indictment was constructively amended de novo. *United States v. Adamson*, 291 F.3d 606, 612 (9th Cir. 2002). If not properly preserved, a constructive amendment claim is reviewed for plain error. *United States v. Mickey*, 897 F.3d 1173, 1183 (9th Cir. 2018) ("Because Mickey failed to raise the constructive amendment issue at trial, we review for plain error.").

**C.  Sufficient Evidence Supports Brunst's Conviction For Conspiracy To Violate The Travel Act (Count 1)**

Brunst's sole sufficiency challenge to his Count 1 conspiracy conviction is that there "was no evidence that Brunst ever knew of any of the 50 ads, or knew or interacted with any of the individuals who posted the ads or were the subjects of the posts." Brunst.Br.54-55. That claim misses the mark.

As the district court correctly recognized, to prove a conspiracy under Section 371, "'the government must establish: (1) an agreement to engage in criminal activity, (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime.'" 2-ER-297 (quoting *Kaplan*, 836 F.3d at 1212). "There is sufficient evidence to support a conviction if, 'viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008) (per curiam) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The district court correctly concluded that the government presented sufficient evidence that Brunst "joined the conspiracy of making Backpage's Adult section profitable by developing and sustaining a platform where prostitutes and prostitution enterprises could advertise sex for money." 2-ER-302. Among other things, the jury heard substantial evidence about "Brunst's participation in structuring Backpage to maintain its longevity and maximize profits from" the sale of prostitution advertisements. 2-ER-300; *see also, e.g.*, 2-ER-300 (noting Brunst's budgetary approval of Backpage's content aggregation strategy); 2-ER-298 (finding "sufficient evidence supporting the existence of an agreement among the Defendants…to work together toward the goal of making money by helping prostitution posters make their ads look less obviously like prostitution ads").

Contrary to Brunst's assertion (Brunst.Br.55), the fact that Brunst may not have personally interacted with a particular prostitution poster (or known about a particular prostitution advertisement) does not immunize him from a conspiracy conviction. As the district court properly instructed the jury, "[o]ne becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the

person does not have full knowledge of all the details of the conspiracy." 2-ER-386; *see, e.g.*, *United States v. Montgomery*, 384 F.3d 1050, 1062 (9th Cir. 2004).

In addition, as the jury was also correctly instructed here, "one may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names, identities, or locations of all of the other members." 2-ER-388; *see, e.g., United States v. Grasso*, 724 F.3d 1077, 1086 (9th Cir. 2013).

To the extent Brunst argues he may only be convicted of conspiracy if he possessed personal, granular knowledge about specific substantive offenses that were (one of the many) objects of the conspiracy, he is mistaken. *See, e.g.*, *United States v. Feola*, 420 U.S. 671, 672 (1975) ("[I]t is clear that one may be guilty as a conspirator for acts the precise details of which one does not know at the time of the agreement."). Indeed, by Brunst's logic, a member of a drug trafficking organization could not be convicted of conspiracy to distribute drugs unless he was also aware of the specifics of each particular downstream drug transaction. That simply is not the law. *See, e.g.*, *United States v. Jaimez*, 45 F.4th 1118, 1123 (9th Cir. 2022); *United States v. Collazo*, 984 F.3d 1308, 1332 (9th Cir. 2021) (en banc).

Viewing the evidence in the light most favorable to the prosecution, the district court correctly determined there was sufficient evidence supporting the jury's verdict that Brunst conspired to violate the Travel Act.

### D. There Was No Constructive Amendment To Count 1 Of The Superseding Indictment

Brunst also asserts (Brunst.Br.56-57) that the district court constructively amended the indictment when it denied the defendants' sufficiency challenges to Count 1. That claim lacks merit.[13]

"A constructive amendment occurs when the defendant is charged with one crime but, in effect, is tried for another crime." *United States v. Pang*, 362 F.3d 1187, 1194 (9th Cir. 2004); *see Adamson*, 291 F.3d at 614. This Court has "identified two kinds of constructive amendments: (1) those involving a 'complex of facts presented at trial distinctly different from those set forth in the charging instrument' and (2) those where 'the crime charged in the indictment was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved.'" *Singh*, 995 F.3d at 1078-1079.

Brunst does not meaningfully attempt to establish either type of constructive amendment. Understandably so: the facts presented at trial were quite similar to those alleged in the superseding indictment, *compare* 1-ER-277-286; 2-ER-287-303

---

[13] Brunst raises a constructive amendment claim for the first time on appeal. Because his newfound argument rests exclusively on the district court's post-trial Rule 29 Order (and not based on anything that happened at trial), it is not clear whether plain error review applies here. Regardless, under any standard of review, Brunst's claim is meritless.

*with* 20-ER-5506-5554, and the crime charged in the indictment was not "substantially altered at trial," *see, e.g.*, 2-ER-386.

Rather, Brunst's late-breaking constructive amendment claim rests on a peculiar set of assertions. As noted, in its Rule 29 Order, the district court rejected Brunst's sufficiency challenge to his Count 1 conspiracy conviction. 2-ER-297-303. In so doing, the court explained that "Defendants' proffered standard for a specific, detailed agreement tied to the 50 ads is too stringent." 2-ER-298. Based on that single statement, Brunst now asserts the district court "acted contrary to" its own prior handling of the three-month trial, including "its own evidentiary ruling[s] and the ultimate jury instructions," and caused him to be "convicted of an impermissible boundless conspiracy." Brunst.Br.55-56. Brunst is incorrect.

As an initial matter, in their motion for a new trial (filed contemporaneously with their motions for judgments of acquittal), the defendants claimed the government had improperly argued during closing that the jury should convict them on Count 1 "based on a legally impermissible boundless conspiracy." *See* 6-ER-1533-1534. In support, the defendants quoted the same excerpt from closing argument Brunst now claims the district court erroneously adopted in its Rule 29 Order. *See* 6-ER-1534 (quoting 51-ER-14527); Brunst.Br.56 (same). The district court rejected the defendants' request for a new trial, holding that it "need not address Defendants' boundless conspiracy argument because nothing in the

Government's summation supports that claim." 2-ER-343. In fact, the district court specifically found that the "Government adhered to the Court's prior orders that Defendants were not 'indicted for the amorphous notion of "prostitution."'" 2-ER-343-344. In other words, and contrary to Brunst's latest assertion, the district court did not countenance a conviction based on a "boundless conspiracy."

In any event, Brunst cannot establish that the district court's decision denying his Rule 29 motion subverted the Fifth Amendment's grand jury requirement. *See United States v. Davis*, 854 F.3d 601, 603 (9th Cir. 2017) ("The Fifth Amendment's grand jury requirement establishes the substantial right to be tried only on charges presented in an indictment returned by a grand jury.") (internal quotation marks omitted). The evidence presented at trial and the court's instructions to the jury were all consistent with the superseding indictment returned by the grand jury. And the jury's verdict, based on that evidence and those instructions, was supported by sufficient evidence. The Fifth Amendment requires nothing further.

## VI. SUFFICIENT EVIDENCE SUPPORTS BRUNST'S CONCEALMENT MONEY LAUNDERING CONVICTIONS (COUNTS 53-62)

Brunst argues (Brunst.Br.57-61) there was insufficient evidence to support his convictions for concealment money laundering. Specifically, Brunst claims there was insufficient evidence that the money transfers involved proceeds of a specified unlawful activity, Brunst.Br.57-59, and insufficient evidence of an intent to conceal, Brunst.Br.59-61. Each contention is meritless.

### A.  Background

1.  The superseding indictment charged the defendants with 10 counts of concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). 20-ER-5561-5562. Each count corresponded to a specific financial transfer from a Website Technologies bank account to an account held by Cereus Properties. 20-ER-5561-5562. The total amount of those transfers, which all took place in 2016, was close to $17 million. 20-ER-5561-5562.

As this Court has explained, the substantive elements of concealment money laundering are: "'(1) the defendant conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of unlawful activity; (3) the defendant knew that the proceeds were from unlawful activity; and (4) the defendant knew that the transaction was designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.'" *Singh*, 995 F.3d at 1075 (quoting *United States v. Wilkes*, 662 F.3d 524, 545 (9th Cir. 2011)); *see* 18 U.S.C. § 1956(a)(1)(B)(i).

2.  As relevant here, the government presented substantial evidence to the jury that: "Brunst created a separate 'shell company' called Website Technologies, for the purpose of opening bank accounts under a name that was not Backpage," 2-ER-289; the defendants sold Backpage to Ferrer in April 2015 to distance themselves "from Backpage's business of selling illegal ads for prostitution," 2-ER-291;

107

"Backpage operated in the same way before and after that sale," 1-ER-275; following the sale, "revenue from Backpage was only sent to and divided between Website Technologies and Ad Tech BV," 2-ER-292; "following the 2015 sale, Backpage proceeds going to Website Technologies derived 'from postings in the Female Escort section primarily,'" 2-ER-292; Cereus Properties was a company owned by Brunst, Spear, Larkin, and Lacey that collected the interest and debt payments owed by Ferrer for his purchase of Backpage, 2-ER-291; and the source of the monies paid to Cereus Properties by Website Technologies was Backpage's revenue from prostitution advertisements, 2-ER-292-293. *See also* 2-ER-320-321 (district court summarizing evidence supporting concealment money laundering); 6-ER-1515-1519.

The district court correctly instructed the jury about the elements of concealment money laundering, including that each charged transaction had to involve "the proceeds of a violation or violations of the Travel Act." 2-ER-403; *see* Ninth Circuit Model Criminal Jury Instruction 18.4. After careful deliberation, the jury ultimately convicted Brunst and Spear on each of the 10 counts of concealment money laundering, and it did not reach a verdict with respect to Lacey. 2-ER-437-441.

3. In their post-trial motions for a judgment of acquittal, the defendants argued there was insufficient evidence that "(1) the funds in [the charged] transfers

were proceeds of Travel Act violations; and (2) they had an intent to conceal the nature or source of the funds." 2-ER-321. The district court rejected both claims. 2-ER-321-325.

a.    The court began by explaining that a "defendant need not actually be convicted of the specified unlawful activity—what here would be Travel Act offenses—before a money laundering conviction can be had under Section 1956(a)(1)(B)(i)." 2-ER-321; 2-ER-321 ("Ninth Circuit law is clear that a defendant may be convicted of money laundering even if the defendant is not charged or convicted of the underlying specified unlawful activity."); 2-ER-321-322 (citing *United States v. Golb*, 69 F.3d 1417 (9th Cir. 1995)). Relatedly, the court noted that, in order to convict, the jury did not need to "necessarily have found that it was the Travel Act violations alleged in Counts 2-18 that specifically created the unlawful proceeds." 2-ER-322. This is because, the court explained, Section 1956 "criminalizes transactions in proceeds, not the transactions that create the proceeds." 2-ER-322 (citing *Wilkes*, 662 F.3d at 545; *United States v. Garcia*, 37 F.3d 1359, 1365 (9th Cir. 1994)).

The court then found "there was sufficient evidence from which a jury could infer that the funds [at issue] were proceeds from Backpage's sales of sex-for-money ads," and that the defendants knew as much. 2-ER-323; *see* 2-ER-323 (summarizing such evidence); 2-ER-323 (the government's witnesses "explained the movement of

these funds: from Backpage ad sales to Website Technologies to Cereus Properties"). The court accordingly determined that a "rational jury could have concluded that the funds transferred in Counts 53-62 were proceeds from Backpage's sale of illegal prostitution ads." 2-ER-323.

b.      The court next rejected the defendants' claim that there was insufficient evidence that the transactions were designed, at least in part, to conceal the nature or source of the funds. After reviewing the evidence presented at trial, the court found that "a rational jury could infer that the purpose of the transactions, at least in part, was to conceal that the source of the proceeds flowing through Website Technologies to Cereus were illegal proceeds of prostitution ads sold on Backpage." 2-ER-324-325. Among other things, the court noted Ferrer's testimony that "Brunst formed Website Technologies as a shell company with the purpose of concealing that the proceeds going to Website Technologies was revenue from the sale of Backpage ads," 2-ER-324, and that "the sale of Backpage was intended to distance the Defendants from Backpage's business of selling illegal ads for prostitution," 2-ER-291.

## B.      Standard of Review

Although this Court reviews de novo "a district court's decision denying a motion for acquittal based on sufficiency of the evidence," *United States v. Ubaldo*, 859 F.3d 690, 699 (9th Cir. 2017), the standard of review "is highly deferential" to

the jury's verdict, *United States v. Rubio-Villareal*, 967 F.2d 294, 296 (9th Cir. 1992) (en banc). Courts applying this highly deferential standard "must bear in mind that it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002) (internal quotation marks omitted); *see also Musacchio v. United States*, 577 U.S. 237, 243 (2016) ("On sufficiency review, a reviewing court makes a limited inquiry tailored to ensure that a defendant receives the minimum that due process requires.").

### C. Viewing The Evidence In The Light Most Favorable To The Prosecution, A Rational Jury Could Have Found Brunst Guilty Of Concealment Money Laundering

When reviewing the sufficiency of the evidence, this Court engages in a two-step inquiry, first construing the evidence "in the light most favorable to the prosecution," and then, using the evidence so construed, determining whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Shetler*, 665 F.3d 1150, 1163 (9th Cir. 2011) (internal quotation marks omitted). In so doing, this Court does "not ask itself whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt, only whether *any* rational trier of fact could have made that finding." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc) (citations and internal quotation marks omitted).

Viewing the evidence in the light most favorable to the prosecution, the district court correctly found that Brunst's concealment money laundering convictions were supported by sufficient evidence. In particular, and as detailed below, the district court correctly held there was sufficient evidence (1) the transactions involved proceeds from a specified unlawful activity—namely, violations of the Travel Act; and (2) Brunst knew the transactions were "designed in whole or in part…to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i).

1.      Brunst renews (Brunst.Br.57-59) the claim that the loan payments from Website Technologies to Cereus Properties did not involve proceeds of a specified unlawful activity.[14] The crux of Brunst's argument appears to be that, because none of the defendants were convicted of Travel Act violations for advertisements published after the sale of Backpage in April 2015, the government failed to establish that the financial transactions between Website Technologies and Cereus Properties in 2016 involved proceeds from Travel Act violations. Brunst.Br.58. That contention misperceives the elements of concealment money laundering.

---

[14] Brunst also contends (Brunst.Br.57-58) that treating the funds transferred from Website Technologies to Cereus Properties as proceeds from a specified unlawful activity violates the First Amendment. For the reasons discussed earlier, *see supra* pp. 57-67, that claim is meritless.

It is well-established that money laundering does not require proof that the defendant also committed the specific unlawful activity. *See, e.g.*, *Golb*, 69 F.3d at 1422; *United States v. Martinelli*, 454 F.3d 1300, 1312 (11th Cir. 2006) ("It is by now abundantly clear that in a money laundering case (or in a money laundering conspiracy case), the defendant need not actually commit the alleged specified unlawful activity."); *United States v. Cherry*, 330 F.3d 658, 667 (4th Cir. 2003) ("It is clear that a defendant may be convicted of money laundering even if she is not a party to, much less convicted of, the specified unlawful activity."); *United States v. Awada*, 425 F.3d 522, 525 (8th Cir. 2005) ("[T]here is absolutely no requirement that a money laundering defendant also be involved in the underlying crime.").

Indeed, a defendant may even be acquitted of committing the specified unlawful activity but convicted of laundering proceeds from that same unlawful activity. *See, e.g.*, *United States v. Richard*, 234 F.3d 763, 768 (1st Cir. 2000) (affirming money laundering conviction despite acquittal on substantive charge of specified unlawful activity; laundering "does not require proof that the defendant committed the specified predicate offense; it merely requires proof that the monetary transaction constituted the proceeds of a predicate offense") (citation omitted); *Cherry*, 330 F.3d at 667; *United States v. Mankarious*, 151 F.3d 694, 703 (7th Cir. 1998) (affirming money laundering convictions despite dismissal of specified-unlawful-activity counts).

113

As the district court correctly explained, the "requirements under Section 1956 are that Defendants knew the proceeds derived from [specified] unlawful activity and that the proceeds 'in fact' derived from unlawful activity." 2-ER-322-323. "This accords with what the [j]ury was instructed," 2-ER-323, and what the jury found beyond a reasonable doubt—namely, for each of the 10 concealment counts, that Brunst knowingly "conducted a financial transaction involving property that represented the proceeds of a violation or violations of the Travel Act." 2-ER-403.

Contrary to Brunst's suggestion (Brunst.Br.58-59), the district court never "conceded" a failure of proof on this element. The language Brunst quotes is from the district court's order granting the defendants a judgment of acquittal on the *Section 1957* money laundering counts. *See* 2-ER-334. As the district court correctly recognized, "[u]nlike Section 1956 charges, the Ninth Circuit imposes a tracing requirement in Section 1957 cases due to Section 1957's potentially broad reach." 2-ER-333; *see, e.g.*, *United States v. Hanley*, 190 F.3d 1017, 1025-1026 (9th Cir. 1999). The district court found that, with respect to the Section 1957 charges, the government had failed to adequately "trace the proceeds that derived from a particular Travel Act violation or violations." 2-ER-334-335. No such strict tracing requirement exists for Section 1956 money laundering charges, which is why the district court found the evidence sufficient for the defendants' concealment money

114

laundering convictions despite finding the evidence insufficient for the Section 1957 charges.

2.    Brunst also renews (Brunst.Br.59-61) the claim that there was insufficient evidence the financial transactions were designed, at least in part, to conceal the nature or source of the illicit funds. According to Brunst, the charged transactions cannot constitute money laundering because they were loan payments made in connection with the sale of Backpage. *See* Brunst.Br.61. That is incorrect for several reasons.

First, as this Court has emphasized, "[t]he money laundering statute is violated if the transaction in question is 'designed in whole or *in part*' to conceal." *Singh*, 995 F.3d at 1076 (emphasis in original). Thus, even if the transactions had other, simultaneous purposes (such as paying down the loans Ferrer received from the defendants to purchase Backpage), that alone does not preclude a money laundering conviction. *Cf.* Brunst.Br.60-61.

Second, as this Court has repeatedly held, the "necessary concealment" under Section 1956(a)(1) "is that of the source of the funds, not the identity of the money-launderer." *United States v. Tekle*, 329 F.3d 1108, 1114 (9th Cir. 2003); *see, e.g.*, *United States v. Sun*, 673 Fed. Appx. 729, 733 (9th Cir. 2016) (quoting *Tekle*); *United States v. Kellum*, 119 Fed. Appx. 32, 34 (9th Cir. 2004) (quoting *Tekle*). As a result, this Court has consistently rejected arguments—like those advanced by

Brunst—that there is insufficient evidence of money laundering if "the transactions in question were open, notorious, and did not disguise defendant's identity." *Tekle*, 329 F.3d at 1113-1114 (internal quotation marks omitted). *Cf.* Brunst.Br.59-60.

Third, contrary to Brunst's suppositions, the multifaceted nature of the financial transactions charged in Counts 53-62 are a distant cry from the defendants merely "'divvying up the joint venture's gains.'" Brunst.Br.59 (quoting *United States v. Adefehinti*, 510 F.3d 319, 322 (D.C. Cir. 2007)). As the district court found, the evidence established that the defendants' creation of Website Technologies and their decision to sell Backpage to Ferrer in a seller-financed transaction were each driven by a desire to publicly distance themselves from Backpage (while not separating themselves from its sizeable revenues).

This Court has repeatedly recognized that such "multi-layered transactions"— designed to "provid[e] additional buffers" between the illicit funds and its ultimate recipients—are common hallmarks of concealment money laundering. *Wilkes*, 662 F.3d at 547; *see id.* (distinguishing "*Adefehinti*, where defendants merely allocated the proceeds from a fraudulent sale of property through relatively straightforward transactions"); *see, e.g.*, *Tekle*, 329 F.3d at 1114 ("Their actions were those that money-launderers typically take to" conceal "the nature and source of the funds derived from [unlawful activity].").

116

Viewing the evidence in the light most favorable to the prosecution, a rational jury could have concluded that the defendants designed such multi-step transactions (from Backpage to Website Technologies to Cereus Properties to defendants) at least in part to conceal the nature or source of the illegal funds. *See, e.g.*, *Singh*, 995 F.3d at 1076 (observing that, if the transactions were not designed in part to conceal the nature or source of the illegal proceeds, the defendants could "have saved themselves a good deal of time and effort by using" more straightforward financial processes); *Wilkes*, 662 F.3d at 547 ("Concealing this [illicit] connection appears to be the dominant, if not the only, purpose of these multi-layered transactions."); *Sun*, 673 Fed. Appx. at 733 (similar); *Kellum*, 119 Fed. Appx. 34 (similar).

## VII. SUFFICIENT EVIDENCE SUPPORTS BRUNST'S INTERNATIONAL PROMOTIONAL MONEY LAUNDERING CONVICTIONS (COUNTS 64-68)

Brunst also claims (Brunst.Br.62-63) there was insufficient evidence supporting his convictions for international promotional money laundering. In addition to making the same argument about specified unlawful activity as he makes with respect to the concealment money laundering convictions, Brunst.Br.57-59, Brunst cursorily claims insufficient evidence that he acted with "the intent to promote the carrying on of specified unlawful activity"—here, violations of the Travel Act. 18 U.S.C. § 1956(a)(2)(A); 2-ER-404. That contention is also meritless.

### A. Background

1. As relevant here, the superseding indictment charged the defendants with five counts of international promotional money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A). 20-ER-5562-5563.[15] Each count corresponded to a specific financial transfer from an Ad Tech B.V. bank account, located in the Netherlands, to an account held by Cereus Properties. 20-ER-5562-5563. The total amount of those transfers, which all took place in 2016, was more than $11 million. 20-ER-5562-5563.

2. Consistent with this Court's model jury instruction, the district court instructed the jury that to convict on international promotional money laundering, it needed to find the following two elements: (1) "the defendant transported money from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States"; and (2) "the defendant acted with the intent to promote a violation of the Travel Act." 2-ER-404; *see* Ninth Circuit Model Criminal Jury Instruction 18.5; 18 U.S.C. § 1956(a)(2)(A).

The jury convicted Brunst on Counts 64-68, acquitted Spear on those same counts, and did not reach a verdict with respect to Lacey. 2-ER-442-444.

---

[15] The jury acquitted Brunst, Spear, and Lacey on a sixth count (Count 63). 2-ER-442.

3.    In his post-trial motion for a judgment of acquittal, Brunst argued there was insufficient evidence that he acted with the intent to promote a violation of the Travel Act. 2-ER-325. The district court rejected that assertion. 2-ER-325-326.

In summarizing the evidence presented to the jury, the district court noted that, following the sale of Backpage to Ferrer in April 2015, all Backpage revenue went to Website Technologies and Ad Tech B.V.; that Ad Tech B.V. was registered in the Netherlands; that Cereus Properties was owned by the defendants and collected the loan payments owed by Ferrer in connection with the sale of Backpage; and that the funds sent by Ad Tech B.V. to Cereus Properties "then 'almost immediately' went to Defendants." 2-ER-326; 2-ER-320.

The court then held that, viewing the evidence in the light most favorable to the prosecution, a rational jury could have inferred "an intent to promote the Travel Act offenses from Ad Tech B.V.'s deposit of funds into Cereus Properties' account." 2-ER-326; *see* 2-ER-325-326 (explaining that this Court has "found sufficient intent to promote where evidence showed that funds were distributed to co-conspirators" or "were used to pay persons integral to the success of the illegal activity") (citing cases). "A rational jury could also have concluded," the court found, "that Mr. Ferrer, as the co-conspirator in control of Ad Tech B.V., could not have continued selling prostitution ads on Backpage without making these payments to Cereus Properties, which was owned by Defendants." 2-ER-326.

### B. Standard of Review

As previously discussed, this Court reviews the district court's denial of a motion for a judgment of acquittal de novo, affording due deference to the jury's verdict. *Ubaldo*, 859 F.3d at 699.

### C. There Was Sufficient Evidence That Brunst Acted With An Intent To Promote Violations Of The Travel Act

As the district court correctly recognized, 2-ER-325, this Court has "consistently held that a jury may infer intent to promote the illegal activity from evidence that illicit proceeds have been transferred." *United States v. Barragan*, 263 F.3d 919, 923 (9th Cir. 2001); *see, e.g.*, *United States v. Manarite*, 44 F.3d 1407, 1415-1416 (9th Cir. 1995) (rejecting the defendants' argument that the charged transactions lacked an intent to promote because they "simply distributed the cash, pocketing their share"); *United States v. Montoya*, 945 F.2d 1068, 1076 (9th Cir. 1991) ("[W]e agree with the Government that Montoya could not have made use of the funds without depositing the check."), *rev'd on other grounds*, *McCormick v. United States*, 500 U.S. 257 (1991). This reflects the common-sense conclusion that a defendant acts with the intent to promote the unlawful activity when "the transaction in which the defendant engaged was necessary in order for the defendant to realize the benefit of the underlying illegal activity." *United States v. Wilson*, 39 Fed. Appx. 495, 498 (9th Cir. 2002).

Contrary to Brunst's contention (Brunst.Br.62), this Court's decision in *United States v. Baker*, 63 F.3d 1478 (9th Cir. 1995), supports affirmance here. *See* 2-ER-326 (district court affirmatively relying on *Baker*). In *Baker*, this Court found sufficient evidence of an intent to promote in connection with payments made by the defendant, who trafficked contraband cigarettes, to his cigarette suppliers. *See* 63 F.3d at 1494. In rejecting Baker's argument that he lacked an intent to promote the unlawful activity, this Court observed that "Baker could not have continued the illegal trafficking without paying his cigarette suppliers." *Id.*

The same is true here: a rational jury could have reasonably determined, especially when viewing the evidence in the light most favorable to the prosecution, that Ad Tech B.V.'s payments to Cereus Properties was integral to the continued success of Backpage and, therefore, Brunst's continued receipt of Backpage's illicit proceeds. *See* 2-ER-326 (finding that a "rational jury could...have concluded" that Backpage "could not have continued selling prostitution ads" without Ad Tech B.V. "making these payments to Cereus Properties"). Among other things, as detailed earlier, after the sale Brunst remained significantly "involved in the financial problems the company was having," 34-ER-9624-9625, including by continuing to assist Ferrer "in trying to obtain credit card processing" for Backpage. 2-ER-291. In addition, Brunst remained in constant communication with Ferrer or Backpage's new CFO. 2-ER-291.

As a result, a rational jury could have inferred that Ad Tech B.V.'s payments to Cereus Properties were necessary to keep receiving Brunst's assistance and, therefore, necessary to keep payments successfully being processed at Backpage. Under this Court's precedents, nothing further is required.

## VIII. THE DISTRICT COURT CORRECTLY DENIED THE DEFENDANTS' MOTION TO DISMISS THE INDICTMENT BASED ON ALLEGED GOVERNMENT MISCONDUCT

Brunst claims (Brunst.Br.63-66) this Court should dismiss the superseding indictment because the government violated the defendants' attorney-client privilege and "gained an 'unfair advantage.'" Brunst.Br.64. That contention is mistaken. As the district court correctly held, the communications purportedly invaded by the government were not privileged; even if any of the communications had been privileged, the defendants waived that privilege; and even if the communications were privileged and not waived, the defendants suffered no prejudice. *See* 2-ER-538-556.

### A. Background

1. As part of its investigation, the government obtained search warrants for various email addresses associated with Backpage. To avoid inadvertently violating attorney-client privilege, the warrants also authorized a "filter team" process. 2-ER-539; *see also* 20-ER-5619. The filter team initially identified certain

communications as potentially privileged and kept those emails from the prosecution team. 20-ER-5620.

After Ferrer executed a written waiver of Backpage's corporate attorney-client privilege, the government sought an order from the district court that "(1) Backpage's corporate attorney-client privilege has been waived and (2) the prosecution team may therefore gain access to the emails and other communications that were previously withheld by the filter team." 20-ER-5620.

The district court ultimately denied the government's motion. *See* 19-ER-5332-5339. The court held that, "for the limited purpose of addressing the Government's access to the privileged emails at issue, the Court finds that the Government cannot use Ferrer's written waiver of attorney-client privilege to circumvent the terms of" a joint defense agreement Ferrer had previously executed with the defendants. 19-ER-5335; 2-ER-540 (summarizing order). The court also made clear that it was declining "to address the issue of whether Ferrer had the authority to waive Backpage's corporate-attorney client privilege." 19-ER-5335 n.4.

2. In August 2019, the government produced to the defense several Memorandum of Interviews (MOI) involving its interviews of Ferrer. SER-152. In May 2020, the defendants moved to dismiss the indictment, on the grounds that the Ferrer MOIs revealed that the government had invaded the defendants' attorney-

client privilege. SER-168-190. As support, the defendants cited to 15 "examples" from six different government interviews of Ferrer. 2-ER-541-543.

After holding oral argument, the district court denied the motion in a detailed, 19-page written order. The district court rejected the defendants' request on three independent bases.

a.     First, the court held there "was no invasion of the attorney client relationship" because the defendants had failed to establish that any of the communications purportedly invaded were privileged. 2-ER-545-548. The court observed that the "party asserting the attorney-client privilege bears the burden of establishing the relationship and the privileged nature of the communication." 2-ER-545 (citing *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009)). Critically, the court found that the defendants' "[m]otion contains no analysis of the privileged nature of the communications." 2-ER-546. The court then examined each of the 15 examples relied on by defendants. For each one, the court determined that the defendants "have not carried their burden of showing the essential elements to prove the existence of privileged relationships and/or the privileged nature of the communications." 2-ER-548.

b.     Second, the court found that, "even if Defendants were to show the examples it has put forward were privileged, in many cases Defendants appear to have waived the privilege by disclosure to third parties or failure to show that the

communications were made in confidence." 2-ER-548-549. Given its ruling on the motion, the court once again declined to decide whether Ferrer could "waive the corporate attorney-client privilege on behalf of Backpage." 2-ER-556 n.5.

c.    Third, the court held that, even if the communications at issue were privileged and had not been waived, the defendants had also failed to establish the requisite prejudice. 2-ER-549-556. The court explained that the burden is on the defendant to show "'actual and substantial prejudice.'" 2-ER-549 (quoting *United States v. Haynes*, 216 F.3d 789, 796 (9th Cir. 2000)). The court then held that the defendants had failed to show prejudice, because there was no improper invasion of the defendants' confidential trial strategy and because much of the material cited by the defendants "w[as] already public." 2-ER-553-555. As the district court put it, "[t]here can be no prejudice sufficient to support a dismissal when the prosecutor learns what it already knows." 2-ER-555.

d.    The court also rejected the defendants' argument that the government had somehow "ran afoul" of the prior order denying the prosecution team access to the filtered emails on the basis of Ferrer's waiver of Backpage's corporate attorney-client privilege. 2-ER-556. The court explained that the defendants had failed to show any "privileged communications that were improperly obtained by the Government," and it further found that "the MOIs do not show that the Government posed improper questions aimed at eliciting privileged material." 2-ER-556.

**B.     Standard of Review**

This Court reviews the denial of a motion to dismiss an indictment due to outrageous government misconduct de novo. *United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011). This Court also reviews de novo "whether the party has met the requirements to establish the existence of the attorney-client privilege." *Ruehle*, 583 F.3d at 606. It reviews any factual findings underlying the district court's determinations for clear error. *Id.*

**C.     Brunst Fails To Demonstrate Any Reversible Error In the District Court's Ruling**

1.     The attorney-client privilege protects "[u]nder certain circumstances" confidential communications between clients and their attorneys. *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126 (9th Cir. 2012); *see also Ruehle*, 583 F.3d at 608 (observing that "'[i]ssues concerning application of the attorney-client privilege in the adjudication of federal law are governed by federal common law'"). "Because it impedes full and free discovery of the truth," this Court has repeatedly held that the privilege is to be "strictly construed." *Ruehle*, 583 F.3d at 607 (internal quotation marks omitted). And as the district court correctly recognized, the party asserting the "attorney-client privilege bears the burden of establishing the relationship and the privileged nature of the communication." 2-ER-545 (citing *Ruehle*, 583 F.3d at 607); *see Ruehle*, 583 F.3d at 609 (explaining that the party asserting the privilege also has

126

the obligation, "if necessary, to segregate the privileged information from the non-privileged information").

This Court typically uses an eight-part test for determining "whether information is covered by the attorney-client privilege: '(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.'" *Ruehle*, 583 F.3d at 607 (quoting *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 n.2 (9th Cir. 1992)); *see also* 2-ER-545 (discussing this Court's eight-part test).

2. As explained above, after closely examining all of the examples identified by the defendants in their motion, the district court held that the defendants had failed to establish that any involved an attorney-client relationship and/or privileged attorney-client communications. The court also noted that the defendants' motion "contains no analysis of the privileged nature of the communications." 2-ER-546. "Defendants seem to rest," the court observed, "on a blanket claim of privilege." 2-ER-546.

On appeal, Brunst appears to double-down on that misguided approach. Rather than attempt to show that any of the purported invasions involved communications that were actually privileged, Brunst merely offers the following

conclusory assertion: "Judge Brnovich incorrectly found that there was no privilege protecting these communications." Brunst.Br.64. Brunst does not cite, let alone analyze, the eight-factor test used by this Court. And Brunst does not engage with the district court's detailed explanation for why the communications were not privileged. This Court should affirm the district court's denial of the defendants' motion on that basis alone.

Brunst's feeble attempts at proving prejudice fare no better. *See* Brunst.Br.64-65. In fact, Brunst does not even attempt to establish prejudice with respect to any of the purported invasions cited in the defendants' motion to dismiss. Rather, the only specific item Brunst identifies as a source of prejudice on appeal is a single slide from a PowerPoint presentation titled "Backpage.com 2010 Budget Presentation." *See* 25-ER-7036-7071 (Trial Ex. 588); Brunst.Br.65. As Ferrer testified at trial, the PowerPoint was created by Spear, Ferrer, and another Backpage employee and it was presented at the Phoenix New Times' offices in December 2009. 35-ER-9846-9847. Among other things, Brunst fails to explain how a budget-oriented PowerPoint presentation created by non-lawyers and presented to Backpage employees qualifies as a communication covered by the attorney-client privilege.

Finally, Brunst's renewed suggestions that the government violated the district court's limited order regarding the filter team also miss the mark. Brunst.Br.64-66. As the district court correctly held, the government did not "r[un]

afoul of Judge Logan's previous Order." 2-ER-556. Among other things, there is no record basis for concluding that the prosecution team ever reviewed communications determined to be privileged by the filter team. In addition, as the district court found, "the MOIs do not show that [the] Government posed improper questions aimed at eliciting privileged material." 2-ER-556. And, like in Judge Logan's order, the district court did not rely on Ferrer's waiver of Backpage's corporate attorney-client privilege when denying the defendants' motion to dismiss for outrageous conduct.[16]

## IX. THE DISTRICT COURT DID NOT ERR WHEN CALCULATING BRUNST'S OFFENSE LEVEL UNDER THE SENTENCING GUIDELINES

Brunst finally claims (Brunst.Br.67-70) the district court incorrectly calculated his offense level under the advisory Sentencing Guidelines. He is mistaken.

### A.   Background

1.    In its presentence investigation report, the Probation Office determined that Brunst's total offense level was 43. Doc. 2185, ¶203 (Revised Brunst PSR) (Aug. 30, 2024). As the PSR explained, "Brunst's conduct involves two count

---

[16] Brunst claims in passing and in a footnote that the district court should have held an evidentiary hearing before denying the defendants' motion. *See* Brunst.Br.66 n.18. Even assuming that contention is adequately preserved, the district court did not abuse its discretion. *United States v. Cook*, 808 F.3d 1195, 1201 (9th Cir. 2015) (denial of an evidentiary hearing is reviewed for an abuse of discretion). Among other things, Brunst fails to identify a material factual dispute regarding the applicability of the attorney-client privilege.

groups." *Id.* ¶167. Count Group 1 included the Travel Act charges, and Count Group 2 included Brunst's money laundering convictions. *Id.* Because "Count Group 2 embodies conduct that is accounted for in Count Group 1," the Probation Office found that Count Group 2 "is the controlling group pursuant to USSG 3D1.2(c)." *Id.*

In calculating the base offense level for Count Group 2, the PSR started with U.S.S.G. § 2S1.1(a)(1), the guideline for a violation of Section 1956(h) (conspiracy to commit money laundering). Revised Brunst PSR ¶168. That guideline, in turn, provides that the base offense level is determined by the offense level for the underlying offense—here, violations of the Travel Act under 18 U.S.C. § 1952(a)(3)(A). *Id.* The guideline for violations of the Travel Act, U.S.S.G. § 2E1.2(a)(2), provides in pertinent part that the base offense level is "the offense level applicable to the underlying crime of violence or other unlawful activity in respect to which the travel or transportation was undertaken." *See* Revised Brunst PSR ¶168.

The PSR further explained that, because the "underlying offenses include both adult and minor victims," both U.S.S.G. § 2G1.1 (for adult victims) and § 2G1.3 (for minor victims) should be "used to determine the offense levels." Revised Brunst PSR ¶168. Under Section 2G1.1, the base offense level would be 14. *See* U.S.S.G. § 2G1.1(a)(2). Under Section 2G1.3, the base offense level would be 24. *See* U.S.S.G. § 2G1.3(a)(4). Because Section 2G1.3 provides the greater offense level,

the Probation Office determined that section should be used. Revised Brunst PSR ¶168; *see* U.S.S.G. § 2E1.2, cmt. n.1 ("Where there is more than one underlying offense, treat each underlying offense as if contained in a separate count of conviction for the purposes of subsection (a)(2)….Use whichever subsection results in the greater offense level.").

After applying various offense-level enhancements not challenged on appeal and calculating the multiple count adjustment, the Probation Office determined that Brunst's total offense level was 43. *See* Revised Brunst PSR ¶¶170-203.

2.     As relevant here, Brunst objected to the Probation Office's reliance on U.S.S.G. § 2G1.3 for calculating his base offense level. *See* 4-ER-1041-1044. The government contended Brunst's objections should be overruled. *See* 3-ER-719-723.

The district court overruled Brunst's objections and adopted the PSR's application of Section 2G1.3 for purposes of calculating Brunst's base offense level. 1-ER-164-173; *see also* 1-ER-274-276 (district court rejecting Brunst's objection to a two-level enhancement under U.S.S.G. § 2G1.3(b)(3) and finding that Brunst's conviction on Count 1 "supports the guidelines application"); 1-ER-275 (district court finding "[t]here was clear and convincing evidence in the trial record that many minors were advertised on Backpage").

The court further determined that Brunst's total offense level was 43, which combined with a Criminal History Category I, yielded an advisory Guidelines range

of life imprisonment—resulting in Brunst's advisory Guidelines range reverting to the statutory maximum for his counts of conviction (which were less than life imprisonment). 1-ER-173.

The court ultimately sentenced Brunst to a total of 120 months of imprisonment. 1-ER-3.

## B.    Standard of Review

This Court reviews "the district court's interpretation of the Sentencing Guidelines de novo, the district court's application of the Sentencing Guidelines to the facts of the case for abuse of discretion, and the district court's factual findings for clear error." *United States v. Chadwell*, 798 F.3d 910, 914 (9th Cir. 2015) (brackets and internal quotation marks omitted). This Court reviews a district court's findings regarding relevant conduct for clear error. *United States v. Daychild*, 357 F.3d 1082, 1103 (9th Cir. 2004).

## C.    The District Court Did Not Abuse Its Discretion Or Clearly Err In Calculating Brunst's Offense Level

Brunst's challenge to the district court's Guidelines calculations begins on the wrong foot, as he disregards the fact that his money laundering convictions served as the starting point for the Probation Office's and district court's offense level calculation. *Compare* Brunst.Br.67 (asserting that the applicable "offense of conviction was conspiracy to violate the Travel Act" and the applicable base offense guideline was U.S.S.G. § 2X1.1(a)), *with* 1-ER-168 ("With regard to the conspiracy

to commit money laundering offense, the base offense level is guided by guideline section 2S1.1, and under subsection (a)(1) that level is determined by the underlying offense from which the laundered funds were derived.").

Relatedly, the district court reasonably concluded that "the underlying offense[s] from which the laundered funds were derived," U.S.S.G. § 2S1.1(a)(1), were Travel Act violations, U.S.S.G. § 2E1.2(a)(2), where the underlying "unlawful activity" involved both the promotion of a commercial sex act with an adult (U.S.S.G. § 2G1.1(a)(2)) and the promotion of a commercial sex act with a minor (U.S.S.G. § 2G1.3(a)(4)).

In particular, as relevant here and as the district court correctly concluded, the advertisements underlying Counts 2, 4, 5, 10, 12 and 14—all of which involved minors—are "relevant conduct" for purposes of calculating Brunst's offense level. *See* 1-ER-168; U.S.S.G. § 1B1.3. In addition, the court found there to be "clear and convincing evidence in the trial record that many minors were advertised on Backpage." 1-ER-275 (applying U.S.S.G. § 2G1.3(b)).

Given the substantial record evidence supporting the district court's determination, Brunst cannot establish that the district court's relevant conduct finding was "'illogical, implausible, or without support in the record.'" *United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020) (defining clear error).

In fact, Brunst does not meaningfully challenge that minors were advertised on Backpage. Rather, he offers two critiques of the district court's findings, neither of which enjoys legal support. First, he claims the district court erred because Count 1 alleged a conspiracy to facilitate the promotion of prostitution, not a conspiracy to facilitate the promotion of sex with minors. *See* Brunst.Br.68. While that is true, it is legally irrelevant. The court's application of the Guidelines and its determinations about relevant conduct are not strictly limited to formal charges in the indictment. *See, e.g.*, U.S.S.G. § 1B1.3. In addition, the superseding indictment here did include specific allegations about how Backpage "contributed to the proliferation of ads featuring the prostitution of children." 20-ER-5510.

Second, Brunst asserts the district court erred because he was acquitted on the substantive Travel Act offenses with which he was charged. *See* Brunst.Br.68. Once again, that is true but legally irrelevant. Among other things, Brunst cannot rely on Amendment 826 to the Sentencing Guidelines, which addresses acquitted conduct, because it was not in effect when the district court sentenced Brunst and the Sentencing Commission has not made the amendment retroactive. *See* U.S.S.G. § 1B1.10(d). Moreover, as explained earlier, the Travel Act violations underlying Brunst's money laundering convictions are not limited to those Travel Act offenses charged in Counts 2-51. As a result, Brunst's acquittal on those counts does not undermine the district court's findings for purposes of the Guidelines.

### X. SUFFICIENT EVIDENCE SUPPORTS LACEY'S CONVICTION FOR INTERNATIONAL CONCEALMENT MONEY LAUNDERING (COUNT 100)

Lacey claims (Lacey.Br.46-61) there was insufficient evidence supporting his conviction for international concealment money laundering. That contention is meritless.

#### A. Background

1. As relevant here, the superseding indictment charged Lacey with one count of international concealment money laundering, in violation of 18 U.S.C. § 1956(a)(2)(B)(i). The charge was based on Lacey's transmission of $16.5 million from his attorney's IOLTA account in the United States to a trust account at a Hungarian bank. 20-ER-5567.

2. At trial, the government presented substantial evidence that Lacey knew the funds underlying the transmission involved proceeds from Backpage's sale of prostitution advertisements and that the transaction was designed, at least in part, to conceal the nature and source of those illicit funds. 2-ER-327-328.

a. With respect to the transaction itself, the evidence showed that the $16.5 million transfer from Lacey's lawyer's IOLTA account to a bank account in Hungary in January 2017 was simply the last in a series of complex transactions benefitting Lacey. 25-ER-7171; 45-ER-12926-12928. Specifically, the funds at issue traveled the following path: Backpage.com revenue → Website Technologies

→ Cereus Properties → five separate two-year annuity trust accounts owned by Lacey at Arizona Bank & Trust → Becker & House PLLC IOLTA account ending in 9992 → K&H Bank (Hungary) account ending in 1210. 6-ER-1494; 2-ER-327-328.

After Lacey transferred the funds from Cereus Properties to his five separate two-year annuity trust accounts, Lacey contacted his attorney, John Becker, about placing the monies "'where litigious parties, including government parties, cannot access my accounts.'" 2-ER-327-328; 24-ER-6708 (Trial Ex. 1). In pursuit of that goal, Lacey met with bank officer Lin Howard at Arizona Bank & Trust (where his annuity accounts were located) in November 2016 to seek advice about how his monies could be protected from government seizure. 2-ER-328; 6-ER-1488-1490; 44-ER-12578-12586 (Howard testimony). Howard informed Lacey that Arizona Bank & Trust could not help him with that. 44-ER-12583.

After the meeting, Howard told the bank president about Lacey's inquiry, as she had never previously received such a request in her 25 years as a banking officer. 44-ER-12586; 44-ER-12586 ("I was suspicious why it was being brought up and it made me very uncomfortable and I wanted to make sure my boss knew."). As a result of the exchange, Arizona Bank & Trust "ceased doing business" with Lacey. 2-ER-328; 44-ER-12586.

136

On December 29, 2016, and after being turned away by Arizona Bank & Trust, Lacey made five wire transfers, each in the amount of $3.3 million, from his annuity accounts to an IOLTA account held by Becker's law firm at Johnson Bank. 2-ER-296; 2-ER-328; 25-ER-7171; 6-ER-1490. Less than a week later, Becker transferred that $16.5 million from his firm's IOLTA account to a bank account in Hungary associated with Lacey. 2-ER-296; 2-ER-328. Becker later admitted that, in his more than 30 years of practicing law, he has never otherwise performed a similar transaction on behalf of a client. 49-ER-14012-14013.[17]

b.      The government also presented considerable evidence that Lacey knew Backpage's revenues were primarily based on prostitution advertisements. 2-ER-332-333; 6-ER-1499-1503. Among other things, the government offered evidence that Lacey "knew the demand for Adult ads was especially high in proportion to Backpage's total business; that Backpage derived the majority of its revenues from its Female Escort section—ads Mr. Ferrer characterized as prostitution ads; and that the sale of ads that led to prostitution offenses became the dominant portion of

---

[17] The government also showed that Lacey did not file a "Report of Foreign Bank and Financial Accounts" (FBAR) with the Internal Revenue Service until August 2018—18 months after the funds were transferred to Hungary and four months after he was indicted here. 6-ER-1497; 49-ER-14022; *see also* 28-ER-7945-7953 (Trial Ex. 5541) (FBAR). In addition, because the FBAR is focused only on reporting the existence of monies held in foreign financial accounts, it contained no information about the nature or source of the funds located in Lacey's Hungarian bank account. 6-ER-1498; 28-ER-7945-7953.

Backpage's business." 2-ER-299; 2-ER-301 (district court summarizing the extensive evidence notifying Lacey that "Backpage was a platform for prostitution ads"); 2-ER-309 ("the Government's evidence…suggests [Lacey] knew of Backpage's intended purpose"); *see also* 6-ER-1501-1503.

In addition, the government showed the jury evidence of Lacey describing "Backpage's business practice" as "providing 'the oldest profession in the world' with transparency." 2-ER-332 (quoting Trial Ex. 113a); 36-ER-10260-10271; 24-ER-6753-6762 (draft op-ed with redlines by Ferrer). For example, Lacey wrote that "Backpage is part of the solution. Eliminating our adult advertising will in no way eliminate or even reduce the incidence of prostitution in this country. . . . If anything, it will simply make it far more difficult for law enforcement to arrest and prosecute those who seek to harm children. For the very first time, the oldest profession in the world has transparency, record keeping and safeguards. Driving adult activity back into the shadows doesn't end the activity, it ends the safeguards." 6-ER-1501 (quoting Trial Ex. 113a).

Similarly, the government presented an April 2012 email Lacey sent to his ex-wife, in which he explained: "jim [Larkin] and i believe in legalized prostitution and spend millions trying to keep underage off site. not perfect, by any means." 26-ER-7242; 37-ER-10372-10376; 37-ER-10392-10394.

3.     Consistent with this Court's model instructions, *see* Ninth Circuit Model Criminal Jury Instruction 18.6, the district court instructed the jury that to convict Lacey of international concealment money laundering, it had to find the following elements beyond a reasonable doubt: (1) "Lacey transported money from a place in the United States to or through a place outside the United States"; (2) "Lacey knew that the money represents the proceeds of a violation or violations of the Travel Act"; and (3) "Lacey knew the transportation was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the Travel Act violation(s)." 2-ER-405.

Applying those instructions, the jury convicted Lacey. 2-ER-454.

4.     In his post-trial motion for a judgment of acquittal, Lacey contended there was insufficient evidence of the second and third elements of the offense. The district court rejected both contentions. 2-ER-327-333.

a.     With respect to Lacey's knowledge that the funds were proceeds from violations of the Travel Act, the court first found the government "provided sufficient evidence from which a juror could infer that Mr. Lacey knew Backpage sold ads for prostitution." 2-ER-332; *see* 2-ER-332 (detailing examples of such evidence). Second, the court found the government "provided sufficient evidence from which the Jury could have concluded that the funds at issue in Count 100 came from Backpage's prostitution ads." 2-ER-332. Among other things, the court

reiterated that there was "no requirement that the Government must show that Mr. Lacey had knowledge that the funds that were transferred were proceeds from the specific 50 ads charged" in Counts 2-18. 2-ER-332-333. Rather, it was sufficient that there was "evidence from which a jury could infer the source of the funds was from violations of the Travel Act—here, in the form of selling sex for money ads." 2-ER-333.

b.     With respect to the third element, the district court found that the government "provided sufficient evidence to show that the purpose of Mr. Lacey's transfers to the Hungry account, at least in part, was to conceal that the true source of the funds stemmed from sales of Backpage prostitution ads." 2-ER-330. Among other things, the court noted that Lacey repeatedly stated that he "wanted to put his assets somewhere the government 'could not access them.'" 2-ER-330. In addition, the court emphasized that Lacey's transfer of funds to Hungary "was the last transfer in a series of unusual transactions that had the effect of distancing the funds from Backpage proceeds." 2-ER-330-331; 2-ER-331 (explaining that a rational jury could have found such "'buffer' transactions'" to be "indicative of an intent to conceal the source of the funds"). Finally, with respect to Lacey's filing of a FBAR after the fact, the court found that Lacey's willingness to pay taxes on the funds "does not necessarily negate the fact that the transfer concealed the source of the funds more than it did before the funds were transferred." 2-ER-331.

**B.     Standard of Review**

As previously discussed, this Court reviews the district court's denial of a motion for a judgment of acquittal de novo, affording due deference to the jury's verdict. *Ubaldo*, 859 F.3d at 699.

**C.     A Rational Jury Could Conclude That Lacey Knew The Transferred Funds Were Proceeds From Violations Of The Travel Act**

Lacey renews his claim of insufficient evidence with respect to the second element. Lacey.Br.54-61. Contrary to Lacey's assertions, a rational jury—viewing the evidence in the light most favorable to the prosecution—could have concluded that (1) the funds involved in the transfer "represent the proceeds of some form of unlawful activity," 18 U.S.C. § 1956(a)(2)(B)—namely, violations of the Travel Act; and (2) Lacey had knowledge of that fact.

1.     The district court correctly concluded that the transferred funds represented proceeds from violations of the Travel Act. Among other things, the jury was presented with substantial evidence that "the dominant portion of Backpage's business" was the sale of prostitution advertisements, 2-ER-299; "Backpage proceeds going to Website Technologies derived 'from postings in the Female Escort section primarily,'" 2-ER-292; "Backpage operated in the same way before and after th[e] sale" to Ferrer in April 2015, 1-ER-275; and the source of monies paid to Cereus Properties by Website Technologies was Backpage's revenues from

prostitution advertisements, 2-ER-292-293. Viewing the evidence in the light most favorable to the prosecution, there was more than "sufficient evidence from which the Jury could have concluded that the funds at issue in Count 100 came from Backpage's prostitution ads" and, therefore, involved proceeds from Travel Act violations. 2-ER-332.

Lacey seeks to avoid this straightforward conclusion in two ways. Both lack merit.

Lacey initially contends (Lacey.Br.54-59) that such a finding violates the First Amendment. According to Lacey, the First Amendment requires heightened tracing requirements for money laundering offenses under Section 1956 when the unlawful activity involves acts of publishing. Lacey, however, fails to identify a single case imposing such a requirement; indeed, none of the cases cited by Lacey involves charges of money laundering or, for that matter, a criminal prosecution of any sort. Rather, the cases cited by Lacey merely stand for the undisputed proposition that speech is presumptively protected and the government bears the burden of establishing that the speech at issue is unprotected (or otherwise proscribable) under the First Amendment.

Moreover, Lacey disregards the First Amendment instruction the district court provided to the jury in this case. *See supra* p. 54. As relevant here, the district court informed the jury that "[a]ll speech is presumptively protected by the First

142

Amendment" and that it "is the government's burden to establish" that the advertisements at issue "propose[d] an illegal transaction." 2-ER-410.

Of particular relevance here, Lacey does not contest that "[o]ffers to engage in illegal transactions are categorically excluded from First Amendment protection." *Williams*, 553 U.S. at 297; *Pittsburgh Press*, 413 U.S. at 388 ("We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes."); *see supra* pp. 58-59. And for the reasons detailed above, there was substantial evidence to support the jury's determination that the funds transferred by Lacey involved proceeds from violations of the Travel Act. In other words, there was substantial evidence that the funds involved revenues derived from the heart of Backpage's business: advertisements to engage in prostitution, which are unprotected by the First Amendment.

Second, Lacey asserts (Lacey.Br.59-60) there is insufficient evidence of Travel Act violations taking place after the April 2015 sale to Ferrer. For many of the reasons discussed earlier when addressing Brunst's effectively identical argument, *see supra* pp. 112-115, that contention is mistaken.

Among other things, even though none of the defendants here were convicted of committing a Travel Act violation after April 2015, that does not mean there were no Travel Act violations during that time period. Rather, it simply means *these defendants* were not convicted for any such violation. That, however, is of no

143

moment for purposes of money laundering under Section 1956. This is because Section 1956 "criminalizes a transaction in proceeds, not the transaction that creates the proceeds." *Wilkes*, 662 F.3d at 545 (internal quotation marks omitted). As explained in connection with Brunst's similar argument, it is well-established that money laundering does not require proof that the defendant also committed the underlying unlawful activity. *See supra* pp. 112-115.

In convicting Lacey, the jury necessarily found that the funds at issue involved "proceeds of a violation or violations of the Travel Act." 2-ER-405. For the reasons detailed above, and viewing the evidence in the light most favorable to the prosecution, there was ample evidence supporting the jury's determination.

2.    Lacey also briefly argues (Lacey.Br.60-61) there was insufficient evidence that he knew the monies he received from Backpage (via Website Technologies and Cereus Properties) were proceeds stemming from violations of the Travel Act—that is, from the sale of prostitution advertisements. The jury and district court correctly rejected his contention.

Lacey's continued claim (Lacey.Br.60) that he was a "layer away" from Backpage's marketing and growth strategies misses the mark. Even accepting such an assertion as true, it surely was not irrational for a jury to find that Lacey nonetheless *knew* that Backpage's revenues—and, therefore, his continued multi-million-dollar payouts from Backpage—were predominantly based on the sale of

prostitution advertisements. *See supra* pp. 137-140; 6-ER-1500-1503. For purposes of his conviction under 18 U.S.C. § 1956(a)(2)(B)(i), that is all that was required.

> **D. A Rational Jury Could Conclude That Lacey Knew The Transfer Was Designed, At Least In Part, To Conceal The Nature Or Source Of The Illicit Funds**

Lacey also renews his claim of insufficient evidence with respect to the third element. Lacey.Br.46-53. Viewing the evidence in the light most favorable to the prosecution, a rational jury could have concluded that the transfer was "designed in whole or in part to conceal or disguise the nature…[or] source" of the illicit funds. 18 U.S.C. § 1956(a)(2)(B)(i).

As detailed earlier, *see supra* p. 115, this Court has made clear that Section 1956 "is violated if the transaction in question is 'designed in whole or *in part*' to conceal." *Singh*, 995 F.3d at 1076 (emphasis in original). As a result, even if the transfer plausibly served additional purposes (such as Lacey establishing a trust for his children), that does not immunize Lacey from liability under Section 1956. *Cf.* Lacey.Br.52-53.

Similarly, Lacey mistakenly suggests (Lacey.Br.50-52) that his purported willingness to pay taxes on the funds somehow precludes a rational jury from finding that the transfer was designed, in whole or in part, to conceal the nature or source of the funds. That is incorrect. This Court has consistently held that the "necessary concealment" under Section 1956 "is that of the *source* of the funds, not the identity

of the money-launderer," or that the funds exist in the first place. *Tekle*, 329 F.3d at 1114 (emphasis added); *see also supra* pp. 115-116. Contrary to Lacey's contention, a putative money-launderer cannot escape liability merely by declaring his laundered funds legitimate income and paying the applicable taxes. *See, e.g.*, *Wilkes*, 662 F.3d at 547 (observing that "'taking steps to make funds appear legitimate is the common meaning of the term "money laundering"'") (quoting *Regalado Cuellar v. United States*, 553 U.S. 550, 558 (2008)).

Lacey's assertion is particularly misguided given that his transfer to a trust account in Hungary "was the last in a series of transactions made to conceal" the true source and nature of those funds. *Wilkes*, 662 F.3d at 547; *see, e.g.*, 2-ER-330 ("[T]he government provided sufficient evidence to show that the purpose of Mr. Lacey's transfers to the Hungary account, at least in part, was to conceal that the true source of the funds stemmed from sales of Backpage prostitution ads."). Indeed, as the district court summarized, the evidence established that "Lacey and his alleged co-conspirators created Website Technologies and Cereus Properties to insulate those entities from the tainted Backpage proceeds"; after the funds flowed through those entities, Lacey "sent the funds to five separate annuity trusts he controlled"; and from there, "Lacey wired the funds in the trusts to Mr. Becker, who consolidated the money into his IOLTA account before transferring it to Hungary to create a trust for the benefit of Mr. Lacey's two sons." 2-ER-331. As discussed earlier, this Court

has consistently held that a rational jury may find such "multi-layered" transactions indicative of an intent to conceal. *See supra* pp. 116-117 (citing *Wilkes*, *Tekle*, and *Singh*).

Notably, while Lacey claims that he lacked an intent to conceal, he fails to explain in his opening brief why such multi-layered transactions were necessary if that were so. *See, e.g.*, *Wilkes*, 662 F.3d at 547 ("Concealing this [illicit] connection appears to be the dominant, if not the only, purpose of these multi-layered transactions."). For example, if Lacey truly had nothing to hide, it is far from clear why he transferred the funds through his attorney's IOLTA account before sending them onto Hungary. If Lacey's transfer was not designed in part to conceal, Lacey "could, theoretically, have saved [himself] a good deal of time and effort by [instead] using" the sort of straightforward financial "procedures used countless times everywhere every day to move funds quickly and efficiently." *Singh*, 995 F.3d at 1076; *see, e.g.*, *United States v. Naranjo*, 634 F.3d 1198, 1209 (11th Cir. 2011) (holding that "evidence that a defendant placed or directed the deposit of illegal income into a bank account held by a third person or corporation and then received the benefit of those proceeds is sufficient to support a conviction of concealment money laundering").[18]

---

[18] Similarly, Lacey mistakenly suggests (Lacey.Br.48-49) that the transaction at issue here merely involved "the transfer of funds into accounts held in the name of [the] defendant." Among other things, immediately before the funds were sent to

For similar reasons, Lacey's reliance (Lacey.Br.50-52) on cases like *United States v. Rockelman*, 49 F.3d 418, 422 (8th Cir. 1995), is misplaced. In *Rockelman*, the Eighth Circuit held that a "straightforward real estate transaction"—there, the defendant's purchase of a cabin "with the proceeds of his drug sales"—was not designed, at least in part, with an "intent to conceal that would satisfy the money laundering statute." *Id.*; *see id.* (expressing concern that "[a]pplication of the money laundering statute to these facts would turn the money laundering statute into a money spending statute") (internal quotation marks omitted). As detailed above, and unlike the transaction in *Rockelman*, the transfer of funds to a trust account in Hungary through Lacey's attorney's IOLTA account was anything but "straightforward."

Finally, Lacey contends (Lacey.Br.46-48) there was "no concealment" here. To the extent Lacey suggests that a money laundering conviction can only be upheld if a defendant successfully concealed the true nature or source of transferred funds for perpetuity, that of course finds no support in the statute adopted by Congress. Indeed, Section 1956 prohibits transactions that are "*designed* in whole or in part"

---

Hungary, Lacey transferred the funds to his attorney's IOLTA account (not one of his own accounts). In any event, as emphasized earlier, the pertinent concealment here "is that of the source of the funds, not the identity of the money-launderer." *Tekle*, 329 F.3d at 1114.

to conceal the true nature or source of the illicit funds, regardless of whether the transaction successfully did so.

In any event, the only question here is whether the jury could rationally conclude, when viewing the evidence in the light most favorable to the government, that Lacey's transfer was designed, at least in part, to conceal the true nature or source of the funds—*i.e.*, that they were proceeds derived from Backpage's sale of prostitution advertisements. For the reasons detailed above, the district court correctly answered that question in the affirmative. *See, e.g.*, 2-ER-330 (finding that "the Government provided sufficient evidence to show that the purpose of Mr. Lacey's transfers to the Hungary account, at least in part, was to conceal that the true source of the funds stemmed from sales of Backpage prostitution ads").

## XI.  LACEY'S EVIDENTIARY CHALLENGES ARE MERITLESS

Lacey finally challenges (Lacey.Br.61-67) a variety of the district court's evidentiary rulings. Each of those claims lack merit.

### A.  Standard of Review

This Court reviews "a district court's evidentiary rulings for an abuse of discretion" and "whether a district court's evidentiary rulings violated a defendant's constitutional rights" de novo. *United States v. Waters*, 627 F.3d 345, 351-352 (9th Cir. 2010). "[E]videntiary rulings 'challenged on appeal on grounds not raised in the

district court'" are reviewed for plain error. *United States v. Hayat*, 710 F.3d 875, 894 (9th Cir. 2013).

**B.     The District Court Did Not Reversibly Err**

Lacey raises four categories of evidentiary challenges. None is meritorious.

1.     The first category includes purported constitutional challenges to some of the district court's evidentiary rulings. *See* Lacey.Br.61-62. For the reasons detailed above in connection with Brunst's similar claim, *see supra* pp. 79-84, the district court's rulings with respect to the scope of Lacey's potential testimony did not violate his right to testify. Similarly, for the reasons discussed above in connection with the defendants' other First Amendment arguments, *see supra* pp. 57-67, Lacey's conclusory assertion that certain aspects of Ferrer's testimony violated the First Amendment lacks a sound legal or factual basis.

2.     Lacey next alleges that Ferrer was permitted to testify on various topics despite lacking personal knowledge. Lacey.Br.63-64; *see* Fed. R. Evid. 602.

As an initial matter, some of the testimony Lacey now challenges on appeal was not objected to pursuant to Rule 602. *See, e.g.*, 37-ER-10368 (objections based on relevance, hearsay, and Rule 403 overruled). Such claims are accordingly reviewed for plain error.

In any event, and under any standard of review, Lacey fails to show that Ferrer's testimony was impermissibly speculative. As this Court has consistently

explained, "'[p]ersonal knowledge includes opinions and inferences grounded in observations and experiences.'" *United States v. Whittemore*, 776 F.3d 1074, 1082 (9th Cir. 2015); *see, e.g.*, *United States v. Medina*, 711 Fed. Appx. 420, 421 (9th Cir. 2018); *see also* Fed. R. Evid. 701 (opinion testimony by lay witnesses is permissible if, among other reasons, it is "rationally based on the witness's perception").

Each piece of testimony identified by Lacey fits comfortably within the permissible bounds of Rules 602 and 701. For example, the district court correctly recognized that Ferrer could offer his own understanding (and, therefore, personal opinion) about whether and why certain advertisements were indicative of solicitations for prostitution, because there had been a "sufficient foundation laid for [Ferrer's] understanding of what looks like prostitution ads." 35-ER-9866; *see* 35-ER-9866 (overruling objection based on speculation). Similarly, with respect to the use of certain words or phrases in articles or advertisements, the district court made clear that Ferrer could testify "as to what *he* thought [the word(s)] meant." 35-ER-9692 (emphasis added).[19]

---

[19] To the extent Lacey identifies emails that Ferrer himself wrote, *see* 35-ER-9798-9799 (cited at Lacey.Br.64), or emails describing actions Ferrer himself took, *see* 37-ER-10367-10368 (cited at Lacey.Br.63) (discussing email at 26-ER-7240-7241), his claims of impermissible speculation are even further far afield.

151

In short, the district court did not abuse its discretion when permitting Ferrer to testify based on his own "opinions and inferences grounded in observations and experiences."

3.     Lacey posits in passing that the trial included "the continuous admission of evidence blaming Backpage and/or the Defendants for facilitating child-sex trafficking." *See* Lacey.Br.64-65. Because Lacey does not include any specific examples (or record cites to any specific examples), it is not clear the basis of Lacey's current contention. Regardless, contrary to Lacey's claim, the trial did not involve the "nonstop admission" of child sex-trafficking evidence. Lacey.Br.65.

Prior to trial, the district court ruled that the government could admit evidence showing that certain victims, including those that were minors, engaged in sex in exchange for money through advertisements posted on Backpage. 2-ER-528; *see* 2-ER-527-529 (denying the defendants' motion *in limine* in pertinent part). Among other things, the court explained that "[s]ex trafficking and child sex trafficking are, by definition, both forms of prostitution and the Government must prove that Defendants intended to facilitate prostitution through Backpage.com." 2-ER-528 (internal quotation marks omitted). At the same time, the court made clear that the government could not "linger on the details of the abuse sex trafficking victims suffered as a result of being trafficked," nor could the government admit "cumulative testimony about the abuse sex trafficking victims suffered." 2-ER-528-529 (internal

quotation marks omitted). That admonishment was adhered to during the course of the trial.

Finally, the district court specifically instructed the jury that, "[a]lthough some testimony and evidence in the trial occasionally may refer to 'human trafficking,' 'sex trafficking,' or 'child sex trafficking,' no defendant is charged with [those crimes]. So, you should not conclude from any use of those terms during the trial that any defendant has been charged with a trafficking crime or facilitating a trafficking crime." 2-ER-402.

4.  Lacey also claims (Lacey.Br.65-66) the district court abused its discretion when it admitted certain exhibits, not for the truth of their content, but to show the defendants were accordingly put on notice of the concerns held by various organizations and entities. He is incorrect.

As an initial matter, the district court correctly determined that such evidence was not hearsay. *See, e.g.*, *United States v. Rogers*, 321 F.3d 1226, 1229 (9th Cir. 2003) ("The district court admitted the complaint to show that once Rogers received a copy of it, he was aware that IFR may be a fraudulent scheme. This is a proper purpose and the complaint is not hearsay."); *United States v. Staggs*, 136 Fed. Appx. 63, 66 (9th Cir. 2005) (observing "the evidence of Agent Cauthen's phone conversations with Staggs was admitted for the non-hearsay purpose of showing that

153

Staggs was on notice of the fraudulent nature of similar high-yield investment schemes").

In addition, Lacey's critiques of trial exhibits 923 (25-ER-7104), 932 (25-ER-7105), and 1200a (25-ER-7117-7119) are misguided. *See* Lacey.Br.65. Among other things, and contrary to Lacey's assertion, none of those exhibits discuss any of the federal criminal laws with which the defendants were charged with violating at trial. *See, e.g.*, 25-ER-7105 (discussing violations of Maryland state law and 18 U.S.C. § 2421 (Mann Act)). In addition, at the time of the exhibit's admission, the district court instructed the jury that "[t]his exhibit is also not offered for the truth of the -- what the content of the letter is, only that Mr. Ferrer received it and what his impressions were of the -- the exhibit." 35-ER-9897 (discussing Trial Ex. 932)).

Similarly, Lacey's complaint about the two AIM Group reports (trial exhibits 1609a and 1610) is meritless. *See* Lacey.Br.66; 26-ER-7183 (exhibit 1609a); 26-ER-7184-7186 (exhibit 1610). As Lacey acknowledges, the district court admitted those exhibits with an instruction to the jury "that the exhibit is not offered for the truth of the content." 35-ER-9888. As relevant here, Ferrer testified that certain aspects of the reports were *inaccurate*—namely, that they "dramatically underreported [Backpage]'s revenue." 35-ER-9892; 35-ER-9888. In addition, Ferrer explained that, regardless of the errors, he and others at Backpage "were not happy about" the

reports. 35-ER-9892. Contrary to Lacey's assertion, there is nothing impermissible about this line of testimony.

In any event, even if the district court abused its discretion by admitting such an exhibit, the prejudicial impact of any such error was substantially minimized by the district court's limiting instructions. In addition to the limiting instruction at the time of an exhibit's introduction, the district court's final instructions to the jury reiterated that such evidence could only be considered for the limited purpose identified by the court. *See* 2-ER-369 ("[S]ome evidence was received only for a limited purpose; when I have instructed you to consider certain evidence in a limited way, you must do so.").

5.  Because Lacey cannot show multiple errors, his reliance on the cumulative error doctrine is misplaced. *Cf.* Lacey.Br.66-67. Finally, and in any event, even if the district court had abused its discretion or otherwise erred, any such error would have been harmless. *United States v. Haines*, 918 F.3d 694, 699 (9th Cir. 2019) ("evidentiary rulings are subject to harmless error review"). Given the facts detailed above, and the jury's careful and nuanced verdict, there is no record basis to believe that any of Lacey's purported evidentiary violations materially affected the jury's findings of guilt. *See, e.g.*, *United States v. Liera*, 585 F.3d 1237, 1244 (9th Cir. 2009) ("An error is harmless if 'it is more probable than not that the error did not materially affect the verdict.'").

## CONCLUSION

The district court's judgments should be affirmed.

Respectfully submitted,

TIMOTHY COURCHAINE
United States Attorney

A. TYSEN DUVA
Assistant Attorney General

WILLIAM G. VOIT
KEVIN RAPP
Assistant United States Attorneys
District of Arizona

JOSH A. GOLDFOOT
Deputy Assistant Attorney General

PAUL T. CRANE
Attorney, Appellate Section
Criminal Division
United States Department of Justice
950 Pennsylvania Ave. NW, Rm. 1264
Washington, DC 20530
Telephone: (202) 616-9316
Paul.Crane@usdoj.gov

AUSTIN M. BERRY
Trial Attorney
Child Exploitation & Obscenity Section
Criminal Division

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

Dated: February 23, 2026

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* [http://www.ca9.uscourts.gov/forms/form08instructions.pdf](http://www.ca9.uscourts.gov/forms/form08instructions.pdf)

**9th Cir. Case Number(s)**  __24-5374, 24-5375, 24-5376_____

I am the attorney or self-represented party.

**This brief contains** __34,841_____ **words,** excluding the items exempted by

Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App.

P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties;
    [  ] a party or parties are filing a single brief in response to multiple briefs; or
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[X] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _____*s/ Paul T. Crane*_____ **Date** ___February 23, 2026____
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                                          *Rev. 12/01/18*