**Nos. 24-5374, 24-5375, 24-5376**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JOHN "JED" BRUNST; SCOTT SPEAR; &
MICHAEL LACEY,

Defendants-Appellants.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF ARIZONA, NO. 2:18-CR-422-DJH
(THE HONORABLE DIANE J. HUMETEWA, UNITED STATES DISTRICT JUDGE)

_____

**SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME 1 OF 1**

_____

TIMOTHY COURCHAINE
United States Attorney

WILLIAM G. VOIT
KEVIN RAPP
Assistant United States Attorneys
District of Arizona

AUSTIN M. BERRY
Trial Attorney
Child Exploitation & Obscenity Section
Criminal Division

A. TYSEN DUVA
Assistant Attorney General

JOSH A. GOLDFOOT
Deputy Assistant Attorney General

PAUL T. CRANE
Attorney, Appellate Section
Criminal Division
United States Department of Justice
950 Pennsylvania Ave. NW, Rm. 1264
Washington, DC 20530
Telephone: (202) 616-9316
Paul.Crane@usdoj.gov

# TABLE OF CONTENTS

9/10/25    Defendant Daniel Hyer's Judgment (Doc. 2388).........................SER-3

9/9/25     Defendant Daniel Hyer's Plea Agreement (Doc. 2387) .............SER-5

7/3/25     Restitution Order (Doc. 2356)....................................................SER-18

10/11/23  Government's Response to Defendants' Brief in Support of Objections to Court Rulings During Ferrer Testimony (Doc. 1851)...............................................................................SER-50

10/5/23   Defendants' Brief in Support of Objections to Court Rulings During Ferrer Testimony (Doc. 1840).........................SER-68

7/20/23   Order re: Defendants' Motion for Reconsideration (Doc. 1641)...............................................................................SER-103

6/1/23     Order re: Defendants' Motion to Dismiss Superseding Indictment (Doc. 1587) ........................................................SER-110

3/30/23   Defendants' Motion to Dismiss Superseding Indictment (Doc. 1557)...............................................................................SER-128

6/5/20     Government's Response to Defendants' Motion to Dismiss Based on Outrageous Government Misconduct (Doc. 998).................................................................................SER-149

5/1/20     Defendants' Motion to Dismiss Based on Outrageous Government Misconduct (Doc. 940).......................................SER-168

1/9/20     Order re: Defendants' Motion to Dismiss Superseding Indictment (Doc. 844) ............................................................SER-192

1/8/20     Order re: Defendants' Motion to Dismiss Superseding Indictment (Doc. 840) ............................................................SER-203

5/2/19     Order re: Defendants' Motion to Dismiss Superseding Indictment (Doc. 559) ............................................................SER-216

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

**United States of America**

v.

**Dan Hyer**

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)

**No.  CR-18-00422-005-PHX-DJH**

KC Maxwell (Retained)
Attorney for Defendant

USM#: 57049-177

**THE DEFENDANT ENTERED A PLEA OF** guilty on 8/17/2018 to Count 1 of the Superseding Indictment.

**ACCORDINGLY, THE COURT HAS ADJUDICATED THAT THE DEFENDANT IS GUILTY OF THE FOLLOWING OFFENSE(S):** violating Title 18, U.S.C. §371, Conspiracy, a Class D Felony offense, as charged in Count 1 of the Superseding Indictment.

**IT IS THE JUDGMENT OF THIS COURT THAT** the defendant is committed to the custody of the Bureau of Prisons for a term of **TIME SERVED**, with no term of supervised release to follow.

**IT IS FURTHER ORDERED** that defendant's interest in the following property shall be forfeited to the United States: (1) Bank of America account x9342; (2) Bank of America account x0071; and (3) a sum of money equal to $74,644.85, which represents any mortgage and other payments made by Hyer to the real property located at XXXX San Mateo Blvd., Dallas, Texas, 75223, after November 2012.

**IT IS ORDERED** that all remaining counts of the Superseding Indictment are dismissed on motion of the United States.

## CRIMINAL MONETARY PENALTIES

The defendant shall pay to the Clerk the following total criminal monetary penalties:

**SPECIAL ASSESSMENT:** $100.00      **FINE:** WAIVED      **RESTITUTION:** N/A

The Court finds the defendant does not have the ability to pay a fine and orders the fine waived.

The defendant shall pay a special assessment of $100.00 which shall be due immediately.

If incarcerated, payment of criminal monetary penalties are due during imprisonment at a rate of not less than $25 per quarter and payment shall be made through the Bureau of Prisons' Inmate Financial Responsibility Program. Criminal monetary payments shall be made to the Clerk of U.S. District Court, Attention: Finance, Suite 130, 401 West Washington Street, SPC 1, Phoenix, Arizona 85003-2118. Payments should be credited to the various monetary penalties imposed by the Court in the priority

CR-18-00422-005-PHX-DJH                                                              Page 2 of 2
USA vs. Dan Hyer

established under 18 U.S.C. § 3612(c). The total special assessment of $100.00 shall be paid pursuant to Title 18, United States Code, Section 3013 for Count 1 of the Superseding Indictment.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, (10) costs, including cost of prosecution and court costs.

Any unpaid balance shall become a condition of supervision and shall be paid within 90 days prior to the expiration of supervision. Until all restitutions, fines, special assessments and costs are fully paid, the defendant shall immediately notify the Clerk, U.S. District Court, of any change in name and address. The Court hereby waives the imposition of interest and penalties on any unpaid balances.

**THE COURT FINDS** that you have been sentenced in accordance with the terms of the plea agreement and that you have waived your right to appeal and to collaterally attack this matter. The waiver has been knowingly and voluntarily made with a factual basis and with an understanding of the consequences of the waiver.

Date of Imposition of Sentence:  **Tuesday, September 09, 2025**

Dated this 9th day of September, 2025.


                                                    Honorable Diane J. Humetewa
                                                    United States District Judge


                                        **RETURN**

I have executed this Judgment as follows: _____
                                                                                    , the institution
defendant delivered on _____ to _____ at _____
designated by the Bureau of Prisons with a certified copy of this judgment in a Criminal case.


_____          By:    _____
United States Marshal                                     Deputy Marshal

CR-18-00422-005-PHX-DJH- Hyer          9/9/2025 - 12:17 PM

FILED ____ LODGED
RECEIVED ____ COPY

AUG 17 2018

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

FILED ____ LODGED
RECEIVED ____ COPY

SEP - 9 2025

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY __X_____ DEPUTY

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona
KEVIN M. RAPP (Ariz. Bar No. 14249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

BRIAN A. BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-18-422-5-PHX-SPL (BSB) |
|           Plaintiff, | |
|    vs. | **PLEA AGREEMENT** |
| 5. Daniel Hyer, | |
|           Defendant. | |

Plaintiff, United States of America, and the defendant, Daniel Hyer, hereby agree
to dispose of this matter on the following terms and conditions:

**1.**    **PLEA**

The defendant will plead guilty to Count 1 of the Superseding Indictment charging
the defendant with a violation of 18 United States Code (U.S.C.) § 371, Conspiracy, a Class
D felony offense.

SCANNED SER 271

**2.    MAXIMUM PENALTIES**

a.    A violation of 18 U.S.C. § 371 is punishable by a maximum fine of $250,000 (or, if any person derived pecuniary gain from the offense, or if the offense resulted in pecuniary loss to a person other than the defendant, not more than the greater of twice the gross gain or twice the gross loss), a maximum term of imprisonment of 5 years, or both, and a term of supervised release of 3 years.  A maximum term of probation is five years.

b.    According to the Sentencing Guidelines issued pursuant to the Sentencing Reform Act of 1984, the Court shall order the defendant to:

(1)    make restitution to any victim of the offense pursuant to 18 U.S.C. § 3663 and/or 3663A, unless the Court determines that restitution would not be appropriate;

(2)    pay a fine pursuant to 18 U.S.C. § 3572, unless the Court finds that a fine is not appropriate;

(3)    serve a term of supervised release when required by statute or when a sentence of imprisonment of more than one year is imposed (with the understanding that the Court may impose a term of supervised release in all other cases); and

(4)    pay upon conviction a $100 special assessment for each count to which the defendant pleads guilty pursuant to 18 U.S.C. § 3013.

c.    The Court is required to consider the Sentencing Guidelines in determining the defendant's sentence.  However, the Sentencing Guidelines are advisory, and the Court is free to exercise its discretion to impose any reasonable sentence up to the maximum set by statute for the crime(s) of conviction, unless there are stipulations to the contrary that the Court accepts.

**3.    AGREEMENTS REGARDING SENTENCING**

a.    <u>Ability To Request Downward Departure/Variance</u>:  The defendant reserves the right to request a downward departure or a downward variance based on the factors set forth in 18 U.S.C. § 3553(a).  The defendant understands that the government is free to oppose any such request.

- 2 -

1      b.    Restitution.    Pursuant to 18 U.S.C. § 3663 and/or 3663A, the defendant

2    specifically agrees to pay full restitution, regardless of the resulting loss amount but in no

3    event more than $500 million, to all victims directly or proximately harmed by the

4    defendant's "relevant conduct," including conduct pertaining to any dismissed counts or

5    uncharged conduct, as defined by U.S.S.G. § 1B1.3, regardless of whether such conduct

6    constitutes an "offense" under 18 U.S.C. §§ 2259, 3663 or 3663A.    The defendant

7    understands that such restitution will be included in the Court's Order of Judgment and that

8    an unanticipated restitution amount will not serve as grounds to withdraw the defendant's

9    guilty plea or to withdraw from this plea agreement.

10      c.    Assets and Financial Responsibility.    The defendant shall make a full

11    accounting of all assets in which the defendant has any legal or equitable interest.    The

12    defendant also expressly authorizes the United States Attorney's Office to immediately

13    obtain a credit report as to the defendant in order to evaluate the defendant's ability to

14    satisfy any financial obligation imposed by the Court.    The defendant also shall make full

15    disclosure of all current and projected assets to the U.S. Probation Office immediately and

16    prior to the termination of the defendant's supervised release or probation, such disclosures

17    to be shared with the U.S. Attorney's Office, including the Financial Litigation Unit, for

18    any purpose.    Finally, the defendant shall participate in the Inmate Financial Responsibility

19    Program to fulfill all financial obligations due and owing under this agreement and the law.

20      d.    Acceptance of Responsibility.    If the defendant makes full and complete

21    disclosure to the U.S. Probation Office of the circumstances surrounding the defendant's

22    commission of the offense, and if the defendant demonstrates an acceptance of

23    responsibility for this offense up to and including the time of sentencing, the United States

24    will recommend a two-level reduction in the applicable Sentencing Guidelines offense

25    level pursuant to U.S.S.G. § 3E1.1(a).    If the defendant has an offense level of 16 or more,

26    the United States will move the Court for an additional one-level reduction in the applicable

27    Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(b).

28    **4.    AGREEMENT TO DISMISS OR NOT TO PROSECUTE**

- 3 -

1        a.     Pursuant to Fed. R. Crim. P. 11(c)(1)(A), the United States, at the time of

2    sentencing, shall dismiss the following charges against the defendant:  Counts 2-68 of the

3    Superseding Indictment.

4        b.     This office shall not prosecute the defendant for any additional offenses

5    committed by the defendant, and known by the United States, in connection with the

6    subject matter described in the factual basis of this agreement.

7        c.     This agreement does not, in any manner, restrict the actions of the United

8    States in any other district or bind any other United States Attorney's Office.

9    **5.**     **COURT APPROVAL REQUIRED; REINSTITUTION OF PROSECUTION**

10       a.     If the Court, after reviewing this plea agreement, concludes that any

11   provision contained herein is inappropriate, it may reject the plea agreement and give the

12   defendant the opportunity to withdraw the guilty plea in accordance with Fed. R. Crim. P.

13   11(c)(5).

14       b.     If the defendant's guilty plea is rejected, withdrawn, vacated, or reversed at

15   any time, this plea agreement shall be null and void, the United States shall be free to

16   prosecute the defendant for all crimes of which it then has knowledge and any charges that

17   have been dismissed because of this plea agreement shall automatically be reinstated.  In

18   such event, the defendant waives any and all objections, motions, and defenses based upon

19   the Statute of Limitations, the Speedy Trial Act, or constitutional restrictions in bringing

20   later charges or proceedings, and any statements made by the defendant at the time of his

21   change of plea or sentencing in this case may not be used against him in any subsequent

22   hearing, trial, or proceeding.

23   **6.**     **WAIVER OF DEFENSES AND APPEAL RIGHTS**

24       The defendant waives (1) any and all motions, defenses, probable cause

25   determinations, and objections that the defendant could assert to the indictment or

26   information; and (2) any right to file an appeal, any collateral attack, and any other writ or

27   motion that challenges the conviction, an order of restitution or forfeiture, the entry of

28   judgment against the defendant, or any aspect of the defendant's sentence, including the

- 4 -

1    manner in which the sentence is determined, including but not limited to any appeals under

2    18 U.S.C. § 3742 (sentencing appeals) and motions under 28 U.S.C. §§ 2241 and 2255

3    (habeas petitions), and any right to file a motion for modification of sentence, including

4    under 18 U.S.C. § 3582(c).  This waiver shall result in the dismissal of any appeal,

5    collateral attack, or other motion the defendant might file challenging the conviction, order

6    of restitution or forfeiture, or sentence in this case.  This waiver shall not be construed to

7    bar an otherwise-preserved claim of ineffective assistance of counsel or of "prosecutorial

8    misconduct" (as that term is defined by Section II.B of Ariz. Ethics Op. 15-01 (2015)).

9    **7.**     **DISCLOSURE OF INFORMATION**

10        a.     The United States retains the unrestricted right to provide information and

11   make any and all statements it deems appropriate to the U.S. Probation Office and to the

12   Court in connection with the case.

13        b.     Any information, statements, documents, and evidence that the defendant

14   provides to the United States pursuant to this agreement may be used against the defendant

15   at any time.

16        c.     The defendant shall cooperate fully with the U.S. Probation Office.  Such

17   cooperation shall include providing complete and truthful responses to questions posed by

18   the U.S. Probation Office including, but not limited to, questions relating to:

19            (1)     criminal convictions, history of drug abuse, and mental illness; and

20            (2)     financial information, including present financial assets or liabilities

21   that relate to the ability of the defendant to pay a fine or restitution.

22   **8.**     **FORFEITURE, CIVIL, AND ADMINISTRATIVE PROCEEDINGS**

23        a.     Pursuant to 18 U.S.C. § 981(a)(1)(C), the defendant agrees to forfeit, and

24   hereby forfeits, all interest in any property, real or personal, which constitutes or is derived

25   from proceeds traceable to the offense.  Defendant specifically admits and agrees that the

26   following property, without limitation, constitutes and is derived from proceeds traceable

27   to one or more violations of Conspiracy (under 18 U.S.C. § 371) to violate the Travel Act—

28   Facilitate Prostitution (18 U.S.C. § 1952(a)(3)(A)): (1) Bank of America account number

- 5 -

x9342, (2) Bank of America account number x0071, and (3) a sum of money equal to $74,644.85, which represents any mortgage and other payments made by the defendant to the real property located at XXXX San Mateo Blvd, ~~Apt. XXX~~, Dallas, TX 75223, after November 2012.

b.    The defendant further agrees that nothing in this agreement shall be construed to protect him from administrative or civil forfeiture proceedings or to prohibit the United States from proceeding with and/or initiating an action for civil forfeiture (either with respect to the property identified above or with respect to additional property that is not subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) but may be subject to forfeiture under other provisions).

c.    The defendant further agrees to waive all interest in all property subject to forfeiture under this agreement in any administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal. The defendant agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. The defendant further understands and agrees that forfeiture of the property is appropriate and in accordance with the applicable forfeiture statutes, which may include Title 8 U.S.C. § 1324(b), Title 18 U.S.C. §§ 924(d), 981, 982 and 2253, Title 21 U.S.C. §§ 853 and 881, and Title 28 U.S.C. § 2461(c).

d.    Pursuant to 18 U.S.C. § 3613, all monetary penalties, including restitution imposed by the Court, shall be due immediately upon judgment, shall be subject to immediate enforcement by the United States, and shall be submitted to the Treasury Offset Program so that any federal payment or transfer of returned property the defendant receives may be offset and applied to federal debts (which offset will not affect the periodic payment schedule). If the Court imposes a schedule of payments, the schedule of payments shall be merely a schedule of minimum payments and shall not be a limitation on the methods available to the United States to enforce the judgment.

- 6 -

**SER-10**

e.      Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this court may impose upon the defendant in addition to forfeiture.  This agreement does not preclude the United States from instituting any civil or administrative forfeiture proceedings as may be appropriate now or in the future.

f.      The defendant agrees to waive all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, double jeopardy or any other means) to any forfeiture imposed as a result of this guilty plea or any pending or completed administrative or civil forfeiture actions, including that the forfeiture constitutes an excessive fine or punishment.  The defendant agrees to take all steps as requested by the United States to pass clear title to forfeitable assets to the United States, and to testify truthfully in any judicial forfeiture proceeding (including any proceeding to adjudicate the claim of any third party to the forfeited assets).  The defendant acknowledges that all property covered by this agreement is subject to forfeiture and that no other person or entity has a legitimate claim to these items listed, other than any community property interest that his wife may have in the forfeited assets under state law.

g.      The defendant agrees not to file a claim to any of the listed property subject to forfeiture under paragraph 8(a) of this agreement in any civil proceeding, administrative or judicial, which may be initiated.  The defendant further agrees that he will not contest civil, administrative, or judicial forfeiture of that property.  The defendant agrees to waive his right to notice of any forfeiture proceeding involving this property, and agrees not to file a claim or assist others in filing a claim in that forfeiture proceeding.

h.      The government reserves its right to proceed against any remaining assets not identified either in this agreement or in any civil actions which are being resolved along with this plea of guilty, including any property in which the defendant has any interest or control, if said assets, real or personal, tangible or intangible were involved in the offense(s).

i.      The defendant hereby waives, and agrees to hold the government and its

- 7 -

1   agents and employees harmless from any and all claims whatsoever in connection with the

2   seizure, forfeiture, and disposal of the property described above.  Without limitation, the

3   defendant understands and agrees that by virtue of this plea of guilty, the defendant will

4   waive any rights or cause of action that the defendant might otherwise have had to claim

5   that he is a "substantially prevailing party" for the purpose of recovery of attorney fees and

6   other litigation costs in any related civil forfeiture proceeding pursuant to 28 U.S.C. §

7   2465(b)(1).

8   **9.    ELEMENTS**

9                                   **Conspiracy**

10          Beginning no later than 2004, and continuing through in or around April 2018, in

11   the District of Arizona and elsewhere:

12          1.      There was an agreement between two or more persons to commit one or more

13          of the crimes of Travel Act—Facilitate Prostitution (18 U.S.C. § 1952(a)(3)(A)).

14          2.      The defendant became a member of the conspiracy knowing of at least one

15          of its objects and intending to help accomplish it; and

16          3.      One of the members of the conspiracy performed at least one overt act for

17          the purpose of carrying out the conspiracy.

18   **10.    FACTUAL BASIS**

19          a.      The defendant admits that the following facts are true and that if this matter

20   were to proceed to trial the United States could prove the following facts beyond a

21   reasonable doubt:

22          In 1998, I started working at the *Dallas Observer*, an alternative newspaper that

23          later became part of the Village Voice Media Holdings ("VVMH") chain.  During

24          my early years at the *Dallas Observer*, I was an account executive responsible for

25          selling print ads.

26

27          In 2006 or 2007, I was asked to help grow Backpage.com ("Backpage"), which was

28          VVMH's attempt to create a classified advertising website to compete with

- 8 -

Craigslist. During my first few years in this position, my primary responsibility was to increase the number of ads being posted on Backpage. To do so, I helped develop a process called "preboarding" or "aggregation." In general, this process consisted of identifying so-called "escort" and "adult" ads on other websites and creating ads on Backpage for the individuals depicted in those ads in the hope of securing their future business. These aggregation efforts, which I discussed with my bosses Carl Ferrer and Scott Spear, resulted in large revenue and traffic growth for Backpage. As a result, Ferrer and Spear authorized the expansion of the aggregation team I was supervising and authorized me to repeat the aggregation process (which was initially concentrated in Dallas) in other major U.S. markets.

I knew that the majority of the ads that I and others at Backpage were creating through the aggregation process were actually offering illegal prostitution services. Among other things, the true nature of the ads was obvious and we sometimes used ads containing links to *The Erotic Review* (a website where customers would post "reviews" of their encounters with prostitutes, including descriptions of prices charged for particular sex acts) as the source of the content for the new Backpage ads we were creating. In addition, I and other Backpage employees were deluged with near-constant reminders—in the form of news articles discussing prostitution busts on Backpage, warning letters from Attorneys General, and other sources—of the reality of what was being offered. For a period of time, I even received daily "Google alerts" that summarized the new prostitution-related stories about Backpage that kept appearing in the news. Nevertheless, I kept working for Backpage, and kept facilitating these prostitution offenses, because I was afraid of losing my job and because VVMH and Backpage operated in a culture of denial. I also participated in later efforts to expand Backpage's aggregation efforts to overseas markets, where we often did not even bother with taking out code words to conceal the fact that prostitution services were being offered.

- 9 -

1

2    Over time, I also became involved (along with Ferrer, Andrew Padilla, and Joye

3    Vaught) in Backpage's efforts to "moderate" the content of the website's escort and

4    adult ads.  Once again, I knew that the  majority of the ads being "moderated" were

5    actually offering illegal prostitution services—our removal of explicit words and

6    pictures did nothing to change the underlying nature of the services being

7    offered.  In fact, Padilla and I agreed that I and  other Backpage sales and marketing

8    employees use the term "models" in intra-company emails when referring to persons

9    in Backpage ads who appeared to be underage.  The use of this term was to avoid

10    looking bad in a lawsuit.

11

12    b.    The defendant shall swear under oath to the accuracy of this statement and,

13    if the defendant should be called upon to testify about this matter in the future, any

14    intentional material inconsistencies in the defendant's testimony may subject the defendant

15    to additional penalties for perjury or false swearing, which may be enforced by the United

16    States under this agreement.

17    <u>**APPROVAL AND ACCEPTANCE OF THE DEFENDANT**</u>

18    I have read the entire plea agreement with the assistance of my attorney.  I

19    understand each of its provisions and I voluntarily agree to it.

20    I have discussed the case and my constitutional and other rights with my attorney.

21    I understand that by entering my plea of guilty I shall waive my rights to plead not guilty,

22    to trial by jury, to confront, cross-examine, and compel the attendance of witnesses, to

23    present evidence in my defense, to remain silent and refuse to be a witness against myself

24    by asserting my privilege against self-incrimination, all with the assistance of counsel, and

25    to be presumed innocent until proven guilty beyond a reasonable doubt.

26    I agree to enter my guilty plea as indicated above on the terms and conditions set

27    forth in this agreement.

28

- 10 -

1       I have been advised by my attorney of the nature of the charges to which I am

2   entering my guilty plea. I have further been advised by my attorney of the nature and range

3   of the possible sentence and that my ultimate sentence shall be determined by the Court

4   after consideration of the advisory Sentencing Guidelines.

5       My guilty plea is not the result of force, threats, assurances, or promises, other than

6   the promises contained in this agreement. I voluntarily agree to the provisions of this

7   agreement and I agree to be bound according to its provisions.

8       I understand that if I am granted probation or placed on supervised release by the

9   Court, the terms and conditions of such probation/supervised release are subject to

10   modification at any time. I further understand that if I violate any of the conditions of my

11   probation/supervised release, my probation/supervised release may be revoked and upon

12   such revocation, notwithstanding any other provision of this agreement, I may be required

13   to serve a term of imprisonment or my sentence otherwise may be altered.

14       This written plea agreement, and any written addenda filed as attachments to this

15   plea agreement, contain all the terms and conditions of the plea. Any additional

16   agreements, if any such agreements exist, shall be recorded in a separate document and

17   may be filed with the Court under seal; accordingly, additional agreements, if any, may not

18   be in the public record.

19       I further agree that promises, including any predictions as to the Sentencing

20   Guideline range or to any Sentencing Guideline factors that will apply, made by anyone

21   (including my attorney) that are not contained within this written plea agreement, are null

22   and void and have no force and effect.

23       I am satisfied that my defense attorney has represented me in a competent manner.

24       I fully understand the terms and conditions of this plea agreement. I am not now

25   using or under the influence of any drug, medication, liquor, or other intoxicant or

26   depressant that would impair my ability to fully understand the terms and conditions of this

27   plea agreement.

28

SER-15

1

8/12/18
_____              _____
Date                                  DANIEL HYER
                                      Defendant

2

3                    **APPROVAL OF DEFENSE COUNSEL**

4          I have discussed this case and the plea agreement with my client in detail and have

5    advised the defendant of all matters within the scope of Fed. R. Crim. P. 11, the

6    constitutional and other rights of an accused, the factual basis for and the nature of the

7    offense to which the guilty plea will be entered, possible defenses, and the consequences

8    of the guilty plea including the maximum statutory sentence possible.  I have further

9    discussed the concept of the advisory Sentencing Guidelines with the defendant.  No

10   assurances, promises, or representations have been given to me or to the defendant by the

11   United States or any of its representatives that are not contained in this written agreement.

12   I concur in the entry of the plea as indicated above and that the terms and conditions set

13   forth in this agreement are in the best interests of my client.  I agree to make a bona fide

14   effort to ensure that the guilty plea is entered in accordance with all the requirements of

15   Fed. R. Crim. P. 11.

16

8/13/2018
_____              _____
Date                                  K.C. MAXWELL
                                      Attorney for Defendant

17

18

19

20

21

22

23

24

25

26

27

28

- 12 -

1           **APPROVAL OF THE UNITED STATES**

2       I have reviewed this matter and the plea agreement.  I agree on behalf of the United

3 States that the terms and conditions set forth herein are appropriate and are in the best

4 interests of justice.

5                               ELIZABETH A. STRANGE
                                First Assistant United States Attorney

6                               District of Arizona

7                               BRIAN A. BENCZKOWSKI
                                Assistant Attorney General

8                               Criminal Division, U.S. Department of Justice

9

10    **8 / 13 / 18**
  Date                           KEVIN RAPP

11                               MARGARET PERLMETER
                              PETER KOZINETS

12                               ANDREW STONE
                              JOHN J. KUCERA

13                               Assistant U.S. Attorneys

14                               REGINALD E. JONES
                              Senior Trial Attorney

15

16                  **ACCEPTANCE BY THE COURT**

17    **Sept 9, 2025**
  Date

18                         United States District Judge

19

20

21

22

23

24

25

26

27

28

**SER-17**

**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-18-00422-PHX-DJH |
|---|---|
| Plaintiff, | **RESTITUTION ORDER** |
| v. | |
| Scott Spear - 003<br>John Brunst - 004, | |
| Defendants. | |

The Government has filed a Memorandum regarding Restitution and the Remission Process as to Defendants Scott Spear and John Brunst ("Defendants"). (Doc. 2274). Defendant Brunst has filed a Response (Doc. 2280), which Defendant Spear has joined (Doc. 2283), and the Government has filed a Reply. (Doc. 2291). The Court held restitution hearings on January 3rd and 6th, 2025. (Docs. 2295 & 2298). After the hearings, the Court ordered the parties to "simultaneously file supplemental briefing within 14 days re: the restitution statute as it pertains to victims not included in the indictment." (Doc. 2298). The Government and Defendant Brunst have each filed a supplemental motion. (Docs. 2318 & 2320). Defendant Spear has also joined in Defendant Brunst's supplemental Motion. (Doc. 2319).

**I.    Background**[1]

This matter spans seven years and thousands of court documents. A three-month Jury Trial in this matter commenced on August 29, 2023. (Doc. 1741). On

---

[1] The facts are fully set forth in the Court's Order on the Defendant's Rule 29 Motion (Doc. 2063) and will not be wholly repeated here.

1   November 16, 2023, the Jury found Defendant Spear guilty of Conspiracy to Commit
2   Travel Act[2] violations (Count 1); the Travel Act violations alleged in Counts 2–18;
3   Conspiracy to Commit Money Laundering (Count 52); Domestic Concealment of Money
4   Laundering (Counts 53–62); and Transactional Money Laundering (Counts 71–78, 85,
5   and 93).  He was found not guilty of the Travel Act violations alleged in Counts 19–51,
6   and the money laundering counts alleged in Counts 63–68.

7          The Jury also found Defendant Brunst guilty of Conspiracy to Commit Travel Act
8   violations (Count 1); Conspiracy to Commit Money Laundering (Count 52); domestic
9   Concealment Money Laundering (Counts 53–62); International Promotional Money
10  Laundering (Counts 64–68); and Transactional Money Laundering (Counts 78–84, 86–93).
11  He was found not guilty of the Travel Act violations alleged in Counts 2–51, and of one
12  count of International Promotional Money Laundering (Count 63).  Now, the Government
13  seeks restitution on behalf of several Claimants who allege they were victims of
14  Defendants' convicted conduct.

15         **A.     Backpage.com's History**

16         At trial, the Government established the following relevant facts:

17         Launched in 2004 in Phoenix, Arizona, Backpage.com was an online website
18  offering classified ads for a variety of goods and services. (Trial Tr., Doc. 1786 at 6:6–
19  11)).  Defendants owned Backpage.com with Mr. James Larkin ("Mr. Larkin") from its
20  inception in 2004 until the website was sold to Mr. Carl Ferrer ("Mr. Ferrer") in April of
21  2015.  (*Id.*)  Defendants had leadership roles in Backpage.com's parent company Village
22  Voice Media ("Village Voice") during that time: Mr. Brunst served as Chief Financial
23  Officer ("CFO"); and Mr. Spear was an Executive Vice President ("VP"). (Trial Ex. 5)).
24  Backpage.com started as a competitor to Craigslist, an online advertising site that "was
25  eroding into the revenue of [Village Voice] newspapers." (Trial Tr., Doc. 1786 at 25:24–
26  25)).  To generate revenue, Backpage.com initially decided that it would only charge for

27  _____
2   The Travel Act makes it a federal offense for a person to use a facility in interstate
28  commerce with the intent to promote or facilitate the promotion of an unlawful activity—
    here, facilitating the promotion of prostitution. 18 U.S.C. § 1952(a)(3).

"Adult" ads.  (*Id*. at 26:10–11).  The Adult section on Backpage.com contained the categories "Female Escorts"; "Male Escorts"; "Transsexual Escorts"; "Body Rubs"; "Adult Jobs"; and "Phone and Web."  (*Id*. at 6:18–20).  Mr. Ferrer characterized the ads in the Female Escort section of Backpage.com between 2004 and 2009 as prostitution ads.  (*Id*. at 7:10–12).  These types of ads were profitable because escorts "needed repeat business" so they would often post their ads every day.  After Craigslist closed its Adult section in 2010, Backpage.com experienced exponential growth in "revenue from online prostitution ads."  (Trial Tr., Doc. 1793 at 35:23–36:9)).  From 2010 through 2012, Backpage.com's Adult section yielded $138,850,097.36 compared to $208,658.90 from its non-Adult sections, i.e., a 94.2% difference in profits.  (Trial Ex. 1480)).

### B.    Defendants' Convictions

At trial, Defendants orally moved for a judgment of acquittal on all charges under Federal Rule of Criminal Procedure 29 ("Rule 29") at the close of the Government's case.  (Doc. 1903 at 19–93).  The Court exercised its discretion under Rule 29(b) to reserve its ruling until after the Jury returned its verdict.  (Doc. 1852).  On April 23, 2024, the Court issued its written ruling, finding that the evidence supporting Counts 66–99 as to Defendants Brunst and Spear was insufficient; the Court, however, denied the Motion as to their other counts of conviction, including, but not limited to, Defendants' convictions for conspiracy to commit Travel Act violations in Count 1 and Spear's Travel Act convictions in Counts 2–18.  (April 23, 2024, Order on Rule 29 Motions, Doc. 2063 at 19, 25, 73).

The Court will briefly restate the conduct it found sufficiently supports the convictions related to the restitution Claimants to determine whether the Claimants are entitled to restitution.

### 1.    Conduct Supporting Defendants' Conspiracy Convictions

The Jury found Defendants Spear and Brunst guilty of conspiracy to commit Travel Act violations under 18 U.S.C. § 371.  "To prove a conspiracy under 18 U.S.C. § 371, the government must establish: (1) an agreement to engage in criminal activity, (2) one or more

overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime." *United States v. Kaplan*, 836 F.3d 1199, 1212 (9th Cir. 2016) (citation and internal quotation marks omitted).

The Government's theory for this count was that between 2004–2018, there was an agreement among the Defendants to facilitate the promotion of prostitution businesses by posting their sex for money ads on Backpage.com, as charged in the Travel Act Counts; that each Defendant became a member of the conspiracy knowing of at least one of its objects— "to make money"—and intending to help accomplish it; and that one of the members of the conspiracy performed at least one overt act on or after March 28, 2013, for the purpose of carrying out the conspiracy.  (Final Jury Instructions, Doc. 1998 at 24).

The Court found that there was sufficient evidence that Defendants were engaged in a conspiracy because: (1) they knew the demand for Adult ads was especially high in proportion to Backpage.com's total business; that Backpage.com derived the majority of its revenues from its Female Escort section—ads Mr. Ferrer characterized as prostitution ads; and that the sale of ads that led to prostitution offenses became the dominant portion of Backpage.com's business (Doc. 2063 at 21); and (2) the object of the conspiracy was to make money through an agreement to violate the Travel Act (*id*. at 25).

## 2.    Conduct Supporting the Substantive Travel Act Violations

Mr. Spear was found guilty of committing the Travel Act violations charged in Counts 2–18.[3]  Claimants related to ads posted in Counts 2, 4, 5, 12–15, and 15 and 16 are seeking restitution from Defendants.

To show that Defendant Spear violated the Travel Act by selling and publishing prostitution ads on Backpage.com, the Government was required to establish that he "in some significant manner associated" himself with the ad poster's prostitution business enterprise, or that one of his co-conspirator's committed a Travel Act offense in furtherance of the conspiracy such that liability extended to Spear under *Pinkerton v. United States*, 328 U.S. 640 (1946). (Doc. 1998 at 29–30); *United States v. Gibson Specialty Co*., 507

---

[3] Mr. Brunst was acquitted of all Travel Act Counts.

F.2d 446, 449 (9th Cir. 1974); *United States v. Long*, 301 F.3d 1095, 1103 (9th Cir. 2002).

In its Order on Defendants' Rule 29 Motion, the Court found that "Mr. Spear's role in making Backpage.com a platform from which prostitution could be advertised is sufficient to establish his specific intent to facilitate the promotion of the prostitution businesses posting the ads in Counts 2–18." (Doc. 2063 at 30). The Court stated that the evidence sufficiently showed that "Mr. Spear, in the interest of making money, directly helped develop moderation and editing policies that facilitated the promotion of prostitution and allowed Backpage.com to continue to accept payment from pimps, traffickers, and prostitutes for posting the illegal ads." (*Id*.) The Court also found that "there was sufficient evidence adduced that Mr. Ferrer, a co-conspirator, also significantly associated himself with and helped promote the poster's enterprises such that his acts in relation to the ads in Counts 2-18 were fairly attributed to Mr. Spear under a *Pinkerton* theory of liability." (Doc. 2063 at 30–31).

### a.    Count 2

The Jury convicted Mr. Spear of violating the Travel Act in Count 2 of the Superseding Indictment ("SI"), which alleged Defendants used Backpage.com to post a prostitution ad on September 10, 2013, in Massachusetts—an illegal act in that state. (Doc. 2063 at 32). This Count involves Claimant #6, D.O., who was identified as Victim 5 in the SI (Doc. 230). (Doc. 2275 at 2).

Brian Griffin, a Sergeant with the Northborough Police Department ("Sgt. Griffin"), testified that in September 2013 he was alerted to suspicious circumstances of two females loitering around a hotel room. (Trial Tr., Doc. 1923 at 62–70). Believing that they may be involved in prostitution, Sgt. Griffin went to Backpage.com and found an ad depicting one of the females. (Trial Tr., Doc. 1923 at 64–65; Trial Exs. 212, 212a). This ad is the subject of Count 2. Sgt. Griffin called the ad number and made an appointment to see D.O., to pay her for oral sex. (Trial Tr., Doc. 1923 at 66). Upon entering the hotel room, Sgt. Griffin observed a male "John" in the bathroom and learned that he paid for the hotel room in exchange for sex. (*Id*. at 70).

### b.      Counts 4 & 5

The Jury convicted Mr. Spear of committing Travel Act offenses in Counts 4 and 5. These Counts involved Claimant #3, N.F.,[4] who was identified as Victim 8 in the SI (Doc. 230).  N.F. identified the ads from Counts 4 and 5 as ads her pimp posted of her on Backpage.com.  (Tr. Trans., Doc. 1898 at 96–98).  N.F. testified that she became familiar with Backpage.com when she saw her pimp use it to post her ads.  (*Id*. at 82).  She believed Backpage.com was a website "for girls to use [] to escort and to get trafficked."  (*Id*.)  According to her, "escort" meant "to exchange a sexual act for money or a gift."  (*Id*.)  She testified that she would not create her ads, that her pimp created and posted them.  (*Id*.)  She understood that she was advertised for sex acts for money "so my pimps could make money off of me."  (*Id*. at 83).  N.F. testified that every ad posted of her was an offer of sex for money. (*Id*. at 99).  She testified that she would not keep the money but that the pimps would.  (*Id*. at 94–95).

### b.      Counts 12–15

Count 12 is a California Backpage.com ad posted on November 23, 2014, and Count 13 is a California Backpage.com ad posted on January 29, 2015. (Doc. 230 at 51). Prostitution is illegal in California. (Doc. 1998 at 32).  Count 14 is an Arizona Backpage.com ad posted on January 31, 2015, and Count 15 is an Arizona Backpage.com ad posted on January 31, 2015. (Doc. 230 at 51). Prostitution is illegal in Arizona. (Doc. 1998 at 32).

Claimant #2, A.C.,[5] who was identified as Victim 10 in the SI (Doc. 230), testified that she was advertised for an "exchange of money for sex acts" on Backpage.com from November 2014 through January 2015 in Oceanside, San Diego, and other places in California and in Phoenix. (Trial Tr., Doc. 1897 at 30–38).  A.C. identified herself and a woman called "Storm" in the ads associated with Counts 12–15. (*Id*. at 32–35, 47–48). She said Storm was part of a group she was in that was "being trafficked" by a man she referred

---

[4]  N.F. is one of the claimants (Claimant #3) seeking restitution from Defendants. (Doc. 2275).

[5]  A.C. is one of the claimants seeking restitution from Defendants.  (Doc. 2275).

to as "L.G." (*Id*.) She testified that L.G. was her pimp and that L.G. and a woman named Star, another girl that was being trafficked by L.G., would create and post her ads on Backpage.com. (*Id*. at 32–33).

A.C. testified that L.G. and Star took pictures of her in lingerie and then used those photos in her Backpage.com ads. (*Id*. at 33–34). A.C. said L.G. would post her ad using his cell phone. (*Id*. at 34). Upon the ad being posted, "clients"—meaning "the men that would want to exchange money for sex"—would call and text for sex. (*Id*. at 35). After engaging in sexual intercourse with the client, A.C. would text L.G. and he would arrive and retrieve the money. (*Id*. at 37–39). A.C. testified that she did not observe L.G. to have a job other than being a pimp. (*Id*. at 45). A.C. testified that L.G. thought they could make a lot of money during the Super Bowl so she, L.G., Storm, and Star traveled from California to Arizona in January. (*Id*. at 37-38). She testified that L.G. or Star provided the car, and once in Arizona, L.G. purchased a hotel room and Storm began writing her Backpage.com ad profile. (*Id*. at 41). A.C. had a few "dates" while in Phoenix. Eventually, she and Storm agreed to meet a customer who requested "a two-girl special." (*Id*. at 43). The customer ended up being an undercover police officer. After that, A.C. stopped working for L.G. (*Id*. at 54).

### c.   Counts 16 & 17

Counts 16 and 17 alleged that prostitution ads were posted on Backpage.com in Colorado on February 4 and 18, 2015, respectively. (Doc. 230 at 51). Prostitution is illegal in Colorado. (Doc. 1998 at 33–34).

Claimant #4, B.F.,[6] who was identified as Victim 11 in the SI (Doc. 230), testified that she posted herself on Backpage.com in Denver, Colorado from approximately 2012 through 2015. (Trial Tr., Doc. 1920 at 122–24). She copied and pasted other ads and used the "lingo" on Backpage.com to create her own ads. (*Id*.) She testified that her ad would often appear differently than as she originally posted; that sometimes her picture was removed, or the ad would be pushed to the bottom and require her to repost it so it would

---

[6] B.F. is a claimant seeking restitution. (Doc. 2275).

SER-24

go to the top. (*Id*. at 124). She stated that even when her picture was removed, the rest of the ad's content would remain. (*Id*. at 125). Once posted, she said her telephone would ring and she would "go to and have dates with the gentlemen" which she said meant "acts of prostitution." (*Id*.).

In January 2015, B.F. began to work for Brock Franklin ("Franklin"), who wanted to post her on Backpage.com. (*Id*. at 128–29). When she arrived at his home, she observed other women living there. (*Id*.). Franklin and "one of his girls" Isis, took photos of her in a hotel room in Denver where she posed in various positions wearing lingerie. (*Id*. at 131). She testified that for the four to five months she was involved with Franklin, she engaged in daily acts of prostitution for him and that he only permitted her to perform acts of oral sex. (*Id*. at 132–34). Once she received money for the act, it would be immediately handed over to Franklin. (*Id*.). B.F. identified herself in Trial Exhibit 216 as the photos that were taken of her the first night she moved in with Franklin. (*Id*. at 138). She stated that the ad was posted on February 4, 2015, in Denver. (*Id*.). She also identified herself in Trial Exhibit 216a as an ad posted in Ft. Collins, Colorado on February 18, 2015. She testified that both advertisements lead to acts of prostitution. (*Id*.).

## C. Sentencing

The Court held a sentencing hearing on August 28th, and 29th, 2024, as to all Defendants. (Doc. 2171). The Court sentenced Defendant Brunst to a term of one hundred and twenty (120) months of incarceration and imposed a $50,000.00 fine against him. (Doc. 2193 at 1). The Court sentenced Defendant Spear to one hundred and twenty (120) months of incarceration but waived the fee against him. (Doc. 2180 at 1).

## D. Restitution Hearing

The Government now requests restitution for twelve Claimants seeking restitution on behalf of eleven Claimants or their next of kin. (*Id*. at 1). The Government seeks the following claims:[7]

(1) A.B. seeking $47,290.00

---

[7] The Court notes that the Government assigned each Claimant a numeric reference that is different from that assigned in the SI.

SER-25

1     (2) A.C. seeking $95,314.00

2     (3) N.F. seeking $7,038,128.00

3     (4) B.F. seeking $984,300.00

4     (5) M.L. seeking $2,508,673.00

5     (6) D.O. seeking $5,949,554.00

6     (7) C.M.'s next of kin seeking $48,397.79

7     (8) D.R.'s next of kin seeking $2,205,220.00

8     (9) J.R. seeking $4,753.00 plus $10,950 per year

9     (10) E.S.'s next of kin seeking $5,000,000.00

10     (11 & 12) C.W.'s next of kin seeking $4,000.00 and $10,270.00, respectively.

11 (*See* Docs. 2275 at 1–3; 2275-1 at 13; and 2275-4 at 3).

12     At the restitution hearing, Dr. Sharon Cooper, a Developmental-Behavioral and

13 Forensic Pediatrician, testified to the physical harms Claimant #3, N.F., and Claimant #6,

14 D.O., suffered due to being trafficked on Backpage.com and the costs associated with their

15 future medical treatments. (Doc. 2315). Dr. Stan Smith, Ph.D., an economist and President

16 of Smith Economics Group Ltd., also testified about the value of certain losses subsequent

17 to the sex trafficking victimization. (Doc. 2316). The Court finds that Dr. Cooper and Mr.

18 Smith have the requisite knowledge, skill and experience to opine on their findings and

19 their conclusions are based on reliable methodologies within their respective fields. Their

20 reports and testimony also aid the Court in its determination.

21     Dr. Cooper authored a report of findings for N.F. and D.O. related to mental health,

22 physical health, background, education and upbringing. (*Id*. at 16). Her report includes an

23 "associated annual cost for health care" based on a determination of the cost of rape,

24 medication management, inpatient and outpatient care and other factors. Dr. Cooper

25 testified that her findings were based upon her interviews with the referenced victims.

26 However, her opinions were also informed by national studies from 1998 to the present

27 about the types of chronic disorders that effect victims, including minors, who have been

28

abused (including through sex trafficking)[8] over time. (*Id.* 18-19). Her analysis also touched on the effects to victims who have had sexually provocative images posted online and which may be permanent. Given that Dr. Cooper's analysis and report relate to common experiences of all Claimants seeking restitution, the Court considers her testimony as relevant background for the Claimants referenced here because they are similarly situated to N.F. and D.O.

Dr. Smith also testified to the impact that being trafficked would have on the victims' earning capacity. (Doc. 2316). Dr. Smith calculated the value of losses post-sex trafficking on Backpage.com of D.O., which include 1) the loss of wages and employee benefits; and 2) the present value of future life care. Dr. Smith reviewed Dr. Cooper's report of findings on D.O. and incorporated her findings related to mental and physical health into his analysis. Dr. Smith's report states that "[t]his study includes those who have not experienced extreme sexual assault and abuse as D.O. did while being sex trafficked on Backpage.com and thus, likely underestimates the impact on earnings and employment." (*Sealed* Doc. 2275-6). Like Dr. Cooper, the Court finds that Dr. Smith's conclusions are relevant background for the Claimants referenced here because they are similarly situated to D.O.

### 1.    Dr. Cooper's Report and Testimony on Medical Costs

Dr. Cooper estimates the Claimants' annual cost for several "medical diagnoses" including the cost of rape, bipolar disorder, stomach issues, sleep apnea, migraines, bee sting anaphylaxis immunotherapy and other disorders. (Doc. 2275-4 at 26–28; Doc. 2275-6 at 32–34). At the restitution hearing, she testified that in victims of abuse, especially minors, metabolism can become derailed. (Doc. 2315 at 17). She also noted that a victim's baseline cortisol levels can "reset" when abuse is "profound." (*Id.*) She clarified that when a victim has been "victimized significantly, and especially if you've been victimized over a relatively prolonged period of time, your cortisol level will rise and will not come back

---

[8] Dr. Cooper and Dr. Smith submitted expert reports in this matter. (*Sealed* Docs. 2275-4 & 2275-6). They both use the term "sex trafficking" in their reports. The Court understand this to be a general descriptor of what occurred and not to refer to the statutory definition of sex trafficking which was not a charge in this case.

to a normal level. This causes diseases in the human body." (*Id*.)  Dr. Cooper stated that this can lead to concerns of gastrointestinal discomfort, ulcer disease or ulcerative colitis. (*Id*. at 18).

The Court asked about the impact to victims who have had pictures taken of them that can be displayed later.  (*Id*. at 20).  Dr. Cooper stated that this can exacerbate and prolong the victim's victimization as middle-aged victims will still be notified if child sexual abuse material ("CSAM") of them is found. (*Id*. at 22).  The Court asked Dr. Cooper if she can link N.F.'s medical diagnoses to her victimization.  Dr. Cooper linked N.F.'s bipolar disorder, PTSD, recurrent epistaxis, recurrent sinusitis, and polyarticular osteoarthritis (not her anaphylaxis) to her victimization.  (*Id*. at 23–31).  She specifically stated that victims of sex trafficking can have microfractures of the thoracic and lumbar spine "because when you are being sexually assaulted multiple times a day, the positioning of your body may very well foster overflexion of the thoracic spine and the lumbar spine." (*Id*. at 32).  Dr. Cooper clarified that the cost of treatment for anaphylaxis was not included in N.F.'s restitution request.   (*Id*. at 37).   Dr. Cooper, on direct examination, further clarified that even preexisting conditions N.F. and D.O. may have had would have been exacerbated by their victimization "because of the toxic levels of cortisol that occurs when these patients become so stressed as one is in sex trafficking victimization." (*Id*. at 38).

### 2.    Dr. Smith's Testimony and Report on Reduced Income

Dr. Smith estimates three scenarios of lost earnings ranging from $1.2m to $3.6m over the course of Claimants' lives. (Doc. 2275-4 at 42; Doc. 2275-6 at 48).  These earning estimate that the Claimants would work until the age of 67.  (*Id*.)  He estimated the Victims' wages based on: (1) the average earnings of all females with a high school degree (scenario one); (2) the average earnings of a female with some college (scenario 2); (3) and the average earnings of a female with a bachelor's degree (scenario 3).  (Doc. 2275-4 at 37–38).  In his report, Dr. Smith details that victims of sex trafficking have lower annual earning on average.  (Doc. 2275-4 at 41).

As mentioned *supra*, the Court will apply these opinions and conclusions to

qualifying Claimants as they are all generally similarly situated as having been posted on Backpage.com.

## II.    Discussion

"Federal courts have no inherent power to award restitution, but may do so only pursuant to statutory authority." *United States v. Follet*, 269 F.3d 996, 998 (9th Cir. 2001) (citations omitted).  Statutory authority commonly derives from the Victim and Witness Protection Act ("VWPA") (18 U.S.C. § 3663) and the Mandatory Victims Restitution Act ("MVRA") (18 U.S.C. § 3663A).

The Government seeks restitution for twelve Claimants who say they suffered injuries as a result of being posted on Backpage.com under 18 U.S.C. § 3663, the Victim Witness Protection Act.  (Doc. 2274 at 7).  Defendants argue that the Court should accept the Government's initial invitation to defer to the ongoing remission process, which the Court has discretion to do under the VWPA. (Doc. 2280 at 8).  Defendants also argue that the Claimants here are not "victims" under the VWPA and that the alleged claims are not compensable.  (*Id*. at 11, 17).  The Court will first address whether the Claimants are, or are not, victims under the VWPA.

### A.    Who is a "Victim" under the VWPA

The VWPA states that the Court "may order, . . . in lieu of any other penalty authorized by law, that the defendant make restitution to any victim of such offense, or if the victim is deceased, to the victim's estate."  18 U.S.C. § 3663(a)(1)(A).  The term "victim" means "a person directly ***and*** proximately harmed as a result of the commission of an offense for which restitution may be ordered."  *Id*. at (a)(2).  The Supreme Court has held that "the language and structure of the [VWPA] make plain Congress' intent to authorize an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction."  *Hughey v. United States*, 495 U.S. 411, 413 (1990).

After *Hughey*, the VWPA was amended to further define a victim as "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663(a)(2) (1990).  In *Gamma Tech*, the Ninth Circuit

specifically stated that:

> It is clear from our cases that the phrase "directly resulting" means that the conduct underlying the offense of conviction must have caused a loss for which a court may order restitution, but the loss cannot be too far removed from that conduct . . . [A] [d]efendant's conduct need not be the sole cause of the loss, but any subsequent action that contributes to the loss, such as an intervening cause, must be directly related to the defendant's conduct. The causal chain may not extend so far, in terms of the facts or the time span, as to become unreasonable.

*United States v. Gamma Tech Industries, Inc.*, 265 F.3d 917, 928 (9th Cir. 2001) (citations omitted).   The government bears the burden of proving, by a preponderance of the evidence, that the defendants' offenses proximately caused the losses incurred by the victim.  *See United States v. Kennedy*, 643 F.3d 1251, 1263 (9th Cir. 2011).

## 1.    Claimants Named or Referenced in the Counts of Conviction

The Court easily finds that the Claimants specifically named in the Travel Act counts of conviction (Counts 2–18)— D.O. (Count 2), N.F. (Counts 4 and 5), A.C. (Count 14), and B.F. (Counts 16 and 17)—are victims under the VWPA.  D.O., N.F., A.C., and B.F. were illegally advertised on Backpage for prostitution services and the evidence at trial showed that Defendants knew the ads in Counts 2, 4, 5, 14, 16 and 17 were illegal ads for prostitution and that Defendants were directly involved in ensuring the ads were sufficiently white-washed so that they could continue to receive payment for them.  The Court so found in its Rule 29 Order, for example, when it found that "[Defendant] Spear, in the interest of making money, ***directly*** helped develop moderation and editing policies that facilitated the promotion of prostitution and allowed Backpage.com to continue to accept payment from pimps, traffickers, and prostitutes for posting the illegal ads." (Doc. 2063 at 30) (emphasis added).  This conclusion is bolstered by the Court's finding that "Mr. Ferrer, a co-conspirator, also significantly associated himself with and helped promote the poster's enterprises such that his acts in relation to the ads in Counts 2–18 were fairly attributed to Mr. Spear under a *Pinkerton* theory of liability."   (*Id.*) Accordingly, these Claimants were "directly harmed by the defendant's criminal conduct

in the course of the scheme, conspiracy, or pattern" thereof.  18 U.S.C. § 3663(a)(2).

Though Claimants #1 (A.B.), #5 (M.L.), #7 (C.M), #9 (J.R.), #10 (E.S.), and #11 & #12 (C.W.) are not specifically identified in ads charged under the specific Travel Act counts, all are referenced in the SI in regard to Count 1 for Conspiracy to Violate the Travel Act.  The evidence at trial showed that both Defendants' and their co-conspirators' actions harmed these Claimants over the course of their conspiracy to make money by posting illegal ads for prostitution.  18 U.S.C. § 3663(a)(2).  For example, N.F.'s testimony that she was advertised so that her pimps could make money off of her combined with the significant association attributed to all co-conspirators under *Pinkerton*.  (Doc. 2063 at 30–35).  Thus, the Claimants who are named and/or referenced in the SI's counts for which Defendants were convicted of are "victims" within the meaning of the VWPA.  18 U.S.C. § 3663; *Gamma Tech*, 265 F.3d at 927.

### 2.   Claimant #8—D.R.—is not Named in the Superseding Indictment

The more difficult question is whether the D.R., who is not named in the SI, qualifies as a victim under the VWPA.

D.R.'s next of kin seeks $14,500.45 for funeral expenses, $2,267,154.00 for lost future earnings, $9,857.29 for costs associated with participation with Court and $14,550.00 for expert fees.[9]  (Doc. 2324-5 at 3).  The VWPA states that "[i]n the case of a victim who is . . . deceased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, may assume the victim's rights under this section."  18 U.S.C.A. § 3663(a)(2).  D.R.'s next of kin may receive restitution from the Defendants if she meets the criteria of a "victim" of the Defendants' crimes under the VWPA.

D.R. was murdered on December 24, 2016.  (Doc. 2315 at 92; Doc. 2063 at 41). She was not named in the SI.  (*See* Doc. 2275 at 8). And, as her victim representative pointed out, "murder was not an object of [the] conspiracy" for which the Defendants were

---

[9] The victims legal representative includes reimbursement for alcohol and food, which are obviously improper requests.  (*See* Doc. 2324-5).

convicted (Doc. 2316 at 91). Though the Government did not introduce evidence or testimony of D.R. being advertised on Backpage.com during trial, it did provide testimony, during the restitution hearing, that she was advertised on the website. (Doc. 2315 at 81–82). Lead FBI Agent Landau (retired) testified that they identified D.R. through postings on Backpage.com. (*Id.*) Agent Landau stated that D.R. was posted by a "pimp" and murdered by a "john." (*Id.* at 82). She testified that she did not know either Defendant Brunst or Spear. (*Id.*) As a result of D.R.'s murder, Charles McFee was convicted of Conspiracy to Commit Sex Trafficking of Children by Force, Fraud or Coercion in the Northern District of Illinois on June 13, 2019. (Doc. 2280-4). He and his co-defendant, Joseph Hazley were ordered to pay $14,329.29 in restitution to D.R.'s next-of-kin, Y.R. (*Id.*)

The Government argues that D.R. is entitled to restitution from the Defendants in this case. It asserts at the hearing that each "pimp" was an unindicted co-conspirator in its case because their sex-for-money offers could not be successful without "Mr. Brunst and Mr. Spear actively assisting the pimps in posting those ads[.]" (Doc. 2315. at 86–87). They reason that Brunst and Spear should be held responsible for any acts flowing out of Backpage.com's advertisement. Yet, the Ninth Circuit has established guardrails to avoid attenuated restitution orders by requiring the government to "show not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal nexus between the conduct and the loss is not too attenuated (either factually or temporally)." *Gamma Tech Industries, Inc.*, 265 F.3d at 924. While the Court acknowledges that there was sufficient evidence that minors like D.R. were being offered on Backpage.com along with adult women who either advertised themselves or were advertised by others, it is too attenuated to find Brunst and Spear responsible for the acts of McFee and Hazley in committing the murder of D.R. Thus, she is not a "victim" under the VWPA and is not entitled to restitution from the Defendants here. 18 U.S.C.A. § 3663. However, her next of kin are not foreclosed from seeking compensation through the remission fund.

**B.      Claimants Who are Entitled to Restitution**

Eleven Claimants seek restitution from Defendants, as noted *supra*.      The government must prove the amount of the loss.  *United States v. Gossi*, 608 F.3d 574, 580 (9th Cir. 2010). The amount of restitution will be upheld "if the district court is able to estimate, based upon facts in the record, the amount of the [victims] loss with some reasonable certainty."  *United States v. Doe*, 488 F.3d 1154, 1159–60 (9th Cir. 2007). However, restitution need not be measured with "mathematical precision."  *Doe,* 488 F.3d at 1159-60.  The Court will address each Claimants' claim in turn.

**1.      Claimant #1 - A.B.**

A.B. seeks $47,290.00.  (Doc. 2275-1 at 13).  She is seeking $40,000.00 in lost services and alleges that she "estimate[s] this amount based on [her trafficker's] requirement of making $1,000 per night and the pattern [they] worked 2-3 nights per week until [she] lost [her] job, and then 5 nights per week until his arrest." (*Id*.)  She also seeks $4,950.00 for lost wages from losing her day job ("$11.25/hr x 40 hrs/wk x 11 weeks (February 14, 2013-May 7, 2013) = $4,950") and $2,340.00 in therapy costs. (*Id*.)

The Government stipulates that A.B. is only entitled to $7,290.00 for lost wages and therapy costs.  (Doc. 2291 at 10).  This amount encompasses $4,950.00 that A.B. states she lost from missing work as well as $2,340.00 for 117 visits with her therapist, Sarah Probst, at Pneuma Counseling.  (Doc. 2275-1 at 13; Doc. 2324 at 2).  To support her claims, A.B. attached her 2013 Income Tax Return showing that she made $23,172.00 in gross income that year.  (*Id*. at 3).  She has also attached several letters from Kaiser Permanente and Moda Health which show her therapy visits.  (*E.g.*, Doc. 2275-1 at 16).

The Court finds that A.B. is entitled to $2,340.00 in restitution for therapy costs, but not the claimed $4,950.00.  A.B. has not submitted any evidence of where she worked or how much she made.  Restitution need not be measured with "mathematical precision." *Doe*, 488 F.3d at 1159–60.  However, the amount of loss sustained by a victim as a result of the Defendants' offense is the Government's burden to bear by a preponderance of the evidence.  *See* 18 U.S.C. § 3664(e).  Neither the Government nor A.B. included information

1    "sufficient for the court to exercise its discretion in fashioning a restitution order"—which

2    must be included.  18 U.S.C.A. § 3664(a).  Without such information, the Court cannot

3    find that A.B. is entitled to $4,950.00 for lost wages; but she may still seek compensation

4    through the remission process.

5                          **2.      Claimant #2 – A.C.**

6            A.C. seeks $95,314.00 for costs she incurred from 2014 through 2018.  (Doc. 2275-

7    3 at 9).  A.C. was named in counts 12 through 15 of the SI and testified that she was

8    trafficked through Backpage.com.  (Doc. 1897 at 30–38).  A.C. seeks lost wages for a job

9    she was "thinking of working" as well as modeling opportunities she avers she lost out on.

10   (*Id*. at 1).  A.C. also seeks compensation for money she has spent on therapy and

11   medications due to her time being trafficked as well as costs for future therapy.  (*Id*. at 1–

12   8).

13           The Court will not grant A.C. restitution for lost wages as this claim is unsupported.

14   18 U.S.C.A. § 3664(a) ("The report shall include, to the extent practicable, a complete

15   accounting of the losses to each victim.").  However, the Court will grant A.C. the medical

16   costs she seeks as these costs are supported by the record, which includes a letter from

17   A.C.'s psychologist stating that A.C. has been in her care since September 10, 2012.

18   (Doc. 2275-3 at 15).

19           Again, restitution need not be measured with "mathematical precision."  *Doe*, 488

20   F.3d at 1159–60.  The Court will assume an average of $150.00 per hour for therapy costs

21   based on the statements that A.B. submitted.  (*See e.g.*, Doc. 2275-1 at 17).  A.C. submits

22   that she sees Dr. Swan twice a month for a total of twenty-four sessions a year.  (*See*

23   Doc. 2275-3 at 8).  So, over the course of a year, A.C. spends $3,750 on therapy costs.  (*See*

24   *id*.)  A.C. seeks reimbursement for these costs from 2014 through 2058.  (Doc. 2275-3).

25   The Court will reimburse her for her past therapy costs and ten years of future therapy

26   costs.  Therefore, A.C. is entitled to $75,000.00 for therapy costs from 2014 through 2024

27   as well as ten years of future therapy costs.[10]  18 U.S.C.A. § 3663(b)(2)(A).  A.C. can also

28

---

[10] 20 years of therapy costs multiplied by $3,750.00 for costs per year equals $75,000.00.

- 17 -

seek any compensation for her unapproved claims through the remission process.

### 3.      Claimants #3 & #6 – N.F. & D.O.

Victims N.F. and D.O. are represented by the same law firm and utilize the same experts to support their claims, so, the Court will analyze their claims in unison. N.F. was identified in Counts 4 and 5 and testified that she was advertised for sex acts for money on Backpage.com "so my pimps could make money off of me." (Doc 1898 at 83; Trial Exs. 214 and 214a). D.O. was identified as the victim in Count 2. (Doc. 1923 at 65). N.F. and D.O. were both minors when they were trafficked on Backpage.com. (Doc. 2275-6 at 1; Doc. 2275-4 at 2). They are both victims under the VWPA. 18 U.S.C.A. § 3663.

NF seeks $7,038,128.00 in restitution. (Doc. 2275 at 1). She seeks $3,387,148.00 for the cost of future treatment and counseling and $3,650,980.00 for lost wages. (Doc. 2275-4 at 3). These figures are supported by the reports of two expert witnesses: Dr. Cooper and Dr. Smith. (*Id.*) She and Claimant #6, D.O., also seek $29,222.04 in trial preparation and restitution costs shared between them. (Doc. 2324-1 at 3).

D.O. seeks $5,949,554.00 in restitution: $2,298,818.00 for the cost of future treatment and counseling and $3,650,736.00 for lost wages and reduced income. (Doc. 2275-6 at 2). The Court will first address N.F. and D.O.'s medical claims before moving on to their lost wage claims.

### i.      Medical Costs

Dr. Cooper estimates the Claimants' annual cost for several "medical diagnoses" including the cost of rape, bipolar disorder, stomach issues, sleep apnea, migraines, bee sting anaphylaxis immunotherapy and other disorders. (Doc. 2275-4 at 26–28; Doc. 2275-6 at 32–34). On cross examination, Dr. Cooper noted that many of the costs she estimated are the "absolute minimum" for Claimants who are victimized many times, such as the average lifetime cost of rape which she reports at $122,000. (Doc. 2315 at 53). When asked about an interfamilial sexual assault which occurred before N.F. was posted on Backpage.com, Dr. Cooper testified that there is "no comparison to having been sexually assaulted by an individual in her home" versus being trafficked. (*Id.* at 57–58).

The Court finds Dr. Cooper's estimations of medical costs precise enough to entitle Claimants to recovery. As Defendants note, "some precision" is required when calculating restitution. "Speculation and rough justice are not permitted." *United States v. Anderson*, 741 F.3d 938, 954 (9th Cir. 2013). However, "exact precision is not required and district courts do have a degree of flexibility in accounting for a victim's complete losses; thus, a 'reasonable estimate' will suffice." *Id.* Upon reading Dr. Cooper's report and considering her testimony, the Court finds that she has provided a reasonable estimation of the Claimants' medical costs which stem from being trafficked. *See id.*

Dr. Cooper specifically estimates the following costs for N.F. which are supported:
- Cost of Rape - Lifetime Costs of $122,461.00
- IBS - $26,550.00 annually
- Migraines - $6,575.00 annually
- Recurrent Epistaxis - $6,000.00
- Recurrent Sinusitis - $1,542.00
- Gastroesophageal Reflux Disease - $736.00 annually
- Allergic Rhinitis - $7,950.00
- Polyarticular Osteoarthritis - $8,135.00 annually
- Dyspareunia and Endometriosis/Pelvic Inflammatory Disease - $10,002.00 annually
- Hypoactive Sexual Desire Disorder – $5,503.00 annually
- Complex PTSD - $3,060.00

(Doc. 2275-4 at 26–28). The Court will grant N.F.'s request for five years of associated medical costs. So, N.F. is entitled to $497,633.00 in medical costs.[11]

Dr. Cooper estimates the following costs for D.O.:
- Cost of Rape - Lifetime Costs of $122,461.00
- Distal Arthrogryposis - Annual Medical Costs $2,118.00
- Gastroesophageal Reflux Disease - $736.00 annually
- Allergic Rhinitis - $7,950.00
- Post-Traumatic Osteoarthritis - $8,135.00 annually
- Migraines - $6,575.00 annually
- Dyspareunia and Endometriosis/Pelvic Inflammatory Disease - $10,002.00 annually

---

[11] Five years of the annual and lifetime costs listed above: $122,461 + $132,750 + $32,875 + $30,000 + $1,542 + $3,680 + $7,950 + $40,675 + $32,875 + $50,010 + 27,515 + $15,300 = $497,633.00.

- 19 -

- Hypoactive Sexual Desire Disorder – $5,503.00 annually
- Ventral Hernia - $5,432.00
- Schizoaffective Disorder – Depressive Subtype with Suicidal Ideations - $15,957.00 annually
- Complex PTSD - $3,060.00

(Doc. 2275-6 at 32–33). The Court will grant D.O.'s request for five years of associated medical costs. So, D.O. is entitled to $396,273.00 in medical costs.[12]

### ii.    Reduced Income

N.F. seeks $3,650,980.00 for lost wages, and DO seeks $3,650,736.00. (Doc. 2275-4 at 3; Doc. 2275-6 at 2). Claimants rely on the expert report of Dr. Smith, who estimates three scenarios of lost earnings ranging from $1.2m to $3.6m over the course of Claimants' lives. (Doc. 2275-4 at 42; Doc. 2275-6 at 48).

The language in the VWPA is identical to the language in the Mandatory Victim Restitution Act ("MVRA"). *Compare* 18 U.S.C. § 3663A *with* 18 U.S.C. § 3663(b)(2). In *Cienfuegos*, the Ninth Circuit explicitly held that the plain language of the MVRA ("the court shall order . . . that the defendant make restitution to . . . reimburse the victim for income lost by such victim as a result of such offense") "contemplates an award of restitution to the victim's estate for future lost income and certainly does not expressly exclude such an award." *United States v. Cienfuegos*, 462 F.3d 1160, 1164 (9th Cir. 2006). Therefore, the Court can reimburse Claimants for the earning impairments Dr. Smith finds they will suffer due to their victimization.

The Court finds Dr. Smith's report and testimony persuasive. It also finds that his "Scenario 1," a net loss of earnings ranging from $1,222,265.00 to $1,981,619.00 applicable for these Claimants as they are, as Dr. Smith noted, both average minor females whose earnings can be assumed to be based on completion of high school. (Doc. 2316 at 16; 2275-4 at 42; Doc. 2275-6 at 50). Thus, N.F. and D.O. are entitled to $305,643.25.00[13]

---

[12] Five years of the annual and lifetime costs listed above: $122,461.00 + $10,590.00 + $3,680.00 + $7,950.00 + $40,675.00 + $32,875.00 + $50,010.00 + $27,515.00 + $5,432.00 + $79,785.00 + $15,300.00 = $396,273.00

[13] $1,222,265.00, the low end of the range for loss of earnings, is calculated to reimburse claimant NF through age 67. She is currently 27 as she was born in 1998. Therefore, Dr. Smith has calculated her lost wages for forty years of her life. The Court will only

for ten years of restitution due to the impairment on their earning capacity being posted on

Backpage.com caused them. *See Cienfuegos*, 462 F.3d at 1164.

### iii.    Trial Preparation and Restitution Costs

N.F. and D.O. also jointly seek $29,222.04 in trial participation and restitution costs.

(Doc. 2324-1 at 3). This encompasses fees for their experts and their attorneys. (*Id.*) The

Court finds that these reimbursements are allowable under the VWPA's reimbursement

scheme for "attendance at proceedings related to the offense," i.e., the restitution hearing

with some modification. *See* 18 U.S.C.A. § 3663(b)(4) (allowing reimbursement for

"expenses related to participation in the investigation or prosecution of the offense or

attendance at proceedings related to the offense.").

Claimants seek $12,544.00 for Dr. Cooper's participation, $8,332.50 for Dr.

Smith's participation and $8,345.54 for their attorneys' costs. (Doc. 2324-1 at 3). The

Court finds all of these costs appropriate.[14]  In sum, Claimants are entitled to $28,222.04

in trial participation and restitution costs to be split evenly between them, or  $14,111.02

each.

In total, N.F. is entitled to $817,387.27 and D.O. is entitled to $716,027.27.[15]

### 3.    Claimants #4 and #5 – B.F. and M.L.

Claimants #4 and #5, "B.F." and "M.L.",[16] both utilize the same expert witness to

_____

reimburse claimants for ten years of lost wages.  So, they are entitled to $305,643.25 in
lost wages ($305,643.25 equals $1,222,573.00 multiplied by 25% (ten years out of forty
years total)).

[14] The Court takes exception to Ms. Notis-McConarty and Mr. Montgomery's inclusion of
reimbursement for their dinners and drinks, including "Gran Jefe Tequila" for $15 and a
$48 order of Chilean Sea Bass.  (Doc. 2324-1 at 94).  Counsel cannot seriously expect to
recover the cost of a $285.00 dinner as a restitution fee.  Reviewing the exhibit that Counsel
has provided, the Court estimates that they are seeking approximately $1,000.00 in meal
reimbursements which it will deduct from Claimants' sought fees. *See Anderson*, 741
F.3d at 954 ("exact precision is not required and district courts do have a degree of
flexibility in accounting for a victim's complete losses").

[15] N.F.'s reimbursement is for medical costs of $497,633.00, lost future earnings of
$305,643.25, and $14,111.02 for half of the trial participation and restitution costs.  D.O.'s
is for $396,273.00 for medical costs, lost future earnings of $305,643.25 and $14,111.02
for half of the trial participation and restitution costs.

[16] Defendants argue that M.L. cannot recover restitution because she was a willing
participant engaged in misdemeanor prostitution.  (Doc. 2280 at 17).  Indeed, Claimants

1   support their claims for restitution, so, the Court will analyze their claims in unison.

2   Claimant #4, B.F., originally sought $984,300.00 in restitution. (Doc. 2275 at 1). After

3   the hearing, however, she supplemented her supporting documentation with a report from

4   her purported expert, Edith Wong, CPA, CFE, and now seeks $1,237,403.00. (Doc. 2324-

5   2 at 2).[17]  B.F. was identified in Counts 16 and 17. (Doc. 2063 at 38). She testified that

6   she was forced to take "Molly" by her pimp.[18] (Doc. 1920 at 14). Claimant # 5, M.L.,

7   testified that she engaged in sex work on Backpage.com for two different pimps, one in

8   Colorado and one in Las Vegas, Nevada. (Doc. 1902 at 120–21).

9                                    **i.     M.L.**

10      M.L. originally projected her total future treatment costs between $285,288.00 and

11   $1,413,673.00. (Doc. 2145 at 43). She now seeks $559,985.00 for PTSD treatments and

12   therapy for the next ten years as well as pre-restitution treatment costs. (Doc. 2324-2 at 25–

13   31). Specifically, she seeks $28,235.00 in pre-restitution reimbursement, $195,000.00 for

14   Specialized Trauma Specific Psychotherapy, $156,000.00 for Somatic and Body-Based

15   Therapies, $48,000.00 for Neurofeedback therapy, $39,000.00 for Hyperbaric Oxygen

16   therapy and $93,750.00 for continuing psychiatric care. (*Id.*)  M.L. does not seek lost

---

[16] who willingly engaged in prostitution cannot receive restitution. *See United States v. Lazarenko*, 624 F.3d 1247, 1252 (9th Cir. 2010) ("as a general rule, a participant in a crime cannot recover restitution."). But Defendants' argument ignores the fact that M.L. worked for two different pimps and that her second pimp made her immediately hand over any money earned through her sex work. (Doc. 1902 at 122). A claimant can start off as a willing participant only to become a victim once forced or coerced to engage in prostitution unwillingly. Such is the case with M.L., so, the Court finds that she is a victim under the VWPA. 18 U.S.C.A. § 3663.

[17] Defendants argue that Dr. Wong and her sources, Kate Keisel and Dr. Robert Moran, should be subject to cross-examination before the Court considers their expert reports. (Doc. 2341 at 12). The Court finds that Dr. Wong's report and the evidence she relies upon are sufficiently reliable as to negate the necessity for cross-examination here. *See Williams v. Oklahoma*, 358 U.S. 576, 584 (1959) ("[Where] the guilt of the accused has been properly established, the sentencing judge . . . is not restricted to evidence derived from the examination and cross-examination of witnesses in open court but may, consistently with the Due Process Clause of the Fourteenth Amendment, consider responsible unsworn or 'out-of-court' information relative to the circumstances of the crime and to the convicted person's life and characteristics.").

[18] "Molly," otherwise known as Ecstasy, is a synthetic psychoactive drug. *See Ecstasy Or MDMA (also Known As Molly)*, UNITED STATES DRUG ENFORCEMENT ADMINISTRATION, https://www.dea.gov/factsheets/ecstasy-or-mdma-also-known-molly (last visited July 1, 2025).

1    wages. (*Id*.) These costs are supported and the Court will award M.L. $559,985.00 for

2    PTSD treatments and therapy for the next ten years as well as pre-restitution treatment

3    costs.

4            **ii.    B.F.**

5          B.F. originally supported her claim with a letter from Dr. Matthew Brett, her

6    primary care physician. (Doc. 2275-5 at 8). Dr. Brett explains that B.F. has PTSD,

7    Addison's disease, has had to take suboxone to stay off opiates, and has numerous other

8    medical conditions which he says she will have to manage for the rest of her life. (*Id*.) He

9    also states that all her conditions were related to or exacerbated by her "abduction" and

10    that treatments will require tens of thousands of dollars annually. (*Id*. at 8–9).

11          B.F. seeks $1,237,403.00 in total recovery. (*Id*. at 25). She seeks $208,761.00 in

12    pre-restitution costs (including $159,229.00 in lost wages and $36,877.00 in treatment and

13    medication costs), as well as medical costs through the end of her life. (*Id*. at 25, 35–36).

14    These costs are supported, as discussed below.

15          First, the pre-restitution medical costs are supported as these costs relate to

16    counseling and medication B.F. has sought related to the trauma she suffered from being

17    posted on Backpage.com. (Doc. 2324-2 at 22). Second, as for her lost wages, $918,000

18    of the original $984,300 B.F. sought in restitution was related to the lost profits her

19    "traffickers" yielded over the two years and eight months she was posted on

20    Backpage.com. (Doc. 2275-5 at 11). In its Reply, the Government agreed with Defendants

21    that Claimants, including B.F., could not be awarded restitution for amounts earned by

22    pimps trafficking them on Backpage.com. (Doc. 2291 at 10). Now, it appears that she has

23    narrowed her lost wages claim to $159,229 through her expert, Dr. Wong, which relates to

24    lost work hours from 2015 through 2024. (Doc. 2324-2 at 55). Dr. Wong includes this

25    claim because B.F. "has experienced periods when she was unable to work due to

26    continuing trauma from her trafficking." (*Id*. at 24). Dr. Wong has prepared a detailed

27    exhibit showing the time periods she claims B.F. was unable to work, such as 2015, where

28    she lost 1,566 work hours which results in a total loss of $18,006.00 since B.F. was making

minimum wage of $11.50 per hour at her hotel job at the time.  (*Id.* at 55).  She also calculates certain losses for January 1, 2023, through  September 30, 2024, as B.F. had a job making $22 per hour but quit for mental health reasons.  (*Id.*)  Finally, B.F. seeks healthcare costs through 2065.  (Doc. 2324-2 at 57).  The Court will award her these costs for ten years, which equals $253,980.00.[19]

In sum, B.F. is entitled to $450,086.00: $159,229.00 in lost wages, $36,877.00 in pre-restitution treatment and medication costs and $253,980.00 for ten years of future counseling and medication costs.

### 4.     Claimant # 7 – C.M.

C.M.'s next of kin purportedly seek $48,397.79 but the Court has not been apprised as to what this request is for.  (Doc. 2275 at 2).  In fact, the Government's sheet which shows where each Victim's request is supported does not list a pin cite for this request.  (*Id.*)  It instead cites generally to Doc. 2129, its Sentencing Memorandum, then to Exhibit 1, which is an FBI report with no relevance to C.M.'s claim. So, the Court cannot discern what $48,397.79 seeks to reimburse and the request will be denied.  CM's next of kin can still attempt to recover through the remission fund, however.

### 5.     Claimant # 9 – J.R.

J.R. seeks $4,753.50 for counseling and acupuncture treatment she has received as well as $7,200.00 per year for the future cost of counseling.  (Doc. 2145 at 26–27).  J.R. was named in the SI as a victim who was sold for sex.  (Doc. 230 at ¶ 168).  The Court will therefore award her $4,753.50 for medical costs already incurred as well as grant her restitution for ten years of therapy, which equates to $72,000.00.

### 6.     Claimant # 10 – E.S.

E.S.'s next of kin seek $1,782,230.00 in lost wages, $509,992.00 in psychiatric costs, $323,514.88 in medical costs and $13,593,719.00 for the future care of M.K.,[20] ES's

---

[19]  Dr. Wong calculates the yearly costs of counseling to total $18,720.00, office appointments at $1,278.00, and medication at $5,400.00.  (Doc. 2324-2 at 36–37).  Ten years of these costs equal $253,980.00.

[20] The Government has acquiesced that only victims who "personally suffer bodily injury" can recover under the VWPA.  (*See* Doc. 2291 at 11 (citing *United States v. Dayea*, 73 F.

1  minor daughter.  (Doc. 2324-6 at 2).  E.S. is named in the SI and alleges she was trafficked

2  between 2009 and 2013.  (Doc. 230 at ¶ 160).

3      The $323,514.88 Claimant seeks are related to medical bills from the Cleveland

4  Clinic.  (Doc. 2324-16 at 15).  E.S.'s medical bills are related to her gastrointestinal

5  diseases.[21]  (Doc. 2324-6 at 8).  The Court finds that this claim is supported and will award

6  E.S.'s next of kin the $323,514.88.  E.S.'s next of kin also seek $509,992.00 in past mental

7  health care expenses.  (Doc. 2324-6 at 8).  The estate has engaged an expert to estimate

8  these costs as she was treated in at least four different states.  (*Id*. at 9).  Ms. Roxanne

9  Benoit estimates E.S.'s cost of mental health care to be $509,992.00 from the time of her

10  trafficking through the year of her death.  (*Id*.)  The following is a chart Ms. Benoit

11  prepared for E.S.'s total lifetime costs from 2010 through 2022:

| Year | Comprehensive Inpatient Psychiatric Care DRG H2013 [1] Inpatient Care 1-2 times per year 4-6 weeks per stay | Individual Psychotherapy CPT 90837 [2] Counseling 3-4 hours per month | Physician Services CPT 99214 [2] Medication Management 1 visit per month | Case Management [3] Coordinate Services 1-3 hours per month | Annual | NOTES |
|------|------|------|------|------|------|------|
| 2010 | $506 | $6,983 | $1,965 | $2,250 | $11,704 | 1. Comprehensive Inpatient Psychiatric Care price source is Fair Health Benchmark from 2020-2024.  Prices in red indicate estimates based on an average price increase of 54.39% between years 2020-2024. |
| 2011 | $782 | $7,142 | $2,061 | $2,250 | $12,235 | |
| 2012 | $1,207 | $7,304 | $2,162 | $2,450 | $13,123 | |
| 2013 | $1,863 | $7,469 | $2,268 | $2,450 | $14,050 | 2. Individual Psychotherapy and Physician Services price source is Medical Fees Directory for 2015-2018 and 2020-2024 (2019 is not available). Prices in red indicate estimates based on an average price increase of 2.27% for Individual Psychotherapy and 4.90% for Physician Services between years 2015-2018 and 2020-2024. |
| 2014 | $2,876 | $7,639 | $2,379 | $2,450 | $15,344 | |
| 2015 | $4,441 | $7,812 | $2,496 | $2,600 | $17,349 | |
| 2016 | $6,856 | $8,064 | $2,592 | $2,600 | $20,112 | |
| 2017 | $10,585 | $8,400 | $2,748 | $2,700 | $24,433 | |
| 2018 | $16,342 | $8,106 | $2,700 | $2,700 | $29,848 | |
| 2019 | $25,231 | $8,008 | $2,826 | $2,800 | $38,865 | |
| 2020 | $38,955 | $8,190 | $2,964 | $2,800 | $52,909 | |
| 2021 | $101,115 | $8,484 | $3,108 | $2,900 | $115,607 | 3. Usual, Customary, and Reasonable rates based on professional experience. |
| 2022 | $129,413 | $8,736 | $3,264 | $3,000 | $144,413 | |
| | | | | Total Lifetime Costs from 2010 to 2022 | $509,992 | |

26  3d 229, 231 (9th Cir. 1995) (noting that the VWPA is not the equivalent of a wrongful

27  death statute under which very broad recovery is permitted)).  So, the Court will not award

M.K. compensation for her care, but she may still seek compensation through the remission fund.

[21] Dr. Cooper testified that victims of sex trafficking are more likely to have gastrointestinal issues.  (Doc. 2315 at 19).

(Doc. 2324-17 at 10). The Court finds that these costs are overestimated given the actual costs that Claimants 2 and 9 have submitted. So, the Court will instead award E.S.'s estate $7,200.00 a year for her mental healthcare costs, or $86,400.00. *See Doe*, 488 F.3d at 1159–60 (noting that restitution need not be measured with "mathematical precision.").

Finally, as for the $1,782,230.00 sought in lost wages, the Court finds that lost wages are appropriate but will reduce the sought amount. To support the claim for lost wages, E.S.'s estate retained Dr. Harvey Rosen, an economist. (Doc. 2324-6 at 9). Dr. Rosen estimates that the value of E.S.'s lost wages were between $1,320,218.00 and $1,635,007.00. (*Id.*) The Court has already found that Claimants #3 and #6 are entitled to $305,643.25 in restitution due to the impairment on their earning capacity being trafficked caused them based on their expert's report. *See supra* Section II.B.3. To be consistent, the Court will award E.S.'s estate $305,643.25 in restitution due to the impairment on her earning capacity being trafficked caused her. *See Cienfuegos*, 462 F.3d at 1164.

In sum, E.S.'s estate is awarded $716,558.13 in restitution: $323,514.88 in medical bills, $305,643.25 in lost wages and $86,400.00 in past metal healthcare costs E.S.'s estate is entitled to. 18 U.S.C.A. § 3663.

### 8. Claimant #11 – C.W.

C.W.'s next of kin, Claimants 11 and 12, seek $4,000.00 in funeral costs as well as $10,270.00, also for funeral costs as well as lost wages and therapy for C.W.'s mother. (Doc. 2275 at 2–3). The SI alleged that C.W. was sold for sex on Backpage.com in 2015 and 2016 and that she was murdered by a customer on August 15, 2015. (Doc. 230 at ¶ 175). Similar to Claimant #8, C.W.'s murder is too attenuated to find Brunst and Spear responsible for the act. *Gamma Tech Industries, Inc.*, 265 F.3d at 924 (the government is required to show that "the causal nexus between the conduct and the loss is not too attenuated."). Thus, she is not a "victim" under the VWPA and is not entitled to restitution from the Defendants here. 18 U.S.C.A. § 3663. However, her next of kin are not foreclosed from seeking compensation through the remission fund.

/ / /

### 9.      Conclusion

In sum, the Claimants are entitled to the following relief:

- Victim #1 - A.B. is entitled to $4,950.00 for lost wages.
- Victim #2 – A.C. is entitled to $75,000.00 for ten years of past and future therapy costs.
- Victim #3 – N.F. is entitled to $817,387.27: $497,633.00 in medical costs, $305,643.25.00 for her lost earning capacity and $14,111.02 for half of the trial participation and restitution costs for Dr. Cooper and Dr. Smith.
- Victim #4 - B.F. is entitled to $450,086.00: $159,229.00 in lost wages, $36,877.00 in pre-restitution treatment and medication costs and $253,980.00 for ten years of future counseling and medication costs.
- Victim #5 – M.L. is entitled to is entitled to $559,985.00: $28,235.00 in pre-restitution reimbursement, $195,000.00 for Specialized Trauma Specific Psychotherapy, $156,000.00 for Somatic and Body-Based Therapies, $48,000.00 for Neurofeedback therapy, $39,000.00 for Hyperbaric Oxygen therapy and $93,750.00 for continuing psychiatric care.
- Victim #6 – D.O. is entitled to $716,027.27: $396,273.00 for medical costs, lost future earnings of $305,643.25 and $14,111.02 for half of the trial participation and restitution costs for Dr. Cooper and Dr. Smith.
- Victim #9 – J.R. is entitled to $76,753.50: $4,753.50 for medical costs already incurred as well as ten years of therapy.
- Victim #10 – E.S. (J.K.) is entitled to $716,558.13: $323,514.88 in medical bills, $305,643.25 in lost wages and $86,400.00 in past metal healthcare costs E.S.'s estate is entitled to.

Any Claimant whose claim was unsupported for purposes of restitution may still seek compensation through the remission process.

### C.      Restitution must be Paid by Defendants, not the Remission Fund

As the parties note, they have entered into a stipulation regarding the disposition of most of the assets seized in this and related matters.  (Doc. 2274 at 6; Doc. 2280 at 8).  This remission process is currently ongoing in the Central District of California and is being overseen by the Department of Justice's Money Laundering and Asset Recovery Section ("MLARS").  (Doc. 2274 at 6).  The Government states that this process will be utilized to provide compensation for pecuniary losses caused to the potentially thousands of

individuals who were posted on Backpage.com.  (*Id.* at 2).  So, the Court must decide whether the restitution the Court has ordered shall be paid from the remission fund or personally by Defendants.

The Government argues that "Given Brunst and Spear's net worth—and the return of property to them pursuant to the forfeiture settlement—they cannot show that they lack the financial resources to make an order of restitution appropriate."  (Doc. 2274 at 12). Defendants argue that the remission fund was supposed to resolve all of their financial obligations and that the assets they have are meant to provide for their families since they are in prison and will not likely generate income upon their release.  (Doc. 2280 at 30). They assert that "declining to order restitution will not deprive these . . . claimants of compensation . . . [as] they can avail themselves of the remission process[.]" (Doc. 2280 at 23).  The Court disagrees.  The Court declines to defer to the remission process because, as the Government argues, the stipulated settlement does not preclude a restitution order.  (Doc. 2274-1 at 13 ("this agreement does not and cannot bind the Court in the Criminal Action, and the Parties have no agreement as to any criminal restitution which may be sought or ordered in the Criminal Action")).[22]

The VWPA mandates that the Court shall consider "the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate" in determining whether to order restitution.  18 U.S.C. § 3663(B)(i)(II).  The remission fund was created through forfeited funds.  "[C]riminal forfeiture and restitution are separate remedies with different purposes."  *United States v. Davis*, 706 F.3d 1081, 1083 (9th Cir. 2013).  "Forfeiture is imposed as punishment for a crime; restitution makes the victim whole again." *Id.*  In fact, a defendant "may be required to pay restitution and forfeit the same amounts."  *United States v. Newman*, 659 F.3d 1235, 1241 (9th Cir. 2011) (citation omitted).

---

[22]  Furthermore, this restitution Order will likely differ from any order granting the victims compensation through the remission process as the VWPA specifically allows for compensation for a victims' participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense, such as the restitution hearing. *Compare* 28 C.F.R. §9.8(c) *with* 18 U.S.C. § 3663.

1    At the restitution hearing, the parties discussed the remission fund and the money

2    forfeited and returned to Defendants.  $215 million was forfeited by Defendants Lacey,

3    Brunst, Spear, Mr. Larkin's estate, and the company.  (Doc. 2316 at 91).  Defendant

4    Brunst's counsel stated that $40 million was returned to the Defendants, with "a couple of

5    million dollars" being returned to Defendant Brunst.  (*Id*. at 92).  Counsel clarified that

6    $2.5 million was returned to him through the remission process and that he forfeited over

7    $7 million of his own funds to the remission fund.  (*Id*.)  Defendant Spear states that he

8    forfeited 60% of $1.4 million seized from him and that 40% was returned to him—or

9    approximately $560,000.00.  (Doc. 2319 at 3).

10    As the Government argues, Defendants cannot show that they lack the financial

11    resources to pay appropriate restitution.  While the Court must consider Defendants

12    financial resources, the financial needs and earning ability; the Court must also consider

13    the amount of the loss sustained by each victim as a result of the offense.  18 U.S.C.

14    § 3663(B)(i).  The Victims who were named in the indictment and able to show entitlement

15    to restitution must be compensated by Defendants as they were directly and proximately

16    harmed as a result of their involvement in the conspiracy to commit Travel Act offenses.

17    18 U.S.C. § 3663(B)(2).

18    The restitution statutes support this conclusion.  Section 3664, the section on

19    procedures for restitution enforcement, states that "[i]n no case shall the fact that a victim

20    has received or is entitled to receive compensation with respect to a loss from insurance or

21    any other source be considered in determining the amount of restitution." 18 U.S.C.

22    § 3664(f)(1)(B).  Furthermore, the Ninth Circuit has held that this section "requires a

23    district court to set the amount of the defendant's restitution obligation 'in the first instance'

24    ***without regard to forfeited funds***." *United States v. Doe*, 374 F.3d 851, 856 (9th Cir. 2004)

25    (quoting *United States v. Bright*, 353 F.3d 1114, 1122 (9th Cir. 2004) (emphasis added)).

26    Thus, it would be improper for the Court to consider the remission fund in ordering

27    restitution.  *Id*. (stating "offsetting a restitution order by the value of forfeited funds is not

28    permitted where victims have not received compensation from those funds.").  However,

the recovery the Victims have received here cannot be recovered a second time through remission. *See id.*

Accordingly,

**IT IS ORDERED** granting the United States' Supplemental Motion re: Restitution Requests (Doc. 2318) as set forth herein.

**IT IS FURTHER ORDERED** that Defendant Scott Spear shall pay restitution totaling $3,414,137.17 to the following victims in the following amounts:

- Victim #1 - A.B. is entitled to $2,340.00 for therapy costs.
- Victim #2 – A.C. is entitled to $75,000.00 for ten years of past therapy costs and ten years of future therapy costs.
- Victim #3 – N.F. is entitled to $817,387.27: $497,633.00 in medical costs, $305,643.25.00 for her lost earning capacity and $14,111.02 for half of the trial participation and restitution costs for Dr. Cooper and Dr. Smith.
- Victim #4 – B.F. is entitled to $450,086.00: $159,229.00 in lost wages, $36,877.00 in pre-restitution treatment and medication costs and $253,980.00 for ten years of future counseling and medication costs.
- Victim #5 – M.L. is entitled to is entitled to $559,985.00: $28,235.00 in pre-restitution reimbursement, $195,000.00 for Specialized Trauma Specific Psychotherapy, $156,000.00 for Somatic and Body-Based Therapies, $48,000.00 for Neurofeedback therapy, $39,000.00 for Hyperbaric Oxygen therapy and $93,750.00 for continuing psychiatric care.
- Victim #6 – D.O. is entitled to $716,027.27: $396,273.00 for medical costs, lost future earnings of $305,643.25 and $14,111.02 for half of the trial participation and restitution costs for Dr. Cooper and Dr. Smith.
- Victim #9 – J.R. is entitled to $76,753.50: $4,753.50 for medical costs already incurred as well as $72,000.00 for ten years of therapy.
- Victim #10 – E.S. (J.K.) is entitled to $716,558.13: $323,514.88 in medical bills, $305,643.25 in lost wages and $86,400.00 in past metal healthcare costs E.S.'s estate is entitled to.

**IT IS FURTHER ORDERED** that Defendant Spear's restitution obligation shall be paid **jointly and severally** with Defendant Brunst until restitution is paid in full. Defendant Spear shall pay a total of $3,417,037.17 in criminal monetary penalties, due immediately. Having assessed the Defendant's ability to pay, payment of the total criminal

monetary penalties is due as follows: Balance is due in equal monthly installments of $2,000 over a period of 34 months to commence within 30 days of release from imprisonment.  Payment of criminal monetary penalties is due during imprisonment at a rate of not less than $25 per quarter and payment shall be made through the Bureau of Prisons' Inmate Financial Responsibility Program.  Criminal monetary payments shall be made to the Clerk of U.S. District Court, Attention: Finance, Suite 130, 401 West Washington Street, SPC 1, Phoenix, Arizona 85003-2118. Payments should be credited to the various monetary penalties imposed by the Court in the priority established under 18 U.S.C. § 3612(c).  The Court hereby waives the imposition of interest and penalties on any unpaid balance.

**IT IS FURTHER ORDERED** that Defendant John Brunst shall pay restitution totaling $3,414,137.17 to the following victims in the following amounts:

- Victim #1 - A.B. is entitled to $2,340.00 for therapy costs.
- Victim #2 – A.C. is entitled to $75,000.00 for ten years of past therapy costs and ten years of future therapy costs.
- Victim #3 – N.F. is entitled to $817,387.27: $497,633.00 in medical costs, $305,643.25.00 for her lost earning capacity and $14,111.02 for half of the trial participation and restitution costs for Dr. Cooper and Dr. Smith.
- Victim #4 – B.F. is entitled to $450,086.00: $159,229.00 in lost wages, $36,877.00 in pre-restitution treatment and medication costs and $253,980.00 for ten years of future counseling and medication costs.
- Victim #5 – M.L. is entitled to is entitled to $559,985.00: $28,235.00 in pre-restitution reimbursement, $195,000.00 for Specialized Trauma Specific Psychotherapy, $156,000.00 for Somatic and Body-Based Therapies, $48,000.00 for Neurofeedback therapy, $39,000.00 for Hyperbaric Oxygen therapy and $93,750.00 for continuing psychiatric care.
- Victim #6 – D.O. is entitled to $716,027.27: $396,273.00 for medical costs, lost future earnings of $305,643.25 and $14,111.02 for half of the trial participation and restitution costs for Dr. Cooper and Dr. Smith.
- Victim #9 – J.R. is entitled to $76,753.50: $4,753.50 for medical costs already incurred as well as $72,000.00 for ten years of therapy.

**SER-48**

- Victim #10 – E.S. (J.K.) is entitled to $716,558.13: $323,514.88 in medical bills, $305,643.25 in lost wages and $86,400.00 in past metal healthcare costs E.S.'s estate is entitled to.

**IT IS FURTHER ORDERED** that Defendant Brunst's restitution obligation shall be paid **jointly and severally** with Defendant Spear until restitution is paid in full. Defendant Brunst shall pay a total of $3,465,837.17 in criminal monetary penalties, due immediately. Having assessed the Defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:  Balance is due in equal monthly installments of $2,000 over a period of 34 months to commence within 30 days of release from imprisonment.  Payment of criminal monetary penalties is due during imprisonment at a rate of not less than $25 per quarter and payment shall be made through the Bureau of Prisons' Inmate Financial Responsibility Program.  Criminal monetary payments shall be made to the Clerk of U.S. District Court, Attention: Finance, Suite 130, 401 West Washington Street, SPC 1, Phoenix, Arizona 85003-2118.  Payments should be credited to the various monetary penalties imposed by the Court in the priority established under 18 U.S.C. § 3612(c).  The Court hereby waives the imposition of interest and penalties on any unpaid balance.

Dated this 3rd day of July, 2025.

Honorable Diane J. Humetewa
United States District Judge

GARY M. RESTAINO
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

DAN G. BOYLE (N.Y. Bar No. 5216825, daniel.boyle2@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1400
Los Angeles, CA 90012
Telephone (213) 894-2426

NICOLE M. ARGENTIERI
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

AUSTIN M. BERRY (Texas Bar No. 24062615, austin.berry2@usdoj.gov)
U.S. Department of Justice
Child Exploitation and Obscenity Section
1301 New York Avenue, NW, 11th Floor
Washington, D.C. 20005
Telephone (202) 412-4136
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>          v.<br><br>Michael Lacey, et al.,<br><br>                    Defendants. | CR-18-422-PHX-DJH<br><br>**UNITED STATES' RESPONSE TO DEFENDANTS' BRIEF IN SUPPORT OF OBJECTIONS TO COURT RULINGS DURING FERRER TESTIMONY (Doc. 1840) AND DEFENDANT SPEAR'S JOINDER (Doc. 1841)** |

Defendants' Brief in Support of Objections to Court Rulings During Ferrer Testimony (Doc. 1840) seeks reconsideration of several rulings. LRCiv 7.2(g)(1) states:

> The Court will ordinarily deny a motion for reconsideration of an Order absent a showing of manifest error or a showing of new facts or legal authority that could not have been brought to its attention earlier with reasonable diligence. Any such motion shall point out with specificity the matters that the movant believes were overlooked or misapprehended by the Court, any new matters being brought to the Court's attention for the first time and the reasons they were not presented earlier, and any specific modifications being sought in the Court's Order. No motion for reconsideration of an Order may repeat any oral or written argument made by the movant in support of or in opposition to the motion that resulted in the Order. Failure to comply with this subsection may be grounds for denial of the motion.

*See also* LRCrim 12.1(a). Defendants' brief does not show "manifest error" or "new facts or legal authority that could not have been brought to [the Court's] attention earlier with reasonable diligence." LRCiv 7.2(g)(1). For several reasons, Defendants' brief does not warrant reconsideration of any prior rulings.

## I.    Fed. R. Evid. 106 Applies to Specific Statements—Not Entire Categories of Evidence—and Defendants Cannot Use It to Litigate Their "Good Faith" Defense.

Fed. R. Evid. 106 provides that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Rule 106 has a singular purpose: to prevent a party from distorting the meaning of a proffered statement by introducing only part of the statement, while omitting other part(s) necessary to demonstrate the statement's truthful meaning. *United States v. Vallejos*, 742 F.3d 902, 905 (9th Cir. 2014) (Rule 106 "codified the common law Rule of Completeness, which exists to avert 'misunderstanding or distortion' caused by introduction of only part of a document") (quoting *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 172 (1988)). The Rule does not require introducing "*any* unedited writing or statement merely because an adverse party has introduced an edited version." *Id*. If a complete statement doesn't "serve to correct a misleading impression" in the edited statement, Rule 106 "will not be applied[.]" *Id.*

- 2 -

*Rainey* illustrates the Rule's purpose. (*Cf.* Doc. 1840 at 5-6.) In *Rainey*, a plaintiff wasn't permitted to testify about the central thrust of a letter he had written about the plane crash at issue—namely, that the crash was caused by catastrophic power failure. 488 U.S. at 170-71. When examined by opposing counsel as an adverse witness, the plaintiff testified about misleadingly quoted snippets from the letter that discussed other potential causes. But when examined by *his* counsel, the court wouldn't allow him to be questioned about the main topic of his letter. *Id*. The Supreme Court held that "when one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completeness is *ipso facto* relevant and therefore admissible[.]" *Id*. at 172.

Courts evaluate application of Rule 106 on a statement-by-statement basis; the Rule is not meant to be used in a generalized, broad-brush fashion to determine that entire categories of evidence must be introduced whenever an adverse party asserts that such evidence is needed to bolster that party's theory or defense. To that end, the Ninth Circuit has consistently held that Rule 106 should not be construed broadly to require the admission of an entire, complete writing or statement simply because an edited version is admitted. *Vallejos,* 742 F.3d at 905 (the district court correctly explained that "[j]ust because somebody is putting in part of a transcript . . . does not mean for the sake of completeness, everything comes in"); *United States v. Liera-Morales*, 759 F.3d 1105, 1111 (9th Cir. 2014) (affirming exclusion of defendant's exculpatory statements because the admitted portions were neither taken out of context nor misleading: "The district court carefully and thoroughly considered the government's proffered statements from the post-arrest interview and correctly determined that those statements were neither misleading nor taken out of context."); *United States v. Lopez-Figueroa*, 316 F. App'x 548, 549-50 (9th Cir. 2008) (affirming the exclusion of defendant's statements because they weren't necessary to explain the admitted portions); *United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996) (affirming exclusion of defendant's statements under Rule 106 because they did not serve to correct an out-of-context prior statement: "[I]t is often perfectly proper to

SER-52

admit segments of prior testimony without including everything, and adverse parties are not entitled to offer additional segments just because they are there and the proponent has not offered them.") (citation omitted); *United States v. Dorrell,* 758 F.2d 427, 434-35 (9th Cir. 1985) (no Rule of Completeness violation where an edited version of a confession did not "distort[ ] the meaning of the statement") (internal quotation marks omitted); *United States v. Burreson*, 643 F.3d 1344, 1349 (9th Cir. 1981) (affirming exclusion of the entirety of prior testimony because the portions appellants wished to admit were irrelevant).

Other Circuits have similarly held that Rule 106 "permits introduction only of additional material that is relevant and is necessary to qualify, explain, or place into context the portion already introduced." *United States v. Pendas-Martinez*, 845 F.2d 938, 944 (11th Cir. 1988). Further, just because an excluded portion is relevant, does not necessarily mean that it is necessary to qualify, explain or place into context. *United States v. Branch*, 91 F.3d 699, 728 (5th Cir. 1996) (affirming exclusion of statements as self-serving exculpatory statements by the defendant that did not explain or qualify the rest of the statement originally offered by the United States), *abrogated on other grounds as recognized in United States v. Mojica-Baez*, 229 F.3d 292, 310 n.12 (1st Cir. 2000); *United States v. Langford*, 647 F.3d 1309, 1331 (11th Cir. 2011) (affirming exclusion of transcript of defendant's testimony in SEC hearing because defendant failed to identify what specific portions would qualify, explain or place into context the portions that were introduced by the United States). To the extent Defendants contend that any statements offered against them are taken out of context, the burden is on them to provide an explanation regarding what specific additional statements should be introduced so as to "qualify, explain, or place into context the portion already introduced." *Branch*, 91 F.3d at 728.

Defendants' reference to the Rule 106 amendment that takes effect on December 1, 2023 (absent contrary Congressional action) does not change this calculus. (*See* Doc. 1840 at 5.) The amended rule states: "If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement— that in fairness ought to be considered at the same time. The adverse party may do so over

- 4 -

a hearsay objection." Fed. R. Evid. 106 (amended). As the Advisory Committee explains, allowing an adverse party to introduce a completing statement "over a hearsay objection" is rooted in the Rule's core purpose of allowing correction of "a misimpression about the meaning of a proffered statement[.]" Fed. R. Evid. 106, Advisory Committee Notes. The Committee offered this example to illustrate what the amendment is designed to address:

> [A]ssume the defendant in a murder case admits that he owned the murder weapon, but also simultaneously states that he sold it months before the murder. . . . [A]dmitting only the statement of ownership creates a misimpression because it suggests that the defendant implied that he owned the weapon at the time of the crime—when that is not what he said.

Fed. R. Evid. 106, Advisory Committee Notes.

Critically, however:

> The amendment does not give a green light of admissibility to all excised portions of statements. **It does not change the basic rule, which applies only to the narrow circumstances in which a party has created a misimpression about the statement, and the adverse party proffers a statement that in fact corrects the misimpression.** The mere fact that a statement is probative and contradicts a statement offered by the opponent is not enough to justify completion under Rule 106. So, for example, the mere fact that a defendant denies guilt before later admitting it does not, without more, mandate the admission of his previous denial. *See United States v. Williams*, 930 F.3d 44 (2d Cir. 2019).

Fed. R. Evid. 106, Advisory Committee Notes (emphasis added). It is not clear that the amended language reflects any change in Ninth Circuit law. *See, e.g.*, *United States v. Lopez*, 4 F.4th 706, 715 (9th Cir. 2021) (recognizing that "[p]ortions of a document or recording are admissible under Rule 106 notwithstanding the bar on hearsay evidence when offered "to correct a misleading impression in the edited statement" introduced by an opposing party) (quoting *Vallejos*, 742 F.3d at 905).

Doc. 1776 provides additional briefing and caselaw (beyond those discussed in Doc. 1840 at 6) demonstrating why Defendants' self-serving statements are not admissible under Rule 106—particularly where they are not required to clarify a misimpression caused by using only part of a statement or document. (*See* Doc. 1776 at 3-4 (collecting cases).) The United States incorporates that briefing and caselaw here.[1]

---

[1] Defendants can't distinguish *United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996),

### A. Exhibit 616a (November 2010 Correspondence with BMO)

In September 2023, the parties litigated the redactions reflected in Exhibit 616a—particularly regarding a portion of the email thread written by James Larkin. (*See, e.g.*, Doc. 1776 at 6.) As the United States argued:

> The United States redacted this portion because (a) it introduces topics, including the Communications Decency Act, that the Court has ruled aren't admissible, and (b) it contains inadmissible self-serving hearsay. (*See* Doc. 1643 at 10 ("To date, no party has provided the Court with case precedent holding that the CDA immunizes criminal activity like that alleged here. It follows that a jury should not be told that the CDA does. To do so is a misstatement of law and will lead to jury confusion.").)
>
> [¶] Defendants cannot introduce self-serving statements made by former-Defendant Larkin, including misstatements. . . .

(Doc. 1776 at 6.) While Defendants now argue they should have been able to introduce and ask the government's first witness about the Larkin portion of the email chain, Defendants do not show "manifest error" or "new facts or legal authority that could not have been brought to [the Court's] attention earlier with reasonable diligence." LRCiv 7.2(g)(1). None of the authorities Defendants cite were decided since September 2023. (*Cf.* Doc. 1840 at 5-8.) The Court's findings regarding the CDA remain law of the case—and Defendants have failed, as before, to show how that statute immunizes them from federal criminal liability. (*See, e.g.*, Doc. 840 at 4-12; Doc. 1643 at 9-10.)

Defendants' assertion that Larkin's blanket statement that Backpage's operations were "clearly lawful" left the jury with an incomplete picture of Defendant Brunst's mental state also fails. (*Cf.* Doc. 1840 at 8.) The United States introduced Exhibit 616a to show that Brunst and others were aware of questions *raised by BMO* about Backpage.com's activities. Admission of Larkin's self-serving statements wasn't necessary to correct any misimpression on that score. And Defendants' apparent argument that they weren't

---

or *United States v. Ortega*, 203 F.3d 675, 679 (9th Cir. 2000), on the basis that they discuss statements or transcripts, not emails. (*Cf.* Doc. 1840 at 6.) Rule 106 applies to all "writing[s] and recorded statement[s]," and the amended Rule will "cover all statements," including unrecorded ones. Fed. R. Evid. 106, Advisory Committee Notes.

allowed to introduce (or question Mr. Ferrer about) the unredacted exhibit, Exhibit 616, isn't supported by the transcript of the September 27, 2023 proceedings. The daily transcripts show that Defendant Brunst's counsel didn't seek to move Exhibit 616 into evidence, and didn't seek to ask follow-up questions after the Court permitted preliminary yes-or-no questions relating to certain statements that counsel asked about. *See* 09/27/23 PM Daily Tr. at 119-121.

Defendants' related claim that the state attorneys general (AG) letters "are notice of a potential prosecution under state law as to which the CDA was a defense" misses the mark. (Doc. 1840 at 8-9.) The United States introduced the letters to show that Backpage.com and Defendants were put on notice of the AGs' observation that prostitution ads were rampant on Backpage's adult-escorts section. Admission of the letters, by themselves, did not "open the door" to any discussion by Backpage or its representatives about the CDA—a statute that this Court has repeatedly found has no application to this federal criminal prosecution. (*See, e.g.*, Doc. 840 at 4-12; Doc. 1643 at 9-10.)

### B.    Responses to the State AG Letters

The Court informed Defendants that they could seek to have Backpage's responses to the AG letters admitted "when it's your turn[.]" (Doc. 1840 at 9; 09/13/23 PM Daily Tr. at 74.) But this was not a pre-ruling on the responses' admissibility—rather, it was an invitation for the defense to seek to have the letters admitted. When Defendant Spear's counsel offered Exhibits 487 and 5019 into evidence, the Court sustained the United States' hearsay objections to each exhibit. (09/26/23 PM Daily Tr. at 12-15.) Defense counsel did not indicate that the letters weren't being offered for the truth; nor did counsel identify any possible hearsay exceptions. (09/26/23 PM Daily Tr. at 12-15.)

Defendants' present assertion—that the letters should have come in under Rule 106—lacks merit. (*Cf.* Doc. 1840 at 9-10.) For one thing, Defendants fail to identify any specific, allegedly misleading statements in the AGs' letters that would justify admitting Backpage's responses. If Defendants contend that any statements offered against them are taken out of context, the burden is on them to provide an explanation regarding what

SER-56

specific additional statements should be introduced so as to "qualify, explain, or place into context the portion already introduced." *Branch*, 91 F.3d at 728. *See also Vallejos*, 742 F.3d at 905 ("[I]f the 'complete statement [does] not serve to correct a misleading impression' in the edited statement that is created by taking something out of context, the Rule of Completeness will not be applied to admit the full statement."). Yet Defendants have not identified any specific statements in the AG letters that are incomplete or distorting; nor have they explained how the response letters would correct any specific misimpressions in the AG letters.

Rather, Defendants are trying to use Rule 106 as a vehicle for litigating their state-of-mind defenses. Defendants assert, for example, that the response letters are "critical to show Brunst's state of mind as to Backpage's position vis-à-vis the AGs and the steps he understood Backpage to be taking to address the AG's concerns." (Doc. 1840 at 10.) But if Brunst wants to establish good faith reliance on lawyer advice or some other state-of-mind defense, he will have to do far more than simply point out that Backpage hired counsel to write responses to the AG letters. (*See, e.g.*, Doc. 1643 at 12-13.) For now, the record contains no testimony that Brunst relied on the responses in any way. (*Cf.* Doc. 1840 at 10 (simply asserting, without pointing to any evidence, "Brunst's reliance on the responsive letters").) Brunst thus has no basis to assert the letters "go to his understanding . . . that outside counsel had been retained . . . which provided him comfort that any legal issues posed by the AG letters were being sufficiently addressed." (Doc. 1840 at 10.)

Defendants' assertions that the United States or the AGs "put [Backpage's responses] at issue" is likewise insufficient to trigger Rule 106. (*Cf.* Doc. 1840 at 9-10.) These assertions don't show how any specific statements in the AGs' letters were false, incomplete, or misleading. Nor do they show how admission of the responsive letters would "serve to correct," *Vallejos*, 742 F.3d at 905, or "qualify, explain, or place into context," any such specific statements. *Branch*, 91 F.3d at 728. And at least one of the letters, Exhibit 487, contains a lengthy discussion of the CDA and prior litigation—topics precluded by Doc. 1643 and other rulings. (*See, e.g.*, Doc. 1643 at 8-11.)

### C.  Exhibit 836 (July 2016 Wall Street Journal Correspondence)

The redacted version of this July 11, 2016 email chain—Exhibit 836a—consists of a request from a *Wall Street Journal* reporter to a Backpage representative for a response from the company about the presence of TER (The Erotic Review) numbers in Backpage ads. In the redacted exhibit, the reporter asks: "Hi Liz. We do need to get an answer on the TER numbers pretty soon." (*See* Ex. 836a.) Defendants' brief does not show how this request for comment, in itself, is misleading in any way, or how the use of an unredacted (or less redacted) version of Exhibit 836a would correct any misimpression caused by the reporter's simple request for comment. Defendants seem to want to introduce their theory of the case by offering Liz McDougal's hearsay response to the reporter, packaged as a Rule 106 explanation. But Defendants don't articulate how McDougal's *response* would (or even could) correct a misleading impression from the reporter's mere request for comment. And Defendants' suggestion is rife with the kinds of "double hearsay" or "hearsay within hearsay" problems that Defendants have raised in other circumstances.

## II.  Defendants Should Be Barred from Using Carl Ferrer's Attorney-Client Privileged Communications About the California State Prosecution for Impeachment in this Federal Criminal Trial.

### A.  The Proposed Impeachment Material Is Protected by Ferrer's Attorney-Client Privilege, and Ferrer Hasn't Waived the Privilege.

During Ferrer's cross-examination, Brunst's counsel sought to use a privileged attorney-client communication for impeachment purposes, designated GL-CF 36 and 37. As described in Doc. 1844, the communication is an email dated May 18, 2017 from Ferrer to two of his lawyers at the time, James Grant of Davis Wright Tremaine LLP and Dan Quigley of Rusing Lopez & Lizardi, PLLC. The subject line of the email is "Comments on California – Attorney Client Privileged." The email contains two attachments, including a document containing Ferrer's comments on the amended Criminal Complaint in the California criminal case, *People of the State of California v. Carl Ferrer, Michael Lacey, and James Larkin*, Case No. 16FE019224 (Cal. Super. Ct.). (Doc. 1844 at 2.) When Ferrer sent the email, Grant personally represented him in that California criminal case (*see* Doc.

1827 at 5), and Mr. Quigley personally represented him in a civil case in this court, *Sojourner Center v. Backpage.com LLC, et al.*, Case No. 2:17-cv-00399-GMS. (Doc. 1844 at 2.) As Ferrer has explained, Quigley appeared for Ferrer personally in that case, and Ferrer considered him to be his lawyer. (Doc. 1844 at 2.)

Defendants do not explain how they came into possession of this privileged material. Nor do they seriously dispute that it meets all requisites needed to qualify as a privileged attorney-client communication. (*See* Doc. 1840 at 14-16); *United States v. Christensen*, 828 F.3d 763, 802 (9th Cir. 2016). Instead, Defendants assert that Ferrer waived the privilege over this communication by signing a Proffer/Interview Agreement (the Proffer Agreement) and a Joint Defense Agreement (JDA). (Doc. 1840 at 14-16.) Yet neither agreement operated to waive Ferrer's privilege over this communication—and it certainly did not authorize any of Ferrer's personal attorneys to violate their duties of confidentiality and loyalty to him by handing over these materials to Defendants.[2]

> **1.    This Court Has Already Recognized that Ferrer's Confidences as a Former Client Should Be Preserved.**

First, this is not the first time that the parties have litigated these issues in this case. In October 2018, Judge Logan carefully reviewed the Proffer Agreement, the Joint Defense Agreement and other agreements relating to the United States' motion to disqualify Grant and his law firm, Davis Wright Tremaine (DWT), from representing Defendants Lacey and Larkin in this case. (*See* Doc. 338 at 6, 10.) The motion was based, among other things, on Grant's former representation of Ferrer in the California criminal case. (Doc. 118 at 3.)

In the Court's October 12, 2018 Order denying disqualification, Judge Logan emphasized "it has been made clear that neither HCM [another law firm that personally represented Ferrer] nor DWT will participate as trial counsel in this matter, **and both firms have stated that neither firm will participate in cross-examining Ferrer**." (Doc. 338 at 9-10 (emphasis added).) The Court then stated:

---

[2] The United States has standing to address these arguments, as explained in Doc. 1842.

> Moving forward, **the Court will rely on the representations of HCM, DWT, and their respective counsel that the firms will continue to preserve the confidences of Ferrer as a former client**, create ethical walls where necessary, refrain from engaging in trial preparation or participating as trial counsel, and only participate in the limited capacity set forth in the pleadings, without an order from the Court.

(Doc. 338 at 10 (emphasis added).) Cross-examining Ferrer on his attorney-client communications with DWT is flatly contrary to this directive—and underscores the grave ethical and professional concerns posed by the attempted use of such material here.

### 2. The Proffer Agreement Did Not Waive Privilege Over Ferrer's Personal Attorney-Client Communications.

Ferrer's Proffer Agreement, executed on April 5, 2018, did not waive his personal privilege over the May 18, 2017 email and attachments. (*Cf.* Doc. 1840 at 14-15.) Defendants point to the agreement's second paragraph, which states:

> Mr. Ferrer voluntarily waives all claims of attorney-client privilege, whether in his personal or official capacity as the Chief Executive Officer of Backpage.com, LLC **as to communications with any attorney or law firm that represented Backpage.com, or any related entity,** where such communications concerned or related to Backpage.com or any related entity. This waiver does not apply to Mr. Ferrer's current attorneys, Nanci Clarence, Jonathan Baum and anyone working on their behalf. Mr. Ferrer voluntarily agrees to provide all documents and other material that may be relevant to the investigation and that are in his possession or control. **However, Mr. Ferrer shall not disclose any documents or information protected by the Joint Defense Agreement in this matter.** Mr. Ferrer understands that his proffer interview and any benefit he may receive from information he provides to the prosecution does not depend on his waiver of the attorney-client privilege.

(Doc. 174-2 at 2 ¶ 2 (emphasis added).)

The parties intended for the above language to track the approach in a formal "Waiver of Attorney Client Privilege" that Ferrer contemporaneously signed (Doc. 174-2 at 5-6; Doc. 195-3)—that is, it would only waive Backpage's corporate attorney-client privilege but not Ferrer's personal privilege. (*See* Doc 193-9 at 8 ¶ 45.) On April 5, 2018, Ferrer executed a two-page "Waiver of Attorney Client Privilege." In the last paragraph of that document, Ferrer made clear that he was only waiving Backpage's corporate attorney-client privilege and was not waiving his personal attorney-client privilege, either with his current attorneys or with any attorneys who previously represented him on an individual basis: "I further state that this waiver does not apply to any aspect . . . of my personal

SER-60

attorney-client relationship with attorneys who have represented me in the past or who currently represent me in an individual capacity . . . ." (Doc. 195-3 at 3.)

The Proffer Agreement waiver was meant to effectuate the same waiver. (Doc 193-9 at 8 ¶ 45.) That's why it only applied to "communications with any attorney or law firm that represented Backpage.com, or any related entity." (Doc. 174-2 at 2 ¶ 2.) It was not meant to apply to communications to attorneys and law firms that represented Ferrer in a personal capacity. (Doc. 1844 at 2; *see also* Doc. 192 at 7-8.)

Alternatively, Defendants cannot be heard to argue that any waiver in the Proffer Agreement applies to material that they claim is covered by the JDA. The waiver language in the Proffer Agreement states: "However, Mr. Ferrer shall not disclose any documents or information protected by the Joint Defense Agreement in this matter." (Doc. 174-2 at 2 ¶ 2.) So, if the JDA applies to the impeachment material (it does not, as explained below), the Proffer Agreement does not waive privilege over that material. Or, in other words, if the Proffer Agreement effectuated a waiver, that waiver did not apply to materials covered by the JDA.

### 3. The JDA Does Not Apply to the Proposed Impeachment Material.

Defendants assert that, by signing the JDA, Ferrer agreed that if he were to testify as a witness in any proceeding "arising from the Case," then any other signatory may "us[e] for defense purposes any information or material contributed by [him] or by his . . . attorney. This specifically permits use of contributed information or material in cross-examining the witness[.]" (Doc. 1840 at 15.) As Defendants' heavily redacted version of the JDA attached to their brief shows, Ferrer executed the JDA on June 14, 2017. (Doc. 1840 at 35.) But Ferrer sent the impeachment material at issue to his personal counsel on May 18, 2017—before the JDA existed. (*See* Doc. 1844 at 2.) And nothing in the publicly disclosed, redacted JDA indicates that the May 2017 communication falls within the JDA's temporal scope, or that the JDA applies retroactively in any way.

Nor does anything show that the May 2017 communication falls within the JDA's substantive scope. According to Defendants, "[t]he JDA defines 'Case' as 'all matters

SER-61

1   relating to the case of the Arizona federal grand jury investigation and any related
2   proceedings.'" (Doc. 1840 at 15 n.4.) Ferrer wrote the May 2017 email in response to the
3   amended criminal complaint in the California state court prosecution that had been filed
4   against him in Sacramento, California, by the California Department of Justice. (*See* Doc.
5   1844 at 2; Doc. 1827 at 2, 5; *see also* Doc. 118 at 3.) That criminal complaint alleged
6   violations of California state laws; there is no indication that that prosecution charged the
7   federal criminal law violations alleged here. (*See* Doc. 1840 at 11; *cf.* Doc. 230.)

8          And, in all events, Judge Logan carefully reviewed the complete, unredacted JDA
9   and concluded in no uncertain terms that Ferrer's former lawyers remain bound by their
10  duties to "continue to preserve the confidences of Ferrer as a former client, create ethical
11  walls where necessary, refrain from engaging in trial preparation or participating as trial
12  counsel, and only participate in the limited capacity set forth in the pleadings"—*i.e.*, as
13  "auxiliary counsel" who "will not participate at trial counsel [nor] participate in cross-
14  examining Ferrer." (Doc. 338 at 9-10.)

15         Moreover, the Court correctly noted that the attachment to the May 2017 email (GL-
16  CF-37) raised serious questions about the nature and authenticity of that document,
17  including multiple strikeouts, redlines, alterations, and comments. (*See* 09/27/23 PM Daily
18  Tr. at 55-62.) Combined with the overwhelming indicia of privilege surrounding the
19  document, the Court properly precluded Defendants from using it for impeachment.
20  Defendants' brief does not warrant reconsideration.

21
22  **B.     Defendants Have Not Shown that Ferrer's Statements About the California Criminal Complaints Are Prior Inconsistent Statements**

23         Even apart from any waiver issue, Defendants have failed to show that Ferrer's trial
24  testimony is inconsistent with any statement made in the proposed impeachment
25  material.  A basic rule of evidence provides that prior inconsistent statements may be used
26  to impeach the credibility of a witness. But as a preliminary matter, the court must be
27  persuaded that the statements are indeed inconsistent. *United States v. Hale*, 422 U.S. 171,
28  176 (1975). The trial judge has a "high degree of flexibility" in deciding how much

inconsistency is enough to permit use of a prior statement for impeachment. *United States v. Higa*, 55 F.3d 448, 453 (9th Cir. 1995). If the impeaching party fails to establish a threshold inconsistency between the prior statement and the testimony at trial, the prior statement lacks significant probative value and therefore must be excluded. *Hale*, 422 U.S. at 176.

Here, Defendants sought to impeach Ferrer's trial testimony with previous statements to his personal attorney in response to charges in California state court. (Doc. 1840 at 3.) Defendants have identified the following allegedly inconsistent statements: (1) when a payment processing contract is filled out and months spent vetting the contract, there is no disguising of the transaction; (2) there is no evidence of fraudulent merchant bank applications; and (3) a money laundering charge is an attempt to "legislate by prosecution." (Doc. 1840 at 13.) Defendants also claim there are further prior inconsistent statements regarding Website Technologies and payment processing. (Doc. 1840 at 13.)

But Ferrer did not testify inconsistently with any statements Defendants have identified.  For example, he didn't testify that about months being spent applying for or vetting payment processing contracts. Nor did he testify that he submitted fraudulent merchant bank applications. And he did not testify regarding his personal opinion regarding money laundering charges. Allowing the defense to cross-examine Mr. Ferrer on topics not discussed by the government in direct examination would be improper impeachment by a prior inconsistent statement.

Further, the proposed areas of cross-examination would be misleading and confusing to the jury.  The proposed impeachment material contains personal thoughts and statements communicated by Ferrer to his personal attorney for the purpose of preparing a defense to criminal charges brought by the California Department of Justice. The California case is a separate case, involving charges that are separate and different from those in this case. Allowing the defense to impeach Ferrer with statements written to defend against different crimes in California would result in the statements being taken out of context, and would be misleading and confusing to the jury. (*Cf.* Doc. 1643 at 11 (referring

to cases and decisions that do not involve the federal offenses charged here would confuse the jury and involve misstatements of law).)

**III.    The Court Should Reject Defendants' Efforts to Relitigate Prior Rulings on Advice of Counsel and Prior Litigation.**

On pages 16-18 of their brief, Defendants essentially seek to relitigate the Court's motion in limine orders regarding good faith reliance on advice of counsel and references to prior litigation. (*See* Doc. 1643 at 10-13.) First, Defendants claim that because Ferrer's testimony touched on letters or emails written by some attorneys (involving CNN's reporting or state Attorneys General communications), and because Ferrer discussed an email where he disagreed with Brunst's suggestion of hiring counsel to collect monies withheld by Bank Frick, Defendants should be allowed "to tell the other half of the story" or "further illuminate for the jury the roles these individuals held with respect to Backpage[.]" (Doc. 1840 at 16-17.) While Defendants aren't clear on what they mean, it seems they want to use all of this as a springboard for introducing testimony and evidence about the attorneys they or Backpage hired, litigation they pursued, and legal advice they received. This is clearly an attempt to circumvent or seek reconsideration of the Court's prior orders on advice of counsel and references to prior litigation. Yet Defendants have introduced no new authorities or facts sufficient to warrant reconsideration here.

For example, a discussion about *not* hiring counsel and *not* initiating litigation against Bank Frick comes nowhere close to overcoming the Court's rulings regarding references to prior decisions, cases, and other litigation that Defendants or Backpage actually pursued. (*See* Doc. 1643 at 10-11; *see also* Doc. 1597.) Defendants' complaint that the jury should have heard about some of the specific background/legal credentials of Hemu Nigam, an internet safety expert who advised Backpage in approximately 2010-2011, also falls short. (Doc. 1840 at 17-18.) It's not clear whether any Defendants knew the details of Mr. Nigam's background, or that Ferrer is an appropriate witness for attempting to establish that fact.

More importantly, Defendants cannot use these examples as a justification for

**SER-64**

delving into Defendants' receipt of legal advice regarding Backpage's operations. Ferrer's testimony hardly established the four required elements for invoking a good faith reliance on advice of counsel defense. (*See* Doc. 1643 at 12-13, citing *United States v. McLennan*, 563 F.2d 943, 946 (9th Cir. 1977).) Defendants have cited no new legal authorities or facts sufficient to satisfy the *McLennan* test, and they should not be allowed to circumvent those requirements based on their assertions here.

## IV. Spear's Joinder Lacks Merit.

Defendant Spear seeks reconsideration of the Court's previous ruling finding that the Communications Decency Act (CDA) is irrelevant to this case. (Doc. 1643 at 9-10.) Similar to Brunst's argument (*supra* at 2), Spear's joinder does not warrant reconsideration.

The Court previously found that "[t]o date, no party has provided this Court with case precedent holding that the CDA immunizes criminal activity like that alleged here. It follows that a jury should not be told that the CDA does. To do so is a misstatement of law and will lead to jury confusion." (Doc. 1643 at 10.) This Order tracked Judge Brnovich's previous Order on the CDA, when the Court found that the CDA lacked relevance: "This case, however, does not concern civil liability, and the CDA has 'no effect' on 'any other Federal criminal statute.' 47 U.S.C. § 230(e)(1)." (Doc. 793 at 13; *see also* Doc. 840.)

Defendant Spear posits that Judge Brnovich previously ruled that Defendants could raise issues related to the CDA. (Doc. 1841 at 2.) But Defendant Spear selectively cites Judge Brnovich's previous Order. Judge Brnovich ruled—consistent with her Orders at Docs. 793 and 840—that Defendants could not raise issues related to the CDA and how it affected criminal prosecutions:

> Defendants state that they do not intend to elicit a legal conclusion from Professor Goldman regarding whether Section 230 bars the Government charges. However, a plain reading of the disclosure shows that they intend to elicit testimony that section 230 should bar prosecution. Again, that is a policy argument outside the scope of this trial. Testimony related to the policy behind Section 230 or how it should work will be precluded.

(Doc. 1081 at 20.)

Judge Brnovich ruled that a Professor Eric Goldman, who Defendants identified as

SER-65

1   a potential expert, could testify in a limited manner about Section 230—specifically, only

2   that the law "was meant to incentivize internet providers to engage in moderation

3   practices." (Doc. 1081 at 20.) To date, however, Defendants have not attempted to elicit

4   testimony about how the CDA "incentivize[d] internet providers to engage in moderation

5   practices," rather they want to argue that the CDA provided a "complete defense" to any

6   state criminal charges. (Doc. 1840 at 9.) The Court's Orders should remain the law of the

7   case—the CDA doesn't apply here.

8                                      <u>**Conclusion**</u>

9        Defendants' requests for the admission of exhibits, impeachment material, and

10  testimony discussed in Docs. 1840 and 1841 should be denied.

11

12       Respectfully submitted this 11th day of October, 2023.

13

14                                  GARY M. RESTAINO
                                    United States Attorney
15                                  District of Arizona

16
                                    NICOLE M. ARGENTIERI
17                                  Acting Assistant Attorney General
                                    Criminal Division, U.S. Department of Justice
18
                                     <u>*s/Peter S. Kozinets*</u>
19                                  KEVIN M. RAPP
                                    MARGARET PERLMETER
20                                  PETER KOZINETS
                                    ANDREW STONE
21                                  DANIEL BOYLE
                                    Assistant U.S. Attorneys
22
                                    AUSTIN M. BERRY
23                                  Trial Attorney

24

25

26

27

28

- 17 -

## CERTIFICATE OF SERVICE

 I hereby certify that on October 11, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/ Daniel Parke*
Daniel Parke
Legal Assistant

1   Gary S. Lincenberg *(admitted pro hac vice)*
        glincenberg@birdmarella.com
2   Ariel A. Neuman *(admitted pro hac vice)*
        aneuman@birdmarella.com
3   Gopi K. Panchapakesan *(admitted pro hac vice)*
        gkp@birdmarella.com
4   BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
    DROOKS, LINCENBERG & RHOW, P.C.
5   1875 Century Park East, 23rd Floor
    Los Angeles, California 90067-2561
6   Telephone: (310) 201-2100
    Facsimile: (310) 201-2110
7
    Attorneys for Defendant John Brunst
8
    Paul J. Cambria, Jr. *(admitted pro hac vice)*
9       pcambria@lglaw.com
    Erin McCampbell Paris *(admitted pro hac vice)*
10      eparis@lglaw.com
    LIPSITZ GREEN SCIME CAMBRIA LLP
11  42 Delaware Avenue, Suite 120
    Buffalo, New York 14202
12  Telephone: (716) 849-1333
    Facsimile: (716) 855-1580
13
    Attorneys for Defendant Michael Lacey
14
    *[Additional counsel listed on next page]*
15

16              **UNITED STATES DISTRICT COURT**

17             **FOR THE DISTRICT OF ARIZONA**

18

| | |
|---|---|
| 19   United States of America, | CASE NO. 2:18-cr-00422-PHX-DJH |
| 20            Plaintiff, | **DEFENDANTS' BRIEF IN SUPPORT OF OBJECTIONS TO COURT RULINGS DURING FERRER TESTIMONY** |
| 21        vs. | |
| 22   Michael Lacey, et al., | |
| 23            Defendants. | |

24

25

26

27

28

3893354.2

Eric W. Kessler, 009158
    eric.kesslerlaw@gmail.com
Kessler Law Group
6720 N. Scottsdale Rd., Suite 210
Scottsdale, AZ  85253
Telephone: (480) 644-0093
Facsimile: (480) 644-0095

Bruce S. Feder, 004832
    bf@federlawpa.com
FEDER LAW OFFICE, P.A.
2930 E. Camelback Road, Suite 160
Phoenix, Arizona 85016
Telephone: (602) 257-0135

Attorney for Defendant Scott Spear

David Eisenberg, 017218
    david@deisenbergplc.com
DAVID EISENBERG PLC
3550 N. Central Ave., Suite 1155
Phoenix, Arizona 85012
Telephone: (602) 237-5076
Facsimile: (602) 314-6273

Attorney for Defendant Andrew Padilla

Joy Malby Bertrand, 024181
    joy.bertrand@gmail.com
JOY BERTRAND ESQ LLC
PO Box 2734
Scottsdale, Arizona 85252
Telephone: (602) 374-5321
Facsimile: (480) 361-4694

Attorney for Defendant Joye Vaught

# **<u>TABLE OF CONTENTS</u>**

Page

I.     Admission of Exhibits Under the Rule of Completeness That Establish
       Defendants' Good Faith ........................................................................ 5

       A.     Exhibit 616 (November 2010 Correspondence Between Jim Larkin,
              Steve Suskin, and Representatives of BMO) .................................. 7

       B.     Responses to the State AG Letters .................................................. 9

       C.     Exhibit 836 (July 2016 Correspondence Between Liz McDougall and
              *The Wall Street Journal*) .............................................................. 10

II.    Ferrer's Prior Statements Regarding the California Criminal Complaints Are
       Classic Impeachment. ......................................................................... 11

       A.     Ferrer Personally Waived the Attorney-Client Privilege as to the
              Impeachment Material. ................................................................. 14

       B.     The Format of the Prior Inconsistent Statements Is Irrelevant ......... 15

III.   Reference to Attorney Advice and Prior Litigation ................................ 16

IV.    CONCLUSION ................................................................................... 18

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Arthur v. Gallagher Bassett Servs., Inc.,*
5       No. CV 09-4882 SVW (CWX), 2010 WL 11596468, at *6 (C.D. Cal.
        June 1, 2010) .......................................................................................................... 8
6

7
*Beech Aircraft Corp. v. Rainey*
        488 U.S. 153, 109 S. Ct. 439 (1988) ................................................................. 5, 6
8

9
*United States v. Cedeno-Cedeno*
        No. 14CR3305, 2016 WL 4376845 (S.D. Cal. Aug. 17, 2016) ................................ 8

10

11
*United States v. Collicott*
        92 F.3d 973 (9th Cir. 1996) ...................................................................................... 6

12

13
*United States v. Monroe*
        943 F.2d 1007 (9th Cir. 1991) ................................................................................ 15

14
*United States v. Morgan*
        555 F.2d 238 (9th Cir. 1977) .................................................................................. 13
15

16
*United States v. Ortega*
        203 F.3d 675 (9th Cir. 2000) .................................................................................... 6

17

**Statutes**

18

47 U.S.C.A. § 230 ......................................................................................... 7, 8, 11
19

20
18 U.S.C. § 1952 ..................................................................................................... 9

21

**Other Authorities**

22

Fed. R. Evid.
        106 ........................................................................................................... 5, 6, 7, 9
23
        401 .......................................................................................................................... 5
        402 .......................................................................................................................... 5
24
        801(d)(1)(A) ................................................................................................... 15, 16

25
U.S. Const. amend. I ............................................................................................. 11

26

27

28

1    Defendants file this brief to address certain rulings that restricted defense counsel's

2    ability to let the jury hear the truth and impeach Ferrer.

3    **I.**    **Admission of Exhibits Under the Rule of Completeness That Establish**

4    **Defendants' Good Faith**

5    Federal Rule of Evidence 106 states: "If a party introduces all or part of a writing or

6    recorded statement, an adverse party may require the introduction, ***at that time***, of any

7    other part—or any other writing or recorded statement—that in fairness ought to be

8    considered at the same time." (emphasis added).  Because different courts have exercised

9    judgment differently in this respect, Rule 106 has been amended to clarify that the rule

10   should not be construed narrowly.  Effective December 1, 2023, the clarifying amendment

11   states: "If a party introduces all or part of a statement, an adverse party may require the

12   introduction, at that time, of any other part—or any other statement—that in fairness ought

13   to be considered at the same time. ***The adverse party may do so over a hearsay objection***."

14   (emphasis added).  The Advisory Committee Notes regarding the amendment state:

15   
16   > [T]he amendment provides that if the existing fairness standard requires
      > completion, then that completing statement is admissible over a hearsay
      > objection. Courts have been in conflict over whether completing evidence
17   > properly required for completion under Rule 106 can be admitted over a
      > hearsay objection. ***The Committee has determined that the rule of***
18   > ***completeness, grounded in fairness, cannot fulfill its function if the party***
      > ***that creates a misimpression about the meaning of a proffered statement***
      > ***can then object on hearsay grounds and exclude a statement that would***
19   > ***correct the misimpression.*** (emphasis added.)

20   In other words, an email cannot selectively be redacted to omit necessary context on

21   the basis that the redacted, exculpatory portion of the email is hearsay.

22   Under Rule 106, "when one party has made use of a portion of a document, such

23   that misunderstanding or distortion can be averted only through presentation of another

24   portion, the material required for completeness is *ipso facto* relevant and therefore

25   admissible under Rules 401 and 402."  *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 172,

26   109 S. Ct. 439, 451 (1988).  In *Rainey*, a case involving the crash of a Navy training

27   aircraft, one of the plaintiffs (both of whom were surviving spouses of the pilots) was

28   called as an adverse witness during the defendant's case.  The Supreme Court held that the

3893354.2

5

trial court abused its discretion in restricting the cross-examination of plaintiff (by his own counsel) by precluding questioning regarding certain aspects of a letter the plaintiff wrote to the Navy that were not covered on direct examination. *Id*. at 170. Specifically, "read in its entirety," the letter was "fully consistent" with plaintiff's theory that the accident was caused by a power failure. *Id*. By not permitting plaintiffs' counsel to delve into the entire letter, "[i]t is plausible that a jury would have concluded from this information that [plaintiff] did not believe in his theory of power failure and had developed it only later for purposes of litigation." *Id*. at 171. The Supreme Court affirmed the Court of Appeals' ruling that it was "***reversible error*** for the trial court to have prohibited cross-examination about additional portions of [plaintiff's] letter which would have put in context the admissions elicited from him on direct." *Id*. at 160-161, 175 (emphasis added).

At Dkt. 1776, the government relies on several cases for its objection to the admission of purported "self-serving" hearsay. Those cases are readily distinguishable. *United States v. Ortega*, 203 F.3d 675, 679 (9th Cir. 2000) involved a post-crime confession to the government. The Ninth Circuit held that a defendant cannot introduce self-serving statements through a government interviewer by mixing in mitigating circumstances to an inculpatory confession. *Id*. at 682. Further, the defendant's statement was an "unrecorded oral confession," and therefore not subject to Rule 106, which "applies only to written and recorded statements." *Id*.

Likewise, in *United States v. Collicott*, 92 F.3d 973, 977 (9th Cir. 1996), the Court held that Rule 106 did not apply to certain statements made by a witness to law enforcement because (1) "no writing or recorded statement was introduced by a party," (2) the statements made by the witness to law enforcement were otherwise inadmissible hearsay, and (3) "the complete statement did not serve to correct a misleading impression of a prior statement created by taking [the witness'] comments out of context." *Id*. at 983. None of these cases apply to an *email* that has been selectively redacted by the Government to exclude *admissible* hearsay. And the Government ignores the clarifying amendment to Rule 106, which makes clear the impropriety of its redactions.

6

A. **<u>Exhibit 616 (November 2010 Correspondence Between Jim Larkin, Steve Suskin, and Representatives of BMO)</u>**

On September 15, 2023, Exhibit 616a was admitted during the direct examination of Carl Ferrer over Brunst's FRE 106 objection. 09/15/23 Tr. at 12-13. The Government introduced certain portions of Exhibit 616a to show that Brunst was involved with, and on notice of, certain issues being raised by Bank of Montreal (BMO). The Court denied the defense request to admit the entire exhibit during direct examination. The Court told defense counsel, "you can discuss it in your examination of the witness." *Id.* at 12:25-13:2.

Under the rule of completeness, the unredacted email (set forth at Exhibit 616) should have been admitted on direct examination. During cross, Brunst's counsel was not permitted to introduce the redacted portion and was not permitted to ask about key portions—including Larkin's statement to his subordinates and the bank that Backpage's operations were lawful. *See* 09/27/23 PM Tr. at 123:18-21, 124:20-126:13 (severely limiting what counsel could reference in his cross-examination of Ferrer).

Exhibit 616a is a series of back-and-forth emails between Spear, Larkin, and Mary Latta of BMO, copying Brunst. In connection with Brunst, the Government used the e-mail to highlight that the content was shared with Brunst. The government elicited testimony from Ferrer that Backpage's communications with BMO merely "created the impression that we're shutting down these [adult] categories . . . . So the whole thing is a sham." 09/15/23 Tr. at 14:5-16. The unredacted email makes clear that the communications to BMO started with an email from Larkin to BMO, and then, in response to a question from BMO, Spear added more detail.

The redacted portion of the e-mail thread—Larkin's email to BMO that was part of the email chain copied to Brunst—tells BMO, *inter alia*, about moderation steps, that Backpage's operations are lawful, and that Connecticut AG Blumenthal is attacking Backpage as part of an attack on the Communications Decency Act (CDA) in a "political dance" to help him get elected to the Senate. By redacting Exhibit 616a to present an

incomplete email to the jury, the Government successfully left the jury with the false impression that Brunst was made aware of the site being used for illegal purposes, while hiding the underlying email from Larkin advising Brunst and others that Backpage's operations were "clearly lawful."

The redacted portion of the email gives critical context to the notice provided to Brunst.  This notice provided by the redacted portion of the email, which is relevant to Brunst's mental state, is a non-hearsay purpose.  *See Arthur v. Gallagher Bassett Servs., Inc.*, No. CV 09-4882 SVW (CWX), 2010 WL 11596468, at *6 (C.D. Cal. June 1, 2010) ("An out-of-court statement offered for any purpose other than to prove its truth - i.e., to prove the defendant's state of mind or the effect on the listener - is not hearsay").  Further, Defendants should have been permitted to cross-examine Ferrer regarding any impression he formed about Larkin's email to BMO, *i.e.*, the **same basis** for the Government's admission of the **unredacted** portion of the communication.  *See id.; see also United States v. Cedeno-Cedeno*, No. 14CR3305, 2016 WL 4376845, at *8 (S.D. Cal. Aug. 17, 2016) ("Out-of-court statements introduced to show the effect on the listener are not hearsay."); 09/15/23 Tr. at 15:6-8, 17:10-11 (regarding Mr. Spear's e-mail to Ms. Latta, the Government asked Mr. Ferrer what he understood "that statement to mean").

The exhibit also highlights why precluding references to the CDA—a defense to state civil and criminal cases—also leads to a completely misleading presentation of evidence.  As the Court has now seen, the Government has relied heavily on **State Attorneys General** communications with Backpage.  The government has squarely put at issue what Backpage's responses to these AGs **actually were**.  08/31/23 Tr. at 169:9-13 ("These defendants also received letters from the National Association of Attorneys General. They received a number of those letters. And one of their responses was, look at our moderation program. Look at how we're reducing prostitution on our website."); 09/12/23 PM Tr. at 48:18-25; 09/13/23 AM Tr. at 69:7-13; 09/13/23 PM Tr. at 76:6-79:3, 82:5-85:4 (Ferrer testifying that the response to the AGs was "deceptive, highly misleading"), 93:9-94:4; 09/14/23 AM Tr. at 17:2-17, 31:24-32:2, 53:5-59:20, 86:12-15.

8

The AG letters plainly are not notice of a Federal Travel Act violation; at most, they are notice of a potential prosecution under state law as to which the CDA was a defense.

Any rational juror would wonder (1) why Backpage was never charged by an AG at the time the letters were sent (it was only in late 2016 when the State of California brought charges against Larkin, Lacey, and Ferrer) and (2) whether Backpage had any viable defenses to the AG's accusations at the time, and if so, what Backpage said in response. The government therefore should not be allowed to create the misimpression for the jury that Backpage (1) did nothing in response to the AG letters or (2) lacked legal recourse against the State AGs, when they had a complete defense under the CDA.

### B. Responses to the State AG Letters

As noted above, the government put in several letters from State Attorneys General regarding the content on the Backpage site. *See* Exhs. 52, 119, 902. Over objections under Rule 106, the Court allowed the AG letters in, without admitting the corresponding responses from Backpage's attorney, Samuel Fifer. In ruling on the objection (Mr. Feder stated, "I would also ask under Rule 106 for the other letters responsive to this to be shown to the jury"), the Court stated, "You can do that when it's your turn, so overruled." 09/13/24 PM Tr. at 82:16-19. But the defense was not permitted to put into evidence the responsive letters from Backpage at Exhibits 487 and 5019. 09/26/23 PM Tr. at 15-18.

Under Rule 106, and because the government has "opened the door," there are several bases for the admission of Backpage's responses to the AG letters. First, the government put the responses at issue by eliciting testimony from Ferrer regarding the fact that there were responses, that the "owners" (*i.e.*, certain of the Defendants) provided the responses, and that the responses were purportedly "deceptive" and "highly misleading." 09/13/23 PM Tr. at 84:15-19. Therefore, at a minimum, defense counsel should have been permitted to admit the responses and ask Ferrer point-by-point as to what portions he considered to be deceptive.

Second, the AG letters themselves reference Backpage's responses and therefore put them at issue. *See* Exh. 52 at 1 ("Thank you for your recent letter notifying us of

1    additional changes backpage has implemented in order to respond to our concerns . . . ."),

2    ("As you indicated in your recent letter to us, you found that once you began charging for

3    ads in the adult services section of the site . . . ."); Exh. 119 at 1 ("This letter is in response

4    to Backpage.com's assurances . . . ), *id.* at 3-4 (addressing Backpage's "representations"

5    made in prior responsive letters).

6         Third, the Court held that the AG letters are "being offered for the knowledge of

7    certain defendants as to what was going on at Backpage as alleged in the indictment."

8    09/14/23 AM at 66:21-67:1.  But the indictment merely alleges the Government's side of

9    the story.  The defense is entitled to respond to the indictment's charges and what

10   purportedly was in their "knowledge" by putting in the responsive letters.  This is

11   particularly the case as to Brunst.  Ferrer testified that he did not consult with Brunst on the

12   responses to the AG letters.  09/27/13 AM Tr. at 92:21-93:5.  The responses themselves

13   are therefore critical to show Brunst's state of mind as to Backpage's position vis-à-vis the

14   AGs and the steps he understood Backpage to be taking to address the AG's concerns.

15   There is no testimony that Ferrer told Brunst the responses were deceptive or misleading.

16   Therefore, Brunst's reliance on the responsive letters would not amount to "self-serving"

17   hearsay—the letters instead go to his understanding as the CFO of the holding company

18   that outside counsel had been retained to engage in a cooperative dialogue with the State

19   AGs, which provided him comfort that any legal issues posed by the AG letters were being

20   sufficiently addressed.

21        **C.**      **Exhibit 836 (July 2016 Correspondence Between Liz McDougall and**

22                    ***The Wall Street Journal*)**

23        Over objection by the defense, the Court admitted Exhibit 836a, a heavily redacted

24   version of Exhibit 836, for the purpose of showing that WSJ was communicating with

25   Backpage's General Counsel regarding *The Erotic Review*.  09/22/23 AM Tr. at 42-44.  In

26   the redacted portion of the email, which prompts the WSJ response that was admitted,

27   Ms. McDougall says to the WSJ reporter, for example, "[Y]our questions and observations

28   about TER numbers are concerning because they suggest you may not have a good

1   understanding of the complexities of moderating third-party content online."  The

2   government should not be permitted to cherry-pick what it unilaterally deems to be

3   admissible hearsay and keep out exculpatory hearsay that provides necessary context.  As

4   Mr. Ferrer is later copied into the e-mail exchange, defense counsel should have been

5   permitted to ask him about his reaction to Ms. McDougall's redacted comments to WSJ.

6   **II.**   **Ferrer's Prior Statements Regarding the California Criminal Complaints Are**

7   **Classic Impeachment.**

8         The Court did not permit Mr. Lincenberg to use GL-CF-36 (May 18, 2017 email

9   from Ferrer to James Grant and Daniel Quigley[1]) and GL-CF-37 (Ferrer's prior

10  inconsistent statements) to impeach Ferrer.  On September 26, 2016, the California

11  Attorney General filed a criminal complaint against Lacey, Larkin, and Ferrer charging

12  pimping and related crimes.  Exh. 5917.  After the court dismissed the complaint,[2]

13  California then came back on December 23, 2016, and charged these same individuals

14  with the same pimping and related crimes, while adding money laundering charges.

15  Exh. 5919.  California subsequently amended its complaint to include additional money

16  laundering charges premised on bank fraud, after which the court dismissed the pimping

17  and related charges and the money laundering charges based on pimping, leaving just the

18  money laundering charges premised on bank fraud.  (Those charges were pending at the

19  time of the federal indictment and are currently stayed.).

20        The money laundering charges in the California case are based on the same

21

22  [1]  Mr. Quigley, an attorney, represented Medalist Holdings, Inc. (f/k/a New Times, Inc.)
    and its subsidiaries—the companies owned by Larkin and defendants Lacey, Brunst, and

23  Spear.  Mr. Quigley did not represent Ferrer in the California criminal cases.

24  [2]  In dismissing the complaint, the California court expressly stated that the prosecution

25  implicated the First Amendment, even though the court resolved the case on statutory
    grounds under the CDA and did not need to reach the constitutional issue presented.  Exh.

26  5324 at 4 (stating that "The First Amendment is implicated" and "Indeed, the protections
    afforded by the First Amendment were the motivating factors behind the enactment of the

27  CDA.  Congress expressly intended to relieve online publishers from liability for

28  publishing third-party speech").

3893354.2

11

allegations as those made by the Government here.  For example, the California criminal complaint alleges:

- The creation of Classified Solutions, Website Technologies, and PostFastr.  *Id.* at 2.

- "Ferrer applied for a merchant account with the payment processor Stripe for the classified site Postfastr.com.  He omitted any reference to Backpage.com, but planned to use the account to process Backpage transactions."  *Id*. at 3.

- "In early 2015, Defendant Ferrer received notice from American Express that the company would not process Backpage transactions after May 1, 2015.  Defendant Ferrer directed Backpage personnel to 'bury' a message notifying users that American Express would not be accepted, but to process any American Express payments that Backpage users attempted."  *Id.* (also discussing the use of "credits").

As part of Ferrer's Plea Agreement here, he pled guilty to money laundering in the California state criminal case.  Exh. 5994-2 at 3.  On April 12, 2018, Ferrer pled guilty in California to conspiracy to commit money laundering and three substantive money laundering counts. Exh. A at ¶ 1.  In the California plea agreement, Ferrer stipulated that "Because of the nature of the revenue stream, several financial institutions refused to process payments for advertisements on Backpage.com.  However, Defendant created new merchant accounts, manipulated billing descriptors, misled financial institutions, and created shell companies in order to circumvent the financial institutions' unwillingness to process Backpage.com's commercial sex and other transactions."  *Id*. at ¶ 2.

These allegations are precisely what the Government has tried to demonstrate in the instant case.  For example, Ferrer has testified here as follows:

- Regarding banking, "Q. Did you do anything to try to conceal the fact that Backpage was the ultimate recipient of the credit card transactions, the revenue? THE WITNESS: Yes. We created holding companies."  09/12/23 PM Tr. at 71:15-20.

3893354.2

DEFENDANTS' BRIEF IN SUPPORT OF OBJECTIONS
TO COURT RULINGS DURING FERRER TESTIMONY

SER-79

- "Posting Solutions was another shell company similar to, like, Website Technologies, very generic sounding company that we could open bank accounts with."  09/21/23 PM Tr. at 89:8-10.

- Referring to the use of "credits":  "[W]e can direct them to PostFaster and there they can buy credits and the credits they buy in PostFaster will automatically appear under Backpage so we can manage their ad through PostFaster."  09/20/23 PM Tr. at 99:21-100:8.

- Ferrer testified that Backpage changed "billing descriptors" so "Chase won't know or Chase won't figure it out for a while and the transaction will go through."  09/20/23 PM Tr. at 21:14-22:8.

But in response to the allegations in the California case, Ferrer made contemporaneous statements completely at odds with his testimony on direct examination. Counsel attempted to impeach Ferrer with three of those statements:  (1) that when a payment processing contract is filled out and months are spent vetting the contract, there is no disguising of the transaction; (2) there is no evidence of fraudulent merchant bank applications; and (3) a money laundering charge is an attempt to "legislate by prosecution" regarding government pressure to cut off unpopular speech.  GL-CF-37 at 1.  The document notes "CARL COMMENT," followed by the prior inconsistent statements. Because counsel was cut off from using GL-CF-37, counsel never even got to use the other impeachment material from the document.[3]  For example, there are further prior inconsistent statements at the end of the document regarding the purpose of Website Technologies and "standard practice" regarding payment processing.  *Id.* at 44.  These statements are plainly inconsistent with Ferrer's trial testimony.  *See United States v. Morgan*, 555 F.2d 238, 242 (9th Cir. 1977) (prior inconsistent statement admissible "whenever a reasonable man could infer on comparing the whole effect of the two

---

[3]  Moreover, in addition to GL-CF-37, there are other documents of a similar nature which Ferrer prepared, in the same time frame, that also contain statements directly at odds with his trial testimony in this case.

1  statements that they had been produced by inconsistent beliefs.") (quoting 4 Weinstein's

2  Evidence, Matthew Bender, P. 801-76 801-76.1 (1976)).

3       Sustaining the Government's objections, the Court precluded this impeachment,

4  reasoning that the statements may be privileged, it is unclear who authored the statements,

5  the document had strike-outs, the notes may have been a draft, and the statements were not

6  under oath.  09/27/23 PM Tr. at 59-65; 09/28/23 AM Tr. at 65-71.  But the Court refused

7  to allow counsel to address some of these questions through examination of Ferrer, and

8  none of these are proper reasons to keep out the impeachment.

9      **A.**    **<u>Ferrer Personally Waived the Attorney-Client Privilege as to the</u>**

10          **<u>Impeachment Material.</u>**

11       First, as part of his Proffer/Interview Agreement with the Government, Ferrer

12  waived any privileges applicable to the impeachment material:

> Mr. Ferrer ***voluntarily waives all claims of attorney-client privilege, whether in his personal or official capacity as the Chief Executive Officer of Backpage.com, LLC as to communications with any attorney or law firm that represented Backpage.com, or any related entity, where such communications concerned or related to Backpage.com or any related entity.*** This waiver does not apply to Mr. Ferrer's current attorneys, Nanci Clarence, Jonathan Baum and anyone working on their behalf. Mr. Ferrer voluntarily agrees to provide all documents and other material that may be relevant to the investigation and that are in his possession or control. However, Mr. Ferrer shall not disclose any documents or information protected by the Joint Defense Agreement in this matter. Mr. Ferrer understands that his proffer/interview and any benefit he may receive from information he provides to the prosecution does not depend on his waiver of the attorney-client privilege.

21  Exh. 6177 at ¶ 2 (emphasis added) (previously filed at Dkt. 940-2 at 23).

22       There can be no dispute that Ferrer waived privilege as to the impeachment

23  material, given that the material reflects his comments to attorneys regarding the California

24  criminal complaint that concerns his role as the former CEO of Backpage.  Ferrer's

25  counsel points to a *separate* waiver that concerns only privileges held by various corporate

26  entities.  Dkt. 1825.  But the waiver at issue deals with privileges held by ***Ferrer*** in his

27  "personal or official capacity."

28       Second, as part of a June 2017 Joint Defense/Common Interest and Confidentiality

14

Agreement entered into by the Defendants and Ferrer, Ferrer agreed:

> Any client signatory who enters into a cooperation agreement with the government or *who testifies as a witness* in any civil, administrative, or criminal proceeding arising from the Case[4] *consents to any other signatory using for defense purposes any information or material contributed by the client or by his or her attorney*. *This specifically permits use of contributed information or material in cross-examining the witness and permits the presentation of their information or material by the defense at any point of the proceedings*. Each undersigned attorney has explained fully to his or her client the limitations on direct use of the information obtained pursuant to this Agreement. Each Party represents that he/it has considered the foregoing and believes the benefits of being a signatory to this Agreement outweigh any of the limitations imposed by this Agreement.

Exh. B at ¶ 6 (redacted version of JDA).[5]

This provision of the JDA plainly permits Defendants to use Ferrer's prior statements—even assuming they are privileged and there has been no waiver—for impeachment purposes.

### B.     The Format of the Prior Inconsistent Statements Is Irrelevant.

Prior statements need not be under oath to be used for impeachment purposes. "A basic rule of evidence provides that prior inconsistent statements may be used to impeach the credibility of a witness." *United States v. Monroe*, 943 F.2d 1007, 1012 (9th Cir. 1991) (citations and quotation marks omitted) (holding that the district court's ruling that "prior inconsistent statements could not be introduced for impeachment purposes since they had not been given under oath pursuant to Fed. R. Evid. 801(d)(1)(A) . . . *was clearly*

---

[4]    The JDA defines "Case" as "all matters relating to the case of the Arizona federal grand jury investigation and any related proceedings."

[5]    The JDA was previously provided to the Court for *in camera* review in opposition to the Government's Motion to Resolve Attorney-Client Privilege Issues.  Dkt 345 at 4 n.3. A redacted version of the JDA is attached hereto.  In that Order, the Court stated that it "declines to address the issue of whether Ferrer had authority to waive Backpage's corporate attorney-client privilege based on the Defendants' argument that the attorney-client privilege was owned and later shared with Village Voice Media Holdings, LLC." *Id*. at 4 n.4.  In any event, the Court has never decided the issue of whether, pursuant to the JDA, Defendants may use joint-defense material contributed by Ferrer for the purpose of cross-examining Ferrer.

1  *erroneous*") (emphasis added).

2      Further, the Court's concerns regarding the format of the statements could have

3  been addressed through cross-examination of Ferrer.  *Id*. ("The prior statements may have

4  been oral and unsworn, and the making of the previous statements may be drawn out on

5  cross-examination of the witness himself, or if on cross-examination the witness has

6  denied making the statement, or has failed to remember it, the making of the statement

7  may be proved by another witness.") (citations and quotation marks omitted).  These issues

8  flagged by the Court go to weight and can be further explored on re-direct.  The

9  Government seeks to hold Defendants liable for money laundering under *Pinkerton* based

10 on Ferrer's supposed crimes; therefore, the defense should be allowed to bring out that

11 Ferrer himself did not believe he committed any crimes (and that he just said he did to get

12 the benefits of his deal with the Government).

13 **III.    <u>Reference to Attorney Advice and Prior Litigation</u>**

14      The Government has sought to use attorney advice and attorney involvement

15 regarding Backpage as a sword and a shield.  The Government has put in evidence

16 communications involving attorneys (like Steve Suskin, Liz McDougall, Don Moon,

17 Samuel Fifer, Ed McNally, Hemu Nigam, and others) as part of a tack to establish that

18 Defendants were acting in bad faith.  For example, the Government elicited testimony

19 from Ferrer that:

20 - Steve Suskin was "in-house counsel" and presented "sham" statements to CNN

21   in connection with Backpage's dealings with State AGs.  09/14/23 PM Tr. at

22   68:3-69:21.

23 - Hemu Nigam suggested responding to CNN with a statement so that the reporter

24   could "have more substance to utilize that positions Backpage.com in the best

25   light."  09/15/23 Tr. at 41:6-22.

26 - Ferrer testified to Backpage's "legal strategy" regarding its responses to the AG

27   letters (Exh. 588 at Slide 23) involved a "slow dance," the implication being that

28   Backpage's legal strategy was to deceive the AGs.  09/13/23 PM Tr. at

108:6-18.

- In connection with the use of Bank Frick, Ferrer testified that "Jed Brunst even ask[ed] that I hire a lawyer and threaten them," commenting that he thought "it was not a good strategy." 09/21/23 PM Tr. at 78:7-18. The Government then introduced Exhibit 1230, in which Brunst tells Ferrer that he should "fire up [DLA] Piper and get them to send a letter stating that the wire is for the payment of debts owed." *Id*. at 80:19-81:8. The Government followed up by asking Ferrer, "When you said that Mr. Brunst was suggesting you get a lawyer to go after the Frick bank, is this email, does that sort of reference that?" Ferrer responded, "Yes . . . [DLA] Piper is who we would fire up to send a letter." *Id*. at 80:23-81:12.

But when Defendants sought to tell the other half of the story, or further illuminate for the jury the roles these individuals held with respect to Backpage, the Government objected, with the Court generally sustaining those objections.

For example, that Hemu Nigam—whom Backpage retained to oversee its moderation efforts—formerly was a state sex crimes prosecutor and then a federal Internet sex crimes prosecutor is highly relevant.[6] That Backpage hired someone with Nigam's background undermines both the Government's claims that Defendants intended to deceive law enforcement and facilitate business enterprises involved in prostitution, as well as the implication from Ferrer's testimony that Nigam was part of a criminal conspiracy. *See, e.g.,* 09/15/23 Tr. at 31:12-33:10 (referring to Nigam's efforts as a "sham" that would not "eliminate prostitution ads."); Exh. 938. Defendants should be able to argue to the jury in closing, "If Defendants intended to facilitate business enterprises involved in prostitution, why would they hire someone who spent ten years as a state and federal sex crimes prosecutor to oversee Backpage's moderation practices? Doesn't that show the opposite— that Defendants were serious about moderating the content on Backpage?" None of this

---

[6]   https://www.venable.com/professionals/n/hemanshu-nigam

3893354.2

17

gets into "advice of counsel." But when the defense probed this area, the Government's objections were sustained. 09/26/23 PM Tr. at 12:22-25. There are at least 50 references to Nigam in Ferrer's direct testimony. The Government chose to interject Nigam into the trial and to elicit testimony from Ferrer casting aspersions at Nigam (and Defendants' affiliation with him), but now seeks to hide his credentials from the jury. This is particularly significant as to Brunst. Ferrer has testified Brunst was not "affiliated or a part of the moderation department" (09/27/23 AM Tr. at 89:18-22). But as CFO of the holding company, Brunst would have taken comfort in the fact that a former federal prosecutor was dealing with moderation, a fact that plainly goes to Brunst's good faith and lack of intent.

Further, on the Government's motion, the Court has precluded the defense from referencing prior litigation. But the Government sought to use contemplated litigation as a fact *against* Brunst by eliciting testimony from Ferrer regarding the possible retention of DLA Piper to threaten Bank Frick, a strategy with which Ferrer said he disagreed. The implication from this testimony is that banks were giving Backpage trouble, Brunst thought involving lawyers would be a good idea, and Ferrer disagreed. Of course, this testimony is directly contradicted by Backpage's decision to sue Sheriff Dart to get its credit card processing back, a decision that was made when Ferrer owned the company and was CEO (and a decision that contemporaneous emails show Ferrer agreed with, *e.g.*, Exh. 6025). But the defense has been precluded from referencing any prior litigation, even where the initiation of such litigation was in direct response to events that the Government has put at issue (like "credit card Armageddon").

## IV.   **CONCLUSION**

For the foregoing reasons, Defendants request that the Court permit the admission of the exhibits, impeachment material, and testimony discussed herein.

*Pursuant to the District's Electronic Case Filing Administrative Policies and Procedures Manual (May 2023) § II(C)(3), Gary S. Lincenberg hereby attests that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's*

DEFENDANTS' BRIEF IN SUPPORT OF OBJECTIONS
TO COURT RULINGS DURING FERRER TESTIMONY

**SER-85**

1    *content and have authorized its filing.*

2

3    DATED:  October 5, 2023          Respectfully submitted,

4                                     Gary S. Lincenberg

5                                     Ariel A. Neuman
                                      Gopi K. Panchapakesan
6                                     Bird, Marella, Boxer, Wolpert, Nessim,
                                      Drooks, Lincenberg & Rhow, P.C.
7

8                                     By:  _____*/s/ Gary S. Lincenberg*_____

9                                              Gary S. Lincenberg
10                                       Attorneys for Defendant John Brunst

11

12   DATED:  October 5, 2023          Kessler Law Group

13                                    By:  _____*/s/ Eric W. Kessler*_____

14                                             Eric W. Kessler
                                         Attorney for Defendant Scott Spear
15

16   DATED:  October 5, 2023          Paul J. Cambria
                                      Erin McCampbell Paris
17                                    Lipsitz Green Scime Cambria LLP

18                                    By:  _____*/s/ Paul J. Cambria*_____

19                                             Paul J. Cambria
20                                       Attorneys for Defendant Michael Lacey

21   DATED:  October 5, 2023          Feder Law Office, P.A.

22

23                                    By:  _____*/s/ Bruce S. Feder*_____

24                                             Bruce S. Feder
                                         Attorney for Defendant Scott Spear
25

26

27

28

3893354.2                                    19

1   DATED:  October 5, 2023          The Law Office of David Eisenberg, PLC

2                                    By: _____
                                             /s/ David Eisenberg
3                                             David Eisenberg
                                     Attorney for Defendant Andrew Padilla
4

5   DATED:  October 5, 2023          Joy Bertrand Esq. LLC

6                                    By: _____
                                             /s/ Joy Malby Bertrand
7                                             Joy Malby Bertrand
                                     Attorney for Defendant Joye Vaught
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3893354.2                          20

DEFENDANTS' BRIEF IN SUPPORT OF OBJECTIONS
TO COURT RULINGS DURING FERRER TESTIMONY            **SER-87**

Exhibit A

FILED / ENDORSED

APR 1 2 2018

By [signature] Deputy Clerk

1  XAVIER BECERRA
   Attorney General of California
2  JAMES ROOT
   Senior Assistant Attorney General
3  RANDY MAILMAN
   Deputy Attorney General
4  State Bar No. 246134
   1300 I Street, Suite 125
5  P.O. Box 944255
   Sacramento, CA 94244-2550
6  Telephone: (916) 210-7253
   Fax: (916) 322-2368
7  E-mail: Randy.Mailman@doj.ca.gov
   *Attorneys for the People of the State of*
8  *California*

9

10                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                              COUNTY OF SACRAMENTO

12

13  **PEOPLE OF THE STATE OF**          Case No. 16FE024013
    **CALIFORNIA,**
14
                              Plaintiff,
15                                         **PLEA AGREEMENT**
           **v.**
16

17  **CARL FERRER**
    (DOB: 03-16-1961) (Xref # 5094010)
18
                              Defendant.
19

20

21         In order to resolve the charges against him, Carl Ferrer ("Defendant"), represented by and

22  through his attorney of record, Nanci Clarence, agree with the People as follows:

23         1.     Defendant will plead **guilty** to counts 1, 2, 3, and 12 in the First Amended

24  Criminal Complaint charging him as follows:

25             a.  Count 1 – Conspiracy to commit money laundering in violation of California

26                 Penal Code sections 182 (a)(1) and 186.10(a)(1) and (2), a felony.

27             b.  Count 2 – Money laundering in violation of Penal Code section 186.10(a), a

28                 felony.

                                          1

    c.   Count 3 – Money laundering in violation of Penal Code section 186.10(a), a felony.

    d.   Count 12 – Money laundering in violation of Penal Code section 186.10(a), a felony.

2.      The People and Defendant stipulate to the following facts:

On or between January 1, 2013 and September 1, 2016, in the County of Sacramento and throughout the State of California, Defendant, along with Michael Lacey and James Larkin, operated multiple websites, including Backpage.com. Backpage.com offers online classified services, but its overwhelming source of income was generated by charging customers money to post advertisements in the adult escort section. Because of the nature of the revenue stream, several financial institutions refused to process payments for advertisements on Backpage.com. However, Defendant created new merchant accounts, manipulated billing descriptors, misled financial institutions, and created shell companies in order to circumvent the financial institutions' unwillingness to process Backpage.com's commercial sex and other transactions.

Between July 1, 2014 and July 31, 2014, Defendant transferred, between bank accounts, more than $563,575 in revenue generated from the sale of California based adult services section advertisements on Backpage.com, through Bank Corporation, Wells Fargo, and J. P. Morgan Chase, knowing that the money represented the proceeds of bank and wire fraud.

Between August 1, 2014 and August 31, 2014, Defendant transferred, between bank accounts, more than $1,099,309 in revenue generated from the sale of California based adult services section advertisements on Backpage.com, through Bank Corporation, Wells Fargo, and J. P. Morgan Chase, knowing that the money represented the proceeds of bank and wire fraud.

Between May 1, 2015 and May 31, 2015, Defendant transferred, between bank accounts, more than $48,288.85 in revenue generated from the sale of California based adult services section advertisements on Backpage.com, through American Express, knowing that the money represented the proceeds of bank and wire fraud.

3.      Defendant agrees to cooperate with the investigation and prosecution of co-conspirators Michael Lacey and James Larkin in Sacramento County Superior Court case number 16FE024013 by making himself available to the Attorney General's Office to assist in the investigation and prosecution, truthfully recalling and relating information regarding the case, providing truthful testimony at preliminary hearing, grand jury, trial, or other court proceeding

2

PLEA AGREEMENT

SER-90

without further process of subpoena, identifying forfeitable assets, and providing access to Backpage.com transaction data.

4. No later than five business days after entering this plea agreement, or otherwise as directed by the U.S. Attorney's Office for the District of Arizona, Defendant agrees to take all steps within his power to shut down Backpage.com in all countries where it operates.

5. No later than fourteen business days after entering this plea agreement, or otherwise as directed by the U.S. Attorney's Office for the District of Arizona, Defendant agrees to take all steps within his power to forfeit, to the United States, all operating rights for all internet domains—such as Backpage, Ymas, Postfastr, and Truckrjobs—used to operate the website Backpage.com throughout the world.

6. Defendant agrees that he will make Backpage.com data available for law enforcement and act as the declarant to authenticate business records as the custodian of records, if necessary, until the time of sentencing,

7. The People and Defendant agree that sentencing will be scheduled for as soon as possible after Defendant has completed his cooperation and after sentencing in the federal matter.

8. The maximum sentence that can be imposed under this plea agreement is 5 years. Admission to the factual basis contained in paragraph 2 will not be used to support the imposition of enhancements under Penal Code § 186.10 subd. (c).

9. Pursuant to Penal Code § 1192.5, the People agree to recommend that Defendant be sentenced to a period of incarceration concurrent with and not to exceed the custodial time imposed in the matter of *United States v. Carl Ferrer*, United States District Court, District of Arizona, case number CR-18-464-PHX-DJH. Such sentence shall be served in a federal facility. If the court in this matter, 16FE024013, determines that the Defendant has failed to satisfy the above-described obligations to cooperate and testify truthfully, Defendant may be sentenced up to the maximum term of five years in state custody. The People shall, in good faith, consider the nature and extent of Defendant's cooperation in whatever sentencing recommendation is made to

3

the Court.

10.     In lieu of a fine, Defendant agrees, pursuant to his federal plea agreement, to pay full restitution to all victims directly or proximately harmed by his conduct.

11.     The People agree to file any motion necessary in order to achieve the People's recommended sentence.

12.     Defendant understands that the Court is not bound by the terms of this agreement. However, if the Court does not follow the People's recommendations outlined in paragraph 9 above, Defendant will be permitted to withdraw the plea and no statement of Defendant received during the plea will be admitted against the Defendant in any subsequent criminal proceedings.

13.     The Defendant agrees and acknowledges that this plea waives any and all of his appellate rights.

///

1      14.    The People and the Defendant enter into this agreement with the intent to achieve

2 a global resolution of the various criminal actions now pending against Defendant. If the

3 Defendant's plea agreements in Texas and the federal matter in Arizona are not accepted,

4 Defendant may the withdraw his plea of guilty to the charges set forth in paragraphs 1 and 2

5 above.

6

7 Dated: April ___, 2018

8                       CARL FERRER
                         Defendant

9

10 Dated: April ___, 2018

11                      NANCI CLARENCE
                      JONATHAN BAUM
                      Attorneys for Defendant

12

13 Dated: April ___, 2018

14                      RANDY MAILMAN
                      Deputy Attorney General
                      People of the State of California

15

16 STIPULATION SO APPROVED. The above stipulation will be incorporated into the record, and

17 its terms made a part of, or considered by, any probationary order.

18 Dated: April ___, 2018

19                      JUDGE OF THE SUPERIOR COURT

20                        LAWRENCE G. BROWN

21

22

23

24

25

26

27

28

Exhibit B

PRIVILEGED AND CONFIDENTIAL
JOINT DEFENSE PRIVILEGE

## JOINT DEFENSE/COMMON INTEREST AND
## CONFIDENTIALITY AGREEMENT



-1-

SER-95



-2-



-3-



6.    Potential Conflicts of Interest.  Each Party understands and acknowledges that it is possible that any other Party may later become an adverse witness or take an adverse position in the Case.  Each Party further understands and acknowledges that the attorney(s) representing any other Party have the right, and may well have the obligation, to take actions against a Party's interests, including but not limited to, advising his or her own client to cooperate with the government, generating and disclosing evidence or information to the government or other third parties (apart from Defense Materials and other prohibited confidential disclosures pursuant to this Agreement), and cross-examining him/it at trial or other proceedings. Any client signatory who enters into a cooperation agreement with the government or who testifies as a witness in any civil, administrative, or criminal proceeding arising from the Case consents to any other signatory using for defense purposes any information or material contributed by the client or by his or her attorney. This specifically permits use of contributed information or material in cross-examining the witness and permits the presentation of their information or material by the defense at any point of the proceedings. Each undersigned attorney has explained fully to his or her client the limitations on direct use of the information obtained pursuant to this Agreement. Each Party represents that he/it has considered the foregoing and believes the benefits of being a signatory to this Agreement outweigh any of the limitations imposed by this Agreement. Therefore, as a condition precedent to the receipt of any Defense Materials or information, each attorney and client represents that he/it will not assert any future claim that any attorney who is a Party to this Agreement is barred from continuing his or her representation in this matter by virtue of his or her receipt of Defense Materials or other joint defense communications and information.

-4-



-5-



SER-100



Nanci Clarence
For Carl Ferrer

Date: _____6-15-17_____

Tom Henze
For Carl Ferrer

Date: __6/30/17__

Janey Henze Cook
For Carl Ferrer

Date: __6/30/17__

Carl Ferrer

Date: _____

Mike Kimerer
For Jed Brunst

Date: _____

Jed Brunst

Date: _____

-5-

SER-101



_____      Date: _____
Nanci Clarence
For Carl Ferrer

_____      Date: _____
Tom Henze
For Carl Ferrer

_____      Date: _____
Janey Henze Cook
For Carl Ferrer

_____      Date: June, 14, 2017
Carl Ferrer

_____      Date: _____
Mike Kimerer
For Jeb Brunst

_____      Date: _____
Jeb Brunst

_____      Date: _____
Michael Piccarreta

SER-102

**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-18-00422-001-PHX-DJH |
| Plaintiff, | **ORDER** |
| v. | |
| Michael Lacey, et al., | |
| Defendants. | |

Defendants ask this Court to reconsider its recent denial of their Motion to Dismiss the Superseding Indictment. (Doc. 1622). In that Order, the Court rejected Defendants' argument that the Superseding Indictment ("SI") was deficient for failing to allege the elements of aiding and abetting when it charged Defendants with Travel Act violations. (Doc. 1587). Defendants argue that the United States Supreme Court's June 23, 2023, decision in *United States v. Hansen*, -- S.Ct. --, 2023 WL 4138994 (2023) ("*Hansen*") requires reconsideration of that determination. (*Id.*) The Court allowed the parties to brief the issue, which they have done. (*See* Docs. 1628, 1630). Following the briefing, Defendants filed a Notice of Supplemental Authority (Doc. 1632), alerting the Court to the D.C. Circuit Court of Appeals decision in *Woodhull Freedom Foundation v. United States*, __ F.4th __, 2023 WL 4376244 (D.C. Cir. July 7, 2023) ("*Woodhull*"). The Government then filed a Notice of Response to the Notice of Supplemental Authority (Doc. 1633).[1]

---

[1] Defendant Lacey then filed a "Supplemental Citation of Authorities in Support of Defndants' [sic] Motion for Reconsideration of Order Denying Defendants' Motion to Dismiss the Superseding Indictment" (Doc. 1639). Unlike Defendants' Notice of Supplemental Authority, this filing does not alert the Court to new, arguably, intervening

1   The issue before the Court is whether either of these cases render the SI deficient

2   for failing to allege the essential elements of aiding and abetting. The answer is no.

3   **I.    Reconsideration Standards**

4   Local Rule of Civil Procedure 7.2(g) sets forth the standard under which a Court

5   reviews a Motion for Reconsideration. *See also* LRCrim 12.1 (noting applicability of

6   LRCiv 7.1 and 7.2 to motions filed in criminal matters). Rule 7.2(g) states:

> The Court will ordinarily deny a motion for reconsideration of an Order absent a showing of manifest error or a showing of new facts or legal authority that could not have been brought to its attention earlier with reasonable diligence. Any such motion shall point out with specificity the matters that the movant believes were overlooked or misapprehended by the Court, any new matters being brought to the Court's attention for the first time and the reasons they were not presented earlier, and any specific modifications being sought in the Court's Order. No motion for reconsideration of an Order may repeat any oral or written argument made by the movant in support of or in opposition to the motion that resulted in the Order. Failure to comply with this subsection may be grounds for denial of the motion.

LRCiv 7.2(g). *See also School Dist. No. 1J, Multnomah Cnty. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993) (a motion for reconsideration is appropriate where the district court "(1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law"). *Accord Navajo Nation v. Confederated Tribes & Bands of the Yakama Indian Nation*, 331 F.3d 1041, 1046 (9th Cir. 2003) ("Reconsideration is indicated in the face of the existence of new evidence, an intervening change in the law, or as necessary to prevent manifest injustice."); *Motorola, Inc. v. J.B. Rodgers Mech. Contractors*, 215 F.R.D. 581, 586 (D. Ariz. 2003) (motions for reconsideration in this district will be granted when there

---

law. Instead, it cites two Ninth Circuit cases issued years before this Court's June 1, 2023, Order that stand for the proposition that when a defendant unsuccessfully challenges an indictment before trial, the issue is reviewed *de novo* on appeal, and if the appeals court determines that the indictment omitted an essential element, automatic dismissal is required regardless of whether the omission prejudiced the defendant. *See United States v. Du Bo*, 186 F.3d 1177 (9th Cir. 1999) and *United States v. Qazi*, 975 F.3d 989 (9th Cir. 2020). Defendant Lacey does not explain why these cases are appropriate for consideration with the Defendants' Motion for Reconsideration. "Reconsideration may not be used to re-litigate old matters or to raise arguments or present evidence that could have been raised" in the initial motion movants are asking the Court to reconsider. *See e.g., Ramsey v. Arizona*, 2006 WO 2711490, at *1 (D. Ariz. 2006). "Such disagreements should be dealt with in the normal appellate process." *Id.* The Court therefore deems the filing improper.

SER-104

has been a change in the law that was decided or enacted after the Court's decision). Motions for reconsideration should be granted only in rare circumstances and such a decision is within the sound discretion of the trial court. *Navajo Nation*, 331 at 1046; *Defenders of Wildlife v. Browner*, 909 F. Supp. 1342, 1351 (D. Ariz. 1995); *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 883 (9th Cir. 2000) (noting a denial of a motion for reconsideration is reviewed for abuse of discretion).

## II. Discussion

Section 1952(a) of the Travel Act provides:

> Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to . . . otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity . . . and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $ 10,000 or imprisoned for not more than five years, or both.

"Unlawful activity" is defined to include, in relevant part, "any business enterprise involving . . . prostitution offenses in violation of the laws of the State in which they are committed." 18 U.S.C. § 1952(b)(1). The SI alleges fifty Travel Act violations against Defendants, violations that are listed as facilitating the promotion of "prostitution offenses in violation of the laws of the State in which they are committed and of the United States, including but not limited to Title 13, Arizona Revised Statutes, Section 13-3214." (SI ¶ 200-01). The SI tracks the language of the Travel Act and alleges that Defendants

> used the mail and any facility in interstate and foreign commerce with intent to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, to wit: prostitution offenses in violation of the laws of the State in which they are committed and of the United States, including but not limited to Title 13, Arizona Revised Statutes, Section 13-3214, and thereafter performed and attempted to perform an act that did promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of the unlawful activity. . .

(*Id.* ¶ 201). The SI goes on to reference fifty specific ads published on Backpage between September 10, 2013, and February 6, 2018, that constitute the acts promoting or facilitating

- 3 -

1  the promotion of the unlawful business enterprise.  (*Id.*)  Elsewhere, the SI alleges that

2  Defendants "were aware that the overwhelming majority of Backpage's 'adult' and 'escort'

3  ads were actually ads for prostitution" and makes various allegations that Defendants knew

4  its various marketing efforts to prostitution advertisers helped them accomplish their

5  transactions.  (*See e.g.*, SI ¶¶ 34, 70, 71, 73, 76, 81, 107, 132, 135).

6          In their Motion to Dismiss (Doc. 1557), Defendants argued the SI's Travel Act

7  allegations were insufficient because it did not allege the elements of criminal aiding and

8  abetting, and specifically that the SI did not allege Defendants acted "with the intent of

9  facilitating the offense's commission" or that the underlying offense had been committed.

10  (*Id.* citing *Rosemond v. United States*, 572 U.S. 65, 70 (2014)).  The Court disagreed and

11  concluded that Ninth Circuit law did not require the SI to allege the elements of aiding and

12  abetting in bringing Travel Act charges, but even if it did, the SI sufficiently alleged

13  Defendants' intent to aid or facilitate the commission of identified state crimes of

14  prostitution, and that as a matter of law, elements of aiding and abetting would be read into

15  a federal indictment anyway.  (Doc. 1587).

16          In their Motion for Reconsideration, Defendants argue that the Supreme Court's

17  recent decision in *Hansen* and the D.C. Circuit Court of Appeals' decision in *Woodhull*

18  warrant reconsideration of those conclusions.   In both cases, federal statutes were

19  challenged on overbreadth grounds, and in both cases, the courts narrowly construed the

20  statutes to uphold their constitutional reach.   Defendants' argument begs the limited

21  question as to whether either of these cases altered the Ninth Circuit pleading requirements

22  in alleging Travel Act charges.[2]  They clearly do not.

23  _____

24  [2] As they have done in their past motions, Defendants conflate burden of proof issues with
   pleading requirements.  For example, in their Motion for Reconsideration, Defendants

25  argue "like any aiding and abetting offense, a violation of the Travel Act requires *proof*
   that each Defendant knew about and intended to commit each element of the underlying

26  offenses and *proof* of a violation of the underlying state law."  (Doc. 1622 at 4) (emphasis
   added).   When assessing the sufficiency of an indictment, however, a court must only

27  determine whether the indictment contains a "plain, concise, and definite written statement
   of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1); *Hamling

28  v. United States*, 418 U.S. 87, 117 (1974).  Assessing the sufficiency of the proof at this
   stage is entirely inappropriate and may constitute reversal error.  *United States v. Jensen*,
   93 F.3d 667, 669 (9th Cir. 1996).

SER-106

The question before the Supreme Court in *Hansen* was whether a federal law that criminalizes "encouraging or inducing" an immigrant to come or remain in the United States unlawfully violated First Amendment freedom of speech guarantees.  2023 WL 4138994, at *3.  The defendant in *Hansen* conceded that the statute was constitutional as applied to him but that the statute's terms encompassed a substantial amount of protected speech and therefore was unconstitutionally overbroad.  *Id.* at *5.  The Supreme Court disagreed.  In so finding, the Court interpreted "encourage or induce" to be terms of art that Congress used in a specialized, criminal-law sense and explained that these terms "carry the usual attributes of solicitation and facilitation—including [], the traditional *mens rea*" required of those offenses.  *Id.* at *10.  By interpreting "encouraging or inducing" to implicitly include the *mens rea* requirement of intent to bring about a particular unlawful act (as required for criminal solicitation and facilitation), the scope of the statute captured only a narrow band of speech not protected by the First Amendment.  *Id.*

The D.C. Circuit Court issued the *Woodhull* opinion a few weeks after the *Hansen* decision.  *Woodhull*, 2023 WL 4376244 (D.C. Cir. July 7, 2023).  There, the court concluded that section 2421A(a) of the Allow States and Victims to Fight Online Sex Trafficking Act of 2017 ("FOSTA") also was not unconstitutionally overbroad.  *Id.*  FOSTA makes it a felony to "own[], manage[], or operate[] an interactive computer service, . . . or conspire[] or attempt[] to do so" if done "with the intent to promote or facilitate the prostitution of another person."  18 U.S.C. § 2421A(a).  The court rejected Woodhull's argument that the terms "promote" and "facilitate" could be interpreted to broadly encompass activities such as generally advocating about prostitution or giving advice to sex workers to protect them from abuse.  *Id.* at 7.  The court first explained that both verbs have specialized meaning when used in a criminal law context.  *Id.* at 8.  In that context, the court found that "promoting prostitution" proscribes "owning, managing, or operating an online platform with the intent to recruit, solicit, or find a place of business for a sex worker—that is, to aid and abet prostitution."  *Id.*  Noting that "facilitating prostitution" had not been similarly defined in criminal law, the court, invoking the

SER-107

Supreme Court's recent decision in *Hansen*, found that "'facilitate' is a synonym for aiding and abetting when that word is used in the context of criminal statutes." *Id.* at *9. The court then reasoned "[s]o it seems clear that, in this statute, 'facilitate prostitution' is most naturally read [to mean aiding and abetting prostitution," in ways that reach "additional forms of aiding and abetting that go beyond the recruitment, solicitation, or finding of a place of business, which 'promote' already covers." *Id.* Moreover, the court held, the reach of what "facilitate" encompassed was limited by the "very specific criminal object" of the statute—namely, "of another person." *Id.* at *10.

What neither of these cases discuss, much less opine on, are pleading standards related to Travel Act indictments for promoting or facilitating the promotion of prostitution. Their focus was instead on the constitutional reach of the respective statutes, or what conduct was encompassed and thus criminalized when Congress used statutory terms such as "encourage," "induce," "promote," or "facilitate." Both courts acknowledged that when read outside their statutory context, all could reach constitutionally protected speech. But the courts chose to limit the reach of these terms by invoking well-established traditional aiding and abetting law and proscribing only those actions done with the intent to bring about a particular unlawful act. They did not say that for indictments to stand under these statutes (neither of which was the Travel Act), the indictment must allege the essential elements of criminal aiding and abetting.

In short, neither *Hansen* nor *Woodhull* changes the law on pleading standards for indictments nor overturns Ninth Circuit precedent that identifies the essential elements of a Travel Act violation. An indictment under the Travel Act requires allegations of each of the three elements of the crime: (1) interstate commerce or use of an interstate facility (2) with intent to promote an unlawful activity and (3) a subsequent overt act in furtherance of that unlawful activity. *United States v. Tavelman*, 650 F.2d 1133, 1138 (9th Cir. 1981). Here, the SI alleges that between 2004 and April 2018 (1) Defendants ran an interstate online website; (2) with the intent to promote or facilitate the promotion of prostitution; and (3) thereafter, between September 10, 2013, and February 6, 2018, Defendants

published 50 ads facilitating that unlawful activity.  The SI is not deficient, and these cases do not provide the Court a reason to reconsider its prior order determining as much.[3]

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Reconsideration (Doc. 1622) is denied.

Dated this 20th day of July, 2023.

_____
Honorable Diane J. Humetewa
United States District Judge

---

[3] Indeed, absent controlling law stating otherwise, the Court agrees with the Government that Defendants' argument that the SI is deficient due to its failure to allege the elements of aiding and abetting "is a non-starter."  "Aiding and abetting is a lesser-included offense that need not be separately charged."  *United States v. Palfrey*, 499 F.Supp.2d 34, 42 (D.D.C. 2007).

SER-109

**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-18-00422-001-PHX-DJH |
| Plaintiff, | **ORDER** |
| v. | |
| Michael Lacey, et al., | |
| Defendants. | |

Defendants Michael Lacey, James Larkin, Scott Spear, John Brunst, Andrew Padilla, and Joye Vaught ("Defendants") have filed a Motion to Dismiss the Superseding Indictment (Doc. 1557). The United States ("the Government") has filed a Response (Doc. 1577) and the Defendants have filed their Reply (Doc. 1585). Upon consideration of the same, and for the reasons stated herein, the Court denies Defendants' Motion. [1]

## I. Background

On July 25, 2018, a federal grand jury returned a 100-count Superseding Indictment ("SI") against Defendants, alleging they engaged in various criminal acts while operating the website Backpage.com ("Backpage"). (Doc. 230). Count 1 of the SI charges Defendants with conspiracy to facilitate prostitution under the Travel Act, 18 U.S.C. § 1952(a)(3)(A) and Counts 2–51 charges them with fifty violations of facilitating prostitution under the Travel Act, 18 U.S.C. § 1952(a)(3)(A). Each of the fifty violations are based on fifty separate ads that were posted on Backpage (SI ¶¶ 195–201). Tracking

---

[1] The Court finds this matter can be resolved adequately on the parties' briefing and denies Defendants' request for oral argument. *See* LRCrim 12.1(a); LRCiv. 7.2(f); *United States v. Howell*, 231 F.3d 615 (9th Cir. 2000).

the language of the Travel Act, the SI alleges in part that Defendants:

> used the mail and any facility in interstate and foreign commerce with
> intent to otherwise promote, manage, establish, carry on, and facilitate the
> promotion, management, establishment, and carrying on of an unlawful
> activity, to wit: prostitution offenses in violation of the laws of the State in
> which they are committed and of the United States, including but not
> limited to Title 13, Arizona Revised Statutes, Section 13-3214[2], and
> thereafter performed and attempted to perform an act that did promote,
> manage, establish, carry on, and facilitate the promotion management,
> establishment and carrying on of the unlawful activity. . .

(SI ¶ 201). The SI then identifies the fifty specific ads by date and description. (*Id.*) Fifteen of the ads depict specific victims that are alleged to have been women who were sold for sex on Backpage (SI ¶ 201, Counts 2, 4–5, 12–17, 19–24); ten of the ads were posted by P.R, a prostitute who had extensive communications with one of the creators of Backpage, C.F (SI ¶ 201, Counts 3, 6–11, 18, 25–26); and twenty-five ads contain the phrase "GFE," which the SI alleges is code for prostitution or underage prostitution. (SI ¶ 201, Counts 27–51). The SI further alleges that Defendants "were aware that the overwhelming majority of the website's 'adult' and 'escort' ads were actually ads for prostitution" and makes various allegations that Defendants knew their marketing efforts to prostitution advertisers were successful. (*See e.g.*, SI ¶¶ 34, 70, 71, 73, 76, 81, 107, 132, 135). It describes three specific strategies Backpage and Defendants used to attract more prostitution ads: content aggregation (SI ¶¶ 35–44), reciprocal link and affiliate programs (SI ¶¶ 45–67), and moderating ads to "sanitiz[e]" them. (SI ¶¶ 68–70, 72–73, 75, 77–96, 98–104, 108, 110, 112, 116–26, 128–30, 132–34, 136, 139, 143, 145, and 148). The SI also includes "victim summaries" of women who were sold for sex on Backpage and describes how Backpage handled ads submitted by these victims and/or their pimps. (SI ¶¶ 160–176).

The remaining offenses in the SI allege counts for money laundering and forfeiture. (SI ¶¶ 202–11).[3] The Court has gone into even more detail about the allegations of the SI

---

[2] A.R.S. § 13-3214 makes it "unlawful for a person to knowingly engage in prostitution."
[3] Defendant Hyer has pled guilty to Count 1, conspiracy to violate the Travel Act, and awaits sentencing.

- 2 -

SER-111

in several previous Orders and will adopt the remaining description provided in its October 24, 2019, Order denying Defendants' Motion to Dismiss.  (*See* Doc. 793 at 1–7; *see also* Doc. 561 at 3–11).

Since their indictment, Defendants have sought dismissal of the SI on sufficiency grounds no less than three times.  (*See* Docs. 561, 746, 783).  Following a mistrial in September 2021 (Doc. 1308), Defendants moved to dismiss the SI on double jeopardy grounds (Doc. 1355).  This Court denied the motion in December 2021 (Doc. 1444), and Defendants appealed (Doc. 1445).  The Ninth Circuit affirmed the Court's denial and remanded the case for trial, which is currently set for August 8, 2023.  (Docs. 1469; 1546). Given this case's protracted procedural history and many past rulings on the sufficiency of the SI, in the Court's February 17, 2023, Order Setting a Final Pretrial Conference ("FPTO"), the parties were informed that the law of the case doctrine would preclude the Court from accepting new motions that were not based on new law or facts. (Doc. 1524 at 4).

## II.  Legal Standards

An indictment must contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).  "An indictment is sufficient if it, first, contains the essential elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974).  *Accord United States v. Cecil*, 608 F.2d 1294, 1297 (9th Cir. 1979).  A defendant may move to dismiss an indictment for failure to state an offense under Federal Rule of Criminal Procedure 12.  Fed. R. Crim. P. 12(b)(3)(B)(v). When a count charged by an indictment fails to recite an essential element of the offense, that count is facially defective and must be dismissed.  *United States v. Pernillo-Fuentes*, 252 F.3d 1030, 1032 (9th Cir. 2001).  In assessing such a motion, a court must accept the allegations in the indictment as true and "analyz[e] whether a cognizable offense has been

SER-112

charged." *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002). The court "is bound by the four corners of the indictment" and may not consider evidence that does not appear on its face. *Id.*

The law of the case doctrine "generally provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018) (cleaned up). Under the doctrine, "'a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case,' absent a material change in circumstances." *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993). "For the doctrine to apply, the issue in question must have been decided either expressly or *by necessary implication* in the previous disposition." *Id.* (internal quotations and alterations omitted). If the issue in question has already been decided, then reconsideration of the order is generally only permitted if "the prior decision is 'clearly erroneous' and enforcing it would create 'manifest injustice'; intervening, controlling authority encourages reconsideration; or substantially different evidence is produced at a later merits trial." *East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1262 (9th Cir. 2020). "The doctrine encourages the conservation of limited judicial resources and promotes consistency by allowing court decisions to govern the same issues in subsequent stages of the same case." *Id.* at 1261.

## III. Defendants' Motion to Dismiss

On March 30, 2023, Defendants filed a Motion to Dismiss that again challenged the sufficiency of the SI. (Doc. 1557). In their Motion, Defendants primarily argue that the Travel Act charges in the SI are aiding and abetting offenses and as a result, the SI is fatally defective because it does not allege "with respect to each charged ad, both that *someone* committed a prostitution offense and that Defendants intended to facilitate the commission of *that* specific prostitution offense." (*Id.* at 9–10). Defendants say the Court should adopt this interpretation of the Travel Act because (1) the Court should hold the Government to

its position in *Woodhull*[4] that the terms "promote" and "facilitate" in the Allow States and Victims to Fight Online Sex Trafficking Act ("FOSTA") are equivalent to "aid and abet"; (2) the text of the Travel Act "maps neatly on the universal aiding-and-abetting elements reflected in the Ninth Circuit Model Criminal Jury Instructions;" (3) Ninth Circuit law requires that the Government prove, as elements of a Travel Act offense, all the elements of the underlying law that constitutes the unlawful activity Defendants allegedly violated; and (4) if the Travel Act did not require the Government to establish that Defendants were guilty of aiding and abetting an underlying criminal offense, the Act would be unconstitutional as applied. (Doc. 1557 at 13–14). Defendants also argue dismissal of the money laundering counts, and seek dismissal of the entire SI on double jeopardy grounds and on the assumption that the grand jury was not properly instructed on aiding and abetting. (Doc. 1557 at 18–21).

The Government argues that Defendants are simply restyling old arguments they have already presented to this Court. It asserts that "Defendants have made these arguments before, and the Court has found them insufficient to require dismissal. Defendants cite no intervening change in the law, and no new facts about this case to warrant reconsideration." (Doc. 1577 at 7). The Government also disagrees that to sufficiently allege Travel Act charges the Government must plead traditional elements of aiding and abetting offenses, but that even if such were required, the SI sufficiently alleges as much, either explicitly—or, as allowed under Ninth Circuit law—implicitly. (*Id.* at 14).

In its Reply, Defendants argue that "[n]o prior order has decided the narrow issues presented here. The arguments raised are new and are prompted by the government's recent assertions in the *Woodhull* appeal. Deferring these issues until trial only invites error." (Doc. 1585 at 4).

## IV.   Analysis

The Travel Act makes it a federal offense for a person to "travel[] in interstate or foreign commerce or use[] the mail or any facility in interstate or foreign commerce, with

---

[4] *Woodhull Freedom Found'n v. United States*, No. 22-5105 (D.C. Cir. argued Jan. 11, 2023).

SER-114

intent to. . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity."  18 U.S.C. § 1952(a)(3).  Broken into its textual pieces, the Ninth Circuit requires that "[a]n indictment under the Travel Act [allege] each of the three elements of the crime: (1) interstate commerce or use of an interstate facility (2) with intent to promote an unlawful activity and (3) a subsequent overt act in furtherance of that unlawful activity."  *United States v. Tavelman*, 650 F.2d 1133, 1138 (9th Cir. 1981).  *See also United States v. Gordon*, 641 F.2d 1281, 1284 (9th Cir. 1981) (stating "it is clear that the statutory language embodies all of the essential elements [of a Travel Act indictment] and that reference to state law is necessary only to identify the type of unlawful activity involved") (cleaned up).

The Ninth Circuit has clarified that "[t]he Travel Act does not require the commission of the predicate offense; rather, only an 'attempt[ ] to promote' the unlawful activity, 18 U.S.C. § 1952(a), with 'a subsequent overt act in furtherance of that unlawful activity.'" *United States v. Stafford*, 831 F.2d 1479, 1482 (9th Cir. 1987) (*citing Tavelman*, 650 F.2d at 1138).  The intent required under the Travel Act is the "specific intent to facilitate an activity which the accused knew to be unlawful under state law." *United States v. Polizzi*, 500 F.2d 856, 876–77 (9th Cir. 1974).  *See also United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974) (to obtain a conviction under the Travel Act, the Government must show Defendants had "specific intent to promote, manage, establish, carry on or facilitate one of the prohibited activities").  The Travel Act does not contain the words "aid or abet."

The SI does not charge Defendants with the federal offense of aiding and abetting, but for purposes of comparison, the Court finds it helpful to look at what is required of that offense.  The federal aiding and abetting statute, 18 U.S.C. § 2 derives from common-law standards for accomplice liability and states that a person who "aids, abets, counsels, commands, induces or procures" in the commission of a federal offense "is punishable as a principal."  18 U.S.C. § 2; *Rosemond v. U.S.*, 572 U.S. 65, 70 (2014).  "As at common law, a person is liable under § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the

SER-115

offense's commission." *Rosemond*, 572 U.S. at 71. "In proscribing aiding and abetting, Congress used language that 'comprehends all assistance rendered by words, acts, encouragement, support, or presence' . . . —even if that aid relates to only one (or some) of a crime's phases or elements." *Id.* at 73. At trial, the Government must prove that the offense has been committed but need not establish that the principal offender be convicted or even identified. *Feldstein v. United States*, 429 F.2d 1092, 1095 (9th Cir. 1979). The intent required to aid and abet "must go to the specific and entire crime charged." *Id.* at 76. "An intent to advance some different or lesser offense is not, or at least not usually, sufficient." *Id.* The Court has clarified, however, that "a person who actively participates in a criminal scheme knowing its extent and character intends that scheme's commission." *Id.* at 77 (*citing with approval United States v. Easter*, 66 F.3d 1018, 1024 (9th Cir. 1995) (correctly finding that unarmed driver of a getaway car had the requisite intent to aid and abet an armed bank robbery if he "knew" his cohorts would use weapons in carrying out the crime)). *See also United States v. Goldtooth*, 754 F.3d 763, 769 (9th Cir. 2014) (reversing defendants' convictions for aiding and abetting robbery on Indian reservation because there was no evidence that defendants had foreknowledge that robbery was to occur).

The Court finds that its prior rulings have addressed and rejected the reasons Defendants offer as support for why the Court should find the SI deficient for failure to allege the elements of aiding and abetting. Defendants have not shown these rulings are "clearly erroneous," that enforcing them would create manifest injustice, or that intervening, controlling authority encourages reconsideration. *East Bay Sanctuary Covenant*, 950 F.3d at 1262. The Court also finds, however, that the SI is also not deficient for insufficiently alleging elements of aiding and abetting. Finally, the Court declines to reconsider its prior rulings and dismiss the SI due to double jeopardy concerns, the independent-standing money laundering counts, or on assumptions that the grand jury was erroneously instructed.

**A.** **There is No Cause to Reconsider the Court's Prior Rulings Regarding the Alleged Deficiencies of the Travel Act Counts**

SER-116

This Court has previously held, after extensive reviews of the allegations in the SI, that the SI sufficiently alleges the necessary elements of Travel Act offenses and constitutionally puts Defendants on notice of how to defend against the Travel Act crimes alleged against them. The Court rejects Defendants' premise that the Travel Act offenses require the Government to allege the elements of aiding and abetting to satisfy Federal Rule of Criminal Procedure 7. Finding no cause in Defendants' Motion to change its prior findings, these rulings will continue to govern.

### 1. The SI sufficiently alleges specific "unlawful activity"

The Court has already found "that the SI alleges 'unlawful activity' for each Travel Act Count with adequate specificity to inform Defendants of their charges." (Doc. 946 at 9) (specifically finding that "the SI alleges fifty instances where Defendants posted ads on Backpage.com to facilitate specific individual prostitutes or pimps involved in the business of prostitution. (SI ¶¶ 200-201.)"). In their Motion, Defendants now argue that the Travel Act charges are deficient in part because they do not allege that someone committed the underlying offense (or in the context of the Travel Act language, the "unlawful activity"). (Doc. 1557 at 10). Defendants say that "'settled legal concepts' of 'aiding and abetting' and the 'traditional principles of accomplice liability' definitively require, as elements of the charge, proof of (1) commission of an offense by someone . . ." (*Id.* at 11 *citing Rosemond*, 572 U.S. at 76).

The Court disagrees, again. (*See* Doc. 840 at 10–11 (rejecting argument that SI must allege that Defendants or anyone commit the predicate offense). The Ninth Circuit does not require that an indictment allege someone committed the predicate offense to put Defendants on notice that they have been charged with facilitating or promoting state law prostitution offense under Section 1952(a)(3). *See Stafford*, 831 F.2d at 1482 ("[t]he Travel Act does not require the commission of the predicate offense; rather, only an 'attempt[ ] to promote' the unlawful activity, 18 U.S.C. § 1952(a), with 'a subsequent overt act in furtherance of that unlawful activity.'") (*citing Tavelman*, 650 F.2d at 1138). *Accord McIntosh v. United States*, 385 F.2d 274, 277 (8th Cir. 1967) ("accomplishment of the State substantive offense is not a prerequisite to Travel Act conviction.") (citations omitted);

*United States v. Palfrey*, 499 F.Supp.2d 34 (D.C. Cir. 2007) (rejecting insufficiency of indictment for failure to alleged the elements of the predicate state offense: "The Indictment must allege the *essential* elements of the offense with which Defendant is charged, namely, violations of the Travel Act . . . The elements of the predicate state offenses are not essential elements of the Travel Act violations.") (internal citation omitted); *United States v. Welch*, 327 F.3d 1081, 1092 (10th Cir. 2003) ("An actual violation of [the Utah Commercial Bribery Statute] is not an element of the alleged Travel Act violations in this case and need not have occurred to support the Government's § 1952 prosecution"); *United States v. Montague*, 29 F.3d 317, 322 (7th Cir. 1994) ("Section 1952 does not require that the state crime ever be completed."). As *Stafford* and *Tavelman* make clear, the Travel Act requires only that the indictment allege the essential element of "a subsequent overt act in furtherance of that unlawful activity," not that someone committed the underlying offense. *Tavelman*, 650 F.2d at 1138. And as this Court has informed the parties before, the SI here clears that hurdle. (Doc. 840 at 10–11).

Moreover, the Ninth Circuit cases cited by Defendants do not require that a Travel Act indictment allege the underlying offense has been committed. (*See* Doc. 1557 at 13 citing *Myers v. Sessions*, 904 F.3d 1101 (9th Cir. 2018), *United States v. Hiatt*, 527 F.2d 1048 (9th Cir. 1975), and *United States v. Bertman*, 686 F.2d 772 (9th Cir. 1982)). *Myers* stated that "a specific 'unlawful activity' is an element of a Travel Act offense" in finding a defendant was removable for a controlled substance offense. 904 F.3d at 1107–08. The focus of the inquiry in *Myers* was whether, under the *Taylor-Descamps* framework for determining whether a specific conviction is a predicate offense mandating removal under the Immigration and Nationality Act ("INA"), the Travel Act was "divisible," which in turn depended on "whether a statute's 'listed items are elements or means.'" *Id.* at 1107.[5] The court phrased the specific issue as: "whether it is necessary to identify a specific unlawful act to obtain a conviction under the Travel Act, or whether it would be sufficient to conclude that the defendant committed one or more of the crimes listed in § 1952(b)

---

[5] *Taylor v. United States*, 495 U.S. 575 (1990) and *Descamps v. United States*, 570 U.S. 254 (2013).

SER-118

without specifying or reaching agreement on which crime." *Id.*  It concluded that "a specific 'unlawful activity' [was] an element of a Travel Act offense" under that framework.  *Id.* at 1108.  *Myers*, quite simply, did not discuss the essential elements required for a Travel Act indictment, or purport to overrule or modify the elements required *Stafford* or *Tavelman*, neither of which the *Myers* decision mentioned.  Instead, in using the language of the divisibility test under *Taylor-Descamps*, the court characterized the specific unlawful activity that defendant was charged with as an "element" and not a "means" for purposes of finding him removable.  *Id.*

United States v. Hiatt*, which predates *Tavelman*, also does not redefine the required essential elements for a Travel Act indictment.  527 F.2d at 1050.  The defendant there argued that his conviction was a constitutional impossibility because the Alaska prostitution statute on which his Travel Act conviction was based had been found to be unconstitutional by some lower courts.  *Id.*  In assessing the defense, the court stated that "[i]t is correct that the existence of a state law violation is an element of the violation of the Travel Act and that the court must make a determination of whether the underlying state law has been *or could have been* violated."  *Id.* at 1051 (emphasis added).  The court therefore determined that if the alleged "unlawful activity" underlying a Travel Act violation was not unlawful, because, for example, the statute criminalizing the conduct was unconstitutional, a defendant could be not convicted for promoting or facilitating in the promotion of such activity.  *Id. Accord Bertman*, 686 F.2d at 774 (finding that when the unlawful activity is the violation of state law, "[t]he government [] must prove as part of the Travel Act charge that the defendant has or could violated the underlying state law, and the defendant may assert any relevant substantive state law defense").  Neither *Hiatt* or *Bertman* stand for the proposition that an indictment's failure to allege that the underlying offense has been committed by someone renders an indictment defective.[6]  Both cases instead stand for the proposition that defendants indicted for unlawful activity under state law are entitled to present defenses to those state law offenses at trial.

---

[6] Notably, here, the SI alleges the existence of a specific state law violation.  (*See* SI ¶ 201).

- 10 -

Indeed, even if the Court were to assume that the evidentiary burdens of an aiding and abetting offense govern the SI's Travel Act charges, whether the Government has offered sufficient proof of the commission of an offense by another is an issue that goes to the Government's burden at trial, not whether the SI sufficiently alleges a Travel Act charge under Section 1952(a)(3).  The Court has already told Defendants that determining whether specific conduct alleged in the SI in fact qualifies as "unlawful activity" on a motion to dismiss is improper:

> Defendants' concern that each ad is not in fact connected to a business enterprise involving prostitution is premature at this stage.[] When considering the totality of the allegations, the Court finds that publishing an online ad in support of individuals seeking to repeatedly market themselves or others for sex could constitute a violation under the Act for facilitating a "business enterprise involving prostitution." **But whether these allegations in fact constitute a violation is not the question before the Court**.  Rather, the question right now is whether the Travel Act elements are sufficiently alleged to fairly inform Defendants of their charges, not whether the Government has proven its case.  *Buckley*, 689 F.2d at 897. The other question of whether facts support a finding of a "business enterprise involving prostitution" is reserved for the fact-finder, and jumping to pre-trial evidentiary conclusions concerning whether specific conduct in fact qualifies as "unlawful activity" is improper. *Jensen*, 93 F.3d at 669. Here, the Court merely concludes that the SI adequately alleges the necessary Travel Act elements and cannot be dismissed.

(Doc. 946 at 12–13) (emphasis added).  Defendants encourage the Court not to defer on this question until trial.  But it is improper for Defendants to "challenge an indictment, sufficient on its face, on the ground that the allegations are not supported by adequate evidence." *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996) (*quoting United States v. Mann*, 517 F.2d 259, 267 (5th Cir. 1975)).  The proper forum for challenging whether there is adequate evidence is at trial.  *See id.* ("By basing its decision on evidence that should only have been presented at trial, the district court in effect granted summary judgment for the defendants. This it may not do."); *see also United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992) ("Nor do the [criminal] rules provide for a pre-trial determination of sufficiency of the evidence.").  And to the extent Defendants are asking the Court to rule on the properness of a proposed jury instruction, it also finds the request

premature. The Court has ordered the parties to submit their proposed jury instructions and it will consider those arguments in due course. For purposes of this Motion, the Court reaffirms the sufficiency of the Travel Act charges in the SI.

### 2. The SI alleges sufficient *mens rea* for the Travel Act charges

In arguing that the Travel Act charges should be pled as aiding and abetting charges, Defendants also seek to impose the requirement that the Government "prove, with respect to each charged ad . . . that Defendants intended to facilitate the commission of *that* specific [prostitution] offense." (Doc. 1557 at 10). The Court has already confirmed the appropriate *mens rea* standard under the Travel Act:

> [t]he Government's proposed *mens rea* standard, specific intent to promote or facilitate prostitution, is consistent with *Gibson*, *Tavelman*, and *Polizzi*— the Ninth Circuit cases discussing intent requirements of the Travel Act. The SI alleges the Defendants intentionally identified prostitutes, created free Backpage ads for them, and used those ads to try to secure future business. (SI ¶¶ 9, 36). They also helped known prostitution advertisers (Dollar Bill and P.R.) avoid their decency filters and attempted to "conceal the true nature of the ads being posted on" Backpage. (SI ¶¶ 11, 59–67, 132). Unlike the defendants in *Gibson*, where there was "no evidence . . . from which one could infer that the defendants associated with, participated in or sought to make succeed" the criminal venture, the SI meets *Gibson*'s test of requiring Defendants to in "some significant manner associate[]" themselves with the "criminal venture for the purpose of its advancement."

(Doc. 793 at 18). Relatedly, in their Reply, Defendants argue that Defendants' knowledge and intent of the prostitution offenses is "untethered" to the ads that form the basis of the charges, and that this "possibility" or "wish" of unlawful activity is simply not a crime. (Doc. 1585 at 4). The Court has also previously rejected this assertion and identified the many specific facts tethering Defendants' actions to their knowledge that posting the fifty ads would facilitate the business of prostitution. In its October 24, 2019, Order, the Court explained:

> Larkin regularly met with C.F. after the purported sale to discuss and direct the operation of Backpage. (SI ¶ 32). Larkin, Spear, Hyer, and C.F. attended meetings where the Dallas aggregation plan or the business relationship with TER was on the agenda. (SI ¶¶ 38–42, 47–48). Lacey sent Larkin a draft

editorial arguing Backpage brought "the oldest profession in the world . . . transparency." (SI ¶ 137). Larkin reviewed the editorial, forwarded it to C.F., and instructed him to remove any references to editing posts. (SI ¶¶ 107–08). Padilla helped supervise Backpage's moderators. (SI ¶ 12). Larkin, Spear, and C.F. met to discuss trade with TER. (SI ¶ 47). C.F. sent Larkin, Spear, and Brunst a "Backpage strategic plan" that included "expand relationship with TER." (SI ¶ 49). Padilla emailed (with Vaught cc'd or as a recipient) Backpage's India-based moderators to tell them to be "more lenient." (SI. ¶¶ 93, 99). Padilla and Vaught were sent an email informing them that their credit card processing company expressed concern about prostitution ads. Vaught directed a moderator to not remove "sex for money" links from ads. (SI ¶ 139). Vaught received an email from a moderator indicating that Padilla said to allow "GFE" in ads. (SI ¶ 148). Larkin, Spear, Brunst, Hyer, and C.F. received an email in August 2013 notifying them that Chase Bank would no longer accept transactions from Backpage because of it "involvement in Human Trafficking." (SI ¶ 135). Larkin, Spear, C.F., and Brunst discussed strategies for fooling credit card companies into processing payments using shell companies. (SI ¶¶ 178–80).

The alleged facts in the SI, taken as true, establish defendants had the specific intent to promote prostitution in violation of the Travel Act. They conspired together to do so. The conspiracy was successful and resulted in the fifty ads for prostitution that now make up fifty counts of violating the Travel Act.

(Doc. 793 at 19–20). Because the basis for Defendants' disagreement seems to be grounded in their selective reading of the SI, and not because the prior decisions on this issue were clearly erroneous, the Court reaffirms these rulings. *Easy Bay Sanctuary Covenant*, 950 F.3d at 1262. Under current Ninth Circuit law, the Court remains unpersuaded that a different *mens rea* is required for Section 1952(a)(3) Travel Act charges, and specifically, as Defendants propose, that the intent element "go to the specific and entire crime charged," as it must in an aiding and abetting charge. (Doc. 1557 at 10).

### 3. The Travel Act counts are not unconstitutional as applied to the Defendants.

Defendants' aiding and abetting argument is anchored to a position taken by the Government in *Woodhull Freedom Found'n v. United States*, Case No. 22-5105, a case pending before the D.C. Circuit Court of Appeals. *Woodhull* is a First Amendment pre-enforcement challenge to FOSTA. FOSTA proscribes managing certain computer services "with the intent to promote or facilitate the prostitution of another person." 18 U.S.C. §

- 13 -

2421A(a).  In defending the constitutionality of FOSTA against claims that that statute is too vague and broad as to what conduct falls in its ambit, the Government has taken the position in *Woodhull* that the terms "promote" and "facilitate" in FOSTA mean the same thing as "aid and abet," and thus necessarily limit its scope.  Defendants assert that unless the Court applies the same proposed narrowing construction to the Travel Act, "a law making it a crime to 'promote or facilitate' prostitution would be overbroad and vague in violation of the First and Fifth Amendments."  (Doc. 1557 at 5).[7]  Defendants say the Government's position in *Woodhull* "casts grave doubt on the indictment in this case." (*Id.*)

As an initial matter, this is not the first time that Defendants have invoked the Government's position in *Woodhull* to argue that the Travel Act charges here are deficiently pled or unconstitutional as applied to them.  The Court previously declined to be bound by the Government's position in *Woodhull*, stating that "the previous statements made by the Government in other cases are not binding on the Court, not relevant to this prosecution, and, in any case, not inconsistent with the Government's current theory regarding the Travel Act." (Doc. 793 at 17–18).   It expressly noted that the Government's representations related to "different statutes, the Fight Online Sex Trafficking Act and the SAVE Act 18 U.S.C. § 1591." (*Id.*)  The Court continues to agree with its past statements, and the fact that the Government has reiterated the same position in a recent oral argument does not present cause to reconsider its decision.   As Defendants acknowledge, there has been no opinion from the D.C. Circuit Court to suggest that court agrees with the Government's proposed interpretation of FOSTA and of course, this Court would not be bound by such a holding even if it had.

Moreover, and addressing the heart of why Defendants are invoking *Woodhull*, the Court also finds no reason to depart from its previous rulings that the Travel Act counts in

---

[7] Unlike FOSTA, which proscribes managing certain computer services in interstate commerce "with the intent to promote or facilitate the prostitution of another person," the Travel Act proscribes use of "the mail or any facility in interstate or foreign commerce, with intent to. . . otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity." *Compare* 18 U.S.C. § 2421A(a) *with* 18 U.S.C. § 1952(a)(3).

SER-123

the SI are not unconstitutionally vague or overbroad as applied to Defendants.  The Court has already explained that the Travel Act is not overbroad as applied to Defendants because it "requires Defendants to have intended to facilitate prostitution, which is a crime.  *See* A.R.S. § 13-3214. This limits its purview to criminal activity and distinguishes it from cases relied on by Defendants." (Doc. 793 at 20–22).  The Court also explained

> the SI alleges Defendants used a website with the intent to facilitate prostitution (a criminal activity) and executed strategies to further and increase that activity. The Court cannot conclude that such a standard or the allegations in the SI do not give fair warning that facilitating a criminal act is itself a crime.  As applied in the SI, the Travel Act is not unconstitutionally vague.

(*Id.*)  Defendants' proposed narrowing construction is therefore neither necessary to rectify any constitutional deficiency here nor supported by applicable authority, and the Court declines to reconsider these positions.

Apart from the arguments the Government has advanced to support the constitutionality of other federal statutes not at issue here, Defendants have pointed to no authority supporting their contention that an SI alleging Travel Act charges is deficient because it does not allege the elements of aiding and abetting a crime.  Neither the text of the Travel Act nor Ninth Circuit case law require as much.  In this case, as the Court has found several times, for each of the fifty ads, the SI sufficiently alleges all the required elements of a Travel Act charge.

Finally, as the Government points out, and Defendants concede (Doc. 1585 at 7), even if a Travel Act charge could be considered an aiding and abetting offense, an aiding and abetting charge is implied in every federal indictment for a substantive offense and would also resolve any pleading deficiency in that regard.  *United States v. Armstrong*, 909 F.2d 1238, 1241 (9th Cir. 1990). *See also United States v. Vaandering*, 50 F.3d 696, 702 (9th Cir. 1995) (noting that an aiding and abetting instruction is proper even when the indictment does not specifically charge that theory of liability).  In their Reply, Defendants briefly argue that this rule should only apply when a defendant is indicted as a principal of a substantive federal offense.  (Doc. 1585 at 7).  They say that when defendants are

"promotor[s] of someone else's offense," it must allege all the elements of an aiding and abetting offense or is deficient. (*Id.*) But Defendants neither cite to relevant case law[8] supporting this proposition nor otherwise explain why this rule would not apply to persons charged as "facilitators" of another's offense, as here. *United States v. Garcia*, 400 F.3d 816, 820 (9th Cir. 2005) (explaining that aiding and abetting is not a separate and distinct offense from the underlying substantive crime but is a different theory of liability for the same offense).

### B. There is No Cause to Reconsider the Court's Prior Rulings Regarding Double Jeopardy or the Independence of the Money Laundry Counts.

**Double Jeopardy.** Defendants again argue that Government's failure to allege the essential elements of the Travel Act warrant dismissal on the grounds that double jeopardy would not prevent the Government from "simply slotting in fifty more of the millions of Backpage.com ads, also without any allegation of aiding and abetting as to those specific ads and any underlying prostitution offenses." (Doc. 1557 at 18). But the Court has previously found that these counts are plead in a manner that provides notice to Defendants of the charges being brought against them and allows them to defend against those particular charges. (*See* Doc. 946 at 12–13). This includes specifically alleging which ads form the basis of each of the fifty counts. (*Id.* at 13 (rejecting claim that SI improperly indicts Defendants for facilitating the amorphous notion of prostitution: "They were indicted for facilitating via publishing ads) on fifty distinct occasions where prostitutes, prostitution-related businesses, or other groups were involved in the business of

---

[8] In passing, Defendants cite to *United States v. Superior Growers*, 982 F.2d 173 (6th Cir. 1992), but *Superior Growers* does not stand for the proposition that an aiding and abetting charge is only implied in a indictment for a principal offender. *Superior Growers* found that an indictment for "conspiracy to aid and abet the manufacture of marijuana" in violation of 21 U.S.C. §§ 846 and 841(a)(1) and 18 U.S.C. § 2 was deficient when it failed to allege facts showing that defendants knew their customers were manufacturing or planning to manufacture marijuana. *Id.* at 178 ("It seems to us then that in order to conspire or agree to assist "X" in the manufacture of marijuana, "Y" and "Z" have to know that "X" is manufacturing marijuana or planning to. Otherwise, all "Y and Z" are agreeing to do is to aid and abet a "possibility," or a "criminal wish"; which simply isn't a crime"). The case is distinguishable both on the grounds that (1) the defendants there were charged under the federal aiding and abetting statute with conspiracy to aid and abet the manufacture of marijuana; and (2) unlike the allegations in that case, the SI here is replete with allegations showing that Defendants knew they were facilitating the promotion of prostitution. (*See* Doc. 793 at 19–20).

prostitution").  Defendants would therefore be able to raise a double jeopardy defense if the Government tried to "slot[] in fifty more" ads.  This is not sufficient reason to dismiss the SI.

**Money Laundering Counts.**  Defendants contend that the Court's prior Order ruling that the money laundering counts could stand even if the Travel Act counts were dismissed is clearly erroneous.  (Doc. 1557 at 18).  Defendants argue that because "the government has not alleged an underlying crime, [] Defendants cannot be liable for laundering money that was not 'criminally derived.'  18 U.S.C. § 1957(a). The money laundering charges premised entirely on those underlying crimes cannot stand once the Travel Act foundation crumbles." (*Id.*)  The Court disagrees.  Defendants can be convicted for money laundering without being found guilty for the activity that generated the laundered money – there are other elements aside from the unlawful business activity that the Government may fail to prove at trial that would render acquittals of Defendants on these counts.  Moreover, per this Order, the Travel Act "foundation" has not crumbled; even if the law was otherwise, the Travel Acts alleged in the SI are not deficient.

**C.    The Court Does Not Find Cause to Review Instructions to the Grand Jury.**

Finally, Defendants argue that the SI should be dismissed if the instructions provided to the grand jury were erroneous regarding the elements of the Travel Act. (Doc. 1557 at 19).  Defendants say that given the Government's position that it need not prove an underlying unlawful activity was committed by someone else, they assume the grand jury was improperly instructed.  The Court disagrees with Defendants that a grand jury need be provided with the elements of an aiding and abetting charge to have properly indicted Defendants.  As stated herein, the elements of a Travel Act offense are threefold: "interstate commerce or use of an interstate facility (2) with intent to promote an unlawful activity and (3) a subsequent overt act in furtherance of that unlawful activity." *Tavelman*, 650 F.2d at 1138.  As such, the Court does not find cause to perform an *in camera* review of the grand jury instructions to see if they were instructed on the elements of aiding and abetting.

- 17 -

SER-126

## V.     Conclusion

For the foregoing reasons, the Court again finds the SI is not constitutionally deficient.  Accordingly,

**IT IS ORDERED** that Defendants' Motion to Dismiss (Doc. 1557) is **denied.**

Dated this 31st day of May, 2023.

Honorable Diane J. Humetewa
United States District Judge

- 18 -

**SER-127**

1  Timothy J. Eckstein, 018321
   Joseph N. Roth, 025725
2  Sarah P. Lawson, 036436
3  **OSBORN MALEDON, P.A.**
   2929 North Central Avenue, 20th Floor
4  Phoenix, Arizona  85012-2793
   (602) 640-9000
5  teckstein@omlaw.com
   jroth@omlaw.com
6  slawson@omlaw.com
7
8  *Attorneys for James Larkin*
9  Additional counsel on following page
10
11         **IN THE UNITED STATES DISTRICT COURT**
12         **FOR THE DISTRICT OF ARIZONA**
13
   United States of America,                    Case No. 2:18-cr-00422-PHX-DJH
14
15                    Plaintiff,                 **DEFENDANTS' MOTION TO**
                                                 **DISMISS SUPERSEDING**
16  vs.                                          **INDICTMENT**
17  Michael Lacey, *et al.*,                     (Oral Argument Requested)
18
                      Defendants.
19
20
21
22
23
24
25
26
27
28

Paul J. Cambria, Jr. (NY 15873, admitted *pro hac vice*)
Erin E. McCampbell (NY 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
(716) 849-1333
pcambria@lglaw.com
emccampbell@lglaw.com

*Attorneys for Michael Lacey*

Bruce S. Feder (AZ 004832)
FEDER LAW OFFICE PA
2930 E. Camelback Rd., Suite 160
Phoenix, Arizona  85016
(602) 257-0135
bf@federlawpa.com

Eric Walter Kessler
KESSLER LAW OFFICE
6720 N. Scottsdale Rd., Suite 210
Scottsdale, Arizona  85253
(480) 644-0093
Eric.kesslerlaw@gmail.com

*Attorneys for Defendant Scott Spear*

Gary S. Lincenberg
Ariel A. Neuman
Gopi K. Panchapakesan
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW P.C.
1875 Century Park E., Suite 2300
Los Angeles, California 90067
(310) 201-2100
glincenberg@birdmarella.com
gpanchapakesan.@birdmarella.com
aneuman@birdmarella.com

*Attorneys for John Brunst*

David S. Eisenberg
DAVID EISENBERG PLC
3550 N. Central Ave., Ste. 1155
Phoenix, Arizona  85012
(602) 237-5076
david@eisenbergplc.com

*Attorneys for Andrew Padilla*

2

Joy Malby Bertrand
JOY BERTRAND ESQ LLC
P.O. Box 2734
Scottsdale, Arizona  85252
(480) 656-3919
joyous@mailbag.com

*Attorneys for Defendant Joye Vaught*

**SER-130**

1    The government accuses Backpage of having been the "internet's leading source
2    of prostitution advertisements," and claims that Defendants "employed . . . business
3    strategies that were specifically intended to promote and facilitate prostitution." Doc.
4    230 ("SI") ¶¶ 1, 10. After years of failed civil suits and criminal enforcement efforts,
5    the government shut down the website and seeks to punish and impoverish its one-time
6    owners and employees. The Superseding Indictment does not charge Defendants with
7    any prostitution offenses, however. Instead, relying on the Travel Act, 18 U.S.C. §
8    1952, the government says it is enough to prove that Defendants, through Backpage,
9    promoted or facilitated prostitution by hosting ads the Defendants knew, or should have
10   known, might be associated with prostitution.

11   The government has always taken the position that, under the Travel Act, it
12   "does not have to prove" that a state law was "actually violated." Doc. 1216-3 at 147
13   (proposed jury instruction). When Defendants suggested that the government must
14   prove that each of them "knowingly did an act which the law forbids, purposely and
15   intending to violate the law," the government responded that "[t]his is a misstatement
16   of the applicable law. To be convicted under the Travel Act, one does not need to violate
17   the underlying state law." *Id.* at 154. "Rather, a defendant must have acted with
18   specific intent to 'facilitate the promotion' of the underlying unlawful activity. And
19   'facilitate' is given its ordinary meaning: to make easy or less difficult." *Id.*

20   But on November 2, 2022, in a matter pending before the D.C. Circuit, the
21   government argued the opposite–that a charge of "promoting" or "facilitating" under
22   the Travel Act is an aiding and abetting offense, requiring, among other things, proof
23   that the defendant intended to facilitate the commission of a specific underlying
24   criminal act. *See* Br. of United States in *Woodhull Freedom Found'n v. United States*,
25   Case No. 22-5105, at 28-30 (D.C. Cir., Nov. 2, 2022) (asserting that "[t]he phrase
26   'promote or facilitate,' as used in the Travel Act, *is equivalent to 'aid or abet'*"

27
28

SER-131

1   (emphasis added)).[1]   The government stated that "whatever meaning 'promote' or

2   'facilitate' might have in everyday speech, their meaning as terms of art in criminal

3   statutes, invoking traditional principles of accomplice liability, is established." *Id.* at

4   29.

5       As the government's position in *Woodhull* makes clear, the Travel Act cannot

6   be used to punish the promotion of "prostitution" in the abstract or theoretical assumed

7   prostitution offenses, but only conduct undertaken with the "specific intent to aid or

8   abet a specific crime under traditional principles of accomplice liability." *Id.* at 51.

9   Without proof that a defendant participated in a particular criminal venture with the aim

10  of making it succeed, there can be no aiding and abetting. *See, e.g.*, *Altamirano v.*

11  *Gonzales*, 427 F.3d 586, 594 (9th Cir. 2005) ("It is well-established that in order to aid

12  and abet another to commit a crime it is necessary that a defendant in some sort

13  associate himself with the venture, that he participate in it as in something he wishes to

14  bring about, that he seek *by his action* to make it succeed.") (cleaned up).   Moreover,

15  there can be no aiding and abetting without proof that an underlying offense was

16  committed. Indeed, notwithstanding the government's position on jury instructions in

17  this case, the Ninth Circuit has held that "[t]he existence of a state law violation is an

18  element of the violation of the Travel Act." *United States v. Hiatt*, 527 F.2d 1048, 1051

19  (9th Cir. 1975).

20      In *Woodhull*, the government has pressed its view that the terms "promote or

21  facilitate" as used in the Travel Act are "equivalent to" aiding and abetting because,

22  without that narrowing, a law making it a crime to "promote or facilitate" prostitution

23  would be overbroad and vague in violation of the First and Fifth Amendments. *See*

24  *Woodhull* Brief at 48-51, 57-58. While Defendants welcome the government's recent

25  confirmation in the D.C. Circuit that the scope and applicability of the Travel Act is not

26  boundless, this confirmation casts grave doubt on the indictment in this case.   The

27

28
---
[1] The government's brief in *Woodhull* is attached as **Exhibit A** (referred to for convenience as the "***Woodhull* Brief**").

SER-132

1   government can no longer dispute that its charges of promotion or facilitation under the

2   Travel Act are aiding and abetting offenses that require proof of the intent to facilitate

3   the commission of a specific underlying prostitution offense. *Id.* at 28-30.

4          Here, however, the Superseding Indictment fails to allege the elements of aiding

5   and abetting as required. Rather, it charges 50 separate substantive Travel Act offenses

6   based on Backpage's publication of 50 ads, contending that each ad was likely for

7   prostitution, regardless of whether the text proposes an unlawful transaction. SI ¶¶ 200-

8   01. The indictment fails to allege that any ad was linked to a specific prostitution

9   offense, that any Defendant was aware of that specific offense, or that any Defendant

10  "intend[ed] to facilitate *that* offense's commission." *Rosemond v. United States*, 572

11  U.S. 65, 76 (2014) (emphasis added). A person (even a known prostitute) could not be

12  prosecuted solely on the allegation that she posted an ad stating, for example:

13  "HOTTEST in town!!!!!- 26," SI ¶ 201, Count 17. Nor should the ad allow prosecution

14  of Defendants, who were several steps removed as alleged operators and owners of the

15  web platform where the ad was one among millions posted by third parties. Clumping

16  50 such ads together in a single indictment does not cure the deficiency. When an

17  indictment does not allege each required element, the government is relieved

18  unconstitutionally of the burden to prove every element of the offense. *In re Winship*,

19  397 U.S. 358, 364 (1970).

20         The failure to allege the express and implied elements of the charged offenses

21  requires dismissal of the Travel Act charges. Because the money laundering charges

22  hinge entirely on the purported Travel Act violations, they must also be dismissed.

23  Finally, the indictment should be dismissed if the grand jury was not instructed on the

24  essential elements of an aiding and abetting offense.

25  **I.      Pertinent background and allegations in the Superseding Indictment.**

26         The background facts regarding the parties and many details in the Superseding

27  Indictment have been discussed in past motions and orders and will not be repeated at

28  length here. *See, e.g.*, Doc. 561 at 3-11; Doc. 793 at 2-7; Doc. 946 at 2-4. The

SER-133

1    background pertinent to the arguments raised in this motion is set forth below, accepting

2    the truth of the allegations of the indictment.

3         **A.    The Superseding Indictment's factual allegations.**

4         Backpage.com was an online classified ad site similar to craigslist.com.  SI ¶¶

5    20-21.  It replicated the "back pages" classified sections of weekly newspapers such as

6    the *Phoenix New Times*, which Defendants Lacey and Larkin founded.  SI ¶¶ 18-21.

7    Among other categories of ads (car sales, job postings and the like), Backpage users

8    could post in an "adult" section.  The Superseding Indictment contends that Defendants

9    were aware that "the overwhelming majority of the website's 'adult' and 'escort' ads

10   were actually ads for prostitution."  SI ¶¶ 9, 34.  The indictment includes "victim

11   summaries" of individuals featured in Backpage ads, SI ¶¶ 160-76, although there are

12   no allegations that any Defendant knew of the existence of any of those individuals or

13   the facts described.

14        The indictment further alleges that Backpage used various methods to increase

15   the number of adult ads (all of which the government characterizes as "prostitution"

16   ads).  *See* SI ¶¶ 35-44 (summarizing so-called "aggregation" business practice that

17   encouraged those placing ads on other websites, like Craigslist, to also place their ads

18   on Backpage); SI ¶¶ 45-67 (summarizing so-called "reciprocal link and affiliate

19   programs" business practices to increase adult ads through referrals from other websites

20   and affiliations with those who placed many ads on various websites); SI ¶¶ 11, 68-70,

21   77-96, 99-104 (describing Backpage's "moderation" policies—rules web platforms use

22   to filter and screen third-party content—and implementation efforts allegedly intended

23   to "conceal the true nature of the ads being posted"); *see generally* Doc. 793 at 4-5.

24        **B.    The Superseding Indictment's charges are tied to 50 ads.**

25        Count 1 charges Defendants with conspiracy to commit a violation of the Travel

26   Act, 18 U.S.C. § 1952(a)(3)(A) (Travel Act-Facilitate Prostitution).  SI ¶¶ 196-198.

27   The charge (like the Superseding Indictment as a whole) does not allege Defendants

28   conspired to promote or facilitate any specific prostitution offense, nor does it suggest

that promoting or facilitating a specific offense is an element of the Travel Act charges.
Rather, counts 2-51 allege 50 separate Travel Act violations based on 50 ads published
on Backpage. SI ¶ 201 (listing Counts 2-51 and descriptions of the fifty ads). As to
each ad, the Superseding Indictment charges that Defendants:

> used the mail and any facility in interstate and foreign commerce with
> intent to otherwise promote, manage, establish, carry on, and facilitate the
> promotion, management, establishment, and carrying on of an unlawful
> activity, to wit: prostitution offenses in violation of the laws of the State in
> which they are committed and of the United States, including but not
> limited to Title 13, Arizona Revised Statutes, Section 13-3214, and
> thereafter performed and attempted to perform an act that did promote,
> manage, establish, carry on, and facilitate the promotion management,
> establishment and carrying on of the unlawful activity, as follows . . .

SI ¶ 201. For each count, the indictment alleges that Defendants "publish[ed] ad" on a
particular date. *Id*. The 50 ads can be divided into three categories: (1) 15 ads the
indictment says depicted individuals identified in the "victim summaries" (Counts 2,4-
5, 12-17, 19-24); (2) 10 ads involving P.R., whom the government alleges was a
prostitute known to a purported co-conspirator (Counts 3, 6-11, 18, 25-26); and (3) 25
ads that contain the term "GFE," which the indictment alleges is a "coded term for
prostitution," while providing no further information about those 25 ads or any
individuals associated with those ads (Counts 27-51).

The Superseding Indictment alleges that some Backpage-hosted ads led to acts
of prostitution, but, critically, does not allege any prostitution offenses connected to *any*
of the *charged ads*. For example, the indictment does not allege that anyone responded
to any charged ad, that sexual conduct occurred as a result of any charged ad, or that
money was exchanged for sexual conduct as a result of a charged ad causing a
prostitution offense under state law. Moreover, the indictment does not allege that any
Defendant knew of the existence of any of the charged ads, the persons associated with
any of the charged ads, or the intent of any such persons to engage in prostitution
offenses. There is no allegation that any Defendant had any role whatsoever in
Backpage's publication of any charged ad.

Counts 53-100 allege various money laundering offenses. To support those

SER-135

1   charges, the Superseding Indictment asserts that essentially all of Backpage's revenue

2   "constituted the proceeds of unlawful activity" because most of the ads on Backpage

3   were, according to the government, really associated with prostitution and published in

4   violation of the Travel Act.  SI ¶ 177.

5       **C.    Prior orders have not decided this issue.**

6       As the Court knows, this case has involved complex and lengthy litigation and

7   the Court has denied more than one motion to dismiss.  *See, e.g.*, Docs. 793, 840, 946.

8   In Doc. 840 (denying a motion to dismiss based on Section 230 and void for vagueness),

9   the Court stated, "the Travel Act does not require the government to allege Defendants

10  committed the underlying violation of state law."  Doc. 840 at 10.

11      Defendants agree that the Travel Act does not require proof that *they*

12  individually committed a prostitution offense in violation of state law.  The Travel Act

13  does, however, require proof that *someone* did, as "[t]he existence of a state law

14  violation is an element of the violation of the Travel Act" and the government must

15  allege and prove that "the underlying state law has been or could have been violated."

16  *Hiatt*, 527 F.2d at 1051.  This Court has not yet ruled on the question prompted by the

17  government's position, as articulated in *Woodhull*, that is implicated here—whether the

18  government's Travel Act charges here are aiding and abetting offenses, requiring the

19  government to prove, with respect to each charged ad, both that *someone* committed a

20  prostitution offense and that Defendants intended to facilitate the commission of *that*

21  specific prostitution offense.

22  **II.    Argument**

23      **A.    Legal standard**

24      The Fifth Amendment requires an indictment to set forth the elements of the

25  charged offenses.  *United States v. Bernhardt*, 840 F.2d 1441, 1445 (9th Cir. 1988).

26  The indictment must "contain[] the elements of the offense charged" to "fairly inform[]

27  a defendant of the charge against which he must defend."  *Hamling v. United States*,

28  418 U.S. 87, 117 (1974).  In addition, "[t]o be legally sufficient, the indictment must

1    assert facts which in law constitute an offense; and which, if proved, would establish

2    prima facie the defendant's commission of that crime." *United States v. Superior*

3    *Growers Supply, Inc.*, 982 F.2d 173, 177 (6th Cir. 1992) (citing *Fleisher v. United*

4    *States*, 302 U.S. 218 (1937)). The "failure to recite an essential element of the charged

5    offense is not a minor or technical flaw subject to harmless error analysis, but a fatal

6    flaw requiring dismissal of the indictment." *United States v. Omer*, 395 F.3d 1087,

7    1088 (9th Cir. 2005). "[T]he fact that an indictment may have tracked the language of

8    the statute will not render it valid if it fails to allege an essential element of the offense

9    or the minimum facts required to fulfill the purposes of indictments." *United States v.*

10   *Cecil*, 608 F.2d 1294, 1297 (9th Cir. 1979).

11   **B.    The Superseding Indictment does not allege two essential elements of
12         the Travel Act charges.**

13         **1.    The Travel Act charges are aiding and abetting offenses. As
                  such, essential elements of the crime are (a) the commission of
14                an offense and (b) an intent to aid the commission of that
                  offense.**

15         The Travel Act creates a federal offense for aiding and abetting a business

16   enterprise's commission of state-law prostitution offenses. As with any aiding or

17   abetting offense, to "aid and abet" (or using the Travel Act analogues "promote" and

18   "facilitate") means that: (1) "someone else committed" an offense, (2) the defendant

19   aided at least one element of the offense, and (3) the defendant acted "with the intent to

20   facilitate" the criminal offense. Ninth Circuit Model Criminal Jury Instructions § 4.1

21   (2022) (aiding and abetting). Although a defendant's acts must only "facilitat[e] one

22   or another element," the "state of mind" must "extend[] to the entire crime." *Rosemond*,

23   572 U.S. at 75-76. The intent "to facilitate that offense's commission . . . must go to

24   the specific and entire crime charged." *Id*. at 76.

25         The government contends, however, that the existence of actual violations of

26   state law are unnecessary and that Defendants do not "need[] the intent to violate the

27   state prostitution offense before being found guilty." *See* Doc. 1216-3 at 147

28   (proposing jury instruction before first trial that "the United States does not have to

prove that the referenced states' laws were actually violated"); Doc. 1216-3 at 104 (disputing that "Defendants needed the intent to violate the state prostitution offense"). The government's statement on the law is wrong for several reasons.

*First*, the government has now affirmatively taken the opposite position, asserting that "[t]he phrase 'promote or facilitate,' as used in the Travel Act, is equivalent to 'aid or abet.'" *Woodhull* Brief. at 28-29.  In *Woodhull*, the D.C. Circuit is considering whether the Allow States and Victims to Fight Online Sex Trafficking Act of 2017, 132 Stat. 1253 (2018) ("FOSTA") is unconstitutionally overbroad and vague.[2]  FOSTA makes it a crime to "own[], manage[], or operate[] an interactive computer service . . . with the intent to promote or facilitate the prostitution of another person." 18 U.S.C. § 2421A.  To defend the law's constitutionality, the government's primary argument is that "promote" and "facilitate" are "terms of art in criminal statutes, invoking traditional principles of accomplice liability," and that "the phrase 'promote or facilitate,' as used in the Travel Act, is equivalent to 'aid or abet.'" *Woodhull* Brief. at 28-29.  Consequently, says the government in *Woodhull*, there is no constitutional problem because FOSTA's reach does not extend beyond someone who "intentionally aids and abets the commission of crimes," and the "invocation of aiding-and-abetting liability draws on settled legal concepts to provide adequate notice of what the statute prohibits."  *Id*. at 2.[3]

Given this concession, the government cannot credibly contend here that it is irrelevant whether state law was "actually violated," (Doc. 1216-3 at 147) or whether Defendants intended the violation.  The "settled legal concepts" of "aiding and abetting" and the "traditional principles of accomplice liability" definitively require, as elements of the charge, proof of (1) commission of an offense by someone and (2) a state of mind extending "to the specific and entire crime," *Rosemond*, 572 U.S. at 76. Indeed, the government's *Woodhull* Brief cites (at 25) as evidence for its reading of the

---

[2] The court heard argument on January 11, 2023.  The court's decision is pending.
[3] A transcript of the oral argument before the D.C. Circuit is attached as **Exhibit B**.

SER-138

Travel Act and FOSTA the "influential LaFave treatise" which states: "The guilt of the principal must be established at the trial of the accomplice as a part of the proof on the charge against the accomplice. If the acts of the principal [are not criminal,] then the accomplice may not be convicted." Wayne R. LaFave, 2 *Substantive Criminal Law* § 13.3(c). And "the accomplice must have a state of mind extending to the entire crime." *Id*. § 13.2(b) (quoting *Rosemond*).

**Second**, the Travel Act's text confirms the government's position in *Woodhull*: for non-principals who are charged with "promoting" or "facilitating" unlawful activity, the Act is an aiding and abetting offense limited in scope by "traditional principles of accomplice liability." *Woodhull* Brief at 29. Indeed, the statutory text maps neatly onto the universal aiding-and-abetting elements reflected in the Ninth Circuit's Model Criminal Jury Instructions:

| Traditional Aiding and Abetting | Travel Act Text |
|---|---|
| Someone else committed an offense. | There is a "business enterprise involving . . . prostitution offenses" that "are committed." 18 U.S.C. § 1952(b)(i). |
| The defendant committed an act to aid at least one element of the offense. | The defendant "performs or attempts to perform an act" to "promote . . . or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity." 18 U.S.C. § 1952(a)(3)(A). |
| The defendant acted with intent to facilitate each element of the offense. Ninth Circuit Model Criminal Jury Instructions § 4.1 (2022) | The defendant "travels in interstate" commerce or "uses . . . any facility in interstate . . . commerce with intent to . . . otherwise promote . . . or facilitate . . . any unlawful activity." 18 U.S.C. § 1952(a)(3). |

By adding the interstate commerce requirement, the Travel Act creates a federal offense for aiding and abetting a business enterprise's commission of certain state-law offenses, including prostitution offenses. As with any aiding and abetting liability, the government must prove the existence of an offense and defendants' criminal intent.

**Third**, the "existence of a state law violation is an element of the violation of the Travel Act." *Hiatt*, 527 F.2d at 1049, 51 (element satisfied when defendant's conduct

SER-139

in managing "house of prostitution" would have violated Alaska prostitution laws). As the Ninth Circuit has explained, this circuit along with "most circuits" "require[s] that the specific elements of the underlying law that constitute the unlawful activity be found as elements of the Travel Act offense." *Myers v. Sessions*, 904 F.3d 1101, 1110 (9th Cir. 2018). Even in Travel Act cases charging a principal offender, the Ninth Circuit has held that the government "must prove as part of the Travel Act charge that the defendant has or could have violated the underlying state law, and the defendant may assert any relevant substantive state law defense." *United States v. Bertman*, 686 F.2d 772, 774 (9th Cir. 1982) (principal charged with traveling interstate to bribe state official). *See also United States v. Jones*, 909 F.2d 533, 538 (D.C. Cir. 1990) (reversing conviction of operators of escort service where jury instruction did not require "intent specified by the state [prostitution] laws with respect to each element of the escort service's allegedly unlawful activity"); *United States v. Goldfarb*, 643 F.2d 422, 426 (6th Cir. 1981) (holding that "as a predicate to a Travel Act conviction . . . the defendants must have engaged in some form of unlawful activity prohibited by the law of the State of Nevada" and noting that the Ninth Circuit is among courts requiring "proof of the commission or attempted commission of a state defined criminal offense" as an "essential element of a Travel Act conviction"); *United States v. Kahn*, 472 F.2d 272, 277 (2d Cir. 1973) (The "initial inquiry in a Travel Act case is whether the underlying activity violates a state law," including the "assertion of a particular state law defense.").

In other words, just like general aiding and abetting liability, the Travel Act requires proof of some violation of state law, and that the defendants intended to commit each element of the underlying offenses.

***Fourth***, if the Travel Act required less—if the government did not need to show the aiding and abetting of an underlying criminal offense—the statute would be unconstitutional as applied here. Allowing a prosecution to move forward without requiring the government to allege or prove that the Defendants knew about, assisted,

SER-140

1    and intended to assist in the commission of a specific criminal offense would be

2    unconstitutional.  *See, e.g.*, *United States v. Hansen*, 25 F.4th 1103, 1109 (9th Cir.

3    2022), *cert. granted*, 143 S. Ct. 555 (2022) (holding that statute criminalizing the

4    encouragement of certain violations is unconstitutionally overbroad because, among

5    other reasons, it is not limited to traditional aiding and abetting, which "requires

6    someone to have committed an underlying criminal offense").

7              **2.    The Superseding Indictment fails to allege the commission of
                       an offense or an intent to aid the commission of that offense.**

8

9          The Superseding Indictment's Travel Act charges (2-51) fail to allege the key

10   elements of aiding and abetting: (1) the commission of a state law violation and (2) a

11   state of mind extending "to the specific and entire crime," *Rosemond*, 572 U.S. at 76.

12   In a previous order, Judge Brnovich characterized the Travel Act charges as alleging

13   "fifty instances where Defendants posted ads on Backpage.com to facilitate specific

14   individual prostitutes or pimps involved in the business of prostitution."  Doc. 946 at

15   8-9.  Taking the government's allegations as true that the charged ads were really for

16   illegal prostitution transactions, such allegations do not suffice.

17         First, no allegation links any of the fifty ads to a specific prostitution offense.

18   For many ads (the "GFE" ads, Counts 27-51) the indictment alleges nothing other than

19   the existence of the ad itself.  For some ads (those linked with victim summaries, Counts

20   2,4-5, 12-17, 19-24, and those involving P.R., Counts 3, 6-11, 18, 25-26), the

21   indictment alleges that the person who placed the ad generally engaged in prostitution.

22   At most, the government alleges that individuals who may have committed *other*

23   prostitution offenses also placed these ads.  This does not prove that Backpage's

24   publication of any charged ad was associated with an underlying state law prostitution

25   offense, the "existence" of which is "an element of the violation of the Travel Act."

26   *Hiatt*, 527 F.2d at 1051.

27         Second, the indictment fails to allege that Defendants' state of mind extended to

28   the entire crime.  Taking Arizona's law for example (the state statute cited in Counts 2-

51, SI ¶ 201), the crime of prostitution requires proof that a defendant "knowingly" "engag[ed] in or agree[d] or offer[ed] to engage in sexual conduct under a fee arrangement with any person for money or any other valuable consideration." A.R.S. §§ 13-3214(A), 13-3211(5). "Sexual conduct" means "fondling" or "manipulating" the "genitals, anus or female breast," "sexual intercourse, oral sexual contact or sadomasochistic abuse." A.R.S. § 13-3211(8), (9). The Superseding Indictment does not allege that any Defendant knew about these charged ads, much less knew of any exchange for "sexual conduct under a fee arrangement" tied to any such ad. *See also Rosemond*, 572 U.S. at 78 (holding that in addition to the requisite knowledge, the accomplice must have had "advance knowledge").

The details matter. By eliding allegations of an actual violation of state law and requisite intent, the indictment makes no distinction between illegal and legal ads. A person (even a known prostitute) can place an ad for lawful services, including lawful sexual services. In Arizona, for example, it is legal to advertise for and pay someone to "privately model lingerie or to privately perform a striptease." A.R.S. § 13-1422(G)(7) (defining "escort", a lawful "adult oriented business"); A.R.S. § 9-500.10 (regulating escort advertising). The essential elements of aiding and abetting liability are necessary to separate non-criminal and criminal conduct, and the Superseding Indictment fails to allege them.

The Sixth Circuit's decision in *United States v. Superior Growers Supply, Inc.*, 982 F.2d 173 (6th Cir. 1992), is highly instructive. Although not a Travel Act case, the indictment there was parallel in structure to the Superseding Indictment, "charging defendants, a garden supply store, its owners and an employee, with conspiracy to aid and abet the manufacture of marijuana," along with "89 overt acts" to further their customers' growing of marijuana. *Id*. at 175. Marijuana cultivation was illegal throughout the country at the time. The allegations linking the defendants' business with those in the cultivation business were significant, defendants: made and sold "equipment and supplies used for the illegal manufacture and cultivation of marijuana;"

1   "advertise[d] their products in 'High Times' magazine and other marijuana-related

2   publications;" would "sell or give publications concerning the growing of marijuana

3   and other marijuana-related publications to many of their customers;" provided

4   "information and advice on the growing of marijuana" to customers; and would on

5   occasion "accept marijuana or hashish in partial payment for equipment and supplies."

6   *Id*.

7           Although the indictment alleged those defendants had reason to know that some

8   of their customers might have been marijuana cultivators, the Court held that the

9   indictment was still missing the "essential elements" of the "actual manufacture of

10  marijuana" and defendants' "intent to further" that unlawful act.  *Id*. at 178-79.  A

11  charge of conspiracy to aid and abet is only "legally and factually viable *when an*

12  *underlying crime has been committed*."  *Id*. at 180.  Otherwise, there is only an

13  agreement to "aid and abet a 'possibility,' or a 'criminal wish[,]' which simply isn't a

14  crime."  *Id*. at 178.

15          The Travel Act and conspiracy charges likewise fail here.  As was the case in

16  *Superior Growers*, the government merely stacks allegations about how defendants

17  used legal means to target customers (i.e., Backpage publishing adult ads, allowing only

18  facially lawful ads, and encouraging those who placed ads to place more ads) on top of

19  allegations that the Defendants knew that Backpage's customers included "prostitutes"

20  and "pimps."  But that does not state an offense.  "Charges of conspiracy are not to be

21  made out by piling inference upon inference, thus fashioning what . . . is called a dragnet

22  to draw in all substantive crimes."  *Id*. (cleaned up and citation omitted).  Whatever

23  innuendo or suspicion is in the indictment, "knowledge of the underlying crime and

24  intent to further it are essential elements of a conspiracy to aid and abet a substantive

25  crime."  *Id*.  Those elements are missing here.

26          This conclusion is consistent with the numerous cases addressing Backpage, in

27  which other federal courts previously held that the publication of third-party ads on

28  Backpage.com could not create liability, including under an aiding and abetting theory.

1    Those cases have been briefed previously and will not be recited again here.  *See, e.g.*,

2    Doc. 561 at 4-8.  As but one example, in *M.A. ex rel. P.K. v. Vill. Voice Media Holdings,*

3    *LLC*, the court held that the allegations that Backpage used marketing practices to

4    increase ad placements, knew prostitutes used Backpage, and that "no reasonable

5    person could review the postings in the adult categories and deny prostitution was the

6    object of almost each and every ad" "do not describe the specific intent required for

7    aiding and abetting" of a person's prostitution.  809 F. Supp. 2d 1041, 1050, 1054 (E.D.

8    Mo. 2011).

9         The government has never cited a case, and we can find no case, involving any

10   prosecution under the Travel Act anything like the theory charged here.  Rather, the

11   reported cases invariably involve proof of a defendant's direct involvement in the

12   business enterprise committing underlying prostitution offenses.  *See, e.g.*, *Hiatt*, 527

13   F.2d at 1049-50 (defendant had "active role" in management of "massage parlor" and

14   "acknowledge[d] . . . was in fact a house of prostitution," including "maintain[ing]

15   records of the women's earnings" and "monitor[ing] sessions through one-way

16   mirrors . . . to verify the earnings"); *United States v. Monaco*, 700 F.2d 577, 579 (10th

17   Cir. 1983) (defendants "owned and operated" "massage parlors" where employees

18   "would perform sexual acts with customers for money" "as part of their work"); *United*

19   *States v. Palfrey*, 499 F. Supp. 2d 34 (D.D.C. 2007) (denying motion to dismiss where

20   indictment alleges defendant owned and managed a multistate prostitution business).

21   The Superseding Indictment does not allege the "essential elements" of aiding and

22   abetting liability present in these other cases.

23        **C.    The failure to allege essential elements of the Travel Act charges**
          **compels dismissal of the Superseding Indictment.**
24

25        The failure to allege essential elements of the Travel Act charges requires

26   dismissal.  The failure to allege these essential elements deprives defendants of notice

27   of the charges against them and the ability to prepare a defense.  *Bernhardt*, 840 F.2d

28   1441, 1445 (9th Cir. 1988).  The failure to allege these elements means that the Fifth

1   Amendment's requirement of fair notice in an indictment is "not satisfied, since the

2   essential facts set out in [the indictment] do not describe a crime." *Superior Growers*,

3   982 F.2d at 179 (citing *Hamling*, 418 U.S. at 117-18).   The failure to allege the

4   "occurrence of the underlying crime has to be an essential element" of an aiding and

5   abetting offense (or a conspiracy to commit an aiding and abetting offense) and its

6   absence requires dismissal.  *Id*. at 178.  Moreover, an indictment must "enable [the

7   defendant] to plead double jeopardy." *Bernhardt*, 840 F.2d at 1445.  After this case,

8   would double jeopardy prevent the government from simply slotting in fifty more of

9   the millions of Backpage.com ads, also without any allegation of aiding and abetting as

10  to those specific ads and any underlying prostitution offenses?

11          The money laundering counts must also be dismissed.    Judge Brnovich

12  previously ruled the money laundering counts could stand regardless of a dismissal of

13  the Travel Act counts.  *See* Doc. 946 at 17 (order denying Def. Brunst's Motion to

14  Dismiss).  That ruling is clearly erroneous, as the money laundering counts all hinge on

15  the Travel Act counts.  Although "the government need not allege all the elements of

16  the 'specified unlawful activity,' i.e., the underlying offense," Doc. 946 at 17, the

17  proceeds must be derived from a specified unlawful activity.  *See* 9th Cir. Model Crim.

18  J. Inst. 18.7 (2022) (requiring the government to prove "the property was, in fact,

19  derived from . . . the specified unlawful activity alleged in the indictment").   The

20  contention of this motion is that the government has not alleged an underlying crime,

21  and Defendants cannot be liable for laundering money that was not "criminally

22  derived."  18 U.S.C. § 1957(a).  The money laundering charges premised entirely on

23  those underlying crimes cannot stand once the Travel Act foundation crumbles.  *U.S.*

24  *v. Garrido*, 713 F.3d 985, 989-99 (9th Cir. 2013) (reversing money laundering

25  convictions because the "criminally derived property" was from a defectively alleged

26

27

28

1    underlying crime).[4]

2         **D.    The Court should also dismiss if the grand jury was given incomplete,
3              misleading instructions of the elements of the Travel Act.**

4         The failure to accurately instruct the grand jury can require dismissal if the

5    erroneous instruction "substantially influenced the grand jury's decision to indict or" if

6    the error creates "grave doubt that the decision to indict was free from the substantial

7    influence" of the error. *United States v. Navarro*, 608 F.3d 529, 539 (9th Cir. 2010)

8    (describing standard for "errors brought to the district court's attention" before the end

9    of trial). This occurs when the erroneous instructions are "flagrantly misleading" or

10   when the instructions fail to "at least impl[y]" "all the elements." *United States v.*

11   *Larrazolo*, 869 F.2d 1354, 1359 (9th Cir. 1989) *overruled on other grounds by Midland*

12   *Asphalt Corp. v. United States*, 489 U.S. 794, 799-800 (1989).

13        Here, contrary to its position in *Woodhull*, the government has not alleged that

14   any of the Defendants published the charged ads with the intent to aid or abet specific

15   prostitution offenses (as opposed to "prostitution" in the abstract), and has urged that

16   proof of the existence of actual violations of law are unnecessary and that Defendants

17   do not "need[] the intent to violate the state prostitution offense" for conviction. *See*

18   Doc. 1216-3 at 104, 147. Given that, it is fair to assume that the government failed to

19   instruct the grand jury on the essential elements of aiding and abetting, which are

20   essential to the government's Travel Act charges.

21        The Court is in possession of the sealed grand jury instructions on the Travel

22   Act. *See* Doc. 879 (ordering production for in camera review). The Court should

23   review those instructions to determine if the grand jury was properly instructed that the

---

24   [4] The cases the government cites in opposition to an earlier motion to dismiss (Doc. 776
25   at 16) stand only for the proposition that a defendant can be convicted of certain money
     laundering offenses if he or she knows that the funds at issue were illegally derived,
26   e.g., where the defendant is acquitted of a substantive drug offense but knew the funds
     were derived from drug sales. If the Court were to dismiss the Travel Act charges, then
27   there would be no "specified unlawful activity" underlying the money laundering
28   charges.

promotion and facilitation charged under the Travel Act required it to find that Defendants had aided and abetted the commission of specific prostitution offenses. If not, the Court should dismiss the indictment because it was procured through "flagrantly misleading" instructions that fail to instruct on "all the elements."

### III.  Conclusion

The Superseding Indictment fails to allege the essential elements required to prove a crime under the Travel Act. The Superseding Indictment should be dismissed.

DATED this 30th day of March, 2023.

**OSBORN MALEDON, P.A.**

By      s/ Joseph N. Roth
       Timothy J. Eckstein
       Joseph N. Roth
       Sarah P. Lawson
       2929 North Central, 20th Floor
       Phoenix, Arizona  85012-2794

*Attorneys for James Larkin*

**LIPSITZ GREEN SCIME CAMBRIA LLP**

By      s/ Paul J. Cambria, Jr. (w/permission)
       Paul J. Cambria, Jr. (*pro hac vice*)
       Erin E. McCampbell (*pro hac vice*)
       42 Delaware Avenue, Suite 120
       Buffalo, New York 14202

*Attorneys for Michael Lacey*

**FEDER LAW OFFICE PA**

By      s/ Bruce S. Feder (w/permission)
       Bruce S. Feder
       2930 E. Camelback Road, Suite 160
       Phoenix, Arizona  85016

**SER-147**

**KESSLER LAW OFFICE**

By      s/ Eric W. Kessler (w/permission)
        Eric W. Kessler
        6720 N. Scottsdale Rd., Suite 210
        Scottsdale, Arizona  85253

*Attorneys for Scott Spear*

**BIRD, MARELLA, BOXER, WOLPERT,
NESSIM, DROOKS, LINCENBERG &
RHOW P.C.**

By      s/ Gary S. Lincenberg (w/permission)
        Gary S. Lincenberg
        Gopi K. Panchapakesan
        Ariel A. Neuman
        1875 Century Park E., Suite 2300
        Los Angeles, California  90067

*Attorneys for John Brunst*

**DAVID EISENBERG PLC**

By      s/ David S. Eisenberg (w/permission)
        David S. Eisenberg
        3550 N. Central Ave., Ste. 1155
        Phoenix, Arizona  85012

*Attorneys for Andrew Padilla*

**JOY BERTRAND LAW**

By      s/ Joy M. Bertrand (w/permission)
        Joy M. Bertrand
        P.O. Box 2734
        Scottsdale, Arizona  85252

*Attorneys for Joye Vaught*

21

**SER-148**

MICHAEL BAILEY
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1200
Los Angeles, CA 90012
Telephone (213) 894-3391

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-18-00422-PHX-SMB |
|---|---|
| Plaintiff, | |
| v. | **RESPONSE TO DEFENDANTS' MOTION TO DISMISS BASED ON OUTRAGEOUS GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE [DOC. 940]** |
| Michael Lacey, et al., | |
| Defendants. | [REDACTED FOR PUBLIC DISCLOSURE] |

1    Undeterred by losing five prior motions to dismiss, and based on materials they've
2    had for the better part of a year, Defendants now seek dismissal for a sixth time—asserting
3    a claim of "outrageous government misconduct."  Long on hyperbole, short on substance,
4    Defendants' latest effort boils down to the notion that the government improperly learned
5    from CEO Carl Ferrer that Backpage had invoked First Amendment, *mens rea* and
6    Communications Decency Act (CDA) theories to rationalize the country's largest online
7    marketplace for prostitution solicitations—the same theories that Backpage previously
8    disclosed in courts around the country.  This motion is unavailing for several reasons.

9    First, while Defendants complain that Backpage's CEO Carl Ferrer provided the
10   government with privileged communications, the examples provided by Defendants do not
11   involve typical privileged material, *i.e.*, emails, memoranda, recordings or other items
12   revealing the substance of confidential communications between an attorney and client.
13   (Doc. 940 at 11-12.)  Rather, they are Ferrer's memories of Backpage's known business
14   practices and public legal strategy.  Defendants fail to establish the privileged nature of the
15   statements identified in their Motion, which is their burden under federal law.

16   Second, these statements cannot be privileged because they have not remained
17   confidential.  Even if Defendants hadn't publicly asserted the same legal theories in scores
18   of cases throughout the country over the last decade, Defendants revealed these theories in
19   this case in their earliest filings.  (*See, e.g*., Docs. 23 and 26.)  Simply put, it was no secret
20   that Defendants would rely on First Amendment, *mens rea*, and CDA arguments to defend
21   their operation of a website whose revenue-generating business model was
22   overwhelmingly based on advertising the sale of adults and children for sex.

23   Third, even if these statements might once have been privileged, Ferrer, as
24   Backpage's CEO, waived the privilege on behalf of the company.  Defendants—
25   Backpage's *former* owners, managers, and employees—have no authority to prevent that
26   waiver.  Defendants rely on Judge Logan's previous order as the "clearest evidence" of the
27   government's misconduct.  (Doc. 940 at 15.)  Defendants, however, exaggerate the scope
28   of Judge Logan's order, which "decline[d] to address the issue of whether Ferrer had

SER-150

authority to waive Backpage's corporate attorney-client privilege" and instead made clear the ruling was "for the limited purpose of addressing the Government's access to the privileged emails" at issue in the government's motion. (Doc. 345 at 4.) Ferrer possessed the ability to waive privilege on Backpage's behalf and he has exercised that right.

Fourth, Defendants are unable to articulate any prejudice they have suffered. Ferrer's statements did not concern privileged trial strategy information. Accordingly, the burden does not shift to the government, but remains with Defendants to demonstrate prejudice. Defendants fail to articulate any prejudice here.

The government did not violate Defendants' Fifth and Sixth Amendment rights by "invading" attorney-client privileges. With no rights violated, Defendants' argument that the government engaged in outrageous conduct fails. Without any misconduct, Defendants' request for dismissal, or any other remedy, has no basis in fact. Defendants' motion should be denied.

## I.    RELEVANT FACTUAL BACKGROUND

### A.    Carl Ferrer Waived Backpage's Corporate Attorney-Client Privilege; Judge Logan's Limited Order

On April 5, 2018, Carl Ferrer executed a written waiver of the corporate attorney-client privilege held by Backpage.com LLC and various other Backpage-related entities. (Doc. 195-3.) Based on that waiver, among other reasons, the government sought an order from the Court confirming that Backpage's corporate attorney-client privilege had been waived and therefore the prosecution team could gain access to the emails and other communications that were in the filter team's possession. (Doc. 195 at 13.) On October 18, 2018, after further briefing (Docs. 235, 269, 324), the Court denied the government's motion in a limited order. (Doc. 345.)

The Court relied on the validity of a Joint Defense Agreement ("JDA") that "established joint-defense privileges" and "demonstrate[d] that the emails themselves are protected from disclosure." (*Id.* at 4.) Specifically, Judge Logan held: "for the limited purpose of addressing the Government's access to the privileged emails at issue, the Court

finds that the Government cannot use Ferrer's written waiver of attorney-client privilege to circumvent the terms of the JDA." (*Id.*)  Judge Logan added:  "At this time, the Court declines to address the issue of whether Ferrer had the authority to waive Backpage's corporate attorney-client privilege based on the Defendants' argument that the attorney-client privilege was owned and later shared with Village Voice Media Holdings, LLC." (*Id.* at 4, n.4.)  The corporate waiver of Backpage's attorney-client privilege is an open issue in this matter.

**B.    Defendants Filed This Motion Eight Months After Receiving Ferrer's MOIs And Six Months After The Substantive Motions Deadline**

The government produced Ferrer's Memoranda of Interviews (MOIs) in August 2019.  (Doc. 730.)  Two months later, Defendants filed nine substantive motions on October 18, 2019, the substantive motion deadline.  (Doc. 664; *see* Docs. 775, 777, 778, 781, 782, 783, 784, 785, 786.)  One of those motions was a joint motion to dismiss the indictment in which Defendants argued the superseding indictment "should be dismissed for gross abuse of the grand jury process."  (Doc. 782 at 6.)  That motion attached and relied heavily on Ferrer's MOIs to argue that Ferrer contradicted many of the statements included in the charging documents.  (*Id.* at 9-11; Doc. 780.)  On January 9, 2020, the Court denied Defendants' motion.  (Doc. 844.)  In their motion *in limine* to preclude certain expert testimony of Quoc Thai, filed several weeks ago, Defendants again attached Ferrer's MOIs.  (Doc. 909 at Exs. B & C.)

In the instant motion, Defendants claim: "[W]hen the government finally provided its [MOIs] from the Ferrer interviews, the government's repeated invasions of Defendants' privileged communications became clear."   (Doc. 940 at 10.)   All of this begs the question—if the serious allegations of misconduct now leveled by Defendants were so "clear" eight months ago, why wait until now to file this sixth motion to dismiss?

**C.    Defendants' Examples Of "Privileged Communications"**

Defendants cite 19 specific paragraphs among the 185-pages of Ferrer's MOIs that they    believe    demonstrate    "repeated    invasions    of    Defendants'    privileged

communications."[1]  (Doc. 940 at 10-12.)  Defendants did not quote directly from the MOIs, but instead paraphrased Ferrer's statements.  (*Id.*)  However, to properly evaluate Defendants' claims, the actual statements should be reviewed.  To assist in this review, the government groups the statements into the following categories, and quotes the full MOI paragraphs cited by Defendants, as follows:

>    1.   First Amendment, *Mens Rea*, or CDA Theories



---

[1] Defendants suggest that there are "many dozen" invasions into privileged communications beyond the "few examples" discussed in their motion.  (Doc. 940 at 10.)  Should Defendants raise new examples in their reply brief, the Court need not consider them.  *United States v. Puchi*, 441 F.2d 697, 703 (9th Cir. 1971) (new point raised in reply brief need not be considered by the Court); *cf. Potter v. Dist. of Columbia*, 558 F.3d 542, 553 (D.C. Cir. 2009) (courts will not "hunt[ ] for truffles buried in . . . the record") (citations and internal quotation marks omitted).  In addition to being contrary to case law, if Defendants believed other invasions rose to the level of "outrageous conduct," they should have included them in their motion to permit the government a fair opportunity to respond.



2.    "Escort" Ads and Moderation

**SER-154**



2 This bracketed language appears in the MOI.

3.     <u>Backpage's Sale to Ferrer</u>

4.     <u>Backpage's Decision to Accept Gift Cards</u>

5.     <u>National Center for Missing and Exploited Children (NCMEC)</u>

- 7 -

6.   <u>Continuing Operations Abroad</u>

In total, seven out of the 19 paragraphs discuss the First Amendment, *mens rea*, and the CDA; eight of these paragraphs relate to escort ad moderation; and the final four touch on Backpage's sale, decision to accept gift cards, interactions with NCMEC, and a theoretical plan to continue operations abroad.

## II.   <u>LAW AND ARGUMENT</u>

### A.   **Defendants Fail To Establish that Any Identified MOI Statements Are Privileged, And Have Waived Any Privilege Through Public Disclosures**

The attorney-client privilege protects "[u]nder certain circumstances" confidential communications between clients and their attorneys. *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126 (9th Cir. 2012) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). Because this privilege "contravene[s] the fundamental principle that the public has a right to every man's evidence," the Ninth Circuit construes it narrowly. *Id.* (citations and quotations omitted); *United States v. Ruehle*, 583 F.3d 600, 609 (9th Cir. 2009) ("As the party asserting the privilege, Ruehle was obliged by federal law to establish the privileged nature of the communications and, if necessary, to segregate the privileged information from the non-privileged information.").

Courts have recognized several ways by which parties may waive the privilege. *In re Pac. Pictures Corp.*, 679 F.3d at 1126. "An express waiver occurs when a party discloses privileged information to a third party who is not bound by the privilege, or

otherwise shows disregard for the privilege by making the information public." *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003). It is well-understood that the mere fact that a person is a lawyer does not lay a cloak of privilege upon everything that lawyer prepares, sees, or hears. *United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996). The party asserting privilege has the burden of showing that the privilege has not been waived. *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002).[3]

Here, Defendants have failed to carry their burden. *Ruehle*, 583 F.3d at 609. Defendants make "no effort to identify with particularity" how Ferrer's statements are privileged, let alone how any of his above-identified statements divulged the substance of any confidential attorney-client communications. Defendants fail to answer the most basic questions about why they believe Ferrer's statements are privileged, including: (1) "Which attorney was representing which party when the communications were made?"; (2) "Was it a privileged communication because of the JDA or for some other reason?"; (3) "Was the attorney a party to the JDA, if not, how is the statement privileged?"; and (4) "Did the statement reflect legal or business advice?" None of these questions is discussed, much less answered; rather, Defendants argue the Court can deem these statements privileged by simply reviewing the MOIs. (Doc. 940 at 7.) Defendants have made the same mistake as the trial court in *Ruehle* by "invert[ing] the burden of proof, improperly placing the onus on the government to show what information was not privileged." 583 F.3d at 609.

Even if Defendants established Ferrer's memories are privileged, it's clear that confidentiality has not been maintained. Indeed, from the earliest days of this case, Defendants have trumpeted their previous successes in defending their operation of Backpage based on the First Amendment, the CDA and *mens rea* in briefing before this Court. (*See, e.g.*, Doc. 23 at 2-4, 11-12; Doc. 26 at 1-2, 4-5, 10-11; Doc. 183 at 7-9; Doc.

---

[3] *See also, e.g.*, *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 and n.2 (9th Cir. 1992) (privilege proponent must demonstrate the following "eight essential elements: '(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.'" (citations omitted).

503 at 5-7; Doc. 561 at 15-19; Doc. 783, *passim*.)  To the extent any of Carl Ferrer's memories about what occurred at Backpage years ago could be considered privileged, that privilege has been waived.

       1.    Public Disclosure of First Amendment, *Mens Rea* and CDA Theories

       Defendants' legal defenses to civil and criminal liability are no secret.  Defendants have publicly disclosed their defense theories regarding Backpage's operations, including reliance on the First Amendment, the CDA, and not possessing criminal intent, in a multitude of ways.  First, Defendants made all these arguments in previous cases.  *See, e.g., M.A. ex rel. P.K v. Vill. Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041 (E.D. Mo. 2011) (ruling Backpage immune under the CDA and finding the company did not have *mens rea* to commit federal crimes); *J.S. v. Vill. Voice Media Holdings, L.L.C.*, 359 P.3d 714, 717 (Wash. 2015) (Washington Supreme Court upholding trial court's denial of Backpage's motion to dismiss noting "[t]his case turns on whether Backpage merely hosted the advertisements that featured J.S., in which case Backpage is protected by CDA immunity, or whether Backpage also helped develop the content of those advertisements, in which case Backpage is not protected by CDA immunity"); *Doe ex rel. Roe v. Backpage.com, LLC*, 104 F. Supp. 3d 149, 161 n.9 (D. Mass. 2015) (Backpage argued they did not possess the requisite *mens rea* "to make out a case under 18 U.S.C. § 1595"); *People v. Ferrer*, 2016 WL 7237305, at *2 (Cal. Super. Ct. Dec. 9, 2016) ("Defendants [including Lacey and Larkin] claim that the complaint and prosecution are: barred by the First Amendment, legally deficient under [the CDA], and devoid of any facts that constitute public offenses under the criminal statutes."); *People v. Ferrer*, No. 16FE024013 (Cal. Super. Ct. Aug. 23, 2017).[4]

       Second, Defendants have repeatedly advanced these theories in this case, including in their very first filings in this matter.  (Doc. 23 at 3-4 ("the government's underlying assumptions have been repeatedly litigated, and in each case, rejected on First Amendment

---

[4] This decision is unpublished, but Defendants attached it to a previous motion to dismiss.  (Doc. 541-1.)

SER-159

grounds"); Doc. 26 (same).)  Third, Defendants' public disclosures have not been limited to court filings.  For years, Don Bennett Moon publicly discussed the theories that Defendants now label as "privileged."[5]  For example, in a memorandum to NCMEC staff in 2013, Moon wrote about Backpage's vigorous defense of "First Amendment rights," "immunity from civil claims under the [CDA]," the importance of and legal protection for anonymous internet speech, and the legality of accepting "gift or prepaid cards."  (Memo. from Moon to John D. Ryan & Staca Shehan at 5-9, 14-15, attached as Ex. A.)  Indeed, nearly every "privileged" communication identified by Defendants is discussed in this memorandum to a third party.  (*See, e.g., id.* at 13-14 (opining on "user age and identification verifications regulations" and procedures).)

### 2.  Public Disclosure of Ad Moderation Policy

The other chief category identified by Defendants as "privileged" relates to ad moderation, including Ferrer's reference to the company's receipt of an attorney memorandum on the subject.  Ferrer's MOIs state that in ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (2/5/19 MOI ¶¶ 80(a)-(b) (Ex. 15)); *see also* (4/17/18 MOI ¶ 7(c) (Ex. 10).)  When a document is widely-circulated within a corporation, it loses any attorney-client protection, even if based on advice of counsel.  *Sherwood v. BNSF Ry. Co.*, 325 F.R.D. 652, 661 (D. Idaho 2018) ("A corporation's legal compliance policy that serves as a reference or instructional guide to corporate employees is primarily a 'business' policy rather than a 'legal' policy, even if based on the advice of counsel."); *Stevens v. Corelogic, Inc.*, 2016 WL 397936, at *4 (S.D. Cal. Feb. 2, 2016) (documents that are shared "widely within the corporation" are not protected by the attorney-client privilege).  Ferrer's recollections of these practices, which were circulated as "company policy" to Backpage's moderators, are not protected by the attorney-client privilege.

### 3.  Defendants' Remaining Examples Aren't Privileged

---

[5] The government discussed Moon's role with Backpage in a previous motion. (Doc. 929 at 5.)

1    The few examples provided by Defendants that do not fit into either of the two

2    categories discussed above also are not privileged.  Defendants point to statements made

3    by Ferrer about shutting down Backpage's escort section.  (Ex. 11 at ¶ 143.)  Ferrer

4    mentioned that he discussed this idea with Defendants Larkin and Brunst, along with

5    several attorneys and that everyone agreed with the idea.  This isn't privileged. Ferrer

6    wasn't seeking legal advice; he was making a business decision as Backpage's CEO.

7    Moreover, Ferrer's recollection, as reflected in the MOIs, does not reveal the substance of

8    any specific legal advice or analysis he might have received regarding this "idea."

9    Similarly, the paragraphs cited by Defendants that discuss Hemanshu Nigam are not

10   privileged.  (Ex. 14 at ¶¶ 23-24.)  The first paragraph states,

11   (Id. at ¶ 23.)

12   This isn't a "confidential communication."  It's not even a communication.  The next

13   paragraph suggests that

14   (Id. at ¶ 24.)  Backpage's decision to remove

15   The Erotic Review links is not privileged.  Ferrer's discussion does not reveal the basis for

16   Mr. Nigam's recommendation, just a conclusion that Backpage adopted as a business

17   decision.  Indeed, Defendant Padilla communicated this decision to Backpage employees

18   stating the company's "internet safety experts" made the suggestion.  (Feb. 18, 2011 email

19   from A. Padilla, attached as Ex. B.)  Further, this decision was shared in an email with a

20   third-party public relations consultant (who appears to have had input in the decision).

21   (Doc. 269-6 at 4) (listed under The Erotic Review category, "Inform moderators that all ID

22   numbers that are not clearly marked as massage license authentication numbers should be

23   removed upon discovery."); (see also Doc. 230 ¶ 100.)

24   The final two examples do not require much explanation.  First, Defendants claim

25   Moon's presentation of an agreement for Ferrer to sign constituted a privileged

26   communication.  (Doc. 940 at 11 (citing Ex. 10 at ¶ 45).)  But Ferrer makes clear Moon

27   represented the sellers in the company's sales transaction, so no privilege could attach in

28

1    any communications between the two on this issue.[6] (Ex. 10 at ¶ 45.)  Finally, Defendants

2    argue Ferrer's discussion about Backpage moving operations to Europe was privileged.

3    (Doc. 940 at 11 (citing Ex. 13 at ¶ 81).)  A communication, however, cannot be privileged

4    when there's no discussion between an attorney and her client.  *Ruehle*, 583 F.3d at 607.

5    **B.    Carl Ferrer Waived Backpage's Attorney-Client Privilege**

6          Carl Ferrer has the authority as Backpage's CEO to waive the company's attorney-

7    client privilege.  *See generally Commodity Futures Trading Comm'n v. Weintraub*, 471

8    U.S. 343, 349 (1985) ("[W]hen control of a corporation passes to new management, the

9    authority to assert and waive the corporation's attorney-client privilege passes as well.

10   New managers . . . may waive the attorney-client privilege with respect to communications

11   made by former officers and directors.  Displaced managers may not assert the privilege

12   over the wishes of current managers, even as to statements that the former might have made

13   to counsel concerning matters within the scope of their corporate duties.").

14         The government has raised this issue previously, but the Court has not ruled on it.

15   (Doc. 345 at 4, n.4.)  Defendants counter this axiom by claiming that after Ferrer purchased

16   Backpage, "he, Larkin, Lacey, and their respective companies entered into agreements

17   providing that they would be represented jointly and would share privileges."  (Doc. 235

18   at 7.)  Defendants argue that this "joint representation" prevents the new owner of a

19   company (Ferrer) from sharing *any* information stretching back to the company's

20   inception, without consent from the sellers.  This expansive interpretation flies in the face

21   of controlling law that the attorney-client privilege "ought to be strictly confined within

22   the narrowest possible limits consistent with the logic of its principle."  *Ruehle*, 583 F.3d

23   at 607.  If it were true that a company's sellers could prevent the buyers from disclosing

24   any corporate privileged statements without the seller's consent, this tactic would be used

25   liberally in sales transactions.  When individuals sell a company, they lose the ability to

26   prevent the new ownership from waiving the company's privilege as to previous

27

28         [6] Defendants provide no further explanation about how a conversation with
     opposing counsel could be considered privileged.

- 13 -

communications.[7]

## C.    Defendants Suffered No Constitutional Violations

Defendants argue that the government's "interference" with their attorney-client privilege violated their rights under the Fifth and Sixth Amendments.  The governmental misconduct required to establish a due process violation under the Fifth Amendment must be so outrageous as to shock the conscience of the court.  *United States v. SDI Future Health, Inc.*, 464 F. Supp. 2d 1027, 1048–49 (D. Nev. 2006) (citations omitted).  Cases in which courts have found a due process violation justifying dismissal of an indictment or barring further prosecution are extremely limited.  *Id.* (citing *Rochin v. California*, 342 U.S. 165 (1952)).  This constitutional defense is reserved for "only the most intolerable government conduct."  *Id.* (citing *United States v. Voigt*, 89 F.3d 1050, 1065 (3rd Cir. 1996)).

Similarly, the Sixth Amendment is violated "only when the government's action substantially prejudices the defendant."  *United States v. Green*, 962 F.2d 938, 941 (9th Cir. 1992) (quotations and citations omitted); *see also United States v. Rogers*, 751 F.2d 1074, 1077 (9th Cir. 1985) (indictment may not be dismissed for government interference with the attorney-client relationship absent prejudice to defendant).  In *Green*, the Ninth Circuit noted that defendant had not expressly argued he was prejudiced and found that "[a]lthough a defense strategy was revealed to the prosecutor, there is no indication that Green's ability to defend himself was impaired or that the government was able to utilize the information in any way."  *Id.*

To justify dismissal, Defendants must meet a high bar.  Defendants must show that law enforcement's conduct is "'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" *United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013) (quoting *United States v. Russell*, 411 U.S. 423, 431-32 (1973)).  Defendants raising such claims must meet an "extremely high standard."

---

[7] Defendants' "joint representation" argument could only apply to future privileged communications.  Defendants concede that Ferrer did not have any "joint representation" agreements with Defendants before the sale.  (Doc. 235 at 7.)

*United States v. Garza-Juarez*, 992 F.2d 896, 904 (9th Cir. 1993). Dismissal is "limited to extreme cases" in which the defendant can demonstrate that the government's conduct "violates fundamental fairness" and is "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011) (quoting *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991) (internal quotation marks omitted)). Accordingly, the "doctrine of outrageous government misconduct, although often invoked by defendants, is rarely applied by the courts." *SDI Future Health, Inc.*, 464 F. Supp. 2d at 1049.

Defendants fail to demonstrate the government's conduct shocked the conscience or violated fundamental fairness. At each interview, the government admonished Ferrer to avoid divulging joint defense privileged information. (4/5/18 MOI at 1-2 (Ex. 9); 4/17/18 MOI at 1 (Ex. 10); 5/10/18 MOI at 1 (Ex. 11); 7/26/18 MOI at 1 (Ex. 13); 12/14/18 MOI at 1 (Ex. 14); 2/5/19 MOI at 1 (Ex. 15); 5/13/19 MOI at 1 (Ex. 16).) While Defendants assert the MOI of the July 23, 2018 interview did not reflect the admonition (Mot. at 15, citing Ex. 12), the Motion fails to identify any allegedly privileged statements from that interview. (*Cf*. Mot. at 11-12.) Defendants next argue that, despite giving Ferrer these admonitions, "the government thereafter repeatedly questioned Ferrer, and elicited information from him, about communications with and advice of counsel." (Mot. at 9, n.3.) Yet, apart from making this overarching allegation, Defendants fail to detail any instances in the record where the government "repeatedly questioned" Ferrer about or "elicited" any privileged communications. Moreover, Defendants have failed to show that any statements identified in their Motion are privileged, much less that Defendants suffered prejudice so manifest that it has impaired their ability to defend themselves. Without any constitutional violations (and, as shown below, without any prejudice), Defendants' requests for dismissal or other remedies also fail.

### D.   Defendants Do Not And Cannot Articulate Prejudice Suffered

Defendants rely almost exclusively on *United States v. Danielson* to support their argument that they suffered prejudice. 325 F.3d 1054 (9th Cir. 2003), as amended (May

19, 2003); (Mot. at 15-17, 22.)  That case, however, is inapposite.  In *Danielson*, the government improperly "obtained information about Danielson's trial strategy."  *Id.* at 1067.  The government "deliberately and affirmatively took steps, while Danielson was represented by counsel, that resulted in the prosecution team's obtaining privileged information about Danielson's trial strategy." *Id.* at 1059.  Specifically, the government used an informant to record conversations with defendant about his trial strategy, including his plan to testify in his own defense and what arguments he would raise to counter the criminal charges.  *Id.* at 1067.  *Danielson* articulated the standard of what constitutes prejudice, and who has the burden of proof, "in a trial strategy case."  *Id.* at 1070.  The court ruled that "once the government has improperly interfered with the attorney-client relationship and thereby obtained *privileged trial strategy information*, the prosecutor has the 'heavy burden' of showing non-use."  *Id.* at 1072 (emphasis added).

Critically, *Danielson* recognized that no prejudice exists if the defense has already revealed its trial strategy.  The court wrote: "In [*United States v.*] *Irwin* [612 F.2d 1182, 1189 (9th Cir. 1980)], for example, we found no prejudice arising out of the prosecution's learning the defendant's trial strategy because . . . '[d]efense counsel had [already] revealed the nature of the defense in his initial conference with the prosecutor.'" 325 F.3d at 1070.

No matter how the Court views the Ferrer statements Defendants identified, there is no question that the statements do not involve Defendants' "privileged trial strategy information."  First, Defendants learned about Ferrer's cooperation with the government almost immediately after their arrests.  (Docs. 118-1 & 118-2.)  Ferrer never had the opportunity to learn about Defendants' trial strategy.  Without knowledge of trial strategy, no disclosure could occur.  Second, the issues that troubled the *Danielson* court, including, disclosure of defendant's trial witnesses, non-public defenses to charges, and whether defendant would exercise his right to testify, are entirely absent here.  325 F.3d at 1067.  The legal theories that Ferrer alluded to formed the cornerstone of Backpage's (and Defendants') publicly-filed defenses to civil and criminal litigation long predating this case.  Defendants re-disclosed those defenses to the government in their earliest filings in

- 16 -

1   this prosecution, on April 9, 2018.  (*See* Docs. 23 and 26.)  Third, as shown above, Ferrer

2   waived any conceivable privilege that could have still attached to that information.

3          Accordingly, the burden of proving prejudice remains with Defendants.  Defendants

4   offer no specifics on the prejudice they suffered, choosing to argue generally that "the

5   government now has deep insights into the defense's strategy and thinking, which it can

6   use to guide its prosecution of this matter and to evaluate and prepare for any defense

7   Defendants may put on." (Doc. 940 at 17.)  Yet, the notion that Defendants would assert

8   First Amendment, *mens rea* and CDA-based theories simply wasn't a secret, let alone a

9   source of "deep insight" into Defendants' anticipated "trial strategy."  The Ninth Circuit

10  has made clear that a defendant suffers no prejudice, even if the government improperly

11  obtained his trial strategy, if he previously revealed the nature of his trial strategy.  *Irwin*,

12  612 F.2d at 1189; *see also Green*, 962 F.2d at 941; *SDI Future Health, Inc.*, 464 F. Supp.

13  2d at 1048.  Defendants' claim of prejudice doesn't reflect reality.

14         Moreover, in the years since their arrests in this case, Defendants have filed six

15  motions to dismiss, including motions based on the First Amendment and *mens rea* (Doc.

16  561); the Communications Decency Act (Doc. 783); grand jury abuse (Doc. 782); the Fifth

17  and Sixth Amendments (Doc. 456); and failure to allege necessary elements of the Travel

18  Act (Doc. 746).  These motions also contain all the "privileged" trial strategies Ferrer

19  purportedly identified.  Defendants' ability to defend themselves at trial has not been

20  impaired.  *Green*, 962 F.2d at 941.

21  **III.    <u>CONCLUSION</u>**

22         The government did not violate Defendants' attorney-client privileges.  It follows

23  that without any intrusion of these privileges, no constitutional violations occurred, and the

24  government could not have acted outrageously.  The record is also devoid of any prejudice,

25  substantial or otherwise.  Defendants' sixth motion to dismiss should be denied.

26

27

28

- 17 -

1    Respectfully submitted this 5th day of June, 2020.

2                                        MICHAEL BAILEY
                                         United States Attorney
3                                        District of Arizona

4                                        *s/ Andrew C. Stone*
                                         KEVIN M. RAPP
5                                        MARGARET PERLMETER
                                         PETER S. KOZINETS
6                                        ANDREW C. STONE
                                         Assistant U.S. Attorneys
7
                                         JOHN J. KUCERA
8                                        Special Assistant U.S. Attorney

9                                        BRIAN BENCZKOWSKI
                                         Assistant Attorney General
10                                       U.S. Department of Justice
                                         Criminal Division, U.S. Department of Justice
11
                                         REGINALD E. JONES
12                                       Senior Trial Attorney
                                         U.S. Department of Justice, Criminal Division
13                                       Child Exploitation and Obscenity Section

14

15                          **CERTIFICATE OF SERVICE**
16         I hereby certify that on this same date, June 5, 2020, I electronically transmitted the
    attached document to the Clerk's Office using the CM/ECF System for filing and
17   transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered
    their appearance as counsel of record.

18   *s/ Zachry Stoebe*
19   Zachry Stoebe
    U.S. Attorney's Office

20

21

22

23

24

25

26

27

28

- 18 -

**SER-167**

1   Thomas H. Bienert, Jr. *(admitted pro hac vice)*
        tbienert@bmkattorneys.com
2   Whitney Z. Bernstein *(admitted pro hac vice)*
        wbernstein@bmkattorneys.com
3   BIENERT KATZMAN, PLC
    903 Calle Amanecer, Suite 350
4   San Clemente, CA 92673
    Telephone: (949) 369-3700
5   Facsimile: (949) 369-3701

6   Attorneys for James Larkin

7   Paul J. Cambria, Jr. *(admitted pro hac vice)*
        pcambria@lglaw.com
8   Erin McCampbell *(admitted pro hac vice)*
        emccampbell@lglaw.com
9   LIPSITZ GREEN SCIME CAMBRIA LLP
    42 Delaware Avenue, Suite 120
10  Buffalo, New York 14202
    Telephone: (716) 849-1333
11  Facsimile: (716) 855-1580

12  Attorneys for Michael Lacey

13  *[Additional counsel listed on next page]*

14          **IN THE UNITED STATES DISTRICT COURT**

15              **FOR THE DISTRICT OF ARIZONA**

16

17  United States of America,              CASE NO. 2:18-cr-00422-PHX-SMB

18              Plaintiff,                  **DEFENDANTS LACEY, LARKIN,
                                            BRUNST, AND SPEAR'S MOTION
19          vs.                             TO DISMISS BASED ON
                                            OUTRAGEOUS GOVERNMENT
20  Michael Lacey, *et al.*,               MISCONDUCT INVADING
                                            ATTORNEY-CLIENT PRIVILEGE
21              Defendants.

22                                          **UNDER SEAL**

23
                                            **Oral Argument Requested**
24

25                                          Assigned to Hon. Susan M. Brnovich,
                                            Courtroom 506
26

27

28

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

SER-168

Gary S. Lincenberg *(admitted pro hac vice)*
  glincenberg@birdmarella.com
Ariel A. Neuman *(admitted pro hac vice)*
  aneuman@birdmarella.com
Gopi K. Panchapakesan *(admitted pro hac vice)*
  gpanchapakesan@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for John Brunst

Bruce Feder (AZ Bar No. 004832)
  bf@federlawpa.com
FEDER LAW OFFICE, P.A.
2930 E. Camelback Road, Suite 160
Phoenix, Arizona 85016
Telephone: (602) 257-0135

Attorney for Scott Spear

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

SER-169

# **TABLE OF CONTENTS**

Page

I.  INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND ............................................................................. 2

    A.  The Government Knew of the Joint Attorney-Client Relationships and
Joint Defense of Backpage and Related Parties From the Outset. .................... 2

    B.  Judge Logan Rejected the Government's Motion to Override Privileges and
Obtain Information About Attorney-Client Communications. .......................... 4

    C.  The Government Repeatedly Interrogated Ferrer About Defendants'
Privileged Communications and Advice from the Outset and Even After
Judge Logan's Rulings. ................................................................................... 5

III.  ARGUMENT .................................................................................................... 7

    A.  The Government Elicited Attorney-Client Privileged Information. ................... 8

    B.  The Government's Outrageous Misconduct Violated Defendants' Fifth and
Sixth Amendment Rights. ............................................................................... 9

    C.  The Government Has the "Heavy Burden" Of Proving No Prejudice. ........... 10

    D.  Dismissal is the Appropriate Remedy For the Government's Gross
Misconduct. .................................................................................................. 12

        1.  Dismissal is the Appropriate Remedy for the Government's
Constitutional Violations. ....................................................................... 14

        2.  Dismissal is the Appropriate Remedy for the Government's
Misconduct Even Absent A Constitutional Violation. .............................. 15

        3.  Preclusion Of Witnesses And Evidence and Disqualification of
Prosecutors and Agents Also Are Available as Alternative Remedies. .. 16

IV.  CONCLUSION ............................................................................................... 17

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

**SER-170**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Donnelly v. DeChristoforo*
   416 U.S. 637 (1974)................................................................13

*Kastigar v. United States*
   406 U.S. 441 (1972)........................................................ 11, 17

*Segura v. United States*
   468 U.S. 796 (1984)................................................................13

*United States v. Aguilar*
   831 F. Supp. 2d 1180 (C.D. Cal. 2011)...............................14

*United States v. Chapman*
   524 F.3d 1073 (9th Cir. 2008)...................................... 14, 15

*United States v. Chen*
   99 F.3d 1495 (9th Cir. 1996).................................................8

*United States v. Danielson,*
   325 F.3d 1054, 1071 (9th Cir. 2003) ......................10, 12, 17

*United States v. Fernandez*
   388 F.3d 1199 (9th Cir. 2004)..............................................15

*United States v. Haynes*
   216 F.3d 789 (9th Cir. 2000)..................................................9

*United States v. Horn,*
   811 F. Supp. 739 (D.N.H. 1992)..........................................16

*United States v. Irwin*
   612 F.2d 1182 (9th Cir. 1980)................................................9

*United States v. Jicarilla Apache Nation*
   564 U.S. 162 (2011).................................................................8

*United States v. Kojayan*
   8 F.3d 1315 (9th Cir. 1993) ........................................... 13, 14

*United States v. Lopez*
   4 F.3d 1455 (9th Cir. 1993) ........................................... 12, 15

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

**SER-171**

*United States v. Marshank*
    777 F. Supp. 1507 (N.D. Cal. 1991) ......................................... 14, 15, 16

*United States v. Mett*
    65 F.3d 1531 (9th Cir. 1995) .............................................................. 17

*United States v. Morrison*
    449 U.S. 361 (1981) ................................................................ 14, 16

*United States v. Pederson,*
    2014 WL 3871197 (D. Or. Aug. 6, 2014) ............................................. 13

*United States v. Ross*
    372 F.3d 1097 (9th Cir. 2004) ........................................................... 15

*United States v. Ruehle*
    583 F.3d 600 (9th Cir. 2009) .............................................................. 7

*United States v. Sabri*
    973 F. Supp. 134 (W.D.N.Y. 1996) ................................................... 14

*United States v. Schell*
    775 F.2d 559 (4th Cir. 1985) ............................................................. 14

*United States v. Simpson*
    927 F.2d 1088 (9th Cir. 1991) ........................................................... 12

*United States v. Stringer*
    535 F.3d 929 (9th Cir. 2008) .........................................................9, 15

*United States v. Sullivan*
    2020 WL 1815220 (D. Haw. Apr. 9, 2020) ........................................... 16

*United States v. W.R. Grace*
    526 F.3d 499 (9th Cir. 2008) ........................................................... 12

*Upjohn Co. v. United States*
    449 U.S. 383 (1981) ........................................................................ 8

*Williams v. Woodford*
    384 F.3d 567 (9th Cir. 2004) ............................................................. 9

**Other Authorities**

Fed. Rule Evid. 501 ............................................................................... 7

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

SER-172

## I.   INTRODUCTION

Defendants Michael Lacey, James Larkin, Scott Spear, and John Brunst move to dismiss the indictment based on the government's brazen and outrageous invasions of the attorney-client privileges jointly held by them, entities they own and control, Backpage, and Carl Ferrer. Commencing near the time of indictment and when the government reached a cooperation agreement with Ferrer, the government repeatedly, knowingly, and intentionally interrogated Ferrer about privileged communications and advice given by Defendants' counsel relating to the core of the issues in this case. The invasions occurred during each and every one of the government's interviews of Ferrer.

The government elicited from Ferrer privileged information about advice from lawyers related ███████████████████████████████████. Despite knowing from the outset that certain lawyers represented Defendants and/or their entities and were part of joint representation and/or common interest arrangements with Ferrer and Backpage, and that Ferrer thus could not unilaterally waive the privilege, the government plowed ahead with detailed questions about privileged communications. The government's conduct took place over 13 months and incredibly, continued even after Judge Logan rejected the validity of the "waivers" on which the government purported to rely.

The invasions began no later than April 2018, even though the government already knew the identities of Defendants' counsel and knew of joint representation and common interest arrangements. Indeed, on April 25, 2018, it filed a motion to disqualify certain counsel *based* on those arrangements. Dkt. 118. The invasions continued in May 2018, even after Defendants' counsel warned that Ferrer could not waive the privileges. The invasions continued in July 2018, while the government's motion to access Defendants' privileged communications based on Ferrer's purported unilateral "waiver" was pending before Judge Logan (Dkt. 195), and after the government received Defendants' opposition, setting out the pertinent facts and controlling law in detail (Dkt. 226). During an October 5, 2018 hearing over whether the Court would give the government permission to delve into privileged communications based on waiver, the defense pressed the government to disclose whether it had already done so without court permission.

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

1  The government deflected the question and failed to disclose it had already repeatedly done just

2  what it then was asking for permission to do. Dkt. 348, pp. 91-92.

3        Even after Judge Logan denied the government's motion in October 2018, and despite

4  his explicit rejection of the very theories on which the government was purportedly relying to

5  justify its invasions of Defendants' privileges, the government's invasions continued. Not only

6  did the government continue invading Defendants' privileges for another seven months, but it

7  used the time to go back and revisit with Ferrer all of its prior privilege invasions from 2018.

8  Indeed, when the February 2019 deadline came for the government to disclose the interview

9  memoranda that documented its invasion of Defendants' privileges, the government filed an *ex*

10  *parte*, *in camera* motion to significantly extend the time to disclose those materials. Defendants

11  learned of the secret motion only after a clerical error led to them being mailed a copy of the

12  order granting the extension. *See* Dkt. 447. The government then used the extension not only to

13  *delay disclosing* its misconduct, but also to *facilitate continued misconduct.*

14        The government cannot reasonably dispute that it repeatedly invaded Defendants'

15  privileged communications—its own memos document that fact. The government also cannot

16  plausibly deny that it did so intentionally, despite knowing of joint representations and common

17  interest arrangements, without seeking advance Court permission, and even after Judge Logan

18  refused to grant such permission. The privileged information that the government learned from

19  the Ferrer interviews has infected its prosecution of this case, including through its issuance of a

20  superseding indictment, its interviews of other witnesses, and its preparation for trial. The

21  government's conduct was outrageous unconstitutional, and Defendants are severely and

22  irreparably prejudiced. The indictment must be dismissed.

23  **II.    FACTUAL BACKGROUND**

24      **A.    The Government Knew of the Joint Attorney-Client Relationships and Joint Defense of Backpage and Related Parties From the Outset.**

25        For several years before bringing this case, the government investigated Backpage,

26  Defendants, and the entities that owned or were affiliated with the website (such as Village Voice

27  Media Holdings, LLC. ("VVMH")). These parties had been involved in a number of cases across

28  the country, successfully defeating charges that the website and its owners could be liable for ads

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

SER-174

1  posted by third-party users.[1] A number of law firms had jointly represented Backpage, VVMH,

2  Carl Ferrer, and Defendants in these cases and otherwise.[2]

3       From the investigation, and well before, the government knew that VVMH, Backpage,

4  and Defendants had worked extensively with counsel for more than a decade. For example,

5  Backpage produced 2.1 million pages of documents in response to a grand jury subpoena that

6  preceded the indictment in this case (No. 16-04-108), which were accompanied by a privilege log

7  listing 7,000 withheld documents and identifying over 75 attorneys that had represented VVMH,

8  Backpage, and related parties. The government also sought to compel production of 350 emails

9  with an attorney (Hemanshu Nigam, a former federal prosecutor) who had advised about

10  practices for review and moderation of user-submitted ads, but Judge Campbell ruled that these

11  communications were privileged and properly withheld. Dkt. 195-8 at 11-13.

12       At the outset of the prosecution, Defendants cautioned the government not to review or

13  elicit information about attorney-client communications. *See* Declaration of Ariel A. Neuman

14  ("Neuman Decl."), Ex. 1 & 2. More specifically, Defendants explained that counsel had

15  represented Backpage and other entities and individuals jointly, and therefore Ferrer could not

16  waive privileges unilaterally. *Id.,* Ex. 1 at 1. Defendants also requested that the government

17  promptly disclose all communications with Ferrer or from his personal attorney, Nanci Clarence,

18  about other counsel's prior representation of Backpage or related parties, including specifically

19  memoranda of interviews or FBI Form 302s. *Id.,* Ex. 3.

20       In response, the government acknowledged that Ferrer could not waive jointly held

21  privileges, but claimed it had "taken steps to avoid disclosure of any JDA-protected material."

22  *Id.*, Ex. 4. The government later expanded on this claim, asserting it had "taken extensive efforts"

23

---

24   [1]   Defendants have addressed these cases in prior briefing on the government's Motion to

25  Resolve Privilege Issues. *See* Dkt. 235 at 4-9, *see, e.g.*, *In re Grand Jury Subpoenas to Backpage.com, LLC and Village Voice Media Holdings, LLC*, No. GJ12-172RAJ (W.D. Wash. Jan. 17, 2013); *People

26  v. Ferrer*, No. 16FE019224, 2016 WL 7237505 (Cal. Super. Ct. Dec. 9, 2016).

27   [2]   *E.g.*, SNR Dentons, Paul Hastings, Akin Gump, Perkins Coie, Davis Wright Tremaine, and

28  several others. *See* Dkt. 235 at 4-9.

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

1  "to prevent the receipt of any JDA-protected information" in interviews of Mr. Ferrer, and citing

2  case law for the proposition that Defendants had no grounds to object because they had "failed

3  to allege specific facts that indicate communication of privileged information to the

4  Government." *Id.,* Ex. 5 at 3.[3] At the same time, however, the government refused to provide

5  records of its interviews with Ferrer, saying that its reports had not been finalized and would not

6  be produced until February 29, 2019 as part of *Jencks* Act disclosures. *Id.,* Ex. 6 at 2 (later

7  postponed by four months based on an *in camera, ex parte* government motion that Defendants

8  only learned about through clerical error (*see* Dkt. 471, 535)).

9      While purporting to avoid Ferrer disclosing any privileged information, the government

10  proposed filing a motion with the Court to "address[] potential privilege issues posed by this

11  case," specifically whether Ferrer could waive privileges for Backpage or other parties and

12  whether use of a taint team was permissible. *Id.,* Ex. 5 at 2. The government filed its Motion to

13  Resolve Attorney-Client Privilege Issues on June 14, 2018. Dkt. 195. Unbeknownst to

14  Defendants, and contrary to the assurances the government had given, it had *already* invaded

15  privileges—repeatedly—in interviewing Ferrer. *See, infra* Section II.C.

16      **B.  Judge Logan Rejected the Government's Motion to Override Privileges and Obtain Information About Attorney-Client Communications.**

17      The government's Motion to Resolve Privilege Issues sought a broad ruling that Ferrer

18  could unilaterally waive privilege protections relating to Backpage and dealings with attorneys

19  because he had acquired the website in 2015. Defendants responded that Ferrer did not and

20  could not control privileges because Backpage had been jointly represented with other parties

21  (including VVMH and Defendants), and the parties had longstanding agreements that joint

22  representation/joint defense privileges could not be waived without the other parties' consent.

23  *See* Dkts. 226, 235, 324. Judge Logan rejected the government's motion; he held that the parties'

24

25  ───────────────
    [3]  As Defendants later learned when the government finally turned over the 302s from Ferrer's
26  interviews, the government's "extensive efforts" consisted solely of discussing with Ferrer's
    criminal defense counsel staying away from joint defense privileged information during his
27  proffers, but the government thereafter repeatedly questioned Ferrer, and elicited information
    from him, about communications with and advice of counsel. *See* Neuman Decl., Exs 9-16.
28

4

**SER-176**

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

agreements were clear and precluded Ferrer from unilaterally waiving privileges or disclosing privileged information. Dkt. 345 ("Logan Order II") at 4 (holding disclosure is barred unless a party first obtains written consent from other JDA parties, "[i]t is undisputed that Ferrer did not obtain the written consent," and therefore "the Government's argument for access to the privileged communication fails"); *see also* Dkt. 338 ("Logan Order I") at 8 (order denying government's motion to disqualify counsel and finding that the joint representation and defense agreements are "valid and enforceable").[4]

At the same time, Judge Logan denied Defendants' concomitant motions that sought discovery of the government's communications with Ferrer to assess whether privileges had been invaded. Logan Order II at 8. The Court accepted the government's assurances that it had protected against disclosure because its taint team had screened and segregated communications for 265 attorney names, and these materials had not been provided to the attorneys prosecuting this case. *See id.* (citing government's reply, Dkt. 169 at 16). Based on the government's representations, and given his ruling that the government was barred from accessing privileged communications, Judge Logan found that "Defendants' concerns about fairness are unfounded at this point." *Id.*

### C. The Government Repeatedly Interrogated Ferrer About Defendants' Privileged Communications and Advice from the Outset and Even After Judge Logan's Rulings.

Because of the government's misrepresentations—and the Court's acceptance of them in determining there was no need to inquire into whether the government had improperly accessed any privileged communications—Defendants had no means to assess whether the government *had* infringed privileges. However, when the government finally provided its Memoranda of Interviews (MOIs) from the Ferrer interviews, the government's repeated invasions of Defendants' privileged communications became clear. The following are just a few examples (of many dozen):[5]

---

[4]   The Orders are attached as Neuman Decl., Exs. 7 and 8.

[5]   All of the MOIs, as revised and adopted by Ferrer in 2019 (after Judge Logan's rulings), are



- Ex. 9: Memorandum of April 5, 2018 Interview (as adopted and revised by Ferrer on February 5, 2019), ¶¶ 81(a), 88, 95:

- Ex. 10: Memorandum of April 17, 2018 Interview (as adopted and revised by Ferrer on February 5, 2019), ¶¶ 7(c), 45, 76(b), 145, 167(a):

- Ex. 11: Memorandum of May 10, 2018 Interview (as adopted and revised by Ferrer on February 5, 2019), ¶¶ 133, 143:

- Ex. 13: Memorandum of July 26, 2018 Interview (as adopted and revised by Ferrer on May 13, 2019) ¶¶ 81, 85:

- Ex. 14: Memorandum of December 14, 2018 Interview (as adopted and revised by Ferrer on May 13, 2019), ¶¶ passim, 14 and passim, 23, 24, 101, 111:

attached as Neuman Decl., Ex. 9 (April 5, 2018 MOI); Ex. 10 (April 17, 2018 MOI); Ex. 11 (May 10, 2018 MOI); Ex. 12 (July 23, 2018 MOI); Ex. 13 (July 26, 2018 MOI); Ex. 14 (Dec. 14, 2018 MOI); Ex. 15 (Feb. 5, 2019 MOI); and Ex. 16 (May 13, 2019 MOI).

6

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

1 ● ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮

3 ● ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮▮ ● ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5 ▮▮▮▮▮▮▮▮ ● ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6 ▮▮▮▮▮▮▮▮

7 ● Ex. 15: Memorandum of February 5, 2019 Interview, ¶¶ 80(a) and (b):

8 ● ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9 ▮▮▮▮▮▮▮▮▮▮▮▮▮

As the MOIs demonstrate, the government invaded Defendants' privileges from its first interview of Ferrer (on April 5, 2018), and continued to do the same in seven successive interviews spanning more than thirteen months, despite Defendants' cautions voiced in April and May 2018, about joint representation and privilege rights; continued after assuring Defendants and the Court that they were taking "extensive efforts" to avoid privilege disclosures; and continued even after Judge Logan's rulings that the government *could not* access privileged communications or claim that Ferrer could effect a waiver. The government went so far as to use interviews on February 5 and May 13, 2019 to revisit *all* the prior interviews and have Ferrer correct and adopt all of the interview memos, thus having Ferrer reconfirm or discuss further all the privileged information covered in the prior interviews.[6] And, throughout this time, the government avoided and delayed producing the MOIs, ensuring Defendants would not have specific grounds to complain until well after the fact.

## III.  ARGUMENT

The government's blatant disregard for Defendants' attorney-client privileges, *even after the Court rejected its waiver theories*, violated Defendants' Fifth and Sixth Amendment rights, caused substantial prejudice, and constituted outrageous misconduct for which the most drastic remedy – dismissal of the indictment – is appropriate.

---

[6]  The February and May 2019 sessions resulted in each of the prior MOIs having two versions – an original and then a "revised" version that was reviewed and adopted by Ferrer.

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

### A.    The Government Elicited Attorney-Client Privileged Information.

In federal court, "[i]ssues concerning application of the attorney-client privilege in the adjudication of federal law are governed by federal common law," not state law. *United States v. Ruehle*, 583 F.3d 600, 608 (9th Cir. 2009) (citations omitted); *see also* Fed. Rule Evid. 501. "The attorney-client privilege 'is the oldest of the privileges for confidential communications known to the common law.'" *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 169 (2011) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). The "privilege applies to communications between lawyers and their clients when the lawyers act in a counseling and planning role, as well as when lawyers represent their clients in litigation." *United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996) (privilege covers "advice regarding the client's business affairs.") Its aim is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Jicarilla*, 564 U.S. at 169. "The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Upjohn*, 449 U.S. at 389. It protects both the advice given by the attorney and the "giving of information to the lawyer to enable [the lawyer] to give sound and informed advice." *Id.* at 390; *see also Chen*, 99 F.3d at 1499–500 ("People need lawyers to guide them through thickets of complex government requirements, and [. . .] have to be able to talk to their lawyers candidly without fear that what they say to their own lawyers will be transmitted to the government.").

Here, the lawyers were not only being consulted with reference to their knowledge in the law, they were also helping to navigate the "thickets of complex government requirements" in a new and developing area of the law – civil and criminal liability for owning and operating a website hosting content posted by third parties. The government elicited from Ferrer communications to and from the lawyers relating ████████████████████████████████████ ███████████████████████████████████. The government elicited those privileged communications even after Judge Logan ruled that Ferrer could not disclose the communications. As Judge Logan found, Ferrer could not unilaterally waive the applicable privileges without the consent of the other parties to the various joint representation and joint

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

defense agreements, which he did not have. *See* Logan Order I at 10; *see also* Logan Order II.

**B.**  **The Government's Outrageous Misconduct Violated Defendants' Fifth and Sixth Amendment Rights.**

Government interference with a defendant's attorney-client relationships may violate the defendant's "Fifth Amendment right to due process of law." *United States v. Irwin*, 612 F.2d 1182, 1185 (9th Cir. 1980). "A claim of outrageous government conduct premised upon deliberate intrusion into the attorney-client relationship will be cognizable where the defendant can point to actual and substantial prejudice." *United States v. Haynes*, 216 F.3d 789, 797 (9th Cir. 2000) (citation and internal punctuation omitted). "A claim of government interference with the attorney-client relationship has three elements: (1) the government was objectively aware of an ongoing, personal attorney-client relationship; (2) the government deliberately intruded into that relationship; and (3), as a result, the defendant suffered actual and substantial prejudice." *United States v. Stringer*, 535 F.3d 929, 941 (9th Cir. 2008).

Similarly, deliberate interference to "the confidential relationship between a criminal defendant and defense counsel" also violates the Sixth Amendment right to counsel "if it substantially prejudices the criminal defendant." *Williams v. Woodford*, 384 F.3d 567, 584–85 (9th Cir. 2004). "Substantial prejudice results from the introduction of evidence gained through the interference against the defendant at trial, from the prosecution's use of confidential information pertaining to defense plans and strategy, and from other actions designed to give the prosecution an unfair advantage at trial." *Id.*

Here, the government interrogated Ferrer five times between April 5 and July 26, 2018—each time probing Ferrer about communications with Defendants' counsel. Ferrer purported to waive the privilege as to communications with Backpage's lawyers, but the government *knew* that the lawyers about whom it was questioning Ferrer either were Defendants' lawyers who were in a joint defense arrangement with Ferrer/Backpage or were both Defendants' counsel and Backpage's counsel (i.e. there was a joint representation). The government also knew that Defendants had not waived privilege and had warned that Ferrer could not waive their privileges or any jointly held privileges. In response, the government said it would respect the jointly held privileges (*knowing* that was untrue, as it already was invading them), while also making the very

9

same arguments regarding waiver that Judge Logan later rejected. *Compare* Neuman Decl., Exs. 2 & 3; Dkt. 269; Logan Order I; Logan Order II.

The MOIs show that the government made no attempt to probe Ferrer about counsel that only represented Ferrer or Backpage. There were such lawyers, but their names do not come up anywhere in the MOIs. Instead, the government just interrogated Ferrer about privileged communications with Defendants' counsel, and Ferrer provided the requested information. The government's "warnings" to Ferrer were nothing but window dressing—and the government appears to have dispensed with even the window dressing at the July 23, 2018 interview. *See* Neuman Decl., Ex. 12.

The clearest evidence that the government *willfully* invaded Defendants' privileges is that the government continued to interrogate Ferrer about Defendants' privileged communications after Judge Logan rejected the government's arguments regarding waiver on October 18, 2018, ruling that the government had no basis to access Defendants' privileged communications. Logan Orders I and II. The government nonetheless interviewed Ferrer on December 14, 2018, and repeatedly inquired about Defendants' privileged communications. From the MOI, it appears the government did not even acknowledge Judge Logan's rejection of the government's position regarding waiver. Neuman Decl., Ex. 14. Then, on February 5 and May 13, 2019, the government had Ferrer review notes or memoranda of the 2018 interviews all over again, and asked Ferrer to reconfirm or further comment on the information therein, *including all the privileged information they had previously elicited. Id.*, Exs. 15 & 16. Thus, the government's intent to invade Defendants' privileges is demonstrated by the fact that the government inquired into Defendants' attorney-client communications without court permission commencing with its very first interview of Ferrer, and continued to invade Defendants' privileges long after Judge Logan rejected the government's waiver argument.

### C.    The Government Has the "Heavy Burden" Of Proving No Prejudice.

To determine whether the government's review of privileged material results in a violation of Defendants' Constitutional rights, courts apply a burden-shifting analysis. First, a defendant must make a *prima facie* showing that the government intentionally—*i.e.* affirmatively, rather than

10

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

passively—reviewed privileged material. *United States v. Danielson*, 325 F.3d 1054, 1071 (9th Cir. 2003), as amended (May 19, 2003). Here, there is no question that the violation was intentional rather than passive. The prosecutors asked Ferrer questions which elicited the privileged information, including discussing at length conversations with and among attorneys, even after they had been warned by defense counsel. The government then doubled down, continuing its inquiries into privileged information even after Judge Logan rejected its theories of waiver. And during the hearing that led to that rejection, it stood silent when pressed as to whether its rejected theories might implicate the ongoing interviews of Ferrer. This is not a case where the prosecutors passively received privileged information, such as through a document production. The prosecutors here knew that invasion of the privilege was a serious concern, yet went ahead and elicited privileged information again and again, in interview after interview.

"Once the prima facie case has been established, 'the burden shifts to the government to show that there has been . . . no prejudice to the defendant[] as a result of these communications.'" *Id.* This is a "heavy burden," and "the mere assertion by the government of the integrity and good faith of the prosecuting authorities is not enough." *Id.* at 1072 (internal quotation marks omitted). Indeed, just as with immunized testimony, the *Kastigar* analysis applies to both "direct and indirect use" of wrongly obtained privileged information. *Id.* at 1072. As a result, the government "must show . . . that all of its pre-trial and trial strategy was based on independent sources." *Id.* at 1074. Further, "strategy in this context is a broad term that includes, but is not limited to, such things as decisions about the scope and nature of the investigation, about what witnesses to call (and in what order), about what questions to ask (and in what order), about what lines of defense to anticipate in presenting the case in chief, and what to save for possible rebuttal." *Id.* The government's "burden of proof . . . is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.'" *Id.* at 1071 (quoting *Kastigar v. United States*, 406 U.S. 441, 460 (1972)). "In the absence of such an evidentiary showing by the government, the defendant has suffered prejudice." *Id.* at 1072. Thus, "[u]nder the second step of the analysis, the government must

introduce evidence and show by a preponderance of evidence that it did not use th[e] privileged information." *Id.* at 1074.

Here, the defendants have made a *prima facie* showing that the government "acted affirmatively to intrude into the attorney-client relationship." The prejudice Defendants suffered is manifest. The prosecutors who will try this case, and the agents who investigated it (some of whom will testify at trial), have had privileged information since not later than April 2018. Since that time, they have interviewed numerous additional witnesses, returned a superseding indictment with new and additional allegations, filed several substantive motions, including a motion to disqualify counsel in 2018 and another motion to disqualify filed just recently, repeatedly changed their proposed witnesses and exhibits, and, most importantly, prepared for a trial at which they hope to convict Defendants of serious offenses. Their entire strategy has been centered around the testimony of Ferrer, whose interviews they sought to shield from Defendants for as long as possible. They have repeatedly referred to his statements and his explanation of certain evidence when alleging Defendants' guilt. Indeed, the information they obtained from Ferrer suffuses their entire prosecution of this case. With the privileged information in hand, they can prepare him for cross-examination on why he took certain actions. Further, the government now has deep insights into the defense's strategy and thinking, which it can use to guide its prosecution of this matter and to evaluate and prepare for any defense Defendants may put on.

The prejudice from the government's misconduct pervades the case to such an extent that no hearing is required. But if the government can somehow show on the papers that its entire prosecution of this case is not tainted by its violations of Defendants' constitutional rights, then at a minimum, the Court should order an evidentiary hearing where the government is put to its "heavy burden" of proof on that point. *See Danielson*, 325 F.3d at 1074 (remanding to "hold an evidentiary hearing at which this standard can be applied").

**D.** **Dismissal is the Appropriate Remedy For the Government's Gross Misconduct.**

"There are three legitimate grounds for a court's exercise of supervisory power: 'to implement a remedy for the violation of a recognized statutory or constitutional right; to

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct.'" *United States v. Lopez*, 4 F.3d 1455, 1463 (9th Cir. 1993) (quoting *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir.1991)); *see also United States v. W.R. Grace*, 526 F.3d 499, 511 n.9 (9th Cir. 2008).

"Prosecutors are subject to constraints and responsibilities that don't apply to other lawyers." *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993). "The prosecutor's job isn't just to win, but to win fairly, staying well within the rules." *Id.* As Justice Douglas once warned, "[t]he function of the prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall. His function is to vindicate the right of people as expressed in the laws and give those accused of crime a fair trial." *Donnelly v. DeChristoforo,* 416 U.S. 637, 648–49 (1974) (Douglas, J., dissenting). Indeed, the Ninth Circuit has observed that "hard-bitten litigation tactics are unbecoming a prosecutor." *Kojayan*, 8 F.3d at 1323.

What could be a more "hard-bitten litigation tactic" than prosecutors knowingly invading privileges, misleading Defendants and the Court about its conduct, sloughing off Defendants' concerns that their privileges were being invaded, and then doubling-down on that invasion after the prosecutors' theory of waiver is explicitly rejected by the Court? What could be a more "hard-bitten litigation tactic" than to repeatedly, knowingly, and intentionally invade Defendants' privileges to gain a tactical advantage in this case?[7] "[T]he Government cannot be permitted to benefit from its violations of the Constitution." *Segura v. United States*, 468 U.S. 796, 839 (1984) (Stevens, J., dissenting). And, even if the conduct does not violate the Constitution, the Government should not be permitted to escape the consequences of its misconduct.

---

[7]   Such conduct by a prosecutor is so problematic that in *United States v. Pederson*, 2014 WL 3871197 (D. Or. Aug. 6, 2014), following guilty pleas sparing defendants the death penalty, and with no motion pending, the Court *sua sponte* issued a Supervisory Opinion to criticize the government's privilege invasions and discovery misconduct. The court found government misconduct in (1) never requesting permission from the court prior to reviewing the privileged communications, (2) failing to notify defense counsel for some time after it learned of the invasions, (3) trying to use the privileged communications to support a crime-fraud argument, and (4) "most troubling…in large part, the government, which was aware of the problems to a substantial degree, did not alert the court of these problems of its own volition."

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

### 1. Dismissal is the Appropriate Remedy for the Government's Constitutional Violations.

Dismissal of the indictment here is an appropriate exercise of the Court's supervisory powers in light of the government's Constitutional violations and the ongoing prejudice to Defendants. Indeed, dismissal of the indictment is appropriate "where there is continuing prejudice from a constitutional violation that cannot be remedied by suppression of the evidence." *United States v. Marshank*, 777 F. Supp. 1507, 1525 (N.D. Cal. 1991) (citing *United States v. Morrison*, 449 U.S. 361, 365-66 n.2 (1981)). Here, the government's invasions of Defendants' privileges so pervasively infect the prosecution of this case that suppression does not remedy the problem. The bell of information obtained from Ferrer cannot be "unrung," and the ways in which the prosecution team has used and will use it cannot be disentangled.

In these instances of outrageous government misconduct, dismissal is the appropriate remedy. *See, e.g. United States v. Chapman*, 524 F.3d 1073, 1088 (9th Cir. 2008) (affirming dismissal of indictment, where district court was "concerned that any lesser sanction would be like endorsing the AUSA's conduct" (internal alterations omitted)); *Kojayan*, 8 F.3d at 1324-25 (dismissing indictment pursuant to court's "supervisory power" where "prosecutorial misconduct [. . .] deprived the defendants of due process of law" "to make it clear that [*inter alia*,] the misconduct was serious [. . . and] steps must be taken to avoid a recurrence of this chain of events."); *United States v. Schell*, 775 F.2d 559, 562-66 (4th Cir. 1985) (reversing conviction and ordering that the indictment be dismissed under the Fifth Amendment, based on the government's intrusion into defendants' attorney client relationship); *United States v. Aguilar*, 831 F. Supp. 2d 1180, 1206-10 (C.D. Cal. 2011) (dismissing indictment under the court's supervisory powers, based on government misconduct including, *inter alia*, "improperly obtaining attorney-client privileged communications," and so as not to allow the government "to benefit from a 'do over,' [and in the] hopes that this ruling will have a valuable prophylactic effect"); *United States v. Sabri*, 973 F. Supp. 134, 147 (W.D.N.Y. 1996) (dismissing charged offense based on holding that "government's manipulation of the attorney-client relationship [was] offensive to the principles which underlie our criminal justice system," and concluding "that the government's conduct as to [the dismissed charge] was outrageous and violative of the defendant's Fifth Amendment due

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

SER-186

process rights"); *Marshank*, 777 F. Supp. at 1523 (dismissing indictment under both the Fifth and Sixth Amendment, where "the taint of the government's constitutional transgression infected every part of the investigation and prosecution of the defendant").

### 2. Dismissal is the Appropriate Remedy for the Government's Misconduct Even Absent A Constitutional Violation.

Even if the Court finds that the government's misconduct does not rise to the level of a Constitutional violation, it "may [also] exercise its supervisory powers to dismiss an indictment in response to outrageous government conduct that falls short of a due process violation." *United States v. Fernandez*, 388 F.3d 1199, 1239 (9th Cir. 2004) (quoting *United States v. Ross*, 372 F.3d 1097, 1109 (9th Cir. 2004)). "[E]xercise of [the Court's] supervisory powers is an appropriate means of policing ethical misconduct by prosecutors." *Lopez*, 4 F.3d at 1463 (it is "within the discretion of the district court to act in an appropriate manner to discipline [the prosecutor] if he subverted the attorney-client relationship"). To warrant dismissal under these circumstances, the government's conduct must (1) be flagrant and (2) cause substantial prejudice to the defendant. *Id.*; *see also Stringer*, 535 F.3d at 941. While "accidental or merely negligent governmental conduct is insufficient to establish flagrant misbehavior," a finding of "willfulness" is not required. *Chapman*, 524 F.3d at 1085. Rather, government action in "reckless disregard" of the defendant's rights satisfies the standard. *Id.*

Here, the government did not act accidentally or negligently. It knowingly and repeatedly invaded Defendants' privileges, and purposefully elicited and then reconfirmed its elicitation of privileged information, even after its theories regarding waiver were rejected by the Court, all while affirmatively misrepresenting to Defendants what it was doing. It also stood silent when pressed as to whether those theories might infect its interviews of Ferrer, and then went back and asked him all the same questions all over again, re-violating the privilege over and over. While no finding of "willfulness" is required, here it would be difficult to reach any other conclusion. And as discussed above, Defendants have suffered "substantial prejudice" warranting dismissal.

---

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

### 3. Preclusion Of Witnesses And Evidence and Disqualification of Prosecutors and Agents Also Are Available as Alternative Remedies.

Where courts find the government's conduct is not sufficiently outrageous to warrant dismissal, but nonetheless is violative of constitutional rights and ethical norms, they impose remedies short of dismissal "tailored to the injury suffered." *Morrison*, 449 U.S. at 364. For example, in *United States v. Horn*, the government obtained access to certain confidential attorney work product materials. 811 F. Supp. 739, 745-48 (D.N.H. 1992), *rev'd in part on other grounds*, 29 F.3d 754 (1st Cir. 1994). The court held that the government's conduct was not sufficiently "outrageous" to warrant dismissal, but it nonetheless imposed a series of remedies to address the resulting prejudice suffered by the defendants, including: (1) disqualifying the lead prosecutor (who had reviewed the materials) from any participation in the case; (2) ordering the government to provide defendants with a written summary of each government witness' testimony, and a list of exhibits to be introduced through or testified to by each witness; (3) making certain witnesses available to the defendants for deposition prior to trial; and (4) prohibiting the government from introducing any of the documents at issue, or eliciting any testimony concerning their substance. *Id.* at 752.

Although this case does not involve discrete and limited violations of Defendants' privileges, in such cases preclusion of the particular evidence (or testimony) at issue is "the remedy characteristically imposed." *Morrison*, 449 U.S. at 365; *see also Marshank*, 777 F. Supp. 1521-22 ("Suppression is an appropriate remedy where the court can identify and isolate the evidence obtained in violation of the defendant's Fifth Amendment due process rights. The prosecution is thus denied 'the fruits of its transgression' and the due process right to a fair trial is preserved.") (citation omitted). Suppression of evidence beyond just the privileged materials themselves is likewise appropriate under the court's supervisory powers. *See, e.g., United States v. Sullivan*, 2020 WL 1815220, at *9-10 (D. Haw. Apr. 9, 2020) (suppressing 473 files obtained by the government, only 4 of which were privileged, in light of the government's conduct, despite finding that the defendant had not suffered any prejudice).

Here, if the Court does not dismiss the indictment entirely, the Court should order the exclusion of all privileged information obtained by the government, and all documentary and

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

1  testimonial evidence, legal theories, or other government work product derived directly or

2  indirectly therefrom. *See Danielson*, 325 F.3d at 1072 ("[W]e have interpreted *Kastigar's* prohibition

3  on use to include both direct and indirect use. For example, information derived from compelled

4  testimony may not be used in providing 'assistance in focusing the investigation, deciding to

5  initiate the prosecution, refusing to plea bargain, interpreting evidence, planning cross-

6  examination, and otherwise generally planning trial strategy.'" (citation omitted)). That not only

7  means excluding Ferrer as a witness, but also all other evidence the government developed based

8  on the breaches of Defendants' privileges.

9       Defendants further submit it is impossible to separate the taint of the government's

10  privilege invasions from the entirety of the prosecution.[8] Should the Court choose not to dismiss

11  the indictment, removing those prosecutors and agents who have been exposed to the privileged

12  information – here, the entire prosecution team – would be a less effective remedy, but

13  nevertheless would send the strong message that such intentional privilege invasions cannot be

14  countenanced, would provide some deterrence of similar misconduct, and would at least remove

15  those individuals who participated in and directly benefited from the invasions of Defendants'

16  privileges.

17  **IV.  CONCLUSION**

18       The government has violated Defendants' Constitutional rights, with brazen and

19  outrageous conduct that continued even after Judge Logan's rulings. While Defendants submit

20  that the indictment must be dismissed now, at a minimum, the Court should hold a

21  *Kastigar/Danielson* hearing to put the government to its burden of proof, and then determine the

22  remedy the Court will impose.

23

24

25  _____

26  [8]  The Ninth Circuit has recognized that attorneys may be disqualified for violation of applicable ethical rules, even absent a Constitutional violation. *See United States v. Mett*, 65 F.3d 1531, 1537 (9th Cir. 1995). The government's conduct has not conformed to the requirements of the Arizona Rules of Professional Conduct, providing an independent basis under the Court's supervisory powers for the relief Defendants seek. *See* 28 U.S.C. § 530B.

27

28

17

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

**SER-189**

Respectfully submitted,

DATED: May 1, 2020

Thomas H. Bienert, Jr.
Whitney Z. Bernstein
BIENERT KATZMAN PC

By: _____*s/Thomas H. Bienert, Jr.*_____
Thomas H. Bienert, Jr.
Attorneys for James Larkin

*Pursuant to the District's Electronic Case Filing Administrative Policies and Procedures Manual (Jan. 2020) § II (C) (3), Thomas H. Bienert, Jr. hereby attests that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized its filing.*

DATED: May 1, 2020

Paul J. Cambria, Jr.
Erin McCampbell
LIPSITZ GREEN SCIME CAMBRIA LLP

By: _____*s/ Paul J. Cambria, Jr.*_____
Paul J. Cambria, Jr.
Attorneys for Michael Lacey

DATED: May 1, 2020

Gary S. Lincenberg
Ariel A. Neuman
Gopi K. Panchapakesan
BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS, LINCENBERG & RHOW, P.C.

By: _____*s/Gary S. Lincenberg*_____
Gary S. Lincenberg
Attorneys for John Brunst

DATED: May 1, 2020

FEDER LAW OFFICE, P.A.

By: _____*s/ Bruce Feder*_____
Bruce Feder
Attorneys for Scott Spear

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 1, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*/s/ Toni Thomas*
Toni Thomas

1    **WO**

2

3

4

5

6                **IN THE UNITED STATES DISTRICT COURT**

7                    **FOR THE DISTRICT OF ARIZONA**

8

9    United States of America,                  No. CR-18-00422-001-PHX-SMB

10                   Plaintiff,                  **ORDER**

11   v.

12   Michael Lacey, et al.,

13                   Defendants.

14

15

16          Pending before the Court is Defendants' Joint Motion to Dismiss Indictment for Grand

17   Jury Abuse or, in the Alternative, for Disclosure of Grand Jury Transcripts. (Doc. 782,

18   "Mot." or "Motion".) The Government responded and Defendants replied. (Doc. 812,

19   "Resp."; Doc. 826, "Repl.".) Defendants requested oral argument, but the Court elects to

20   resolve the Motion without it. *See* LRCiv 7.2(f). Defendants move to dismiss the

21   indictment because the grand jury process was "unconstitutionally tainted," or

22   alternatively, for "the disclosure of the grand jury transcripts so that the Defendants and

23   the Court can examine the government's actions before the grand jury." (Mot. at 8; *see*

24   Repl. at 6.) Having considered the parties' briefings, the superseding indictment, (Doc.

25   230, "SI"), and pertinent case law, the Court denies Defendants' Motion as explained

26   below.

27   **I.       BACKGROUND**

28          The grand jury initially returned a 93-count indictment against Defendants on March

28, 2018. (Doc. 3.) Roughly five months later, it returned a 100-count superseding indictment against them. (Doc. 230, "SI".) The SI charges conspiracy (Count 1), facilitating prostitution under the Travel Act (Counts 2-51), conspiracy to commit money laundering (Count 52), concealment of money laundering (Count 53-62), international promotion of money laundering (Count 63-68), transactional money laundering (Counts 69-99), and international concealment of money laundering (Count 100) against Defendants. (*See generally id.*) Defendants now move to dismiss the SI in its entirety for grand jury abuse, or alternatively, for disclosure of the grand jury's transcripts. (Mot. at 8.)

## II.  LEGAL STANDARD

"[T]he grand jury is deeply rooted in Anglo-American history." *United States v. Calandra*, 414 U.S. 338, 342 (1974); *see Costello v. United States*, 350 U.S. 359, 361-62 (1956). It exists to "determin[e] whether there is probable cause to believe a crime has been committed" and to "protect[] . . . citizens against unfounded criminal prosecutions." *Calandra*, 414 U.S. at 343. "The grand jury proceeding is accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process." *United States v. Mechanik*, 475 U.S. 66, 75 (1986) (O'CONNOR, J., concurring); *see also Costello*, 350 U.S. at 363 ("An indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more[]"); *see also United States v. R. Enters, Inc.*, 498 U.S. 292, 300 (1991) (noting how "the law presumes, absent a showing to the contrary, that a grand jury acts within the legitimate scope of its authority").

### A. <u>Dismissing Indictment for Error in Grand Jury Proceedings</u>

"[A]s a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988). In line with this, Federal Rule of Criminal Procedure 52(a)'s harmless error inquiry requires federal courts disregard errors, defects, irregularities, or variances not affecting substantial rights. *See Mechanik*, 475 U.S. at 70-

72 (finding post-trial refusal to dismiss indictment for Rule 6(d)[1] violation because error rendered harmless after guilty verdict). "[T]here is 'no reason not to apply [Rule 52(a)] to errors, defects, irregularities, or variances occurring before a grand jury[.]'" *Bank of Nova Scotia*, 487 U.S. at 255 (quoting *Mechanik*, 475 U.S. at 71-72).

When "a court is asked to dismiss an indictment prior to the conclusion of the trial, . . . dismissal of the indictment is appropriate *only* 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia*, 487 U.S. at 256 (emphasis added) (quoting *Mechanick*, 475 U.S. at 78 (O'CONNOR, J., concurring)). "[*Bank of Nova Scotia*'s 'grave doubts'] standard does not 'circumvent the harmless-error inquiry prescribed by Federal Rule of Criminal Procedure 52(a),' because it requires the defendant[s] suffer prejudice." *United States v. Navarro*, 608 F.3d at 539. Instead, the "grave doubts" standard merely defines when an error is harmless.[2] *Id.*

In cases of alleged prosecutorial misconduct, "[t]he Court's power to dismiss an indictment on the ground of prosecutorial misconduct is frequently discussed but rarely invoked." *United States v. Samango*, 607 F.2d 877, 881 (9th Cir. 1979). "One challenging an indictment carries a difficult burden. He must demonstrate that the prosecutor engaged in flagrant misconduct that deceived the grand jury or significantly impaired its ability to exercise independent judgment." *United States v. Al Mudarris*, 695 F.2d 1182, 1185 (9th Cir. 1983) (citing *United States v. Wright*, 667 F.2d 793, 796 (9th Cir. 1982)). "Dismissal of an indictment is required only in flagrant cases in which the grand jury has been overreached or deceived in some significant way, as where perjured testimony has knowingly been presented[.]" *Samango*, 607 F.2d at 882 (quoting *United States v. Thompson*, 576 F.2d 784, 786 (9th Cir. 1978)).

---

[1] Rule 6(d) provides who may be present while the grand jury is in session, during deliberations, or voting. Fed. R. Crim. P. 6(d).

[2] In the context of dismissing an indictment for grand jury violations, the Ninth Circuit has explicitly held that "[t]he *Bank of Nova Scotia* 'grave doubt' standard applies to dismissal before the verdict.'" *Navarro*, 608 F.3d at 540.

SER-194

In evaluating whether to dismiss, a court may not look beyond the indictment to determine if the evidence upon which it was based is sufficient. *See Costello*, 350 U.S. at 363; *see also United States v. Lunstedt*, 997 F.2d 665, 667 (9th Cir. 1993) ("A district court cannot grant a motion to dismiss an indictment if the motion is substantially founded upon and intertwined with evidence concerning the alleged offense" (citations and internal quotations omitted)). A court can only grant "such a dismissal if it is entirely segregable from the evidence to be presented at trial." *Id.* (citations and internal quotations omitted). If this is not the case, "the motion falls within the province of the ultimate finder of fact and must be deferred [to the jury]." *Id.* (citations omitted).

## B. <u>Disclosing Grand Jury Transcripts</u>

The longstanding cornerstone of the grand jury is that "[i]t deliberates in secret and may determine alone the course of its inquiry." *Calandra*, 414 U.S. at 343; *see also United States v. Johnson*, 319 U.S. 503, 513 (1943); *Costello*, 350 U.S. at 362. Not even a judge presides to monitor its proceedings. *Calandra*, 414 U.S. at 343. "This 'indispensable secrecy of grand jury proceedings,' must not be broken except where there is a compelling necessity" that is "shown with particularity." *United States v. Procter & Gamble Co*, 356 U.S. 677, 682 (1958) (internal citation omitted). "To allow the intrusion . . . into the indispensable secrecy of grand jury proceedings—as important for the protection of the innocent as for the pursuit of the guilty—would subvert the functions of federal grand juries by all sorts of devices . . . such as ready resort to inspection of grand jury minutes." *Johnson*, 319 U.S. at 513.

The Supreme Court has acknowledged numerous public policy principles justifying the secrecy of grand jury proceedings:

> (1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before [the] grand jury and later appear at the trial of those indicted by it; (4) to encourage free

SER-195

and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.

*Douglas Oil Co. of Cal. v. Petrol Stops Northwest*, 441 U.S. 211, 219 n.10 (1979) (citing *Procter & Gamble Co.*, 356 U.S. at 681-82, n.6 (quoting *United States v. Rose*, 215 F.2d 617, 628-29 (3rd Cir. 1964))).

Nevertheless, Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) permits the Court to authorize disclosure of grand jury transcripts "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." The Supreme Court has articulated a three-part analysis for this disclosure: "[p]arties seeking grand jury transcripts under Rule 6(e) must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." *Douglas Oil Co. of Cal.*, 441 U.S. at 222. This showing must be made even if the grand jury whose transcripts are sought has "ended its activities." *Id.* And "[m]ere 'unsubstantiated, speculative assertions of improprieties in the proceedings' do not supply the 'particular need' required to outweigh the policy of grand jury secrecy." *United States v. Ferreboeuf*, 632 F.2d 832, 835 (9th Cir. 1980) (citation omitted).[3]

## III.   ANALYSIS

### A. <u>Dismissing the Superseding Indictment for Vague and Speculative Grand Jury Abuse Based on Evidentiary Disputes is Unwarranted.</u>

Defendants argue dismissal is appropriate because the SI "reveals three separate ways in which the government abused the grand jury process." (Mot. at 9.) They argue it "[(1)] recklessly, explosively, and irrelevantly accuses Defendants of engaging in child sex

---

[3] Neither party requests the Court preliminarily conduct *in camera* review of the grand jury transcripts or instructions.

trafficking . . . [(2)] materially misrepresents key documentary evidence . . . [and] [(3)] makes clear that the government incorrectly and/or incompletely instructed the grand jury regarding the applicable law." (*Id.*) Because the SI somehow shows these three things, Defendants essentially argue the Government must have abused the grand jury process. (*See id.* ("The totality of these misrepresentations of fact and law leaves no doubt that the government abused the grand jury process [under the 'grave doubts' standard]"); *see also* Repl. at 6.)

As a general matter, the Government claims Defendants have not met their "heavy burden of showing irregularities in the Grand Jury proceedings," (Resp. at 6 ("Defendants "cherry-pick paragraphs from the SI and juxtapose them with reports of interviews in a futile effort to show that the Grand Jury was prejudiced and misled[]")), and that the proper forum for their disagreements about "certain items of evidence" is trial—not on a motion to dismiss, (*see generally id.* at 9-12).[4]

The Court agrees with the Government that Defendants have failed to meet the heavy burden of overcoming the presumption of regularity in grand jury proceedings to foreclose the possibility of a trial on the merits. *See Bank of Nova Scotia,* 487 U.S. at 256; *see also Mechanik*, 475 U.S. at 75. Defendants make no particularized or non-speculative showing of any way in which the grand jury process was abused by the Government that warrants the extraordinary remedy of dismissal. *See Bank of Nova Scotia*, 487 U.S. at 256. Defendants claim the SI's allegations of child sex trafficking are irrelevant, (Mot. at 9-12), is clearly incorrect. Defendants' knowledge relating to child sex trafficking or juvenile prostitution on Backpage is relevant to six charged counts as well as their mens rea.[5] The Government's inclusion of these allegations is also not overly prejudicial to Defendants'

---

[4] The Government also claims Defendants' Motion improperly reargues its other motions to dismiss that are before the Court. (Resp. at 13.) The Court agrees that Defendants' Motion reargues its other motions and finds these arguments do not show grand jury abuse occurred. (*See* Mot. at 16-20.) Further, the Motion *once again* challenges the SI with respect to *mens rea* and the First Amendment. (*Id.*) The Court will not re-engage in that discussion here. (*See* Doc. 793 at 12-20.) Lastly, Defendants again challenge the Government's grand jury instructions pertaining to the Travel Act. (*See* Mot. at 19.) This issue was raised in another Motion to Dismiss, (*see* Doc. 746), and is also not separately addressed here.

[5] Counts 2, 4, 5, 12, 14, and 23 all involve juvenile victims.

opportunity for a fair trial. Without Defendants even identifying an actual violation during grand jury proceedings, there is no reason to believe Defendants were prejudiced. Nevertheless, Defendants ask the Court to speculate on post-hoc interpretations of selected references in the SI and find that the Government must have abused the grand jury process. There is no reasonable inference that this is the case here, and Defendants' arguments are insufficient to simply toss out the historically defined province of a grand jury's probable cause determination. *See Calandra*, 414 U.S. at 342. Again, Defendants highlight no specific conduct during the grand jury proceedings and also do not argue any structural error at grand jury proceeding requires dismissing the indictment. *See Navarro*, 608 F.3d at 538. The Court refuses to find such a strong presumption of regularity in grand jury proceedings to be overcome by such vague and speculative showings.

Additionally, Defendants' disagreements with the Government's representation of evidence in the SI does not warrant preemptively shutting the doors of a possible trial. *See Costello*, 350 U.S. at 363; *see also Lunstedt*, 997 F.2d at 667. Many of Defendants' arguments are necessarily "founded upon and intertwined with evidence concerning the alleged offense[s]." *Lunstedt*, 997 F.2d at 667. For instance, Defendants attach about 120 pages of disputed evidentiary exhibits to their Motion in arguing that they inadequately support the grand jury's decision to indict. (*See* Docs. 782-1, 782-2, and 782-3.) The Court has reviewed these exhibits in light of Defendants' allegations and finds their allegations to be a matter of interpretation reserved for trial. For example, Defendants allege the Government "misrepresented the evidence to the grand jury," (Mot. at 13), regarding "plausible deniability" and what it means, (*id.* at 14). After reviewing the supporting documents in this case, the Court finds a juror could interpret that clause in numerous ways. In any event, this allegation is inappropriately brought under the guise of asserting grand jury abuse. *Lunstedt*, 997 F.2d at 667. In another example, Defendants allege no evidence supports the SI's allegation that "some banks closed accounts that were held by Backpage out of concern the accounts were being used for illegal purposes." (*Id.* at 15.) In truth, a plethora of evidence does supports that statement in the SI. These factual disputes are

properly reserved for trial and fail to support dismissing an indictment. *See Costello*, 350 U.S. at 363 ("If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury.") The Court will not engage in such a preliminary trial for Defendants and intrude upon the grand jury's province absent a more particularized showing.

Accordingly, this Court finds Defendants have not established a violation during grand jury proceedings (let alone sufficiently identify one) substantially influenced the grand jury's decision to indict or that there is grave doubt its decision to indict was free from substantial influence of such (unidentified) violation. *See Bank of Nova Scotia*, 487 U.S. at 256. Defendants' factual disputes about evidence are also inappropriately resolved here on a motion to dismiss. Their speculative and attenuated arguments about grand jury abuse without identifying a prejudicial violation are unavailing considering the strong presumption of regularity accorded to grand jury proceedings.

### B. Disclosing Grand Jury Transcripts and/or Instructions is Inappropriate Because Defendants Have Not Shown a Ground May Exist to Dismiss the Indictment.

Defendants alternatively argue the Court should disclose the grand jury transcripts and/or instructions under Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) so they can "examine . . . and determine what occurred before the grand jury." (Mot. at 22.) They argue disclosure is appropriate because the Government abused the grand jury process, *Jencks*, *Giglio*, and/or *Brady* warrant disclosure, and that the secrecy of the grand jury's proceedings is no longer important here. (*Id.* at 21-22; Repl. at 14-15.) At a minimum, they claim they are "entitled to the legal instructions provided to the grand jury and any colloquy between the grand jurors and the prosecutors regarding the applicable law." (Mot. at 21 n.6.)

The Government claims "Defendants have not met their burden of demonstrating the particularized, specific need for grand jury materials required by *Douglas Oil*." (Resp. at 15.) It claims their request to disclose grand jury transcripts and/or instructions should be denied because it would "enable Defendants to 'engage in a fishing expedition in hopes of uncovering an impropriety or defect in the proceeding where they have no basis to conclude that an impropriety or defect exists." (*Id.*)

As discussed at length above, the Court finds that Defendants' arguments that the grand jury process was abused do not warrant dismissing the superseding indictment. As a result of this finding, the Court cannot authorize disclosure of the grand jury materials because Defendants have not "show[n] a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). In other words, Defendants have identified no compelling reason with any sort of particularity worthy of breaching the secrecy of the grand jury. *See Procter & Gamble Co.*, 356 U.S. at 682; *see also Johnson*, 319 U.S. at 513. Without a showing that a ground may exist to dismiss the indictment for grand jury abuse, disclosure of grand jury transcripts is unavailable by Rule 6(e)'s text. *See* Fed. R. Crim. P. 6(e)(3)(E)(ii).

Furthermore, and contrary to Defendants' assertion that the secrecy of the grand jury is no longer relevant here, the Court finds Rule 6(e)'s considerations and standard for disclosure discussed in *Douglas Oil* informative. *See id.*, 441 U.S. at 219. With these considerations in mind, the Court finds Defendants' bare assertions that the grand jury proceedings "must have been improper" not persuasive enough to establish that the secrecy of the grand jury is less important than the need for disclosure. *See id.* ("parties seeking grand jury transcripts under Rule 6(e) must show . . . that the need for disclosure is greater than the need for continued secrecy[.]") The Court also finds Defendants' request for "disclosure of *all* grand jury transcripts" extraordinarily overbroad. *See id.* ("parties seeking grand jury transcripts under Rule 6(e) must show . . . that their request is structured to cover only material so needed.") Lastly, Defendants do not argue any specific aspect of the grand jury proceedings must be disclosed to avoid a possible injustice. Not only is no

SER-200

particular aspect identified, as noted, but they also do not identify any potential prejudice.

Lastly, Defendants are not "entitled to the legal instructions provided to the grand jury and any colloquy between the grand jurors and the prosecutors." *See United States v. Stephanyan*, No. CR 15-0234 CRB (JSC), 2016 WL 4398281, at *2 (N.D. Cal. Aug. 28, 2016) ("Defendant's insistence that . . . no 'particularized need' is required for disclosure of the government's instructions to the grand jury is wrong."). Having found no particularized need for disclosing the grand jury transcripts, the Court will not order disclosure of these grand jury items either.

Accordingly, Defendants have failed to show that a ground may exist to dismiss the SI and similarly failed to provide a compelling and particularized need for disclosure of the grand jury transcripts and/or instructions that trumps the secrecy of the grand jury's deliberations.

## IV.    CONCLUSION

The Court finds Defendants have failed to establish that dismissing the superseding indictment for vague and speculative grand jury abuse is warranted under the "grave doubts" standard. Since Defendants have not established a ground for dismissing the superseding indictment for grand jury abuse may exist, or a particularized need for disclosure exists, the Court cannot disclose the grand jury transcripts or instructions. Even assuming a ground for dismissal may exist, Defendants' have not met the threshold established in *Douglas Oil* to warrant disclosure.

Accordingly,

**IT IS ORDERED DENYING** Defendants' Joint Motion to Dismiss Indictment for Grand Jury Abuse or, in the Alternative, for Disclosure of Grand Jury Transcripts, (Doc. 782);

**IT IS FURTHER ORDERED GRANTING** Defendants' Motion to File Under Seal, (Doc. 779), as it relates to sealing Doc. 780.

Dated this 9th day of January, 2020.

Honorable Susan M. Brnovich
United States District Judge

1  **WO**

2

3

4

5

6  **IN THE UNITED STATES DISTRICT COURT**

7  **FOR THE DISTRICT OF ARIZONA**

8

9  United States of America,                    No. CR-18-00422-PHX-SMB

10                     Plaintiff,               **ORDER**

11  v.

12  Michael Lacey, et al.,

13                     Defendants.

14

15         Pending before the Court is Defendants Motion to Dismiss Indictment Based on

16  Section 230 of the Communications Decency Act or, Alternatively, as Void for Vagueness.

17  (Doc. 783, "Motion".) The Government responded, (Doc. 809, "Resp."), and Defendants

18  replied (Doc. 830, "Reply"). The Court has considered the pleadings and enters the

19  following Order.

    **I.    BACKGROUND**

20         Defendants are former officers, executives, and employees of Backpage.com, a

21  classified advertisement website specializing in "adult" services largely used as forums for

22  soliciting prostitution.[1] (*See generally* Doc. 230, "SI".) On July 25, 2018, a federal grand

23  jury returned a 100-count Superseding Indictment against Defendants. (*Id.*) The

24  Superseding Indictment alleges Defendants engaged in numerous criminal acts—

25  conspiracy, violations of the Travel Act, and money laundering—while operating the

26

27  ─────────────────

28  [1] As this Court previously established, the Superseding Indictment's factual allegations are
    taken as true at this stage. (*See* Doc. 793, "Order" (citing *United States v. Boren*, 278 F.3d
    911, 914 (9th Cir. 2002))).

website Backpage.com ("Backpage").[2] Count 1 alleges Defendants "knowingly and intentionally" entered into a conspiracy, 18 U.S.C. § 371, to commit violations of the Travel Act, 18 U.S.C § 1952 (a)(3)(A), against all defendants. (SI ¶¶ 195-99.) Counts 2-51 allege Defendants:

> "used the mail and any facility in interstate and foreign commerce with intent to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, to wit: prostitution offenses in violation of the laws of the State in which they are committed and of the United States, including but not limited to [A.R.S.] Section 13-3214, and thereafter performed and attempted to perform, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity."

(SI ¶ 201.) The fifty advertisements supporting Counts 2-51 market the sale of women or minors using coded-terms common to prostitution. (*Id.*) The ads specifically depict a range of prostitution-related business activities and transactions. Some of the ads depict specific victims, (Counts 2, 4-5, 12-17, 19-24), whose services were offered in multiple ads. (SI ¶¶ 160-76.) The Superseding Indictment alleges Defendants employed three distinct strategies to attract ads they knew were for prostitution. (SI ¶ 34.) Particularly relevant here, Backpage also *created* prostitution ads by copying content from other prostitution websites and then soliciting pimps and prostitutes by offering free trials. (SI ¶¶ 35-44.) Defendants created a business relationship with TheExoticReview.com ("TER"), a "prostitution website" where clients, known as "johns", could rate escorts. (SI ¶¶ 45-67.) Further, the Superseding Indictment outlines detailed moderation practices Backpage used to evade detection by law enforcement and create a "veneer of deniability." (SI ¶ 13.) Among other techniques, Defendants stripped known prostitution terms from advertisements but allowed ads to be posted with the underlying message unchanged. Defendants, at various points, assisted known pimps and prostitutes in changing ads to avoid deletion by Backpage moderators. (SI ¶¶ 45-67.)

Defendants previously argued this alleged conduct was consistent with traditional editorial functions protected by the First Amendment. (*See generally* Doc. 583.) Applying

---

[2] This Courts prior order outlines the charges in greater detail. (*See generally* Doc. 793.)

Section 230 of the Communications Decency Act ("CDA" or "§ 230"), 47 U.S.C. § 230, to the Superseding Indictment, Defendants now make a similar argument. That is, because § 230 immunizes publishers like Backpage from prosecution under all state criminal law, the Superseding Indictment fails to state an offense and should be dismissed pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v). (Mot. at 4-11.) Alternatively, Defendants claim the Travel Act, as applied by the Superseding Indictment, fails to give adequate notice of criminality, meriting dismissal of all counts as void for vagueness. (*Id.* at 11-13.)

## II.      LEGAL STANDARD

"An indictment is sufficient if it, first, contains the essential elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). Since federal crimes are "solely creatures of statute," *Dowling v. United States*, 473 U.S. 207, 213, 105 S. Ct. 3127, 87 L.Ed.2d 152 (1985) (internal quotation marks omitted), a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute. *United States v. Pirro*, 212 F.3d 86, 91-92 (2d Cir. 2000). Accordingly, Federal Rule of Criminal Procedure 12 allows a defendant to file a pretrial motion to dismiss for failure to state a defense if the motion "can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(B)(v). Such a motion "is generally capable of determination before trial if it involves questions of law rather than fact." *United States v. Kelly*, 874 F.3d 1037, 1046 (9th Cir. 2017) (quoting *United States v. Nukida*, 8 F.3d 665, 669 (9th Cir. 1993). An indictment must "set forth all the elements necessary to constitute the offense intended to be punished." *Hamling v. United States*, 418 U.S. 87, 117 (1974) (quoting *United States v. Carll*, 105 U.S. 611, 612 (1882)). Therefore, when a count charged by an indictment fails to recite an essential element of the offense, that count is facially defective and must be dismissed. *United States v. Pernillo-Fuentes*, 252 F.3d 1030, 1032 (9th Cir. 2001). In determining whether an indictment charges a cognizable offense, courts are bound by the four corners of the indictment, must accept the truth of the allegations in the

indictment, and cannot consider evidence that does not appear on the face of the indictment. *United States v. Lyle*, 742 F.3d 434, 436 (9th Cir. 2014); *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002); *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996).

Defendants Motion implicates two federal statutes—the CDA and Travel Act. Statutory construction "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *United States v. Albertini*, 472 U.S. 675, 680, 105 S. Ct. 2897, 86 L.Ed.2d 536 (1985) (quoting *Park 'N Fly, Inc., v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985)). "Due respect for the prerogatives of Congress in defining federal crimes prompts restraint in this area, where we typically find a narrow interpretation appropriate." *Dowling*, 473 U.S. at 213, 105 S.Ct. 3127 (internal quotation marks omitted).

## III. DISCUSSION

Defendants claim immunity from prosecution in the manner charged by the Superseding Indictment. That is, § 230 of the CDA grants publishers of third-party content, like Defendants here, immunity from violations of state criminal laws. (Mot. at 4) Specifically, § 230 grants immunity to interactive computer services for liability based on publishing third-party content or for failing to remove any such content, regardless of whether the website knew or should have known that third parties were posting illegal content. (*Id.*) Defendants argument is straightforward: Section 230 preempts all state criminal laws; the instant Travel Act charge is based on violation of underlying state criminal laws prohibiting prostitution; Thus, § 230 precludes prosecution in the manner charged. (*Id.*) Even if not precluded by § 230, Defendants contend the Travel Act charges are impermissibly vague and merit dismissal on that basis alone. (Mot. at 11.) Both arguments fail.

### a. Does the CDA preclude Travel Act charges?

#### i. Section 230 of the Communications Decency Act

Congress enacted the CDA as Title V of the Telecommunications Act of 1996, Pub. L. No. 104—104, primarily to protect minors from exposure to indecent and obscene

material on the internet. *See Batzel v. Smith*, 333 F.3d 1018, 1026 (9th Cir. 2003) (reviewing legislative history of the CDA); *see also* S. Rep. No. 104-23, at 187-193 (1996) (noting that Congress "has been troubled by an increasing published reports of inappropriate uses of telecommunications technologies to transmit pornography, engage children in inappropriate adult contact, terrorize computer network uses through 'electronic stalking' and seize personal information.") To avoid unduly burdening the continued development of the internet, Congress enacted § 230." 47 U.S.C. § 230. "Whether wisely or not," Congress "made the legislative judgment to effectively immunize providers of computer services from civil liability in tort with respect to materials disseminated by them but created by others." *Blumenthal v. Drudge*, 992 F. Supp. 44, 49 (D.D.C. 1998).

In relevant part, § 230(c)(1) specifies that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Thus, § 230 gives interactive service providers[3] "a reasonable way to . . . help them self-regulate themselves without the penalty of law." *See* 141 Cong. Rec. H8460-01, B8470 (1995) (statement of Rep. Barton). Accordingly, § 230(e)(2) provides that "no provider of an interactive computer service shall be liable on account of – (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." 47 U.S.C. § 230 (c). But this grant of immunity is not absolute. Section 230(e), entitled, "Effect on other laws," provides:

> (1) No effect on criminal law. Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this Act, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, United States Code, *or any other federal criminal statute.*

---

[3] Defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet . . . ." 47 U.S.C. § 230(f)(2).

- 5 -

(2) No effect on intellectual property law. Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

(3) State law. Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

(4) No effect on communications privacy law. Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

47 U.S.C. § 230(e)(1)-(4) (emphasis added). The above state law and federal criminal law carve-outs bear directly on Defendants arguments. 47 U.S.C. § 230(e)(1),(3).

### ii.  The Travel Act, 18 U.S.C § 1952

The Superseding Indictment alleges violations of the Travel Act, Title 18, United States Code, Section 1952. Section 1952(a)(3) criminalizes the "use of mail or any facility in interstate or foreign commerce, with intent to . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment or carrying on, of any unlawful activity." The definition of "unlawful activity" includes a range of activities that violate a state or federal law. Specifically, § 1952 (b) defines "unlawful activity" as follows:

> (b) As used in this section "unlawful activity means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or controlled substances . . . or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States, or (3) any act which is indictable under subchapter II of chapter 53 of title 31, United States Code, or under section 1956 or 1957 of this title."

18 U.S.C. § 1952(b). A violation of § 1952 is thus premised upon another distinct violation of state or federal law. *United States v. Polizzi*, 500 F.2d 856, 870 (9th Cir. 1974). "Although state law becomes the focus of this inquiry, 'the gravamen of a charge under § 1952 is a violation of federal law.'" *Id.* (quoting *United States v. Karigiannis*, 430 F.2d 148, 150 (7th Cir. 1970), *cert. denied*, 400 U.S. 904, 91 S. Ct. 143, 27 L.Ed.2d 141 (1970)).

- 6 -

"Reference to state law is only necessary to identify the type of unlawful activity in which defendants intended to engage." *Id.* (internal quotation marks and citation omitted).

### iii.   The Superseding Indictment's Viability

This is not the first time the Court has considered the application of the CDA to the Superseding Indictment. (Doc. 793 at 13.) In denying Defendants prior motion to dismiss, (Doc. 561), this Court found Defendants conduct fell outside "traditional, editorial functions" protected by the First Amendment and CDA. (Doc. 793 at 13 (finding the Superseding Indictment alleged conduct "qualitatively different" from the protected activities in the cases Defendants cited both then and reargue now)). The order distinguished cases cited by Defendants precisely because they were premised on the CDA's grant of immunity from *civil liability*.[4] (*Id.*) "[T]he CDA," on the other hand, "has no effect on any other Federal criminal statute." (*Id.* (citing 47 U.S.C. § 230(e)(1))). Defendants would be well served to consult and, at a minimum, address this Court's prior analysis before petitioning the Court to dismiss on similar grounds. Regardless, after consideration of Defendants Motion and Reply, this Court's earlier analysis holds.

Defendants arguments fail for three reasons. First, Defendants fail to demonstrate the CDA precludes charges under a federal criminal statute like the Travel Act. This, alone, merits denial of Defendants Motion. Second, even assuming the § 230 applies to the instant Travel Act charges, they do not establish § 230's immunity covers the conduct the Superseding Indictment alleges. Third, Defendants misread the Travel Act to require an underlying violation of state criminal law by Defendants themselves.

First, Defendants narrow reading of the CDA to preclude prosecution under a federal criminal statute is unconvincing, particularly given the statutes plain language. At the outset, § 230(e)(1) immediately declares the CDA has "[n]o effect on criminal law." 47 U.S.C. § 230(e)(1). Directly following this disclaimer, Congress clarifies § 230 may not be

---

[4] Citing nearly identical case-law, Defendants arguments here, largely repeat and expand on those previously made and considered by this Court in a similar, albeit not identical context. *Compare* Doc. 561 at 21-24 (arguing Defendants activities fell under First Amendment protection) *with* Doc. 783 at 5-7 (repeating those arguments to seek immunity under § 230.).

interpreted to impair enforcement of some specific criminal statutes likely implicated by the CDA or "any other federal criminal statute." *Id.* Defendants argue that by listing some specific federal criminal statutes § 230 expressly leaves unaffected, the statute's carve-outs only touch substantive federal statutes. They Travel Act, they contend, is not such a statute. That is, because the Travel Act, they believe, depends on violation of underlying substantive state criminal statutes, it falls outside § 230(e)'s scope. They call this a "common sense notion." (Reply at 4.) The Court finds otherwise. Defendants "common-sense" distinction directly contravenes § 230's plain language. Given the straightforward nature of § 230(e)'s disclaimer—"nothing in this section shall be construed to impair enforcement of . . . any other Federal criminal statute"—Defendants battle is uphill.[5] Why the Court should not, "[a]s in all such cases, . . . begin by analyzing the statutory language, 'assum[ing] that the ordinary meaning of that language accurately expresses the legislative purpose,'" Defendants do not explain. *Hardt v. Reliance Stand. Life. Ins. Co.*, 560 U.S. 242, 251 (2010) (quoting *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 175 (2009)). Nor do Defendants explain why, if Congress desired to limit § 230 so, they did not explicitly do so. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452, 122 S. Ct. 941, 151 L.Ed.2d 908 (2002) ("It is a general principle of statutory construction that when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.").

Instead, § 230's plain language supports the Government's position. The modifier 'any' in § 230(e)(1), employed without any limiting language, "amounts to 'expansive language [that] offers no indication whatever that Congress intended [a] limiting construction." *See Atlantic Recording Co. v. Project Playlist, Inc.*, 603 F.Supp.2d 690, 704

---

[5] Defendants reading ignores a ready explanation for § 230's explicit carveouts for federal criminal statutes concerning obscene and harassing phone calls, 47 U.S.C. § 223, providing access of harmful materials to minors, 47 U.S.C. § 231, particular acts relating to obscenity, 18 U.S.C. §§ 1460-1465, and sexual exploitation of children, 18 U.S.C. §§ 1460-1470. The specific federal statutes emphasized by the § 230(e)(1) carve-outs directly correspond to a central concern of the CDA—"to control the exposure of minors to indecent material." *See Batzel v. Smith*, 333 F.3d 1018, 1026 (9th Cir. 2003).

SER-210

(S.D.N.Y. 2009) (citing *Harrison v. PPG Indus.*, 446 U.S. 578, 589, 100 S. Ct. 1889, 64 L.Ed.2d. 525 (1980). This conclusion is bolstered by the fact that the 'surrounding statutory language' supports the conclusion that Congress intended the word 'any' to mean all federal criminal laws. *See ACLU v. Dep't of Def.*, 543 F.3d 59, 69 (2d. Cir. 2008) (holding that the word "any" in statute "deserves an expansive application where the surrounding statutory language and other relevant legislative context support it."). Defendants reading eschews both "common-sense" and established principles of statutory interpretation. As this Court previously held, the CDA does not preclude the charges under a federal criminal statute like the Travel Act here. (Doc. 793 at 13.)

Second, even if the CDA applied to generally preclude charges under the Travel Act, Defendants do not establish the CDA applies to their conduct as alleged by the Superseding Indictment. Fundamentally, Defendants contend this prosecution seeks to hold them liable for the "exercise of a publisher's traditional editorial functions"—whether to block or allow content—"perforce immune" under § 230.[6] (Mot. at 5; *Fair Housing Council of San Fernando Valley v. Roomates.com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008). But, as the Government's response correctly identifies, this Court previously considered this argument, holding "the SI does not attack protected editorial functions." (Doc. 793 at 12). As this Court previously explained, "[t]he SI does not allege Defendants are criminally liable because they unknowingly or unintentionally operated a website used by third parties to post prostitution ads. Rather, it alleges Defendants purposely sought out opportunities to increase prostitution advertising on Backpage . . . , intentionally identified prostitutes, created free Backpage ads for them, and used those ads to try and secure future

---

[6] Defendants overstate § 230's grant of immunity. Recognizing the scope of § 230's immunity is far from absolute, courts regularly find conduct, like that alleged by the Superseding Indictment, beyond the reach of § 230(c)(1), particularly at the pleading stage. *See e.g., Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 670 (7th Cir. 2008) ("To appreciate the limited role of § 230(a)(1), remember that 'internet content providers' may be liable for contributory infringement if their system is designed to help people steal music or other material in copyright."); *Anthony v. Yahoo, Inc.*, 421 F.Supp.2d 1257, 1262-63 (N.D. Cal. 2006) (section 230(a)(1) did not apply where defendant allegedly created fake user profiles to induce users to renew subscriptions to defendant's online dating service); *Hy Cite Corp. v. badbusinessbureau.com*, 418 F.Supp.2d 1142, 1148-49 (D. Ariz. 2005) (immunity not granted at the pleading stage where defendant allegedly created defamatory content).

SER-211

business." (Doc. 793 at 15.) The Superseding Indictment alleges conduct far beyond the simple maintenance of neutral policies prohibiting certain content. *Cf. Dart v. Craigslist, Inc.*, 665 F.2d 961, 968-69 (N.D. Ill. 2009). Again, at this stage, these allegations are accepted as true. *United States v. Buckley*, 689 F.2d 893, 897 (9th Cir. 1982), *cert denied*, 460 U.S. 1086, 103 S. Ct. 1778, 76 L.Ed.2d 349 (1983). Challenging the adequacy of the evidence supporting the allegations is improper at the pleading stage. "A motion to dismiss . . . is not a device for summary trial of the evidence." *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996); *see also United States v. Boren*, 278 F.3d 911, 914 (2002) ("The indictment either states the offense or it doesn't. There is no reason to conduct an evidentiary hearing"); *United States v. Nukida*, 8 F.3d 665, 670 (9th Cir. 1993) ("[t]he proper procedure for raising [a] challenge to the sufficiency of the government's evidence [is] . . . not a pretrial motion to dismiss.") (internal quotation marks omitted).

Third, and lastly, the Travel Act does not require the government allege Defendants committed the underlying violation of state law. Defendants argue their conviction for the underlying state prostitution offenses is a legal impossibility. That is, because § 230(e)(3) immunizes Defendants from prosecution under state law for publishing advertisements, regardless of whether those ads were used to commit actual acts of prostitution or illegal sex trafficking.[7] (Mot. at 8.) Not only does § 230 not immunize Defendants from the instant prosecution, but Defendants misconstrue the Travel Act's requirements.

In the Ninth Circuit, "[a]n indictment under the Travel act requires allegations of each of the three elements of the crime: (1) interstate commerce or use of an interstate facility (2) with intent to promote an unlawful activity and (3) a subsequent overt act in furtherance of that unlawful activity." *United States v. Tavelman*, 650 F.2d 1133, 1138 (9th Cir. 1981). The Superseding Indictment clears each hurdle. It alleges Defendants, with

---

[7] Defendants support their argument with an email from the former President of the National Center for Missing & Exploited Children ("NCMEC"). The Court does not reach the merits of this extrinsic evidence. *United States v. Kelly*, 874 F.3d 1037, 1047 (2017) ("In determining whether an indictment charges a cognizable offense, we are bound by the four corners of the indictment, must accept the truth of the allegations in the indictment, and cannot consider evidence that does not appear on the face of the indictment.") (citations omitted).

SER-212

intent to promote or facilitate state law prostitution offenses, performed overt acts in furtherance of that unlawful activity. (*See generally* SI ¶¶ 1-201.) Given Defendants are charged with facilitating or promoting, rather than directly committing, prostitution offenses in violation of state law, it is unsurprising they could not be convicted for the "underlying state law offense on which the Travel Act charge is based." (Mot. at 8.) Although the Ninth Circuit has yet to directly address this topic, the case law of other circuits supports the denying the Motion on this ground as well. *United States v. Welch*, 237 F.3d 1081, 1092 (10th Cir. 2003) ("The Travel Act proscribes not the unlawful activity per se, but the use of interstate facilities with the requisite intent to promote such unlawful activity. An actual violation of [the Utah Commercial Bribery Statute] is not an element of the alleged Travel Act violations in this case and need not have occurred to support the Government's § 1952 prosecution."); *United States v. Montague*, 29 F.3d 317, 322 (7th Cir. 1994) ("[T]he federal crime to be proved in Section 1952 is the use of interstate facilities in furtherance of the unlawful activity . . . Section 1952 does not require that the state crime ever be completed."); *United States v. Palfrey*, 499 F. Supp. 34, 43 (D.D.C. 2007) ("The statute requires only that a defendant 'inten[ded] to . . . promote . . any unlawful activity,' not that the defendant have completed such unlawful activity.'") (internal citation omitted).

Defendants cases are inapt. *See e.g., United States v. Fernandez*, 722 F.3d 1 (1st Cir. 2013); *United States v. Tonroy*, 837 F.2d 1281 (5th Cir. 1988). Unlike the state prostitution offenses here, the underlying violations in *Fernandez* were lawful when they occurred; the Travel Act charges in *Tonroy* were based on direct violations of a state bribery statute, not the promotion or facilitation of unlawful activity Defendants here face. *See United States v. Bertman*, 686 F.2d 772, 774 (9th Cir. 1982) ("When the unlawful activity charged in the indictment is the violation of state law, the commission of or the intent to commit such a violation is an element of the federal offense.") Defendants remaining cases all involve allegations of direct violations of state criminal statutes, not federal criminal laws like the Travel Act here. *See Backpage.com v. McKenna*, 881 F. Supp. 2d 1262, 1273 (W.D. Wash. 2012); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d

805, 823 (M.D. Tenn. 2013); *Backpage.com, LLC v. Hoffman*, No. 13-cv-03952, 2013 WL 4502097, at *7 (D.N.J. Aug. 20, 2013).

Defendants misinterpret both the CDA and Travel Act. The CDA's grant of immunity "protects certain internet-based actors from certain kinds of lawsuits," *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1099 (9th Cir. 2009), but has "no effect" on "any other federal criminal statute." 47 U.S.C. § 230(e)(1). The Travel Act, in turn, condemns interstate travel or use of interstate facilities in furtherance of any unlawful activity, defined broadly as acts in violation of certain underlying state and federal laws. The Superseding Indictment alleges Defendants promoted and facilitated such violations, not their direct commission. (*See generally* SI.) While the focus of the inquiry may fall on underlying violations of state laws criminalizing prostitution, the gravamen of a charge under the Travel Act remains a violation of federal law. *See Polizzi*, 500 F.2d at 870. As this Court held previously, the CDA does not preclude prosecution under federal criminal law.

### a. Void for Vagueness

Defendants argument that the SI is unconstitutionally vague similarly fails. Recycling a previous argument, Defendants argue they lacked fair and reasonable warning that their conduct to assist publication of known prostitution ads could violate the Travel Act. (Mot. at 12 (citing *United States v. Kilbride*, 584 F.3d 1240, 1257 (9th Cir. 2009)). The Court rejected this argument once before and sees little reason to alter its conclusion: "The SI alleges Defendants used a website with the intent to facilitate prostitution (a criminal activity) and executed strategies to further and increase that activity. The Court cannot conclude that such a standard or the allegations of the SI do not give fair warning that facilitating a criminal act is itself a crime." (Doc. 793 at 22.)

Applying the CDA does not change this outcome. The CDA, by its plain language, does not apply to federal criminal prosecutions. 47 U.S.C. § 230(e)(1). As mentioned previously, the CDA's grant of immunity is far from absolute. *Barnes*, 570 F.3d at 1099 ("Looking at this text, it appears clear that neither [§ 230(c)] nor any other declares general immunity from liability deriving from third-party content, as [defendant] argues it does. 'Subsection (c)(1) does not mention immunity or any synonym.'") (quoting *Chi. Lawyers'*

SER-214

*Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 669 (7th Cir. 2008)). Other courts uneven treatment of Defendants claims of CDA immunity from civil liability also weighs against their argument. *Compare M.A. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 3d 1041, 1051 (E.D. Mo. 2011) (dismissing civil claims) *with J.S. v. Village Voice Media Holdings, Inc.*, 359 P.3d 714, 715-16 (Wash. 2015) (denying motion to dismiss). Additionally, as this Court previously recognized, the Superseding Indictment sufficiently alleges Defendants had notice of the illegal nature of the activities they promoted or facilitated. (*See* Doc. 793 at 6.)

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** Defendants Motion to Dismiss Indictment Based on Section 230 of the Communications Decency Act or, Alternatively, as Void for Vagueness (Doc. 783) **DENIED.**

Dated this 7th day of January, 2020.

Honorable Susan M. Brnovich
United States District Judge

- 13 -

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-18-00422-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| Michael Lacey, et al., | |
| Defendants. | |

There are seven defendants in this matter. Of which, six have joined the motion before the Court. Defendants Joye Vaught and Andrew Padilla filed a motion to dismiss the indictment against them or, in the alternative, a motion to allow their counsel to withdraw. (Doc. 456). Defendants James Larkin (Doc. 463), Scott Spear (Doc. 464), Michael Lacey (Doc. 465), and John Brunst (Doc. 467) join the motion to dismiss, but not the alternative motion to withdraw counsel. The seventh defendant, Dan Hyer, has entered a plea of guilty as to Count 1 of the Superseding Indictment and is awaiting sentencing. (Docs. 270, 284, 520). The Government filed a response to the motion to dismiss (Doc. 476), to which Defendants replied. (Doc. 507). Defendants Vaught and Padilla filed Ex Parte Applications and Consents for Withdrawal of Counsel (Docs. 556, 558) Defendants argue the case should be dismissed because the Government has violated their Fifth and Sixth Amendment rights.

## I.     BACKGROUND

On July 25, 2018, a federal grand jury returned a 100-count superseding

indictment against Defendants alleging they engaged in criminal acts while operating of the website Backpage.com ("Backpage"), including conspiracy, facilitating prostitution, and money laundering. (Doc. 230). It included forfeiture allegations. (*Id.*). This is one of multiple cases involving Backpage. In another case before this Court, Backpage itself and related entities have pleaded guilty to Money Laundering Conspiracy, 18 U.S.C. § 1956(h). (CR-18-465-PHX-SMB, the "Backpage Proceedings," Docs. 8, 10, 20). In still another, the CEO of Backpage, Carl Ferrer has pleaded guilty to Conspiracy, 18 U.S.C. § 371. (CR-18-464-PHX-SMB, the "Ferrer Proceedings," Docs. 7, 12, 20). Both of those cases are awaiting sentencing and forfeiture proceedings. Additional forfeiture proceedings are underway in the Central District of California and on appeal in the Ninth Circuit. (Docs. 360, 456, 476, 507).

In the Backpage and Ferrer Proceedings, Backpage and its related entities and Ferrer stipulated to seizures. (Ferrer Proceedings, Docs. 22–23; Backpage Proceedings, Docs. 21–22, 44). Defendants in this case have filed petitions to determine their interest in the property subject to forfeiture in those two cases. (Ferrer Proceedings, Docs. 29–35; Backpage Proceedings, Docs. 28–34). They have also motioned to stay the hearings to determine their interest in the property subject to forfeiture. As of this date, those hearings have not taken place, and the Defendants have not asked this Court to conduct them. Rather, they have agreed to or requested stays.

In the Ferrer Proceedings, the initial hearing to determine the third-party interests in property subject to forfeiture was scheduled for November 16, 2018. (Ferrer Proceedings, Doc. 43). Defendant Larkin filed a motion to stay that hearing pending the outcome of an appeal to the Ninth Circuit of some of the Central District of California seizure cases and a case in Delaware Court of Chancery.[1] (*Id.*, Doc. 44). All Defendants in this cased joined that motion. (*Id.*, Docs. 45–50). The Government did not object to the

---

[1] Defendants contend that the Delaware case, *Camarillo Holdings, LLC, et al. v. Amstel River Holdings, LLC, et al.*, C.A. No. 2018-0606SG, will resolve the "core issues relating of the property rights" of some of the properties at issue in the forfeiture proceedings. (Ferrer Proceedings, Doc. 62)

1    stay. (*Id.*, Doc. 52). The Court reset the hearing for December 7, 2018. (*Id.*, Doc. 53). The

2    Defendants and Government then submitted a joint motion to continue the hearing. (*Id.*,

3    Doc. 54). The Court granted the motion and reset the hearing for January 25, 2019. (*Id.*,

4    Doc. 56). The parties again requested a stay, which was denied. (*Id.*, Docs. 59–60). The

5    parties filed another motion on January 23, 2019, to stay the hearing for at least four

6    months, though they presented different rationales for doing so. (*Id.*, Doc. 62). The Court

7    reset the hearing for June 21, 2019. (*Id.*, Doc. 64). A similar process played out in the

8    Backpage Proceedings. (Backpage Proceedings, Docs. 28–41, 51–57, 59–62, 64–75, 82–

9    83, 85–87).

10        Among the assets Ferrer and Backpage stipulated to forfeit are attorney trust

11   accounts, commonly called IOLTA accounts. The Government moved to seize these

12   accounts in the Central District of California ("CDCA"). It obtained *ex parte* seizure

13   warrants for Defendants Vaught and Padilla's IOLTA accounts on October 31, 2018. The

14   Government informed counsel they can keep earned fees through November 30, 2018.

15   The Government also seized the trust account of one of Defendant Lacey's attorney's in

16   August 2018. Defendants argue that these seizures, along with other actions by the

17   Government, infringe on their Fifth and Sixth Amendment rights to due process and

18   counsel of choice and warrant dismissal of this case. In this proceeding, Defendants

19   previously asked the Court to stop the seizures. (Docs. 360, 401). The Court ruled that the

20   Defendants must seek relief from the seizure warrants in the courts that issued them.

21   (Doc. 447). The seizure warrants have since expired, but the Government has said they

22   may renew them and Defendants say they have not withdrawn from the accounts out of

23   fear of prosecution.

24        Defendants argue their constitutional rights were violated because the seizures

25   were executed in a manner to avoid judicial review after the Government led them to

26   believe it would not be seizing IOLTA accounts, and after Defendants had agreed to the

27   proposed case management schedule without knowledge that the Government would seek

28   pre-trial forfeitures. Defendants also take umbrage with the Government's motion to

disqualify certain counsel from representing Defendant Lacey and Defendant Larkin, which the Court denied. (Doc. 338). They believe they have been retaliated against for their "vigorous" assertion of their rights, while the cooperating defendants are still able to use tainted funds for their counsel. Defendants further argue that the cooperating defendants are especially unreliable, making the seizures especially suspect. Defendants Padilla and Vaught additionally argue that as employees of Backpage, they reasonably expected to receive attorneys' fees as a benefit. They contend the appropriate remedy for the Government's actions is to dismiss the indictment against them.

The Government responds by arguing that Defendants have no right to use tainted funds for attorneys' fees. They also argue that there is a remedy available for defendants to prevent the seizures and future seizures of these funds through a *Monsanto* hearing, where they would be able to prove they could not fund their defense but for the seized assets and that probable cause does not exist to seize the property. *See United States v. Monsanto*, 491 U.S. 600 (1989). Additionally, the funds were only seized after the CEO of Backpage, along with Backpage and its related entities, pleaded guilty to criminal conduct, and shut down the website.

## II.  Discussion

The Fifth and Sixth Amendments protect criminal defendants' rights to due process and assistance of counsel. U.S. Const. amends. V, VI. The rights are overlapping. "The Constitutional guarantees a fair trial through the Due Process Clauses, but it defines the elements of a fair trial largely through the several provisions of the Sixth Amendment[.]" *Strickland v. Washington*, 466 U.S. 668, 684–85 (1984); *see Caplin & Drysdale v. United States*, 491 U.S. 617, 633 (1989) (stating the court is "not sure that" the Fifth Amendment argument "adds anything to petitioner's Sixth Amendment Argument"). The Sixth Amendment right to assistance of counsel includes the right "to select and be represented by one's preferred attorney." *Wheat v. United States*, 486 U.S. 153, 159 (1988). This right is not unlimited, as a "defendant may not insist on representation by an attorney he cannot afford," *id.*, and he has "no Sixth Amendment

SER-219

1  right to spend another person's money for services rendered by an attorney, even if those

2  funds are the only way that defendant will be able to retain the attorney of his choice,"

3  *Caplin*, 491 U.S. at 626.

4  Forfeiture presents a unique problem for Fifth and Sixth Amendment issues.

5  Freezing defendants' assets prior to trial is permissible if the assets would be subject to

6  forfeiture upon conviction. *Kaley v United States*, 571 U.S. 320, 340 (2014). To do so,

7  the Government must show that there is "probable cause to believe that the property will

8  ultimately be proved forfeitable." *Id.* (quoting *United States v. Monsanto*, 491 U.S. 600,

9  615 (1989)). *Kaley* also explains the Government's interest in forfeitures. They "help to

10  ensure that crime does not pay," punish wrongdoing, deter future illegality, and "lessen

11  the economic power of criminal enterprises." *Id.* (citing *Caplin*, 491 U.S. at 630).

12  Forfeitures are also used to "recompense victims of crime, improve conditions in crime-

13  damaged communities, and support law enforcement activities like police training." *Id.*

14  (citing *Caplin*, 491 U.S. at 629–30). The Government may not, however, restrain criminal

15  defendants' "legitimate, untainted assets (those not traceable to a criminal offense)

16  needed to retain counsel of choice," even if the Government was only doing so to

17  preserve the assets for payment of restitution and other criminal forfeitures. *Luis v.*

18  *United States*, 136 S. Ct. 1083, 1088 (2016).

19  1. The Seizures and Defendants' Fifth and Sixth Amendment Rights

20  Defendants contend that the seizures are "unlawful." (Doc. 476 at 2). They

21  compare this case to *U.S. v. Stein* (*Stein I*), 435 F. Supp. 2d 330 (S.D.N.Y. 2006), and the

22  case affirming it, *U.S. v. Stein* (*Stein II*), 541 F.3d 130 (2d. Cir. 2008). In *Stein I* and *II*,

23  the courts dismissed the indictment against former employees and partners of an

24  accounting firm because the government pressured the firm to limit and condition the

25  payment of the defendants' attorneys' fees in order to prevent the Government from

26  indicting the firm. Prior to that case, the firm's practice was to pay for its partners and

27  employees' legal fees for legal matters that arose within the scope of their duties and

28  responsibilities to the firm. *Stein I*, 435 F. Supp. 2d. at 340. The firm changed this policy

- 5 -

in response to pressure from the Government. *Id.* at 336. The result was that the defendants were deprived of their reasonable expectation of attorneys' fees. *Stein II*, 541 F.3d at 155–56. "In a nutshell, the Sixth Amendment protects against unjustified governmental interference with the right to defend oneself using whatever assets one has or might reasonably and lawfully obtain." *Id.* at 156.

Defendants miss an important distinction with the *Stein* cases and their case, however, as the *Stein* cases concerned untainted funds from the accounting firm's general business. "Although 'there is no Sixth Amendment right for a defendant to obtain counsel using tainted funds, [a defendant] still possesses a qualified Sixth Amendment right to use *wholly legitimate funds* to hire the attorney of his choice.'" *Id.* at 155 (quoting *United States v. Farmer*, 274 F.3d 800, 804 (4th Cir. 2001) (alteration and emphasis in original)). The Government in the *Stein* cases never alleged the funds were tainted. In this way, the case is also different than *Luis*, where the Government acknowledged that it was trying to stop Luis from using her own untainted funds. 136 S. Ct. at 1088. Here, the Government is asserting that the assets they are trying to seize are tainted, and, as demonstrated by the CDCA rulings, courts have found probable cause that the assets will ultimately be proved forfeitable. As this Court previously ruled, any disagreement with the CDCA's rulings should be taken up in that court.

In addition to the probable cause findings, Backpage and its related entities, Ferrer, and Hyer have all pleaded guilty, and Backpage and Ferrer have stipulated to forfeitures. The Defendants filed petitions to determine their interests in those stipulated forfeitures in the Backpage and Ferrer Proceedings, but have consented to or requested stays to prevent their interests from being adjudicated. Instead, they have been pursing litigation in the Delaware Court of Chancery to determine their "interests in certain assets the Government seeks to forfeit from Backpage.com, LLC and its affiliates. (Ferrer Proceedings, Doc. 62 at 10–11). Furthermore, the contention that the seizures are escaping judicial review is belied by the Defendants' own contention that some of the seizures have been set for expedited briefing and argument in the Ninth Circuit (Doc. 507

at 9), others are pending at the CDCA (Doc. 527 at 17), and they have not tried to adjudicate their interests in the Backpage and Ferrer Proceedings.

Given the probable cause findings, this case, at least at this point, is much more like *Monsanto* and *Caplin*. Assets may be restrained "based on a finding of probable cause to believe that the assets are forfeitable." *Monsanto*, 491 U.S. at 615. "[T]he Government may—without offending the Fifth or Sixth Amendment—obtain forfeiture of property that a defendant might have wished to use to pay his attorney." *Id.* at 616 (citing *Caplin*, 491 U.S. 617). Allowing pretrial restraint of assets is consistent with "the long-recognized and lawful practice of vesting title to any forfeitable assets, in the United States, at the time of the criminal act giving rise to forfeiture." *Caplin*, 491 U.S. at 627. This ensures any "ill-gotten gains" will not dissipate before conviction and protects the community's interest in recovery. *Monsanto*, 491 U.S. at 616. The Supreme Court affirmed these rulings as recently as 2014 when it decided *Kaley*. 571 U.S. at 371 ("So again: With probable cause, a freeze is valid.").

Here, the seizures were based on the CDCA's finding of probable cause. Pretrial restraints based on probable cause to believe that the assets will be ultimately forfeited does not offend the Fifth or Sixth Amendment. Unlike in the *Stein* cases or in *Luis*, the Government is not attempting to prevent Defendants from using assets it believes are untainted. Accordingly, the seizures do not violate the Fifth and Sixth Amendments.[2]

2. Padilla and Vaught's Reasonable Expectation of Indemnification

Relying on the *Stein* cases, Padilla and Vaught argue that the Government's seizures interfered with funds earmarked to pay their legal fees. As previously discussed, *Stein* is distinguishable because there was no allegation that the accounting firm's funds were tainted. Criminal proceeds are forfeitable to the United States "at the time of the

---

[2] The parties also present First Amendment arguments, with Defendants arguing their activities fall within First Amendment protected activity and the Government arguing there is no First Amendment right to commit or facilitate criminal activity. Both arguments appear to be made in good faith. On April 22, 2019, Defendants lodged a proposed motion to dismiss based on their First Amendment rights. The Court will reserve judgment on the First Amendment issues until that motion is before it.

criminal act giving rise to forfeitures." *Caplin*, 491 U.S. at 627. As *Stein II* recognized, "there is no Sixth Amendment right for a defendant to obtain counsel using tainted funds." 541 F.3d at 155 (quoting *Farmer*, 274 F.3d at 804)). While they may have a reasonable expectation that Backpage would fund their defense, that expectation does not extend to lawfully seized funds. Accordingly, Padilla and Vaught's right to the seized funds are no different than the other defendants.

### 3. The Cooperating Witnesses

Defendants contend the Government treating them differently from the cooperating defendants Ferrer and Hyer—by allegedly not seeking seizure of their counsels' IOLTA accounts—also violates their Fifth Amendment and Sixth Amendment rights. (Doc. 476 at 6–7, 12–13). They argue this undermines the workings of our adversarial system of criminal justice. (*Id.* at 12). Despite the common occurrence of cooperating defendants, however, Defendants do not provide case law to support that precise argument, and the Court is unable to find any.

Preferential terms for defendants that plead guilty is not new to our adversarial system. "[T]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation." *Oyer v. Boles*, 368 U.S. 448, 456 (1968). Selectivity in enforcement is permissible, unless the selection was "based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.*; *see Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) ("To hold that the prosecutor's desire to induce a guilty plea is an unjustifiable standard, which, like race or religion, may play no part in his charging decision would contradict the very premises that underlie the concept of plea bargaining itself.") (internal quotations omitted); *see also United States v. Rodriguez*, 162 F.3d 135, 151–53 (1st Cir. 1998) (holding that the Government's alleged policy of more lenient treatment for co-conspirators that pleaded guilty than those that go to trial was not unconstitutional).

As the Government points out, its primary duty with regard to leniency to cooperating defendants is to disclose that benefits have been provided. *Giglio v. United*

- 8 -

1   *States*, 405 U.S. 150, 154–55 (1972) (holding that the Government must produce

2   evidence to the defense that affects a witness's credibility). By disclosing that the

3   Government has provided the witness with benefits for cooperating, the defense is able to

4   attack the witness's credibility. *Id.* The Government has complied with this obligation.

5   Thus, Defendants' Fifth and Sixth Amendment rights are not violated by the

6   Government's preferential treatment of cooperating witnesses.

7       4.   <u>Vindictive Prosecution</u>

8           The Court is also not convinced that the timing of the seizures, nor any other

9   Government actions, indicate that this case is akin to a vindictive prosecution. Vindictive

10  prosecution is when "prosecutorial actions stem from an animus toward the exercise of a

11  defendant's rights." *United States v. Gallegos-Curiel*, 681 F.2d 1164, 1169 (9th Cir.

12  1982). Defendants must show either direct evidence of a vindictive motive or establish a

13  presumption of vindictiveness. *United States v. Goodwin*, 457 U.S. 368, 380–81 (1982).

14  Defendants have not presented actual evidence. "The presumption [of vindictiveness]

15  applies only to the extent it reflects the very real likelihood of actual vindictiveness."

16  *Gallegos-Curiel*, 681 F.2d at 1167. "A sequence of events is not enough; the likelihood

17  of retaliation is crucial." *Id.* at 1171. A prosecutor is especially free prior to trial to

18  exercise discretion in how he or she goes about prosecuting cases. *See Goodwin*, 457 U.S.

19  at 382 ("A prosecutor should remain free before trial to exercise the broad discretion

20  entrusted to him to determine the extent of the societal interest in prosecution.").

21          The Government moved to seize assets after Backpage and its related entities and

22  Ferrer pleaded guilty and stipulated to forfeitures. The CDCA found probable cause for

23  them. These seizures, as discussed above, comply with the Fifth and Sixth Amendments.

24  This Court will not find a presumption of vindictive prosecution where the Government's

25  seizures have passed constitutional muster.

26      5.   <u>Disclosure of Communications</u>

27          Defendants contend they are entitled to discovery of information relating to the

28  government's purposes in seizing IOLTA accounts. They also request disclosure of all

cases where the Government has seized post-indictment, but prior to trial, attorneys' fees from defendants' counsel of choice. The only support they provide for these requests is "Rule 16 of the Federal Rules of Criminal Procedure." (Doc. 456 at 17). They do not provide which subsection of the rule purportedly commands it nor do they provide any statutes or case law. Rule 16(a)(2) excepts "reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case" from disclosure. Defendants do not attempt to explain why this exception would not apply. Therefore, the Court will not grant Defendants' requests.

6. Vaught and Padilla's Motion to Withdraw Counsel

Vaught and Padilla presented an alternative motion, if the motion to dismiss was denied, to withdraw their counsel pursuant to LRCrim 57.14 and LRCiv 83.3, as Vaught and Padilla no longer have funds to pay them. The Court is satisfied that this constitutes good cause for withdrawal. *See Addis v. McKinley Medical, LLC*, Civ. No. 07-1318-AA, 2011 WL 846688, at *1 (D. Or. March 8, 2011). The Court will direct the appointment of either the Federal Public Defender or counsel from the Criminal Justice Act Panel.

**III.    Conclusion**

THERFORE, Defendants' Motion to Dismiss due to Government Interference (Doc. 476) is **DENIED**. IT IS FURTHER ORDERED:

1. Defendants' request for disclosure of communications relating to the Government's decision to seize attorney trust accounts is **DENIED**.

2. Defendants Padilla and Vaught's motion to withdraw counsel and applications and consent for withdrawal of counsel (Docs. 556, 558) are **GRANTED**. The Clerk of Court shall appoint the Federal Public Defender or counsel from the Criminal Justice Act panel for the District Court to represent Defendants Padilla and Vaught;

SER-225

3. Defendants Motion for Hearing on Motion to Dismiss due to Government Interference (Doc. 501) is **DENIED**.

Dated this 1st day of May, 2019.

Honorable Susan M. Brnovich
United States District Judge

SER-226